UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------------x

JAMES ZIMMERMAN, PHILIP CULHANE,
DAVID HILTBRAND, WILLIAM JACKSON,
GEORGE ZAROU, "JOHN DOE I," and "JOHN DOE II,"

                                    Plaintiffs,

            - against -

POLY PREP COUNTRY DAY SCHOOL, WILLIAM
M. WILLIAMS, DAVID B. HARMAN, AND VARIOUS
MEMBERS OF THE POLY PREP BOARD OF TRUSTEES,
WHOSE NAMES ARE CURRENTLY UNKNOWN AND
THUS DESIGNATED AS "JAMES DOE I-XXX,"

                                    Defendants.

-----------------------------------------------------------------------------x

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★ OCT 2 6 2009 ★

BROOKLYN OFFICE

**09   4586**

COMPLAINT

**PLAINTIFFS DEMAND
A TRIAL BY JURY**

BLOCK, J.

POLLAK. M.J

Plaintiffs, by and through their attorneys, Kevin T. Mulhearn, P.C., complaining of the
Defendants, hereby allege that:

### OVERVIEW

1.      Founded in 1854, Poly Prep Country Day School ("POLY PREP") is a college
preparatory school located in Brooklyn, New York.

2.      POLY PREP's Mission Statement quotes former Headmaster, Joseph Dana Allen: "The
school aims to develop mentality, physique, and character, but because the first of these
are menaces without the last, the greatest of these is character."

3.      From 1966 to present, however, POLY PREP and certain of its administrators, faculty
members, and members of various Boards of Trustees fell woefully short of POLY
PREP's own high "character" mandate by engaging in a conspiracy to conceal and cover
up the prolonged and horrific sexual abuse of many of its sons by POLY PREP's late
renowned football coach, Philip Foglietta ("Foglietta").

4.    Chapter 96 of Title 18 of the United States Code, 18 U.S.C. §§1961–1968, entitled Racketeer Influenced and Corrupt Organizations ("RICO"), was enacted to create sanctions and remedies against individuals and entities who engage in racketeering activity to operate or gain control of business enterprises.

5.    This action is brought by seven men who were sexually abused at POLY PREP during their childhoods and have suffered from the lingering and devastating consequences of that abuse for decades.  Their suffering, moreover, has been increased exponentially by reason of POLY PREP's historic, continued and prolonged suppression and concealment of the sexual abuse which was engineered by Foglietta but condoned and facilitated by POLY PREP and the other named Defendants.  Now, at long last, pursuant to Civil RICO, Plaintiffs seek to receive a small measure of compensation for damages to their "business and property" which were directly and proximately caused by the acts and omissions of the POLY PREP Defendants.  This conspiracy of silence and concealment began in 1966 (Foglietta's first year of employment by POLY PREP) and continues to the present day through the acts and omissions of POLY PREP's current administration.

## JURISDICTION AND VENUE

6.    This Court has exclusive jurisdiction over this matter pursuant to 28 U.S.C. § 1331 insofar as Counts I through IV raise claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968.

7.    Venue is proper in the Eastern District of New York pursuant to 18 U.S.C. § 1965(c) and 28 U.S.C. § 1391(b), because the claims arise in this District and a number of the

2

Defendants reside in, transact business in, or maintain a principal place of business in this District.

## PARTIES

8.   Plaintiff, JAMES ZIMMERMAN ("ZIMMERMAN"), is an adult individual residing in the County of Nassau, State of New York. He attended POLY PREP from 1976 through his graduation in 1982.

9.   Plaintiff, PHILIP CULHANE ("CULHANE"), is an adult individual residing in the city of Hong Kong, China. He attended POLY PREP from 1976 through his graduation in 1984.

10.  Plaintiff, DAVID HILTBRAND ("HILTBRAND"), is an adult individual residing in the County of Chester, State of Pennsylvania. He attended POLY PREP from 1965 through his graduation in 1971.

11.  Plaintiff, WILLIAM JACKSON ("JACKSON"), is an adult individual residing in the County of Broward, State of Florida. He attended POLY PREP from 1963 until his expulsion in 1968.

12.  Plaintiff, GEORGE ZAROU ("ZAROU"), is an adult individual residing in the State of New York. He attended POLY PREP from in or about 1968 through his departure from the school in or about 1972.

13.  Plaintiff, "JOHN DOE I," who wishes to remain anonymous, is an adult individual residing in the State of New Jersey. He attended POLY PREP from 1970 through his graduation in 1976.

14.    Plaintiff, "JOHN DOE II," who wishes to remain anonymous, is an adult individual residing in the State of North Carolina. He attended POLY PREP from 1968 through his departure from the school in 1974.

15.    Defendant, POLY PREP, is, and at all material times has been, a college preparatory school located in Brooklyn, New York. At all material times, various students attended POLY PREP from 5th Grade through 12th Grade.

16.    Defendant, WILLIAM M. WILLIAMS ("WILLIAMS") is, upon information and belief, an adult individual residing in the State of Vermont. WILLIAMS was employed as Headmaster of POLY PREP from 1970 through 2000. At all such times, WILLIAMS was responsible for the training, supervision, and disciplining of Foglietta, and acted in the course of his employment as an agent, servant, and/or employee of Defendant POLY PREP.

17.    Defendant, DAVID B. HARMAN ("HARMAN") is, upon information and belief, an adult individual residing in the State of New York. HARMAN has been employed as Headmaster of POLY PREP, from 2000 to present. At all such times, HARMAN acted in the course of his employment as an agent, servant, and/or employee of Defendant POLY PREP.

18.    Defendants, various members of the POLY PREP Board of Trustees, whose identities are as yet unknown, were from various times – from 1966 to present – members of the POLY PREP Board of Trustees, and, upon information and belief, acted in the course of their employment as an agent, servant, and/or employee of Defendant POLY PREP.

4

## GENERAL ALLEGATIONS

19.     In 1966, POLY PREP hired Philip Foglietta ("Foglietta") as a football coach and physical education instructor for students in the 5th grade through 12th grade. Foglietta worked at POLY PREP in that capacity from 1966 through 1991.

20.     Upon information and belief, from 1966 through 1991, Foglietta sexually abused dozens, if not hundreds, of boys, many on or near the premises of POLY PREP. Upon information and belief, often under the guise of athletic mentor, Foglietta abused boys in an age range of 9 years old to 17 years old.

21.     Upon information and belief, POLY PREP had actual and/or constructive knowledge of Foglietta's sexual abuse of numerous boys at or near POLY PREP, but condoned and facilitated Foglietta's criminal behavior because he was a highly successful football coach and instrumental in raising substantial revenue for the school. POLY PREP, indeed, derived substantial revenue, from alumni donations and otherwise, from the unparalleled success of its football program and resulting overall athletic scholarship programs, during Foglietta's reign.

22.     Upon information and belief, on multiple occasions individuals came forward to POLY PREP's administrators and/or Board of Trustees and complained about Foglietta's sexual abuse of children.

23.     On each such occasion, POLY PREP engaged in a deliberate and criminal cover-up and concealment of Foglietta's criminal and emotionally devastating conduct.

24.     Upon information and belief, Foglietta died in 1998.

5

25.  Upon information and belief, from 1966 through 1991, Foglietta committed numerous violations of the New York State Penal Law with respect to the sexual abuse of children.

26.  Upon information and belief, on numerous occasions, from 1966 through 1991, Foglietta drove children, including JOHN DOE I and JOHN DOE II, from New York State to various other states, for the purpose of engaging in illicit sexual activities with children.

27.  Upon information and belief, from 1966 through 1991, Foglietta committed numerous violations of the United States Criminal Code with respect to the sexual abuse of children.

28.  Upon information and belief, from 1966 through 1991, on numerous occasions, Foglietta violated 18 U.S.C. § 2421, in that he knowingly transported children in interstate commerce, with the intent that such children engage in sexual conduct for which any person (i.e., Foglietta) could be charged with a criminal offense.

29.  Upon information and belief, from 1966 through 1991, on numerous occasions, Foglietta violated 18 U.S.C. § 2423, in that he knowingly transported individuals who had not attained the age of 18 years in interstate commerce, with the intent that said individuals engage in sexual activity for which any person (i.e., Foglietta) could be charged with a criminal offense.

30.  Upon information and belief, from 1966 through 1991, on numerous occasions, Foglietta violated 18 U.S.C. § 2241, in that, while in the territorial jurisdiction of the United States, he knowingly caused children to engage in sexual acts with him by using force and threats against children.

6

31.   Upon information and belief, from 1966 through 1991, on numerous occasions, Foglietta violated 18 U.S.C. § 2242, in that, while in the territorial jurisdiction of the United States, he knowingly caused children to engage in sexual acts with him by threatening or placing these children in fear and by engaging in sexual acts with children when these children were incapable of appraising the nature of the conduct and/or physically incapable of declining participation in those sexual acts.

32.   Upon information and belief, from 1966 through 1991, on numerous occasions, Foglietta violated 18 U.S.C. § 2243, in that, while in the territorial jurisdiction of the United States, he knowingly engaged in sexual acts with persons between the age of 12 years and 16 years, who were at least four years younger than Foglietta.

33.   Upon information and belief, from 1966 through 1991, on numerous occasions, Foglietta violated 18 U.S.C. § 2244.

34.   At all material times, the POLY PREP Defendants not only had actual knowledge that Foglietta had violated, and was continuing to violate, numerous state and federal criminal statutes (including those referenced above) with respect to the sexual abuse of children, but conspired to conceal and cover up those criminal violations.

35.   In 1966, Plaintiff WILLIAM JACKSON ("JACKSON") was attending POLY PREP as, upon information and belief, an eighth grader.

36.   At that time, POLY PREP was investigating several incidents which involved the sexual abuse of younger students by older students.

37.   In 1966 POLY PREP assigned Foglietta to assist in that investigation.  During Foglietta's interviews of JACKSON, Foglietta repeatedly asked JACKSON a series of highly

7

inappropriate and offensive sexually-related questions. Later, on several occasions, in 1966, Foglietta sexually abused JACKSON.

38.     JACKSON then notified his parents, David Jackson and Jean Jackson, of the abuse he suffered from Foglietta, and JACKSON's parents arranged for JACKSON to tell his story of abuse to POLY PREP during a meeting with JACKSON, his parents, POLY PREP's then Headmaster, J. Folwell Scull, and POLY PREP's Athletic Director, Harlow Parker.

39.     JACKSON notified Headmaster Scull and Mr. Parker in graphic and explicit detail as to the nature and extent of Foglietta's sexual abuse, and Mr. Scull reviewed the matter with POLY PREP's then Board of Trustees.

40.     At that point, POLY PREP, Headmaster Scull, Harlow Parker, and its Board of Trustees, proceeded to take the first known action to conceal and cover-up the sexual abuse of a student by Foglietta.

41.     Tragically, to the immeasurable detriment of Plaintiffs and dozens, if not hundreds, of other Foglietta victims, this conspiracy would continue for more than forty years.

42.     Indeed, upon being presented with detailed and credible evidence of Foglietta's sexual abuse of a child, POLY PREP, Headmaster Scull, Athletic Director Harlow Parker, and the POLY PREP Board of Trustees proceeded to conduct a sham investigation and then falsely notified JACKSON and his parents that they had conducted a complete and thorough investigation, that JACKSON's allegations against Foglietta were not credible, that JACKSON was required to cease and desist from making any further allegations of this nature against Foglietta, and that JACKSON would face severe consequences if he persisted in accusing Foglietta of sexual misconduct.

43. Upon information and belief, had POLY PREP, Headmaster Scull, Harlow Parker, and POLY PREP's Board of Trustees conducted a credible, real and legitimate investigation of JACKSON's allegations against Foglietta, rather than a mere sham investigation designed to conceal and cover-up Foglietta's criminal behavior, they would have uncovered a multitude of corroborating evidence to support JACKSON's claims.

44. Indeed, upon information and belief, a number of other POLY PREP students who were interviewed by Foglietta about the abuse of younger students by older students were abused by Foglietta in much the same manner as how he abused JACKSON.

45. The aforesaid conduct of POLY PREP, Headmaster Scull, Harlow Parker, and POLY PREP's Board of Trustees violated 18 U.S.C. § 1512, "Tampering with a witness, victim, or informant," in that said individuals or entities knowingly used intimidation and threats, and corruptly persuaded persons, including WILLIAM JACKSON and his parents, and/or attempted to do so, and/or engaged in misleading conduct towards other persons, including WILLIAM JACKSON and his parents, to (1) influence, delay or prevent the testimony of WILLIAM JACKSON in an official proceeding against Foglietta, and/or (2) caused or induced WILLIAM JACKSON to withhold testimony from an official proceeding against Foglietta.

46. Notably, 18 U.S.C. §§ 1512(f) & (k) provide, respectively, that for the above crime "an official proceeding need not be pending or about to be instituted at the time of the offense," and "whoever conspires to commit any offense under this section shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy."

47. The aforesaid conduct of POLY PREP and its agents and employees had a profound and extremely negative impact on WILLIAM JACKSON which has continued to this day.

48. POLY PREP's sham investigation and ensuing statements and threats served to convince JACKSON's parents that JACKSON had lied about being abused by Foglietta. This caused an irreparable breach of trust between JACKSON and his parents which was never reconciled. JACKSON's parents, indeed, both died emotionally estranged from their son.

49. After the incidents and sham investigation in 1966, JACKSON deliberately acted out at POLY PREP and caused trouble in an effort to get kicked out of school. He succeeded in this endeavor and was expelled for repeated fighting in 1968.

50. JACKSON never graduated from college.

51. As a direct and proximate result of his childhood abuse by Foglietta, and POLY PREP's exacerbation of that abuse by its criminal cover-up and conspiracy, JACKSON has battled throughout his entire adult life with severe psychological and emotional difficulties, relationship troubles, drug abuse and dependency, alcohol abuse and dependency, and severe (and at times crippling) depression.

52. In or about October, 2004, JACKSON attempted suicide by swallowing a bottle's worth of aspirin.

53. As a direct and proximate result of his childhood abuse by Foglietta, and POLY PREP's exacerbation of that abuse by its criminal cover-up and conspiracy, JACKSON has suffered substantial injury to his business and property, including but not limited to diminished educational opportunities and educational accomplishments, diminished vocational opportunities and vocational and career accomplishments, diminished wages

10

and salaries, substantial sums expended to attempt to combat and/or overcome his drug use and dependency and alcohol use and dependency, and substantial sums expended for psychological counseling and/or therapy.

54.     In 1970, Defendant WILLIAMS replaced J. Folwell Scull as POLY PREP Headmaster.

55.     Upon information and belief, J. Folwell Scull and/or the POLY PREP Board of Trustees notified WILLIAMS of the complaint(s) made by WILLIAM JACKSON and/or others to the effect that Foglietta had sexually abused students at POLY PREP.

56.     In the mid-1970s John Marino (Class of 1976) was a student at POLY PREP and a member of POLY PREP's varsity football team.

57.     During John Marino's freshman year at POLY PREP (1972), Foglietta attempted to sexually abuse John Marino but was rebuffed.

58.     Thereafter, Foglietta began a vicious campaign of physical, verbal and emotional abuse against John Marino.  On multiple occasions, often under the auspices of football demonstrations, Foglietta physically assaulted John Marino.  On numerous occasions Foglietta openly and publicly verbally abused John Marino.  During said demonstrations, Foglietta frequently called him insulting names, for example, "a ratfink pussy" or "the most undisciplined faggot he (Foglietta) had ever met."  This campaign did not end until John Marino graduated POLY PREP in 1976.

59.     On multiple occasions, i.e., at least ten times, John Marino saw Foglietta sexually abusing boys on or near the POLY PREP grounds, including on POLY PREP facilities and on Seventh Avenue (in Foglietta's green Chevy Impala).

60.     On one occasion, when John Marino's father (John Anthony Marino) came to POLY

PREP to pick up his son from school, both John Marino and his father, John Anthony

Marino, actually witnessed Foglietta sexually abusing a child.

61.     In or about 1973 (John Marino's sophomore year at POLY PREP), John Marino's

parents, John Anthony Marino and Phyliss Marino, met at POLY PREP with Defendant

WILLIAMS and Harlow Parker, POLY PREP's Director of Athletics and Foglietta's

direct supervisor.

62.     At that meeting, John Marino's parents told Defendant WILLIAMS and Harlow Parker

that their son had told them that Foglietta was sexually abusing boys on or near POLY

PREP grounds, but Defendant WILLIAMS and Harlow Parker told John Marino's parents

that their son had started a false and malicious rumor about Foglietta's sexual abuse of

children, and that John Marino was undisciplined and a trouble-maker.  Defendant

WILLIAMS and Harlow Parker then threatened to expel John Marino from POLY PREP

for his alleged misbehavior, which included John Marino's continued allegations that

Foglietta was sexually abusing children.

63.     According to Phyllis Marino:

> "At one point after this meeting, John told me about an incident with
> Foglietta in one of the changing rooms.  He said that Foglietta had been
> massaging John's leg and went beyond that to his 'privates.'  My husband
> complained to the school about this but they denied it, didn't do anything
> about it, and said that 'kids exaggerate things.'  My husband confronted
> Foglietta directly but he denied everything."

64.     The aforesaid conduct of POLY PREP and Defendant WILLIAMS, and Harlow Parker,

violated 18 U.S.C. § 1512, "Tampering with a witness, victim, or  informant," in that said

individuals or entities knowingly used intimidation and threats, and corruptly persuaded

persons, including John Marino and his parents, and/or attempted to do so, and/or

engaged in misleading conduct towards other persons, including John Marino and his

parents, to (1) influence, delay or prevent the testimony of John Marino and/or his parents

in an official proceeding against Foglietta, or (2) caused or induced John Marino and his

parents to withhold testimony from an official proceeding against Foglietta.

65.   In or about 1974 (John Marino's junior year at POLY PREP), John Marino's parents,

John Anthony Marino and Phyliss Marino, again met at POLY PREP with Defendant

WILLIAMS and Harlow Parker,  POLY PREP's Director of Athletics and Foglietta's

direct supervisor.

66.   At that meeting, John Marino's parents again told Defendant WILLIAMS and Harlow

Parker that their son had told them that Foglietta was sexually abusing boys on or near

POLY PREP grounds, but Defendant WILLIAMS and Harlow Parker again denied these

allegations and told John Marino's parents that their son had started a false and malicious

rumor about Foglietta's sexual abuse of children, and that John Marino was

undisciplined, a trouble-maker, and "on thin ice."  Defendant WILLIAMS and Harlow

Parker again threatened to expel John Marino from POLY PREP for his alleged

misbehavior, which included John Marino's continued allegations that Foglietta was

sexually abusing children.

67.   The aforesaid conduct of POLY PREP, Defendant WILLIAMS, and Harlow Parker,

violated 18 U.S.C. § 1512, "Tampering with a witness, victim, or  informant," in that said

individuals or entities knowingly used intimidation and threats, and corruptly persuaded

persons, including John Marino and his parents, and/or attempted to do so, and/or

engaged in misleading conduct towards other persons, including John Marino and his

parents, to (1) influence, delay or prevent the testimony of John Marino and/or his parents

in an official proceeding against Foglietta, or (2) caused or induced John Marino and/or

his parents to withhold testimony from an official proceeding against Foglietta.

68.     At no time did Defendant WILLIAMS, Harlow Parker, or anyone else at POLY PREP,

notify John Marino, John Marino's parents, or any other POLY PREP student or parent,

that at least one other student, WILLIAM JACKSON, had previously notified POLY

PREP, its then Headmaster, Harlow Parker, and POLY PREP's Board of Trustees, that

Foglietta had sexually abused him.

69.     At no time did Defendant WILLIAMS, Harlow Parker, or anyone else at POLY PREP,

notify any other POLY PREP student or parent, that both WILLIAM JACKSON and

John Marino had notified POLY PREP, and its administrators and/or Board of Trustees,

that Foglietta had sexually abused boys on or near POLY PREP grounds.

70.     This conspiracy, therefore, in which Defendant WILLIAMS, Harlow Parker, and/or

others, deliberately and maliciously threatened John Marino with expulsion based on his

claims that Foglietta had sexually abused boys at or near POLY PREP grounds, is made

all the more venal because at that point POLY PREP, and its administrators and Board of

Trustees, had actual, verified information from other sources (i.e., WILLIAM JACKSON)

that confirmed John Marino's allegations.

71.     The tragic and direct result of that conspiracy is that from 1966 through 1991, dozens, if

not hundreds, of boys at POLY PREP were sexually abused by Foglietta.  If POLY PREP

and its agents and employees had acted appropriately and met its threshold mandate – to

protect the children who were entrusted to the school – untold scores of boys would have

been spared being sexually abused by Foglietta, and having to deal with the deep

emotional scars and damages which are a natural and direct consequence of that abuse.

72.  In 1965, Plaintiff DAVID HILTBRAND ("HILTBRAND") began attending POLY PREP

as, upon information and belief, an eighth grade student.

73.  HILTBRAND graduated POLY PREP in 1971.

74.  On several occasions in 1966, on the POLY PREP grounds and at Foglietta's Bay Ridge

apartment, Foglietta sexually abused HILTBRAND and also sexually abused other boys

in HILTBRAND'S presence.

75.  As a direct and proximate result of Foglietta's abuse, by in or around 1968, HILTBRAND

became an abuser of drugs and a drug addict.  He also was compelled to take a number of

menial jobs far below his capabilities, while he continued to battle his psychological

demons, all of which stemmed from his abuse by Foglietta at POLY PREP.  The

aforesaid conduct of POLY PREP and its agents thus had a profound and extremely

negative impact on HILTBRAND which has continued to this day.

76.  As a direct and proximate result of his childhood abuse by Foglietta, and POLY PREP's

exacerbation of that abuse by its criminal cover-up and conspiracy, HILTBRAND has

battled throughout his entire adult life with severe psychological and emotional

difficulties, relationship troubles, drug abuse and dependency, alcohol abuse and

dependency, and severe (and at times crippling) depression.

15

77.   As a direct and proximate result of his childhood abuse by Foglietta, and POLY PREP's exacerbation of that abuse by its criminal cover-up and conspiracy, HILTBRAND has suffered substantial injury to his business and property, including but not limited to diminished educational opportunities and educational accomplishments, diminished vocational opportunities and vocational and career accomplishments, diminished wages and salaries, substantial sums expended to attempt to combat and/or overcome his drug use and dependency and alcohol use and dependency, and substantial sums expended for psychological counseling and/or therapy.

78.   In 1991 HILTBRAND wrote Defendant WILLIAMS and informed him that HILTBRAND had been sexually abused by Foglietta while he (HILTBRAND) had been a student at POLY PREP.

79.   Defendant WILLIAMS failed and refused to extend HILTBRAND the simple courtesy of responding to HILTBRAND's letter, so HILTBRAND repeatedly left WILLIAMS telephone messages, none of which were returned.  Finally, after weeks of trying to reach WILLIAMS, HILTBRAND telephoned WILLIAMS and WILLIAMS answered the call. WILLIAMS told HILTBRAND that WILLIAMS had failed to respond to HILTBRAND's letter which alleged that Foglietta had sexually abused him because he (WILLIAMS) had hurt his hand while skiing.

80.   WILLIAMS told HILTBRAND that school officials had received anonymous reports over the years of Foglietta abusing students but that HILTBRAND was the first to come forward and identify himself as an accuser.  This was a categorically false and deceptive statement, as the evidence indicates that at least several other POLY PREP students had

16

personally and specifically spoken to POLY PREP administrators and faculty and accused

Foglietta of sexual abuse.

81. WILLIAMS then told HILTBRAND that Foglietta was still on staff at POLY PREP.

82. HILTBRAND was emotionally devastated by that news and insisted to WILLIAMS that

POLY PREP fire Foglietta immediately. WILLIAMS told HILTBRAND in words or

substance that "You don't want him punished . . . he's a bitter sick old man . . . he's a

shell of himself."

83. The aforesaid conduct of POLY PREP, and Defendant WILLIAMS, violated 18 U.S.C. §

1512, "Tampering with a witness, victim, or informant," in that said individuals or

entities, by reason of their false and fraudulent misrepresentations, knowingly and

corruptly persuaded persons, including DAVID HILTBRAND, and/or attempted to do so,

and/or engaged in misleading conduct towards other persons, including DAVID

HILTBRAND, to (1) influence, delay or prevent the testimony of DAVID HILTBRAND

in an official proceeding against Foglietta, or (2) caused or induced DAVID

HILTBRAND to withhold testimony from an official proceeding against Foglietta.

84. Upon information and belief, years later, Defendant WILLIAMS falsely claimed

that when he and HILTBRAND talked (in 1991) WILLIAMS offered to fire Foglietta

immediately, but that HILTBRAND insisted that POLY PREP not fire Foglietta. This

statement was a patent and galling falsehood.

85. In 1991, POLY PREP allowed Foglietta to retire with honor and, knowing full well that

he was a serial pedophile and abuser of children, had the indecency to fete Foglietta, a

man who raped countless innocent young boys on school grounds, with a lavish

17

retirement dinner (attended by approximately 500 people) at the Downtown Athletic Club in New York City.

86. In 1976, Plaintiff JAMES ZIMMERMAN ("ZIMMERMAN") began attending POLY PREP as, upon information and belief, a seventh grade student.

87. ZIMMERMAN graduated POLY PREP in 1982.

88. ZIMMERMAN played varsity football at POLY PREP beginning as a sophomore. He was the co-captain of the 1981 POLY PREP football team (senior year). ZIMMERMAN was also an All-State and All-Ivy League wrestler at POLY PREP.

89. On several occasions in or around 1981, on the POLY PREP grounds, Foglietta sexually abused ZIMMERMAN.

90. As a direct and proximate result of Foglietta's abuse, in 1981, ZIMMERMAN suffered from serious emotional distress and depression, and developed a hatred and aversion to football. ZIMMERMAN, indeed, turned down admission into Colgate University because said admission was contingent upon his playing football for that school.

91. ZIMMERMAN continued to battle psychological demons which stemmed from his abuse by Foglietta at POLY PREP. The aforesaid conduct of POLY PREP and its agents thus had a profound and extremely negative impact on ZIMMERMAN which has continued to this day.

92. As a direct and proximate result of his childhood abuse by Foglietta, and POLY PREP's exacerbation of that abuse by its criminal cover-up and conspiracy, ZIMMERMAN has battled throughout his entire adult life with severe psychological and emotional difficulties, relationship troubles, drug abuse and dependency, alcohol abuse and

18

dependency, and severe (and at times crippling) depression.

93.  As a direct and proximate result of his childhood abuse by Foglietta, and POLY PREP's
     exacerbation of that abuse by its criminal cover-up and conspiracy, ZIMMERMAN has
     suffered substantial injury to his business and property, including but not limited to
     diminished and delayed opportunities and educational accomplishments, diminished and
     delayed vocational opportunities and vocational and career accomplishments, diminished
     wages and salaries, and substantial sums expended for psychological counseling and/or
     therapy.

94.  In 1976, Plaintiff PHILIP CULHANE ("CULHANE") began attending POLY PREP as,
     upon information and belief, a fifth grade student.

95.  CULHANE graduated POLY PREP in 1984.

96.  On many occasions in or around 1976, 1977 and 1978, on the POLY PREP grounds [in a
     physical therapy room adjacent to Foglietta's office which was located in the boys'
     locker-room] Foglietta sexually abused CULHANE.

97.  As a direct and proximate result of Foglietta's abuse, CULHANE suffered from serious
     emotional distress at the time.

98.  As a direct and proximate result of his childhood abuse by Foglietta, and POLY PREP's
     exacerbation of that abuse by its criminal cover-up and conspiracy, CULHANE has
     suffered for many years with severe (and at times crippling) depression.

99.  As a direct and proximate result of his childhood abuse by Foglietta, and POLY PREP's
     exacerbation of that abuse by its criminal cover-up and conspiracy, CULHANE has
     suffered substantial injury to his business and property, including but not limited to

substantial sums expended for psychological counseling and/or therapy.

100.    On August 31, 2009, CULHANE forwarded the following letter (Ex. A hereto) to

Defendant HARMAN:

> *Dear Mr. Harman,*
>
> *I am a 1984 graduate of Poly Prep. A bit on my background – I was president of my class at Poly for four years running, a varsity swimmer, and won various awards while at Poly. I attended Williams College, graduating in 1988, Phi Beta Kappa and Magna cum Laude. I then attended NYU Law School, graduating in 1992, Magna cum Laude and Order of the Coif. Since 1992 I have been with Simpson Thacher & Bartlett, becoming a partner in 2002. For the last ten years I have been in my firm's Hong Kong office. I am writing to you as an alum of Poly.*
>
> *I was repeatedly sexually abused by Coach Phil Foglietta when I was in the fifth and sixth grades, 1976 to 1978. Somehow I managed to make the abuse stop. At the time, I was aware that there were other boys, my classmates, who were being abused by Foglietta.*
>
> *Since I have been living abroad for so long, I was completely unaware of the fact that Foglietta's serial abuse had come to light as a result of the suit by Jay Paggioli. I have now read certain letters and press statements issued by yourself and the school. My understanding from these letters is that the Board of Trustees was to conduct an investigation into what happened. Presumably that investigation was completed? What was the result? Is there a written report detailing the investigations made? I would like to see the report.*
>
> *I have spoken recently with numerous alums, including a former faculty member, and it is clear that there was a culture of knowing at the school, that both faculty and non-abused students knew that Foglietta was engaged in sexually abusing children. There were younger brothers who were warned by their older siblings to stay clear of Foglietta. There were football player classmates of mine who protected each other from his abuse and now grieve that they were not able to protect me. I was able to learn these things in just a few short weeks of effort and so I wonder what the school has learned in its investigations and what it has done to find and heal victims.*
>
> *Poly's mission statement includes the following: "In all pursuits and daily interactions, Poly Prep students are reminded of the importance of character, and of their responsibilities to the community." I must tell you that it appears to*

*me that the school has not properly addressed the situation and I believe the school must act to fulfill its responsibilities to the community, a community that must be defined to include victimized alumni. Not taking full responsibility continues the harm perpetrated by Foglietta – a harm that is alive and rippling through the lives of possibly 100's of victims. I believe that the school must name Foglietta as the abuser, that the school must clearly state that his abuse was of a serial nature spanning three decades, that the school must admit that its then administration failed to address the situation even though it had knowledge, that the school must make a rigorous effort to find the victims and that the school must make restitution to victims in need.*

*This is a great moral challenge for the school. There may be a belief on the part of the administration and Board that the Foglietta chapter is over. You should not and cannot believe this. I am proof that this is not the case. I am 43 years old and have lived with serious bouts of depression for 18 years. It was only this spring that I was able to effectively address the impact that his abuse had on my life. How? I had a son and that little boy growing up in front of me forced me to confront what happened to me. And I found other victims.*

*Not taking effective action will leave the school and its community profoundly damaged and morally tainted. Not taking action leaves the school subject to the very real likelihood of renewed and very serious negative publicity. I believe though that effective closure can and must be achieved for both victims and the school.*

*In addition to the difficult experiences that I have written about above, I have many happy memories of Poly. I believe that the school was in many ways a good institution, with teachers who were excellent at their craft and who frequently and repeatedly went out of their way to help me, to guide and support me, to teach me – and who did so in a way that, notwithstanding Foglietta's abuse, I was able to flourish both at Poly and beyond. This is the Poly Prep that I want to remember and this is the Poly Prep that can have a community of which I am a deeply supportive member.*

*One of your letters states that you are happy to meet with victims. Will you meet with me? Let's see if together we can't find a way out of this situation.*

*I look forward to hearing from you.*

*Best Regards,*
*Philip Culhane*

21

101.   On September 10, 2009, Defendant HARMAN sent CULHANE the following response (Ex. B hereto):

> Dear Philip,
>
> Thank you for your email of August 31.  We are sorry to hear your story.
> Because of previous litigation against the school on this matter, we will need
> to confer with our counsel and be guided by them moving forward.
>
> Best wishes,
>
> David B. Harman
> Headmaster

102.   In or about 1968, Plaintiff GEORGE ZAROU ("ZAROU") began attending  POLY PREP as, upon information and belief, a fifth grade student.  ZAROU departed POLY PREP in or about 1972. In or about 1968, Plaintiff GEORGE ZAROU ("ZAROU") began attending POLY PREP as, upon information and belief, a fifth grade student.  ZAROU departed POLY PREP in or about 1972.

103.   On one or more occasions in or about 1969, on the POLY PREP grounds, Foglietta sexually abused ZAROU.

104.   As a direct and proximate result of Foglietta's abuse, ZAROU became an abuser of drugs and a drug addict, as well as a compulsive gambler.  The aforesaid conduct of POLY PREP and its agents thus had a profound and extremely negative impact on ZAROU which has continued to this day.

105.   As a direct and proximate result of his childhood abuse by Foglietta, and POLY PREP's exacerbation of that abuse by its criminal cover-up and conspiracy, ZAROU has battled throughout his entire adult life with severe psychological and emotional difficulties,

marital and relationship troubles, drug abuse and dependency, drug addictions, alcohol

abuse and dependency, gambling addictions, and severe (and at times crippling)

depression.

106.   As a direct and proximate result of his childhood abuse by Foglietta, and POLY PREP's

exacerbation of that abuse by its criminal cover-up and conspiracy, ZAROU has suffered

substantial injury to his business and property, including but not limited to diminished

educational opportunities and educational accomplishments, diminished vocational

opportunities and vocational and career accomplishments, diminished wages and salaries,

substantial sums expended to attempt to combat and/or overcome his drug use and

dependency, drug addictions, alcohol use and dependency, gambling addictions, and

substantial sums expended for psychological counseling and/or therapy.  In addition, as a

result of his gambling addictions, ZAROU has squandered substantial sums of monies

which he earned.

107.   In or about 1970, Plaintiff JOHN DOE I began attending POLY PREP as, upon

information and belief, a seventh grade student.

108.   JOHN DOE I graduated POLY PREP in 1976.

109.   From on or about 1970 through 1974, on multiple occasions (on average, 2 or 3  times per

week), Foglietta sexually abused JOHN DOE I on the POLY PREP grounds, as well as

one time at JOHN DOE I's home in New Jersey (after driving him from New York in

Foglietta's vehicle).

110.   As a direct and proximate result of Foglietta's abuse, JOHN DOE I became compelled to

accept a series of menial jobs far below his capabilities.  JOHN DOE I also became an

23

abuser of drugs, as well as an abuser of alcohol.  The aforesaid conduct of POLY PREP and its agents thus had a profound and extremely negative impact on JOHN DOE I which has continued to this day.

111.    As a direct and proximate result of his childhood abuse by Foglietta, and POLY PREP's exacerbation of that abuse by its criminal cover-up and conspiracy, JOHN DOE I has battled throughout his entire adult life with severe psychological and emotional difficulties, marital and relationship troubles (including a divorce), drug abuse and dependency, alcohol abuse and dependency, and severe (and at times crippling) depression.

112.    As a direct and proximate result of his childhood abuse by Foglietta, and POLY PREP's exacerbation of that abuse by its criminal cover-up and conspiracy, JOHN DOE I has suffered substantial injury to his business and property,  including but not limited to diminished educational opportunities and educational accomplishments, diminished vocational opportunities and vocational and career accomplishments, diminished wages and salaries, substantial sums expended to attempt to combat and/or overcome his drug use and dependency, alcohol use and dependency, and substantial sums expended for psychological counseling and/or therapy.

113.    In or about 1968, Plaintiff JOHN DOE II began attending POLY PREP as, upon information and belief, a fifth grade student.

114.    JOHN DOE II left POLY PREP in or about 1974 (during his sophomore year).

115.    From 1969 through 1972 on numerous occasions (approximately two to four times per month), Foglietta sexually abused JOHN DOE II on the POLY PREP grounds, in

Foglietta's Bay Ridge apartment, and at JOHN DOE II's parents' summer home in Northwest New Jersey (after Foglietta drove JOHN DOE II there from POLY PREP).

116.  The aforesaid conduct of POLY PREP and its agents thus had a profound and extremely negative impact on JOHN DOE II which has continued to this day.

117.  As a direct and proximate result of his childhood abuse by Foglietta, and POLY PREP's exacerbation of that abuse by its criminal cover-up and conspiracy, JOHN DOE II has battled throughout his entire adult life with severe psychological and emotional difficulties, fears and concerns.

118.  As a direct and proximate result of his childhood abuse by Foglietta, and POLY PREP's exacerbation of that abuse by its criminal cover-up and conspiracy, JOHN DOE II has suffered substantial injury to his business and property, including but not limited to diminished educational opportunities and educational accomplishments, diminished vocational opportunities and vocational and career accomplishments, and diminished wages and salaries.

119.  In or about 2000, Defendant DAVID B. HARMAN ("HARMAN") replaced Defendant WILLIAMS as POLY PREP Headmaster.

120.  On or about October 21, 2002, Defendant HARMAN forwarded a letter to all POLY PREP alumni (annexed hereto as Exhibit C) which provided in pertinent part that:

> *Last spring and then again in the middle of the summer, two Poly graduates informed me, independently, that they were the victims of sexual abuse by [a faculty member/coach, who is now deceased]. I took these allegations extremely seriously and immediately informed the entire Board of Trustees. The Board agreed to conduct an investigation, which is ongoing, and authorized the sending of this letter to all alumni . . .*

121.   Since that time, seven years later (and despite explicit written requests from alumni), POLY PREP has not notified any alumni, including the multitude of Foglietta's victims, of the results of any so-called investigation by POLY PREP or its Board of Trustees. Upon information and belief, no such legitimate investigation actually took place.

122.   To the contrary, upon information and belief, POLY PREP, Defendant HARMAN, and/or various members of the Board of Trustees, made that false representation and forwarded the above letter to alumni for the deceitful purpose of falsely assuring them that POLY PREP was taking affirmative actions to uncover the nature and extent of Foglietta's abuse of children, when in fact POLY PREP, Defendant HARMAN, and/or various members of the POLY PREP Board of Trustees were continuing to conspire to protect POLY PREP, Defendant WILLIAMS, Harlow Parker (who is recently deceased), and various members of the POLY PREP Board of Trustees, from the aforesaid consequences of their prior actions to conceal Foglietta's sexual abuse of children, and, more egregiously, to conceal and cover-up their own condoning and facilitating said unchecked and unpunished sexual abuse for more than a quarter of a century.

123.   By virtue of that conspiracy, Defendant HARMAN and various members of the Board of Trustees are equally culpable for the Civil RICO predicate acts which they conspired to conceal from both POLY PREP alumni and the public-at-large.

## VIOLATION OF "CIVIL RICO":  GENERAL ELEMENTS

124.   Plaintiffs repeat each of the allegations contained in paragraphs "1" through "123" herein, as if each has been fully set forth at length.

125. Each of the Defendants herein is a "person" as that term is defined in 18 U.S.C. §1961(3).

126. The above-named "POLY PREP ENTERPRISE" consists of: (1) POLY PREP COUNTRY DAY SCHOOL, (2) WILLIAM M. WILLIAMS, (3) DAVID B. HARMAN, (4) various other as yet unidentified members of POLY PREP's Board of Trustees, and (5) an association-in-fact consisting of each of the previously enumerated individuals and entities.

127. The POLY PREP ENTERPRISE constitutes an "enterprise" as defined in 18 U.S.C. §1961(4), in that , *inter alia*, at all material times, it was and still is an ongoing organization, and the various associates affiliated with said enterprise functioned and/or function as a continuing unit with one singular purpose: to continue to derive income for POLY PREP COUNTRY DAY SCHOOL and themselves based on an ongoing scheme to conceal and cover up the nature and extent of the sexual abuse that occurred at POLY PREP from 1966 to 1991 (by Foglietta) and the emotional, physical and financial carnage incurred by Plaintiffs and myriad other victims that was left in the wake of Foglietta's unchecked abuse.

128. At all material times, the POLY PREP ENTERPRISE has been and is engaged in activities which affect interstate commerce.

129. The Defendants herein have engaged in a fraudulent scheme to conceal and cover-up Foglietta's prolonged, repeated, and serial sexual abuse of boys from 1966 to 1991, and to profit from that concealment by obtaining millions of dollars in alumni contributions and other fundraising activities based on false pretenses and misrepresentations, by and through the misconduct described herein.

27

130. Defendants POLY PREP COUNTRY DAY SCHOOL, WILLIAM M. WILLIAMS, DAVID B. HARMAN, and various other members of the POLY PREP Board of Trustees are distinct entities from the POLY PREP ENTERPRISE, and such Defendants are, and/or have been, conducting or participating in its affairs.

131. Defendants, POLY PREP COUNTRY DAY SCHOOL, WILLIAM M. WILLIAMS, DAVID B. HARMAN, and various other members of the POLY PREP Board of Trustees, have received income derived from a pattern of racketeering activity, and have used or invested, directly or indirectly, all or part of such income, or the proceeds of such income, in acquisition of an interest in, or the establishment or operation of the POLY PREP ENTERPRISE, which is engaged in and affects interstate commerce, in violation of 18 U.S.C. §1962(a).

132. Defendants, POLY PREP COUNTRY DAY SCHOOL, WILLIAM M. WILLIAMS, DAVID B. HARMAN, and various other members of the POLY PREP Board of Trustees, have engaged in a pattern of racketeering activity to acquire, maintain, directly or indirectly, an interest in or control of the POLY PREP ENTERPRISE by the conduct alleged herein, in violation of 18 U.S.C. §1962(b).

133. Defendants WILLIAM M. WILLIAMS, and DAVID B. HARMAN, and various other members of the POLY PREP Board of Trustees, were and/or are employed by or associated with the POLY PREP ENTERPRISE which is engaged in and/or affects interstate commerce and have controlled, dominated, caused, conducted or participated, directly or indirectly, in the conduct of the POLY PREP ENTERPRISE'S affairs, through a pattern of racketeering activity as alleged herein, in violation of 18 U.S.C. §1962(c).

28

134. Defendants POLY PREP COUNTRY DAY SCHOOL, WILLIAM M. WILLIAMS,
DAVID B. HARMAN, and various other members of the POLY PREP Board of
Trustees, by engaging in the conduct described herein and otherwise, and/or by aiding and
abetting said conduct, conspired to violate 18 U.S.C. §§1962(a),(b) & (c), in violation of
18 U.S.C. §1962(d).

## RACKETEERING ACTIVITIES

### CONTINUITY REQUIREMENT

135. The aforesaid acts of Defendants, particularly the predicate acts of Defendants as set forth
at length in paragraphs 25-46, 56-71, 78-85, and 119-123, above, constitute a "pattern of
racketeering activity" in that they involve a threat of continuing activity. Said threat,
tragically, was realized.

136. The aforesaid predicate acts of Defendants, which extend for a period of time greater than
three (3) years, demonstrate the existence of "closed-ended continuity" in that said acts
refer to a closed period of repeated conduct.

137. In addition, the aforesaid predicate acts of Defendants demonstrate the existence of
"open-ended continuity" in that the racketeering acts themselves include a specific threat
of repetition extending indefinitely into the future, and are part of the POLY PREP
ENTERPRISE'S regular way of doing business. Said threat of repetition, tragically, did
extend into the future (until Foglietta's retirement from POLY PREP in 1991).

### STANDING - DIRECT INJURY TO "BUSINESS OR PROPERTY"

138. As stated at length, particularly in paragraphs 47-53, 75-77, 90-93, 97-99, 104-106, 110-
112, and 116-118, above, each of the Plaintiffs was injured in his "business or property"

29

as a direct and proximate result of the aforesaid predicate acts and RICO violations of the Defendants.

139.   Upon information and belief, the damages and injuries to Plaintiffs which caused directly by the Defendants' RICO violations were a reasonably foreseeable consequence of Defendants' RICO violations.

140.   Upon information and belief, it is well-established in the medical and scientific communities that men who were sexually abused as children are likely to suffer from long-term sexual problems, dysfunctions or compulsions, problems with intimacy, shame, guilt, self-blame, low self-esteem, negative self-images, increased anger, increased rates of drug and/or alcohol abuse, increased probabilities of fear and major depression, increased risk of suicide attempts, social anxiety, conduct disorder, and an increased rate of divorce. (See Marci A. Hamilton, *Facts About Childhood Sexual Abuse*, annexed hereto as Exhibit D).

141.   Upon information and belief, it is well-established in the medical and scientific communities that sexual abuse can alter a child's physical, emotional, cognitive and social development and impact his physical and mental health throughout his lifetime.  A 2002 study by Elliot Nelson, M.D., et al., reaffirmed that childhood sexual abuse has a profound negative impact throughout the victim's life. (See Elliot Nelson et al., *Association Between Self-Reported Childhood Sexual Abuse and Adverse Psychosocial Outcomes: Results from a Twin Study*, 59(2) Archives of General Psychiatry, 139, 139-45, annexed hereto as Exhibit E).

30

142.   Moreover, it is often not until years after the sexual abuse that victims experience the potential range of negative outcomes.  According to Clinician Mic Hunter, in *Abused Boys*, 59 (1991):

> Some of the effects of sexual abuse do not become apparent until the victim is an adult and a major life event, such as marriage or birth of a child, takes place.  Therefore, a child who seems unharmed by childhood abuse can develop crippling symptoms years later and can have a difficult time connecting his adult problems with his past.

143.   Plaintiffs have suffered a full range of the injuries and damages described above which are the direct and proximate result of their sexual abuse as children, which was committed by Foglietta, but condoned and facilitated by the POLY PREP Defendants.

## THRESHOLD STATUTE OF LIMITATIONS CONSIDERATIONS

144.   The statute of limitations period for Civil RICO actions is four (4) years from accrual.

145.   A Civil RICO action accrues as soon as the plaintiff discovers, or reasonably should have discovered, both the existence and source of his injury and that the injury is part of a pattern.

146.   Each of Plaintiffs' claims is timely, therefore, because this Complaint shall be filed within four (4) years of any Plaintiff's discovery of both the existence of his injury and that his injury is part of a pattern.

147.   Moreover, when a plaintiff does not, in fact, know of a defendant's unlawful activity, and when the defendant takes affirmative steps to conceal that unlawful activity, those circumstances are sufficient to toll the limitations period (or to estop the defendant from asserting a limitations defense), irrespective of what the plaintiff should have known.

31

148.    Accordingly, the statute of limitations on Plaintiffs' Civil RICO claims should, as a

matter of both estoppel and equity, be tolled because: (1) by reason of their aforesaid acts

and omissions, Defendants wrongfully concealed, conspired to conceal, and continue to

conceal and conspire to conceal, facts which indicate that Defendants engaged in a pattern

of racketeering activity with respect to their cover-up, condonation and facilitation of

Foglietta's sexual abuse of children; (2) Defendants' said acts and omissions prevented

the Plaintiffs from discovering their Civil RICO claims earlier, and (3) due to

Defendants' prolonged, systematic, entrenched, and successful concealment of many of

the facts pleaded herein, Plaintiffs could not have earlier discovered  the existence of their

Civil RICO claims by exercising normal due diligence.


## COUNT I

### VIOLATION OF 18 U.S.C. § 1962(a)

149.    Plaintiffs hereby repeat and reallege each of the allegations contained in paragraphs "1"

through "148" hereinabove, as if each has been fully set forth at length.

150.    The POLY PREP Defendants have received income derived from a pattern of

racketeering activity, and have used or invested, directly or indirectly, all or part of such

income, or the proceeds of such income, in acquisition of an interest in, or the

establishment or operation of the POLY PREP ENTERPRISE, which is engaged in and

affects interstate commerce, in violation of 18 U.S.C. §1962(a).

151.    Plaintiffs have each been injured as a result of the POLY PREP Defendants' violations of the RICO Act, and as a result are each entitled to an award of treble damages, and attorneys fees' and costs, pursuant to 18 U.S.C. §1964(c), against the POLY PREP Defendants.

## COUNT II

## VIOLATION OF 18 U.S.C. § 1962(b)

152.    Plaintiffs hereby repeat and reallege each of the allegations contained in paragraphs "1" through "151" hereinabove, as if each has been fully set forth at length.

153.    The POLY PREP Defendants have engaged in a pattern of racketeering activity to acquire, maintain, directly or indirectly, an interest in or control of the POLY PREP ENTERPRISE by the conduct alleged herein, in violation of 18 U.S.C. §1962(b).

154.    Plaintiffs have each been injured as a result of the POLY PREP Defendants' violations of the RICO Act, and as a result are each entitled to an award of treble damages, and attorneys' fees and costs, pursuant to 18 U.S.C. §1964(c), against the POLY PREP Defendants.

## COUNT III

## VIOLATION OF 18 U.S.C. § 1962(c)

155.    Plaintiffs hereby repeat and reallege each of the allegations contained in paragraphs "1" through "154" hereinabove, as if each has been fully set forth at length.

156.     The POLY PREP Defendants are employed by or associated with the POLY PREP

ENTERPRISE which is engaged in and/or affects interstate commerce and has controlled,

dominated, caused, conducted or participated, directly or indirectly, in the conduct of the

POLY PREP ENTERPRISE'S affairs, through a pattern of racketeering activity as

alleged herein, in violation of 18 U.S.C. §1962(c).

157.     Plaintiffs have each been injured as a result of the POLY PREP Defendants' violations of

the RICO Act, and as a result are each entitled to an award of treble damages, and

attorneys' fees and costs, pursuant to 18 U.S.C. §1964(c), against the POLY PREP

Defendants.

## COUNT IV

## VIOLATION OF 18 U.S.C. § 1962(d)

158.     Plaintiffs hereby repeat and reallege each of the allegations contained in paragraphs "1"

through "157" hereinabove, as if each has been fully set forth at length.

159.     The POLY PREP Defendants, by engaging in the conduct described herein and otherwise,

conspired to violate 18 U.S.C. §§1962(a), (b) & (c), in violation of 18 U.S.C. §1962(d).

160.     Plaintiffs have each been injured as a result of the POLY PREP Defendants' violations of

the RICO Act, and as a result are each entitled to an award of treble damages, and

attorneys' fees and costs, pursuant to 18 U.S.C. §1964(c), against the POLY PREP

Defendants.

WHEREFORE, based on the aforesaid, Plaintiffs, JAMES ZIMMERMAN, PHILIP CULHANE, DAVID HILTBRAND, WILLIAM JACKSON, GEORGE ZAROU, "JOHN DOE I," and "JOHN DOE II," hereby demand judgment in their favor and against each of the Defendants, jointly and severally, as and for Counts I, II, III and IV, pursuant to 18 U.S.C. §§ 1962(a)(b)(c) & (d), for the full amount of all direct and consequential damages, together with an award of treble damages, pre-judgment and post-judgment interest, attorneys' fees and costs, pursuant to 18 U.S.C. § 1964(c) or otherwise, and any other, different or further relief as this Court may deem just, proper or necessary.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated:   October 26, 2009
         Orangeburg, New York

Respectfully submitted,

**KEVIN T. MULHEARN, P.C.**

KEVIN T. MULHEARN, ESQ. (KM 2301)
*Attorneys for Plaintiffs*
60 Dutch Hill Road, Suite 8
Orangeburg, New York 10962
Phone (845) 398-0361
Fax (845) 398-3836
Email: kmulhearn@ktmlaw.net

**Culhane, Philip M**

| | |
|---|---|
| **From:** | Culhane, Philip M |
| **Sent:** | Monday, August 31, 2009 1:30 PM |
| **To:** | 'dharman@polyprep.org' |
| **Subject:** | Note from a Class of '84 Alum |

Dear Mr. Harman,

I am a 1984 graduate of Poly Prep.  A bit on my background–I was president of my class at Poly for four years running, a varsity swimmer, and won various awards while at Poly.  I attended Williams College, graduating in 1988, Phi Beta Kappa and Magna Cum Laude.  I then attended NYU Law School, graduating in 1992, Magna Cum Laude and Order of the Coif.  Since 1992 I have been with Simpson Thacher & Bartlett, becoming a partner in 2002.  For the last ten years I have been in my firm's Hong Kong office.  I am writing to you as an alum of Poly.

I was repeatedly sexually abused by Coach Phil Foglietta when I was in the fifth and sixth grades, 1976 to 1978.  Somehow I managed to make the abuse stop.  At the time, I was aware that there were other boys, my classmates, who were being abused by Foglietta.

Since I have been living abroad for so long, I was completely unaware of the fact that Foglietta's serial abuse had come to light as a result of the suit by Jay Paggioli.  I have now read certain letters and press statements issued by yourself and the school.  My understanding from these letters is that the Board of Trustees was to conduct an investigation into what happened.  Presumably that investigation was completed?  What was the result?  Is there a written report detailing the investigations made?  I would like to see the report.

I have spoken recently with numerous alums, including a former faculty member, and it is clear that there was a culture of knowing at the school, that both faculty and non-abused students knew that Foglietta was engaged in sexually abusing children.  There were younger brothers who were warned by their older siblings to stay clear of Foglietta.  There were football player classmates of mine who protected each other from his abuse and now grieve that they were not able to protect me.  I was able to learn these things in just a few short weeks of effort and so I wonder what the school has learned in its investigations and what it has done to find and heal victims.

Poly's mission statement includes the following: "In all pursuits and daily interactions, Poly Prep students are reminded of the importance of character, and of their responsibilities to the community."  I must tell you that it appears to me that the school has not properly addressed the situation and I believe the school must act to fulfill its responsibilities to the community, a community that must be defined to include victimized alumni.  Not taking full responsibility continues the harm perpetrated by Foglietta–a harm that is alive and rippling through the lives of possibly 100's of victims.  I believe that the school must name Foglietta as the abuser, that the school must clearly state that his abuse was of a serial nature spanning three decades, that the school must admit that its then administration failed to address the situation even though it had knowledge, that the school must make a rigorous effort to find the victims and that the school must make restitution to victims in need.

This is a great moral challenge for the school.  There may be a belief on the part of the administration and Board that the Foglietta chapter is over.  You should not and cannot believe this.  I am proof that this is not the case.  I am 43 years old and have lived with serious bouts of depression for 18 years.  It was only this spring that I was able to effectively address the impact that his abuse had on my life.  How?  I had a son and that little boy growing up in front of me forced me to confront what happened

1

to me.  And I found other victims.

Not taking effective action will leave the school and its community profoundly damaged and morally tainted.  Not taking action leaves the school subject to the very real likelihood of renewed and very serious negative publicity.  I believe though that effective closure can and must be achieved for both victims and the school.

In addition to the difficult experiences that I have written about above, I have many happy memories of Poly.  I believe that the school was in many ways was a good institution, with teachers who were excellent at their craft and who frequently and repeatedly went out of their way to help me, to guide and support me, to teach me—and who did so in a way that, notwithstanding Foglietta's abuse, I was able to flourish both at Poly and beyond.  This is the Poly Prep that I want to remember and this the Poly Prep that can have a community of which I am a deeply supportive member.

One of your letters states that you are happy to meet with victims.  Will you meet with me?   Let's see if together we can't find a way out of this situation.

I look forward to hearing from you.

Best regards,

Philip Culhane

## Culhane, Philip M

**From:** David Harman [DHarman@PolyPrep.org]
**Sent:** Thursday, September 10, 2009 1:23 AM
**To:** Culhane, Philip M
**Subject:** RE: Note from a Class of '84 Alum

Dear Philip,

Thank you for your email of August 31. We are sorry to hear your story. Because of previous litigation against the school on this matter, we will need to confer with our counsel and be guided by them moving forward.

Best wishes,

David B. Harman
Headmaster



POLY PREP

October 21, 2002

DAVID HARMAN
*Headmaster*

Dear Poly Alumni:

I am writing to you, with great sadness, concerning a subject that, tragically, all of us have read and heard about with increasing frequency -- the sexual abuse of children. Unfortunately, we have recently received credible allegations that such abuse occurred at Poly Prep more than twenty years ago by a faculty member/coach, who is now deceased. I felt that it was important that you, the alumni of the School, know about these allegations. Furthermore, I invite you to offer whatever comments or help you can as we move forward. We will be guided in our actions by what we believe is in the best interest of our entire community and, in particular, our students, both past and present.

Last spring and then again in the middle of the summer, two Poly graduates informed me, independently, that they were the victims of sexual abuse by the aforementioned individual. I took these allegations extremely seriously and immediately informed the entire Board of Trustees. The Board agreed to conduct an investigation, which is ongoing, and authorized the sending of this letter to all alumni and a modified version to our present parents.

Additionally, the Board of Trustees and I have engaged outside consultants and have reviewed the experiences of other schools to guide us at this point. If you have any information or concern regarding sexual misconduct that may have occurred while you were a student at Poly Prep, I would personally welcome your call at school 718-836-9800, Ext. 311, at home 718-222-8848, or by e-mail, dharman@polyprep.org. The school has retained a nationally known psychiatrist in the area of sexual abuse, Dr. Stuart Grassian. If you were the victim of any sexual misconduct that occurred at Poly Prep, you may choose to speak directly and confidentially to Dr. Grassian at 617-244-3315. No personal information disclosed to Dr. Grassian will be shared with the school, unless permission is granted.

Angered and saddened as I am to hear such allegations, I want to assure the alumni

POLY PREP COUNTRY DAY SCHOOL
9216 Seventh Avenue, Brooklyn, NY 11228-3698   718.836.9800   Fax 718.836.0590   dharman@polyprep.org

body that our top priority at the School is to ensure the safety and well being of all of our students. Well before my time, steps were taken to include sexual harassment policies and procedures in our handbooks and implement educational workshops on this subject to inform both students and faculty. Also, we now have a highly competent clinical psychologist working at the school, who is readily available to students, faculty, and parents. We are continually in the process of thoroughly reviewing all of our policies and procedures on sexual harassment and abuse and, where appropriate and necessary, we will make further improvements.

Finally, I want to state emphatically our firm intention to address this subject on a foundation of trust and compassion. These are qualities that we try to inculcate in our students everyday and are central to the mission of Poly Prep. I welcome your response.

Sincerely yours,

David Harman

# FACTS ABOUT CHILDHOOD SEXUAL ABUSE

Marci A. Hamilton
Paul R. Verkuil Chair in Public Law
Benjamin N. Cardozo School of Law
Yeshiva University
Hamilton02@aol.com
(215) 353-8984

Childhood sexual abuse victims constitute a class of victims who share a number of common characteristics. One of the primary characteristics is the extreme difficulty they face making a connection between their typically serious problems in adulthood and the sexual abuse when a child. See generally, Guy R. Holmes, See No Evil, Hear No Evil, Speak No Evil: Why Do Relatively Few Male Victims of Childhood Sexual Abuse Receive Help for Abuse-Related Issues in Adulthood?,17(1) Clinical Psychol. Rev. 69, 69-88 (1997); see also State v. Schnabel, 196 N.J. 116, 133 (2008) (observing that Child Sexual Abuse Accommodation Syndrome involves five behavior patterns that may be exhibited by a sexually abused child: secrecy, helplessness, entrapment and accommodation, delayed reporting, and recantation). The unexpected fallout from childhood sexual abuse – for the typical victim – is compounded by the fact that there are many different problems that can flow from sexual abuse.

The injuries a particular child sex abuse victim will suffer cover a wide swath of possibilities. Researchers in various studies have found -- specifically in men who were sexually abused as children – that long-term adaptation will often include sexual problems, dysfunctions or compulsions, confusion and struggles over gender and sexual identity, homophobia and confusion about sexual orientation, problems with intimacy, shame, guilty and self-blame, low self-esteem and negative self images and increased

anger.[1] There is also an increased rate of substance abuse, a tendency to deny and de-legitimize the traumatic experience, symptoms of Post Traumatic Stress Disorder, and increased probability of fear and depression.[2]

Hundreds of research studies have conclusively shown that sexual abuse can alter a child's physical, emotional, cognitive and social development and impact their physical and mental health throughout his or her lifetime. A 2002 study by Elliot Nelson, M.D., et. al. reaffirmed that childhood sexual abuse has a profound negative impact throughout the victim's life. Elliot Nelson et. al., <u>Association Between Self-reported Childhood Sexual Abuse and Adverse Psychosocial Outcomes:  Results From a Twin Study</u>, 59(2) Archives of General Psychiatry, 139,139-45, available at http://genepi.qimr.edu.au/staff/nick_pdf/CV321.pdf (last visited February 21, 2009). This study examined both members of nearly two thousand same-sex twins (1159 female and 832 male). <u>Id.</u> at 139.  Twins were used to separate the effects of childhood sexual abuse from possible negative effects of family background, such as parental alcohol related problems, fighting and conflict, physical abuse, and neglect. <u>Id.</u> at 143-44.  The study looked at same sex twin pairs where one of the twins was sexually abused as a child and one was not. <u>Id.</u> at 139.  The study found that a person with a history of childhood sexual abuse had an increased risk for subsequently occurring adverse outcomes of:

---

[1]   David Lisak, <u>The Psychological Impact of Sexual Abuse: Content Analysis of Interviews with Male Survivors</u>, 7(4) J. of Traumatic Stress 525, 525-526, 544 (1994).  Unlike the victim of a toxic tort, there is no medical necessity that the abuse will lead to a scientifically dispositive injury.  For example, asbestos exposure leads to asbestosis, a lung disease.  Child sex abuse is more like the tort in <u>Mancuso v. Mancuso</u>, 209 <u>N.J. Super.</u> 51 (App. Div. 1986), where accrual was delayed because the victim was harmed in a relatively minor car accident that would not have led victim to suspect that Parkinson's could result.  Child sex abuse victims simply do not apprehend that the abuse, which they may not even experience as abuse, could lead to devastating effects in adulthood.
[2] <u>Id.</u>

- Major depression,
- Suicide attempt,
- Conduct disorder,
- Alcohol and/or nicotine dependence,
- Social anxiety,
- Rape after the age of 18 years old, and
- Divorce.

Id. at 142.

Men were close to twice as likely to suffer from major depression if they were sexually abused as children, compared with those who were not abused. Ibid. Women and men who were sexually abused as children were roughly five times more likely to attempt suicide, compared to those people that were not abused. Ibid. These adverse outcomes alone make it very difficult for victims of childhood sexual abuse to discover that the sexual acts were abuse and to discover the cause of their injuries because many simply struggle to survive the onset of drug or alcohol abuse, major depression, and suicide attempts.

Often it is not until years after the sexual abuse that victims experience these negative outcomes. Clinician Mic Hunter observed that:

> Some of the effects of sexual abuse do not become apparent until the victim is an adult and a major life event, such as marriage or birth of a child, takes place. **Therefore, a child who seemed unharmed by childhood abuse can develop crippling symptoms years later and can have a difficult time connecting his adulthood problems with his past.**

Mic Hunter, Abused Boys, 59 (1991) (emphasis added).

At the time the child is sexually abused he or she is often too young to appreciate the harmful nature of the acts. Years later when the child does experience the injuries arising from the childhood sexual abuse, the victim is disabled from relating the harm to the abuse in a temporal sense the way that one would expect if the harmful event was closer in time to the realization of the injury.

Page 3

In addition to delayed onset of injury, there are many other reasons that childhood sexual abuse victims may not know they were abused or injured, or able to identify the cause of their injuries until adulthood. The following reasons are by no means exclusive but often affect a child who is sexually abused:

- Most sexual abusers are someone that the child knows and trusts. In fact only 4% of child sex abusers are strangers. Wisconsin Coalition Against Sexual Assault, Child Sex Abuse, *available at* http://www.wcasa.org/info/factsheets/childsa.htm(last visited February 22, 2009) (citations omitted).

- Often abusers manipulate the child victim into thinking that the relationship is built on mutual love. See Maxine Hancock & Karen Burton Mains, Child Sexual Abuse: Hope For Healing 33 (1987) (citations omitted).

- Children may be told by the abuser to keep the abuse a secret. See Dale Robert Reinert, Sexual Abuse and Incest 34-35 (1997).

- Victims sometimes feel shame and embarrassment about the abuse, making the victim feel they are to blame for the abuse. Mary L. Paine & David J. Hansen, Factors Influencing Children to Self-Disclose Sexual Abuse, 22 Clinical Psychol. Rev. 271, 271-75 (2002).

- Many Children lack the cognitive ability to recognize that these acts were abuse and harmful. See Margaret O. Hyde & Elizabeth H. Forsyth, The Sexual Abuse of Children and Adolescents 10 (1997).

- Some children are very confused by the physical sensations that accompany physical acts. The body releases chemicals which tell it that the sexual acts are a good thing, something pleasurable.

- For most victims, the sexual abuse is their first sexual experience and they have nothing to compare it with.

Because the victim could face any one or more of these experiences before, during, or after the time of the abuse, it is often difficult for the victim to realize that the sexual acts themselves are even abuse. See Louise D. Sas & Alison H. Cunningham, Submissions of London Fam. Ct. Clinic Inco. To Fam. Violence Prevention Div. Health

Can., <u>Tipping the Balance to Tell the Secret: Public Discovery of Child Sexual Abuse</u> 1,
91-92 (1995).  These experiences compound the difficulty that is created by the delayed
onset of the emotional problems, all of which makes it difficult if not impossible for the
victim to realize that his or her problems are the result of the sexual abuse.  <u>See</u> Mic
Hunter, <u>Abused Boys</u> at 31, 59.

ORIGINAL ARTICLE

# Association Between Self-reported Childhood Sexual Abuse and Adverse Psychosocial Outcomes

## Results From a Twin Study

Elliot C. Nelson, MD; Andrew C. Heath, DPhil; Pamela A. F. Madden, PhD; M. Lynne Cooper, PhD; Stephen H. Dinwiddie, MD; Kathleen K. Bucholz, PhD; Anne Glowinski, MD; Tara McLaughlin, PhD; Michael P. Dunne, PhD; Dixie J. Statham, MCP; Nicholas G. Martin, PhD

**Background:** Increased risk for serious adverse outcomes has been associated with a history of childhood sexual abuse (CSA). Whether these risks are directly attributable to CSA rather than family background remains controversial.

**Methods:** Structured psychiatric telephone interviews were conducted from February 1996 to September 2000 with both members of 1991 same-sex pairs (1159 female and 832 male pairs) from a young adult Australian volunteer twin panel (mean [SD] age, 29.9 [2.5] years). A binary composite CSA variable was constructed from responses to 5 component questions. The association between CSA and adverse psychosocial outcomes was examined, controlling for family background.

**Results:** A history of CSA, reported by 16.7% of the women and 5.4% of the men, was more common among those reporting parental alcohol-related problems. Significantly increased risk was observed in women reporting a history of CSA for subsequently occurring major depression, suicide attempt, conduct disorder, alcohol dependence, nicotine dependence, social anxiety, rape after the age of 18 years, and divorce; most similar risks reached statistical significance in men. The greatest risks were associated with CSA involving intercourse. Childhood sexual abuse–negative twins (ie, those who denied having experienced CSA) from CSA-discordant pairs compared with other CSA-negative individuals had increased risk for many adverse outcomes suggesting correlated family background risk factors. Childhood sexual abuse–positive members (ie, those who reported having experienced CSA) of CSA-discordant pairs had significantly greater risk for all 8 examined adverse outcomes than their co-twins.

**Conclusions:** Self-reported CSA was associated with increased risk for adverse outcomes, controlling for family background. Family background risk factors also were associated with adverse outcome risk. Discordant pair analysis seems to provide an effective means of controlling for family background risk factors.

*Arch Gen Psychiatry. 2002;59:139-145*

From the Department of Psychiatry, Washington University School of Medicine, St Louis, Mo (Drs Nelson, Heath, Madden, Bucholz, Glowinski, and McLaughlin); Department of Psychology, University of Missouri–Columbia (Dr Cooper); Finch University of the Health Sciences–The Chicago Medical School, North Chicago, Ill (Dr Dinwiddie); Queensland University of Technology, Kelvin Grove, Australia (Dr Dunne); and Queensland Institute of Medical Research, Brisbane, Australia (Ms Statham and Dr Martin).

INCREASED RISK for serious negative outcomes has been reported for individuals with a history of childhood sexual abuse (CSA).[1-3] However, 2 major methodological issues, ascertainment or selection bias and confounding aspects of the family environment (eg, parental alcoholism), complicate interpretation of reported associations. Many investigations have relied on samples ascertained via agency involvement[1-4] (with CSA of greater severity occurring in more problematic family environments) or from clinical populations[1-3,5] (with higher rates of psychiatric illness and greater functional impairment). Still, general population studies have confirmed findings from these samples including increased risk for psychiatric illness (anxiety disorders,[6-11] depression,[6,7,9,10,12-14] alcohol abuse and/or dependence,[6,7,9-11,14,15] drug abuse and/or dependence,[6,7,10] eating disorders,[7,14,16] conduct disorder,[6-10] and borderline personality disorder[17]) and other adverse outcomes (suicide attempt,[6,14] current smoking,[18] sexual revictimization,[16,19,20] and relationship problems[12,14,16,20,21]) associated with self-reported CSA. Most studies have used retrospective designs (ethically mandated interventions preclude entirely naturalistic, prospective approaches), and are, therefore, subject to retrospective reporting bias. One study[5] that assessed psychiatric diagnoses prospectively during adolescence and CSA history (required to have occurred before the age of 16 years) retrospectively at the age of 18 years found increased rates of subsequently occurring psychiatric disorders, particularly when CSA involved intercourse.

Disentangling direct CSA effects from family background risk factors has proved

©2002 American Medical Association. All rights reserved.

## SUBJECTS AND METHODS

### SUBJECTS

Subjects were members of the young adult cohort of the Australian Twin Register, a volunteer twin panel born between January 1, 1964, and December 31, 1971. Almost all were registered with the panel between 1980 and 1982 by their parents in response to approaches either through school systems or mass media appeals. All data reported herein are from a comprehensive assessment completed from February 1996 through September 2000 by trained lay interviewers. Verbal consent was first obtained from participants as per the protocol approved by the institutional review boards of Washington University, St Louis, Mo, and Queensland Institute of Medical Research, Brisbane, Australia. Of 4010 pairs that could be traced, interviews were completed with both members of 2765 pairs (69% pairwise response rate) and 1 member of an additional 735 pairs. The most common reasons for nonparticipation included refusal by twin, incapacitation and/or death, and lack of available contact information. Singletons, 661 opposite-sex pairs, and pairs in which either member gave no response to CSA items or responded problematically (see the "Assessment of CSA" section) were excluded from analyses reported herein. The current sample included the remaining monozygotic and dizygotic same-sex pairs (N=1991) in which both twins responded to at least 1 CSA component question. The sample was 58.2% female and had a mean (SD) age of 29.9 (2.5) years. Twins were asked for the "age at which they first lived apart" rather than whether they were raised together. The 19 individuals (0.5%) who reported having first lived apart before the age of 14 years included both members of only 3 pairs. Because of the ambiguous wording and the relatively few like-sex twin pairs involved, no twin pairs were excluded on this basis.

### ASSESSMENT OF CSA

The current analyses focus on 5 questions about CSA (**Table 1**) from which, consistent with other reports,[19] a composite CSA variable was developed for use in further analyses. Data from 43 pairs were excluded from all analyses because at least 1 twin endorsed a CSA item (other than having been raped, see "Assessment of Outcome Measures and Covariates" section) but reported an onset age of 18 years or older for all endorsed CSA items. Data from 8 pairs, in which 9 of 13 CSA-positive individuals failed to provide an age of CSA occurrence, were retained in the analyses. Childhood sexual abuse was considered to have involved intercourse if respondents reported having been raped before the age of 18 years. Missing data on the occurrence of rape (n=4) or its onset and recency (n=4) in 8 CSA-positive subjects led to their exclusion from analyses incorporating either CSA involving intercourse or rape at the age of 18 years or older.

### ASSESSMENT OF OUTCOME MEASURES AND COVARIATES

A standardized psychiatric diagnostic assessment, an adaptation of the Semi-Structured Assessment for the Genetics of Alcoholism (SSAGA),[25] was administered via telephone. The interview enabled lifetime *DSM-IV*[26] diagnoses of major depressive disorder, conduct disorder, and alcohol and/

challenging since traditional case-control designs may inadequately control for family background overestimating the effects of CSA. Investigators[6,7,14,16,20,21] who have used statistical controls for family environment have reported that risks associated with CSA involving intercourse remained significant, but were much reduced in magnitude; results for less severe CSA were more unclear. A meta-analysis of studies in college student samples argued that CSA has limited importance beyond that attributable to the family environment.[22]

Investigators[23,24] have recently examined these issues in twin pairs, focusing on those discordant for CSA. Because twins share family background risk factors, within-pair differences in CSA-discordant pairs are assumed to have resulted either from CSA, or less plausibly, from risk factors correlated with CSA that are not shared by pair members. A mailed questionnaire survey assessed CSA history in Virginia female like-sex pairs[24] in whom psychopathologic status had been previously assessed. In discordant pairs, the twin reporting CSA involving intercourse had significantly increased risk of depression, alcohol dependence, and having 2 or more psychiatric disorders. An interview study[23] in the older Australian twin panel found a significant difference in adverse outcomes between CSA-positive (ie, those individuals who reported having experienced CSA) and CSA-negative (ie, those who denied having experienced CSA) co-twins only for suicidal ideation in male subjects. Because almost every odds ratio (OR) exceeded unity in both studies, the relatively few discordant pairs may have limited power to detect differences. Both samples[23,24] contained largely middle-aged respondents who were considerably removed from the age of CSA occurrence. The Australian study[23] determined CSA status from a single question about forced sexual activity.

The twin study design provides a means of distinguishing direct CSA effects from correlated family background effects. If CSA-correlated family background effects influence outcomes, then significantly higher risk would be expected for nonabused twins whose co-twins were abused than for members of pairs where neither was abused. The Australian study[23] found significantly increased risk for nonabused individuals with CSA-positive co-twins only for social phobia in women and conduct problems in men; confidence intervals (CIs) were broad because of the small sample sizes. The Virginia study[24] instead controlled for a limited range of parental variables concluding that family background risk factors play a relatively unimportant role in the observed associations.

Using data from a new, younger Australian twin sample, with a more thorough CSA assessment, we examined the extent to which CSA outcome associations are determined by correlated family background risk fac-

©2002 American Medical Association. All rights reserved.

or nicotine dependence. Nondiagnostic sections included questions about marital history, contemplated or attempted suicide, traumatic events, parental alcohol-related problems, family background, and "social anxiety" ($\geq 1$ social fear causing impairment in functioning). Rape occurring at the age of 18 years or older was included as an outcome measure.[19] Divorce was examined conditional on having been married. Onset information was obtained for all outcomes other than divorce.

Maternal and paternal alcohol-related problems were assessed by a single question asked about each parent. Other measures of family background risk factors included as control variables in some analyses were (1) parental fighting, coded positive if parents "often" fought or argued in the twin's presence; (2) parental conflict, coded positive with report of "a lot" of conflict and tension between parents when the twins were between the ages of 6 and 13 years; (3) stepparent presence, that is, having been raised by a stepparent or adoptive parent during part of childhood; (4) neglect, a composite variable reflecting any positive response to "serious neglect," usually punished by either parent in a harsh nonphysical way, or necessary medical therapy not provided after injury; and (5) physical abuse, a composite variable reflecting any positive response to physical abuse, purposely hurt by an adult relative, or hit by either parent so hard that it "often" or "sometimes" hurt the next day. To minimize retrospective recall bias, covariates were coded to reflect a positive response by either twin.

### DATA ANALYSIS

Primary statistical analyses were performed using SAS[27] and the Stata Statistics and Data Analysis Package (version 6.0).[28]

An $\alpha$ level of .05 was required for statistical significance. The robust variance estimator option in Stata (Stata Corp, College Station, Tex) was used to obtain 95% CIs adjusted for the statistical nonindependence of twin-pair observations. Childhood sexual abuse risk associated with the respondents' responses to questions about their parents' problematic drinking was examined. To investigate possible reporting bias, a logistic regression was performed that examined CSA risk via the use of dummy variables coded to represent respondents' and co-twins' responses to parental drinking items.

Comparisons were made between the age at onset of outcomes and CSA occurrence. Survival analysis was performed separately by gender using Cox proportional hazards regression models to calculate hazard ratios representing the risks for adverse outcomes associated with prior occurrence of CSA. Logistic regression models that controlled for gender were fitted to test for indirect, family background contributions to the associations between outcome measures and the respondent's and co-twin's CSA histories. These analyses used dummy variables coded to represent whether respondents reported CSA involving intercourse and for CSA-negative respondents, whether the co-twin was CSA-positive. Members of pairs in which neither twin reported CSA served as the control group for these analyses. Analyses were then repeated including family background variables. Conditional logistic regression was used to determine the relative risks for adverse outcomes in the CSA-positive or CSA-negative members of discordant twin pairs. Additional conditional logistic analyses were performed to determine whether estimates of intrapair risk differed by gender, zygosity (ie, monozygote or dizygote), or whether CSA involved intercourse.

tors vs direct CSA effects. The sample includes both female and male like-sex twin pairs; the examined negative outcomes were not limited to psychiatric disorders.

### RESULTS

All putative CSA component items were more commonly endorsed by women (Table 1). Of 477 subjects who endorsed at least 1 of these items, 67 (14.0%) endorsed 1 item, 156 (32.7%) 2, 190 (39.8%) 3, 59 (12.4%) 4, and 5 (1.0%) 5; the mean (SD) was 2.54 (0.92) items. The Cronbach $\alpha$ coefficient values were 0.79 (overall and women) and 0.75 (men). Given very good internal consistency, the overlap of endorsement across these nonmutually exclusive items, and the report's focus on comparison of discordant pairs, a dichotomous composite variable representing endorsement of at least 1 of these items, henceforth referred to as CSA, was deemed appropriate for use in further analyses. Prevalence rates for CSA were 16.7% and 5.4% for women and men, respectively.

A history of CSA was reported by 31.9% of those reporting vs 11.1% of those denying maternal alcohol-related problems (OR, 3.75; 95% CI, 2.62-5.36) and 19.5% reporting vs 9.5% denying paternal alcohol-related problems (OR, 2.32; 95% CI, 1.85-2.91). When co-twins' reports were also incorporated into a logistic model, the ORs for self-reported CSA were as follows: for both twins

reporting maternal alcohol-related problems, OR 3.09 (95% CI, 1.79-5.33); respondent only reported maternal alcohol-related problems, OR 4.50 (95% CI, 2.79-7.25); and co-twin only reported maternal alcohol-related problems, OR 2.08 (95% CI, 1.19-3.65). Similar values for paternal alcohol-related problems were as follows: both twins reporting 2.62 (95% CI, 2.00-3.45); respondent only, OR 1.87 (95% CI, 1.31-2.68); and co-twin only, OR 1.25 (95% CI, 0.83-1.87). The fact that CSA was more strongly correlated with the respondent's report of maternal alcohol-related problems (Wald $\chi^2_1=8.47$, $P=.004$) with a similar trend for paternal alcohol-related problems (Wald $\chi^2_1=3.59$, $P=.06$) indicates that a mild retrospective recall bias is contributing to the associations.

Childhood sexual abuse began early (mean [SD] age at onset 10.8 [4.06] years), generally preceding the onset of adverse outcomes. Childhood sexual abuse onset predated that of social fears by a mean of 1.7 years (95% CI, 0.3-3.1) and suicide attempt by a mean of 8.9 years (95% CI, 7.1-10.7). Childhood sexual abuse's onset similarly predated the onset of each of the following examined psychiatric disorders: conduct disorders by a mean of 1.7 years (95% CI, 0.4-3.0); major depressive disorder by a mean of 10.3 years (95% CI, 9.3-11.2); alcohol dependence by a mean of 10.5 years (95% CI, 9.4-11.6); and nicotine dependence by a mean of 10.6 years (95% CI, 9.7-11.4).

©2002 American Medical Association. All rights reserved.

**Table 1. Component Childhood Sexual Abuse (CSA) Questions, Endorsement Rates, and Risk by Gender***

| CSA Questions | Women (n = 2318) | Men (n = 1664) | Risk by Gender, OR (95% CI) |
|---|---|---|---|
| Before age 18 years were you ever forced into sexual intercourse or any other form of sexual activity? | 14.2 | 3.9 | 4.10 (3.05-5.49) |
| Before you were 16 years old, were there any sexual contacts between you and anyone other than a family member who was 5 or more years older than you were? By sexual contact I mean their touching your sexual parts, you touching their sexual parts, or sexual intercourse.† | 4.2 | 2.8 | 1.52 (1.03-2.23) |
| Before you were 16 years old, were there any sexual contacts between you and any family members, like a parent or stepparent, grandparent, uncle, aunt, brother or sister, or cousin? By sexual contact I mean their touching your sexual parts, you touching their sexual parts, or sexual intercourse.‡ | 6.8 | 0.9 | 7.94 (4.34-14.53) |
| How about event 5 [You were raped (Someone had sexual intercourse with you when you did not want to, by threatening you or using some degree of force.)]?§‖ | 5.6 | 1.3 | 4.63 (2.88-7.42) |
| Apart from event 5 did event 6 [You were sexually molested (someone touched or felt your genitals when you did not want them to)] ever happen to you?‖ | 12.5 | 4.0 | 3.45 (2.54-4.67) |
| Composite CSA variable¶ | 16.7 | 5.4 | 3.51 (2.70-4.55) |

*All values are given as percentages unless otherwise indicated. OR indicates odds ratio; CI, confidence interval.
†Coded positively in the present context where subjects responded to a follow-up question that contact was "ever forced."
‡Coded positively in this context where subjects responded to further questions that contact involved either an adult or the use of force by a child.
§Coded positively in this context when rape was reported to have occurred before the age of 18 years and included in analyses as CSA involving intercourse.
‖Description in parentheses not read by interviewer to protect confidentiality (appeared in list form in a booklet mailed before the interview to which interviewers directed respondents at the beginning of this section). Traumatic event questions were skipped when respondents had misplaced their booklets.
¶Binary variable with the presence of any positively coded above item defined as CSA.

When survival analysis was used to examine the risk for adverse outcomes subsequent to reported CSA occurrence, significantly increased hazard ratios were found in women for all examined outcomes and in men for all but divorce and social anxiety (**Table 2**). The highest risks were for conduct disorder, suicide attempt, and rape at the age of 18 years or older.

Adverse outcome risks were examined as a function of the extent of CSA reported by the respondent (whether intercourse was involved) and, in CSA-negative respondents, whether the co-twin reported having experienced CSA. As demonstrated by the ORs reflecting their comparison to individuals from CSA-negative concordant pairs (**Table 3**), those reporting a history of CSA involving intercourse had the highest risks for all examined adverse outcomes, which were significantly greater than those for either group of CSA-negative respondents and exceeding those for individuals positive for CSA not involving intercourse for all outcomes other than major depression and social anxiety. Their risks were highest for conduct disorder, suicide attempt, and rape at the age of 18 years or older with respective ORs of 14.53 (95% CI, 8.58-24.60), 14.64 (95% CI, 9.18-23.34), and 10.03 (95% CI, 5.66-17.81) vs individuals from CSA-negative concordant pairs. Those reporting a history of CSA not involving intercourse had significantly higher risks for all adverse outcomes other than divorce when compared with individuals from CSA-negative concordant pairs. Consistent with the hypothesis of a significant family background effect, CSA-negative respondents whose co-twin was CSA-positive also had significantly higher risks for all adverse outcomes other than major depression and divorce when compared with members of CSA-negative concordant pairs. The risks for CSA-positive individuals for whom abuse did not involve intercourse exceeded those for CSA-negative, co-twin-positive individuals only for major depression and social anxiety. When these analyses were repeated controlling for family background variables, ORs were attenuated to varying degrees but the aforementioned pattern largely remained. Despite controlling for these family background variables, increased risk was still observed for CSA-negative, co-twin-positive individuals for 5 of 8 outcomes.

When conditional logistic regression was used to examine the relative risks for adverse outcomes in the CSA-positive vs the CSA-negative members of CSA-discordant pairs, increased risks were noted for all of the examined adverse outcomes (**Table 4**). Odds ratios for this intrapair comparison ranged from 1.56 for major depression (95% CI, 1.06-2.29) and alcohol dependence (95% CI, 1.01-2.40) to 7.50 (95% CI, 1.72-32.80) for divorce. Three separate discordant pair analyses (results not given) that examined whether estimates of intrapair risk differed by gender, zygosity, and the extent of CSA (if intercourse was involved) reported by the CSA-positive pair member found no significant differences.

## COMMENT

In this large twin study, we found that individuals reporting a history of CSA had increased risk for subsequently occurring adverse outcomes of depression, suicide attempt, conduct disorder, alcohol and/or nicotine dependence, social anxiety, rape after the age of 18 years old, and divorce. Our data suggest that CSA occurs in the context of family background risk factors that contribute to adverse outcome risk. We provide strong evidence that CSA is associated with substantial risk not explained by these factors.

The association of CSA with risk for negative outcomes has been extensively documented.[1-21,23,24] In survival analyses, we observed consistently elevated hazard ratios affirming that CSA is associated with increased

©2002 American Medical Association. All rights reserved.

**Table 2. Prevalence Rates for Adverse Outcomes by Childhood Sexual Abuse (CSA) History and Hazard Ratios Reflecting the Risk for Outcomes Associated With Previously Occurring CSA\***

| Examined Association | Women (n = 2318) | | | Men (n = 1664) | | |
|---|---|---|---|---|---|---|
| | CSA− | CSA+ | HR (95% CI) | CSA− | CSA+ | HR (95% CI) |
| Major depression | 27.7 | 49.1 | 1.91 (1.59-2.31) | 19.8 | 35.6 | 1.87 (1.27-2.76) |
| Suicide attempt | 2.6 | 13.7 | 4.12 (2.78-6.10) | 2.5 | 13.3 | 5.42 (2.83-10.38) |
| Conduct disorder | 1.2 | 9.8 | 6.62 (3.55-12.33) | 9.6 | 28.9 | 2.48 (1.21-5.06) |
| Alcohol dependence | 11.8 | 28.9 | 2.98 (2.31-3.83) | 28.8 | 38.9 | 1.67 (1.18-2.37) |
| Nicotine dependence | 24.3 | 42.2 | 1.92 (1.58-2.34) | 30.4 | 54.4 | 2.19 (1.61-2.97) |
| Social anxiety | 8.7 | 18.6 | 1.89 (1.31-2.73) | 7.9 | 13.3 | 0.88 (0.33-2.37) |
| Rape, aged ≥18 y | 2.5 | 9.3 | 3.58 (2.31-5.54) | 0.1 | 3.3 | 26.65 (4.39-161.74) |
| Divorce | 5.4 | 12.7 | 2.53† (1.62-3.94) | 5.7 | 11.6 | 2.19† (0.83-5.78) |

\*All values are given as percentages unless otherwise indicated. Minus sign indicates that the individual denied having experienced CSA; plus sign, that the individual reported having experienced CSA; HR, hazard ratio; and CI, confidence interval.
†The odds ratio rather than the HR was supplied since the age at divorce was not obtained.

**Table 3. Adverse Outcomes as a Function of the Childhood Sexual Abuse (CSA) History of Respondent and Co-twin\***

| Outcome | Controlling Only for Gender | | | | Controlling for Gender and Family Environmental Factors† | | | |
|---|---|---|---|---|---|---|---|---|
| | Resp CSA+ and Intercourse+ (n = 150) | Resp CSA+ and Intercourse− (n = 319) | Resp CSA− and Co-twin CSA+ (n = 283) | Resp CSA− and Co-twin CSA− (n = 3222) | Resp CSA+ and Intercourse+ (n = 150) | Resp CSA+ and Intercourse− (n = 319) | Resp CSA− and Co-twin CSA+ (n = 283) | Resp CSA− and Co-twin CSA− (n = 3222) |
| Major depression | 2.88‡ (2.07-4.00) | 2.35§ (1.82-3.03) | 1.42 (1.09-1.86) | 1.00 | 1.81‡ (1.27-2.59) | 1.83§ (1.40-2.40) | 1.14 (0.85-1.52) | 1.00 |
| Suicide attempt | 14.64‖‖ (9.18-23.34) | 3.34 (2.06-5.42) | 2.57 (1.46-4.55) | 1.00 | 8.81‡‖ (5.29-14.66) | 2.44 (1.44-4.15) | 1.96 (1.08-3.55) | 1.00 |
| Conduct disorder | 14.53‖‖ (8.58-24.60) | 3.89 (2.47-6.11) | 2.90 (1.79-4.71) | 1.00 | 7.69‡‖ (4.43-13.36) | 2.46 (1.46-4.15) | 1.43 (1.06-3.24) | 1.00 |
| Alcohol dependence | 4.23‡‖ (2.92-6.12) | 2.15 (1.60-2.90) | 1.68 (1.24-2.29) | 1.00 | 3.46‡‖ (2.37-5.06) | 1.81 (1.34-2.46) | 1.43 (1.03-1.97) | 1.00 |
| Nicotine dependence | 4.26‡‖ (2.98-6.08) | 1.93 (1.48-2.50) | 1.75 (1.34-2.28) | 1.00 | 3.51‡‖ (2.42-5.08) | 1.68 (1.27-2.21) | 1.54 (1.17-2.04) | 1.00 |
| Social anxiety | 2.90‡ (1.92-4.37) | 1.87§ (1.32-2.63) | 1.14 (0.76-1.73) | 1.00 | 1.83‡ (1.16-2.88) | 1.43 (0.99-2.07) | 0.90 (0.58-1.38) | 1.00 |
| Rape, aged ≥18 y | 10.03‡‖ (5.66-17.81) | 3.33 (1.84-6.04) | 2.50 (1.25-5.02) | 1.00 | 9.94‡‖ (5.39-18.32) | 3.28 (1.79-6.01) | 2.50 (1.23-5.12) | 1.00 |
| Divorce | 6.38‡‖ (3.73-10.93) | 1.32 (0.73-2.38) | 1.17 (0.61-2.26) | 1.00 | 6.03‡‖ (3.40-10.70) | 1.20 (0.66-2.17) | 1.10 (0.57-2.10) | 1.00 |

\*All values are given as odds ratio (95% confidence interval). Odds ratios and 95% confidence intervals were derived from comparisons to twins from pairs where the respondent and co-twin both denied CSA. Resp indicates respondent; plus sign, that the individual reported having experienced CSA; minus sign, that the individual denied having experienced CSA; and ellipses, does not apply.
†The factors include gender, maternal and paternal alcohol-related problems, parental conflict, parental fighting, stepparent, neglect, and physical abuse all coded as pair maximum value.
‡Risk observed for CSA + and intercourse + respondents was significantly greater than that for CSA − and co-twin CSA + respondents.
§Risk observed for CSA + and intercourse − respondents was significantly greater than that for CSA − and co-twin CSA + respondents.
‖Risk observed for CSA + and intercourse + respondents was significantly greater than that for CSA + and intercourse − respondents.

risk for subsequently occurring negative outcomes in women and men; hazard ratios were highest for conduct disorder, rape after the age of 18 years, and suicide attempt. We relaxed the criterion that outcomes must occur subsequent to CSA in further analyses to facilitate comparisons within our report and with the literature, and because of onset-determination issues (eg, less severe CSA often predated CSA involving intercourse).

In the comparison of outcomes as a function of the respondent's and co-twin's CSA history, the highest risks for adverse outcomes were associated with CSA involving intercourse, a replication of other reports.[6,7,10,16,21,24] With control for family background risk factors, these risks were diminished to varying degrees but remained significant. In-

dividuals who reported CSA not involving intercourse had increased risk for all outcomes except divorce; significance was retained (other than for social anxiety) with control for family background risk factors.

The results of comparisons involving CSA-negative individuals whose co-twins were CSA-positive deserve further discussion. These individuals displayed significantly greater risk for most outcomes than members of CSA-negative pairs, strong evidence that the family backgrounds of those who experience CSA are also, on average, associated with considerable risk. However, despite controlling for family background risk factors that included parental alcohol-related problems, fighting, and conflict, presence of a stepparent, physical abuse, and ne-

©2002 American Medical Association. All rights reserved.

**Table 4. Within-Pair Comparison of Adverse Outcome Risks in Childhood Sexual Abuse (CSA)–Positive vs CSA-Negative Members of 283 Same-Sex Discordant Pairs***

| Outcome (No. of Doubly Discordant Pairs) | Within-Pair Risk | |
|---|---|---|
| | OR | 95% CI |
| Major depression (110) | 1.56 | 1.06-2.29 |
| Suicide attempt (41) | 2.73 | 1.37-5.44 |
| Conduct disorder (32) | 3.00 | 1.35-6.68 |
| Alcohol dependence (87) | 1.56 | 1.01-2.40 |
| Nicotine dependence (119) | 1.71 | 1.18-2.47 |
| Social anxiety (50) | 2.33 | 1.27-4.27 |
| Rape, aged ≥18 y (32) | 2.56 | 1.18-5.52 |
| Divorce (17) | 7.50 | 1.72-32.80 |

*OR indicates odds ratio; CI, confidence interval.

glect, many of these risks retained significance. Moreover, few significant differences were found with comparison to CSA-positive, intercourse-negative respondents. A recent examination[29] found that unreliability in CSA reporting largely consisted of false-negative reports in CSA-positive individuals. Similar reporting problems in our sample might explain these findings, particularly if CSA false-negative respondents were more forthcoming about psychosocial outcomes. The closeness of twin relationships could have further blurred distinctions if the nonabused twin's supportiveness led to greater co-twin resiliency at some personal cost. Alternatively, the pattern of risks retaining significance in CSA-negative, co-twin-positive individuals suggests that we may have inadequately controlled for familial risk factors associated with impulsivity and substance abuse. Because all ORs were higher (though not significantly so) for CSA-positive, intercourse-negative individuals than CSA-negative, co-twin CSA-positive individuals, the lack of significance for these comparisons may have resulted from limited power.

In discordant pairs analyses, we observed significantly greater risk for all 8 examined adverse outcomes in CSA-positive respondents vs their CSA-negative co-twins. Because data from CSA false-negative reports would reduce risk estimates, our values are likely conservative. Despite the aforementioned finding of greater risks associated with CSA involving intercourse, we observed no significant heterogeneity of conditional ORs as a function of CSA severity in these discordant pair analyses. Greater levels of family background risk factors occurring in association with CSA involving intercourse may have contributed to our difficulty distinguishing risks associated with less severe CSA. Discordant pair analysis appears to provide an effective means of controlling for family background risk factors across a range of CSA severity.

Two prior twin studies[23,24] used discordant pair analyses to estimate the association between CSA history and negative outcomes. Although few comparisons reached significance in either report, the ORs for the same outcomes essentially fall within our study's 95% CIs. Presumably, because these studies included considerably fewer discordant pairs, their power to detect differences was limited. One investigation[23] also found no significant zygosity effect in discordant pair analyses.

General population studies[6,7,14,16,20,21] have attempted to control for family background factors by identifying important predictors and entering them as control variables in regression models. They typically have reported risks for adverse outcomes associated with CSA to be preserved but considerably decreased in magnitude. This approach may have been overly conservative with considerable correlation of predictor variables (collinearity), including CSA history, limiting significance. In controlling for family background risk factors, we accepted either twin's report of their presence to minimize retrospective recall bias. By definition, this approach could not alter discordant pair analysis results. As noted, we found evidence persisted for family background effects notwithstanding the inclusion of control variables into the logistic models.

Despite our cutoff for CSA (age 18 years) being the highest limit used commonly,[3] our sample's mean age of CSA occurrence (10.8 years) is similar to values previously reported.[2,3,11,30,31] The prevalence of CSA in our sample is consistent with that for contact CSA in general population samples.[2,3,30-35] Our rates for CSA involving intercourse were essentially identical to those in a New Zealand study.[32] Previous reports have also found higher CSA rates associated with parental alcoholism[2,3,32,33,35] and female gender[3,8,10,23,30-32,34] with smaller gender differences when abuse involved extrafamilial perpetrators.[30]

Associations between self-reported CSA and earlier smoking initiation and heavier tobacco use have previously been reported.[36] A positive relationship has been found between the total number of adverse childhood experiences and risk for subsequent smoking behavior.[18] Our finding that, controlling for family background risk factors, self-reported CSA is associated with significantly increased nicotine-dependence risk is a logical extension of these results.[5,18,36]

Our results must be interpreted in the context of potential biases from the following sources: (1) retrospective reporting, (2) CSA definition, (3) sample selection, and (4) assumptions made in control for family background. A bias would result from the use of retrospective self-report data if individuals currently experiencing problems were more likely to recall prior abuse, resulting in an inflation of the observed associations. However, a recent examination[29] of the stability of CSA reports found no relationship between variations in reports and psychiatric status before, during, or after the reported abuse. The greater CSA risk observed with respondents' vs co-twins' report of parental alcohol-related problems could indicate greater willingness for CSA survivors to acknowledge negative aspects of childhood. Onset-dating inaccuracies may have occurred, but would not be expected to systematically bias results.

The level of internal consistency displayed by component items, coupled with the necessity of a binary measure for discordant pair analyses, provide adequate rationale for our composite CSA variable. Although consistent with other studies,[19,20] our use of a cutoff date (respondents' 18th birthday) before which forced intercourse was considered CSA and after which, rape at the age of 18 years old or older would have included abuse persisting into adulthood under both categories, amplifying the association with rape after the age of 18 years. We required conservatively that contact be forced if it

©2002 American Medical Association. All rights reserved.

involved either another child within the family or someone outside the family at least 5 years older. Those who have suggested[22] that males suffer less consequences after CSA may object to combining data across gender, however, we found no evidence for a significant gender effect.

A selection bias may have arisen from the panel's initial recruitment since parents aware of abuse may have been less likely to volunteer their twins. The similarities of CSA prevalence and characteristics to other reports[2,3,30-35] suggest that this bias was limited. Similarly, it is unlikely that telephone assessment introduced any substantial bias over face-to-face[32] approaches. Our exclusion of pairs in which either twin was not interviewed could have eliminated the most severely abused individuals reducing the magnitude of effects attributed to CSA. A post hoc examination including data from same-sex twins with noninterviewed cotwins revealed that CSA-positive women were actually more likely to belong to pairs where both twins were interviewed; no significant differences were observed for male subjects.

We controlled for family background risk factors between rather than within pairs to minimize reporting bias. However, the CSA-positive twin may have received a larger dose of trauma or differentially negative treatment. Alternatively, additional stressors may have had a larger influence on either twin. Our approach could have biased estimates in either direction. Finally, we cannot infer a causal link from results for CSA-discordant pairs. It remains possible that other unmeasured risk factors, for which the twins are discordant, predict both increased risk of CSA and other outcomes.

In the largest sample of CSA-discordant same-sex pairs thus evaluated, we observed significantly greater risk for all 8 examined adverse outcomes in CSA-positive respondents vs their co-twins. The most straightforward interpretation of our results is that there is a direct association between CSA and risk for adverse outcomes. We also provide evidence that family background risk factors contribute increased negative outcome risk. These findings demonstrate the considerable potential of sibling studies for dissecting the direct and correlated family background effects associated with CSA.

*Accepted for publication June 26, 2001.*

*This work was supported by grants AA00277 (Dr Nelson) and AA07728, AA10249, and AA11998 (Dr Heath) from the National Institutes of Health, Bethesda, Md, and grants 941177 and 981351 (Dr Martin) from the Australian National Health and Medical Research Council, Canberra.*

*Corresponding author and reprints: Elliot C. Nelson, MD, Washington University School of Medicine, Department of Psychiatry, 40 N Kingshighway, Suite 1, St Louis, MO 63108 (e-mail: nelsone@psychiatry.wustl.edu).*

## REFERENCES

1. Kendall-Tackett KA, Williams LM, Finkelhor D. Impact of sexual abuse on children: a review and synthesis of recent empirical studies [review]. *Psychol Bull*. 1993;113:164-180.
2. Holmes WC, Slap GB. Sexual abuse of boys: definition, prevalence, correlates, sequelae, and management [review]. *JAMA*. 1998;280:1855-1862.
3. Fergusson DM, Mullen PE. *Childhood Sexual Abuse: An Evidence-Based Perspective*. Thousand Oaks, Calif: SAGE Publications Inc; 1999.
4. Jasinski JL, Williams LM, Siegel J. Childhood physical and sexual abuse as risk factors for heavy drinking among African-American women: a prospective study. *Child Abuse Negl*. 2000;24:1061-1071.
5. Schulte JG, Dinwiddie SH, Pribor EF, Yutzy SH. Psychiatric diagnoses of adult male victims of childhood sexual abuse. *J Nerv Ment Dis*. 1995;183:111-113.
6. Fergusson DM, Horwood LJ, Lynskey MT. Childhood sexual abuse and psychiatric disorder in young adulthood, II: psychiatric outcomes of childhood sexual abuse. *J Am Acad Child Adolesc Psychiatry*. 1996;35:1365-1374.
7. Mullen PE, Martin JL, Anderson JC, Romans SE, Herbison GP. Childhood sexual abuse and mental health in adult life. *Br J Psychiatry*. 1993;163:721-732.
8. Kessler RC, Sonnega A, Bromet E, Hughes M, Nelson CB. Posttraumatic stress disorder in the US National Comorbidity Survey. *Arch Gen Psychiatry*. 1995;52:1048-1060.
9. Silverman AB, Reinherz HZ, Giaconia RM. The long-term sequelae of child and adolescent abuse: a longitudinal community study. *Child Abuse Negl*. 1996;20:709-723.
10. Kessler RC, Davis CG, Kendler KS. Childhood adversity and adult psychiatric disorder in the US National Comorbidity Survey. *Psychol Med*. 1997;27:1101-1119.
11. Spak L, Spak F, Allebeck P. Sexual abuse and alcoholism in a female population. *Addiction*. 1998;93:1365-1373.
12. Bifulco A, Brown GW, Adler Z. Early sexual abuse and clinical depression in adult life. *Br J Psychiatry*. 1991;159:115-122.
13. Bushnell JA, Wells JE, Oakley-Browne MA. Long-term effects of intrafamilial sexual abuse in childhood. *Acta Psychiatr Scand*. 1992;85:136-142.
14. Mullen PE, Martin JL, Anderson JC, Romans SE, Herbison GP. The long-term impact of the physical, emotional, and sexual abuse of children: a community study. *Child Abuse Negl*. 1996;20:7-21.
15. Spak L, Spak F, Allebeck P. Factors in childhood and youth predicting alcohol dependence and abuse in Swedish women: findings from a general population study. *Alcohol Alcohol*. 1997;32:267-274.
16. Fleming J, Mullen PE, Sibthorpe B, Bammer G. The long-term impact of childhood sexual abuse in Australian women. *Child Abuse Negl*. 1999;23:145-159.
17. Johnson JG, Cohen P, Brown J, Smailes EM, Bernstein DP. Childhood maltreatment increases risk for personality disorders during early adulthood. *Arch Gen Psychiatry*. 1999;56:600-606.
18. Anda RF, Croft JB, Felitti VJ, Nordenberg D, Giles WH, Williamson DF, Giovino GA. Adverse childhood experiences and smoking during adolescence and adulthood. *JAMA*. 1999;282:1652-1658.
19. Wyatt GE, Guthrie D, Notgrass CM. Differential effects of women's child sexual abuse and subsequent sexual revictimization. *J Consult Clin Psych*. 1992;60:167-173.
20. Fergusson DM, Horwood LJ, Lynskey MT. Childhood sexual abuse, adolescent sexual behaviors and sexual revictimization. *Child Abuse Negl*. 1997;21:789-803.
21. Mullen PE, Martin JL, Anderson JC, Romans SE, Herbison GP. The effect of childhood sexual abuse on social, interpersonal and sexual function in adult life. *Br J Psychiatry*. 1994;165:35-47.
22. Rind B, Tromovitch P, Bauserman R. A meta-analytic examination of assumed properties of child sexual abuse using college samples. *Psychol Bull*. 1998;124:22-53.
23. Dinwiddie S, Heath AC, Dunne MP, Bucholz KK, Madden PA, Slutske WS, Bierut LJ, Statham DB, Martin NG. Early sexual abuse and lifetime psychopathology: a co-twin–control study. *Psychol Med*. 2000;30:41-52.
24. Kendler KS, Bulik CM, Silberg J, Hettema JM, Myers J, Prescott CA. Childhood sexual abuse and adult psychiatric and substance use disorders in women: an epidemiological and co-twin control analysis. *Arch Gen Psychiatry*. 2000;57:953-959.
25. Bucholz KK, Cadoret R, Cloninger CR, Dinwiddie SH, Hesselbrock VM, Nurnberger JI Jr, Reich T, Schmidt I, Schuckit MA. A new semi-structured psychiatric interview for use in genetic linkage studies: a report on the reliability of the SSAGA. *J Stud Alcohol*. 1994;55:149-158.
26. American Psychiatric Association. *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition*. Washington, DC: American Psychiatric Association; 1994.
27. SAS Institute Inc. *SAS/STAT Software: Changes and Enhancements for Release 6.12*. Cary, NC: SAS Institute Inc; 1996.
28. Stata Corp. *Stata Statistical Software: Release 6.0*. College Station, Tex: Stata Corp; 1999.
29. Fergusson DM, Horwood LJ, Woodward, LJ. The stability of child abuse reports: a longitudinal study of the reporting behavior of young adults. *Psychol Med*. 2000;30:529-544.
30. Finkelhor D, Hotaling G, Lewis IA, Smith C. Sexual abuse in a national survey of adult men and women: prevalence, characteristics, and risk factors. *Child Abuse Negl*. 1990;14:19-28.
31. Fleming JM. Prevalence of childhood sexual abuse in a community sample of Australian women. *Med J Aust*. 1997;166:65-68.
32. Fergusson DM, Lynskey MT, Horwood LJ. Childhood sexual abuse and psychiatric disorder in young adulthood, I: prevalence of sexual abuse and factors associated with sexual abuse. *J Am Acad Child Adolesc Psychiatry*. 1996;34:1355-1364.
33. Fleming J, Mullen P, Bammer G. A study of potential risk factors for sexual abuse in childhood. *Child Abuse Negl*. 1997;21:49-58.
34. MacMillan HL, Fleming JE, Trocme N, Boyle MH, Wong M, Racine YA, Beardslee WR, Offord DR. Prevalence of child physical and sexual abuse in the community: results from the Ontario Health Supplement. *JAMA*. 1997;278:131-135.
35. Vogeltanz ND, Wilsnack SC, Harris TR, Wilsnack RW, Wonderlich SA, Kristjanson AF. Prevalence and risk factors for childhood sexual abuse in women: national survey findings. *Child Abuse Negl*. 1999;23:579-592.
36. Springs FE, Friedrich WN. Health risk behaviors and medical sequelae of childhood sexual abuse. *Mayo Clin Proc*. 1992;67:527-532.

©2002 American Medical Association. All rights reserved.