UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
JAMES ZIMMERMAN, PHILIP CULHANE,
DAVID HILTBRAND, WILLIAM JACKSON,
GEORGE ZAROU, JOHN JOSEPH
PAGGIOLI, "JOHN DOE II," "JOHN DOE III,"
and "JOHN DOE IV,"

             Plaintiffs,

        - against -

POLY PREP COUNTRY DAY SCHOOL,
WILLIAM M. WILLIAMS, DAVID B.
HARMAN, AND VARIOUS MEMBERS OF
THE POLY PREP BOARD OF TRUSTEES,
WHOSE NAMES ARE CURRENTLY
UNKNOWN AND THUS DESIGNATED AS
"JAMES DOES I-XXX,"

            Defendants.

-----------------------------------------------------------X

**MEMORANDUM &**
**O R D E R**

09 CV 4586 (FB)

    On October 26, 2009, seven plaintiffs[1] filed a Complaint under the Racketeer Influenced

and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-68, against Poly Prep Country Day

School ("Poly Prep"), Poly Prep's former headmaster, William M. Williams ("Williams"), Poly

Prep's current headmaster, David B. Harman ("Harman"), and members of Poly Prep's Board of

Trustees ("the Board").[2]  (Compl.[3] ¶¶ 5, 15-18).  Plaintiffs' claims relate to the defendants'

---

[1]In the course of the litigation, the parties entered into a protective order providing for the sealing of certain documents and the redaction of certain of the potential victims' names in an effort to protect their privacy.  For purposes of issuing this Memorandum and Order, the Court has publicly filed a version redacting the names of those alleged victims who requested privacy and referring to them with John Doe designations.  An unredacted version of the Memorandum and Order has been filed under seal.

[2]Plaintiffs later amended their Complaint to add two additional plaintiffs and two state law claims for breach of fiduciary duty and negligent supervision and retention.  Citations to "Am. Compl." refer to this Amended Complaint, dated March 24, 2010.

[3]Citations to "Compl." refer to plaintiffs' original Complaint, filed on October 26, 2009.

alleged response to allegations that Philip Foglietta ("Foglietta"), Poly Prep's football coach and physical education instructor from 1966 through 1991, who is now deceased, sexually abused[4] certain students.  (Id. ¶¶ 3, 22).

Currently pending before this Court is plaintiffs' motion for sanctions, pursuant to Rule 37 of the Federal Rules of Civil Procedure, based on defendants' alleged spoliation and/or fraud on the court.  In addition to seeking sanctions in the form of additional discovery, plaintiffs also seek a cost-shifting sanction and move for permission to file a second amended complaint pursuant to Rule 15 of the Federal Rules of Civil Procedure.


### FACTUAL BACKGROUND

As a result of the destruction and/or disposal of numerous documents by the defendants over the years, as well as their lack of record-keeping, as discussed throughout this Order, many of the facts regarding the long and complicated history of this case remain uncertain and/or disputed among the parties.  However, the Court has attempted, as best as possible, to lay out the facts, as alleged by the parties, in a coherent fashion.

Poly Prep, established in 1854, is a college preparatory school for fifth through twelfth grade students, located in Brooklyn, New York.  (Am. Compl. ¶¶ 1, 18).  From 1966 through 1991, Philip Foglietta was employed as a football coach and physical education instructor at Poly

---

[4]Defendants claim that it was not until plaintiff Hiltbrand came forward in 1991 that the allegations of abuse made against Foglietta were categorized as sexual, rather than verbal, and that it was not until that time that the allegations were deemed credible.  (Am. Compl. ¶¶ 83-85, 100; Mulhearn Decl., Ex. 3 at 67-71, 88-89, 107-08, 110).  Citations to "Mulhearn Decl." refer to the Declaration of Kevin T. Mulhearn, and the 31 exhibits attached thereto, submitted by plaintiffs on July 26, 2010.  Citations to "Mulhearn Decl., Ex. 3" refer to select pages from the transcript of the videotaped deposition of defendant Williams, taken on June 30, 2010, submitted as Exhibit 3 to the Mulhearn Declaration.

Prep. (Id. ¶ 22). His employment corresponded with the tenure of three different headmasters: J. Folwell Scull, who served as headmaster until 1970, defendant Williams, who served from 1970 to 2000, and defendant Harman, who became headmaster in 2000 and still serves to the present day. (Id. ¶¶ 19-20, 41, 59). During much of this time period, Foglietta was supervised by Harlow Parker ("Parker"), who was the Athletic Director at Poly Prep from 1949 until his retirement in 1987. (Mulhearn Decl., Ex. 24[5]).

Plaintiffs allege that, beginning in 1966, accusations of sexual abuse were made against Foglietta by students who attended Poly Prep between 1966 and 1984, by their parents, and by other unidentified individuals; these accusations were brought to the school's attention during meetings with the headmaster, by anonymous letters and telephone calls, and by written and verbal communications from former Poly Prep students. (Am. Compl. ¶¶ 24-25, 41-42, 66-67, 70-71, 122, 140). However, Poly Prep asserts that it was not until 1991, when plaintiff Hiltbrand came forward, that it became clear that these allegations were sexual in nature and appeared to be credible. (Id. ¶¶ 83-85, 100; Mulhearn Decl., Ex. 3 at 67-71, 88-89, 107-08, 110).

Moreover, it was not until October of 2002 that Poly Prep disclosed these allegations of abuse in a letter that defendant Harman sent out to the school's alumni. (Mulhearn Decl., Ex. 10[6]). The letter stated that the school had "recently received credible allegations" of sexual abuse taking place at Poly Prep, but did not name the alleged perpetrator, Foglietta. (Id. (emphasis

---

[5]Citations to "Mulhearn Decl., Ex. 24" refer to a printout of an obituary of Harlow Parker, published online in the *Brooklyn Daily Eagle* on October 1, 2009, submitted as Exhibit 24 to the Mulhearn Declaration.

[6]Citations to "Mulhearn Decl., Ex. 10" refer to the letter from defendant Harman to Poly Prep alumni, dated October 21, 2002, submitted as Exhibit 10 to the Mulhearn Declaration.

added)).  After this letter was distributed, the school received additional complaints from former

students, alleging that they had also been sexually abused at Poly Prep by Foglietta.  The details

of all of the alleged complaints and the school's responses are summarized below.


A.  The Tenure of Headmaster Scull, 1966 - 1970

Plaintiff William Jackson ("Jackson") attended Poly Prep from 1966 until he was

expelled in 1968.  (Am. Compl. ¶ 53).  In 1966, Jackson, then an eighth grade student at Poly

Prep, accompanied by his parents, allegedly met with Headmaster Scull and Athletic Director

Harlow Parker and accused Foglietta of repeated sexual abuse, providing graphic and explicit

details.  (Id. ¶¶ 41-42).  Jackson alleges that he was then told by the school officials that he

"would face severe consequences if he persisted in accusing Foglietta of sexual misconduct."

(Id. ¶ 45).  However, defendants claim that Scull reviewed the matter with the Board,

investigated the accusations, and found that Jackson's allegations were not credible.  (Id.)

Plaintiffs dispute that any investigation was conducted and categorize this supposed investigation

as a "sham" (id.), noting that Poly Prep did not memorialize this meeting or the supposed

investigation in any way.  (Pls.' Mem.[7] at 10).


B.  The Tenure of Headmaster Williams, 1970 - 2000

Plaintiffs contend that, upon assuming the role of headmaster in 1970, Headmaster

Williams was notified of Jackson's earlier complaints; Williams and the defendants, however,

---

[7]Citations to "Pls.' Mem." refer to Plaintiffs' Memorandum of Law in Support of Their
Motion for Sanctions for Spoliation and/or Fraud upon the Court, or, in the Alternative, Leave to
File a Second Amended Complaint, dated July 26, 2010.

4

refute this allegation.  (Am. Compl. ¶ 60; see also Mulhearn Decl., Ex. 3 at 38-39, 69).

John Marino ("Marino"), a freshman at Poly Prep in 1972, alleges that Foglietta

attempted to sexually abuse him, but that he rebuffed Foglietta's advances.  (Am. Compl. ¶ 62).

He also claims that Foglietta thereafter proceeded to physically, verbally, and emotionally abuse

him until he graduated in 1976.  (Id. ¶¶ 62-63).  Marino further alleges that he saw Foglietta

sexually abusing other boys on or near Poly Prep's grounds on at least ten occasions.  (Id. ¶ 64).

According to plaintiffs, in 1973, Marino and his parents met with defendant Williams and Mr.

Parker, at which time Marino accused Foglietta of "fooling around with boys" in Foglietta's car

on Battery Avenue.  (Id. ¶¶ 66-68; Mulhearn Decl., Ex. 3 at 67).  At this meeting, Williams and

Parker allegedly told Marino's parents that "their son had started false and malicious rumors

about Foglietta's abuse of children and that John Marino was undisciplined and a trouble-

maker."  (Am. Compl. ¶ 67).  They also threatened to expel him if he continued to make such

accusations.  (Id.)  During his deposition, defendant Williams acknowledged having this meeting

with Marino and his parents, but testified that the allegations were not deemed credible.  (Pls.'

Mem. at 10 (citing Mulhearn Decl., Ex. 3 at 67, 71)).  Again, it does not appear that this meeting

was memorialized in any way or that any investigation was conducted into these allegations.

(Pls.' Mem. at 10-11).

Plaintiffs further allege that Marino and his parents had a second meeting with Williams

and Parker in 1974 and that Marino again accused Foglietta of sexually abusing male students.

(Am. Compl. ¶ 70).  Plaintiffs also allege that both Marino and his father reported that on one

occasion, they had witnessed Foglietta sexually abusing a child at Poly Prep.  (Id. ¶ 65).  At this

second meeting, plaintiffs claim that Marino was again threatened with expulsion for

misbehavior, which included his continued allegations against Foglietta. (Id. ¶¶ 67, 71).

In his deposition, however, Williams asserted that Marino was a bad student with behavioral problems and that his accusations, which were not considered to be sexual in nature, were therefore not taken seriously. (Mulhearn Decl., Ex. 3 at 68, 70). Williams also testified that he felt that Foglietta did not "seem like the kind of guy who would do that . . . " and that he further believed that the accusations had more to do with Marino not getting enough playing time during football games. (Id. at 67-69). Despite acknowledging the occurrence of at least one of these meetings,[8] Williams asserted in his deposition that "the first time, and only time, that they – anybody had identified themselves as somebody who had been molested in the school" (Mulhearn Decl., Ex. 3 at 99), was when David Hiltbrand sent his letter in February of 1991 alleging sexual abuse by Foglietta. (See discussion, infra at 11-12). In the context of Hiltbrand's letter, Williams testified that "[w]hen a kid says to me, 'I was molested by a teacher,' this is big to me." (Mulhearn Decl., Ex. 3 at 102). However, as plaintiffs' assert, he dismissed Marino's allegations and did not take them seriously.

Williams also stated, during his deposition, that he believes that he discussed Marino's accusations with Parker or Novello,[9] and that they agreed that Marino was not credible because otherwise, he and his parents would have been more explicit in their accusations. (Id. at 68, 70). However, according to Williams, it was school policy to always speak with a teacher after a

---

[8]According to defendant Williams' deposition testimony, he only remembers having one meeting with the Marino family, which allegedly took place during Marino's junior or senior year at Poly Prep. (Mulhearn Decl., Ex. 3 at 64-66). Williams further testified that Parker may not have actually been present at the meeting. (Id.)

[9]No additional information regarding who Novello is, or what his/her position was at Poly Prep, has been provided to the Court.

6

complaint was made against them; therefore, although he had no specific recollection of such a conversation, he claims that either he or Parker must have spoken with Foglietta after the meeting with the Marino family. (Id. at 70, 89). He also believes that Foglietta denied the allegations and responded that he had kids in his car all the time to take them places. (Id. at 68). Regardless, there does not appear to be any record of these meetings or conversations.

In the mid-1970s, Williams received two anonymous letters that stated: "You need to know that Mr. Foglietta is doing terrible things to your students." (Id. at 84-86 (discussing the "first letter")). Williams testified at his deposition that he was concerned by the letters, but that he interpreted the accusations as complaints of verbal, rather than sexual, abuse. (Id. at 88-89). Williams testified that he showed one of the letters to Foglietta and told him: "If I find out that you are doing something that's abusing kids in any way, and I observe it, then – and you're not telling me now, then I'll fire you then." (Id. at 87). Williams also testified that he remembers meeting with Parker about the letters, but does not remember the content of their discussion. (Id.) Williams claims that he did not keep a copy of the letters or put a copy in Foglietta's file because he felt that the information could potentially damage Foglietta's reputation if the letters were misplaced and found by someone who should not have had access to them. (Id. at 90). Williams testified that he threw out the letters because "unsigned complaints should be tossed," and he conducted no further investigation into these allegations. (Id. at 87-88). Plaintiffs note that the receipt of these letters was in no way memorialized until 2002. (Pls.' Mem. at 11).

Furthermore, despite Williams' deposition testimony, plaintiffs contend that, based on his initial memorialization of the receipt of these anonymous letters, Williams actually did believe

7

that they contained accusations of sexual abuse.  (See id.; Mulhearn Decl., Ex. 25[10]).  In support

of this argument, plaintiffs point to the first draft of a handwritten statement from Williams to

David Harman, the Board of Poly Prep, and Robert Herrmann ("Herrmann"), Poly Prep's outside

counsel in 2002.[11]  (Mulhearn Decl., Ex. 25).  In this first draft, dated May 27, 2002, Williams

wrote that the anonymous letters were "from a parent accusing Coach Foglietta of molesting

students."  (Id.)  However, the Board of Trustees apparently asked Williams to rewrite and edit

this letter and he therefore "copied it over with leaving some things out."  (Mulhearn Decl., Ex. 3

at 221; Pls.' Mem. at 21).  In the second draft, dated June 6, 2002, Williams rewrote the sentence

above to read:  "two unsigned letters from parents (possibly the same one) who reported that []

children had been abused by Coach Foglietta."  (Mulhearn Decl., Ex. 26;[12] Pls.' Mem. at 21).

Approximately one year after receiving the anonymous letters, Williams also received an

---

[10]Citations to "Mulhearn Decl., Ex. 25" refer to the note, handwritten by defendant Williams, entitled "Confidential Statement for David Harman, Robert Herrmann and the Trustees of Poly Prep," dated May 27, 2002, which was submitted as Exhibit 25 to the Mulhearn Declaration.

[11]Defendants have indicated that Menaker & Herrmann LLP was Poly Prep's "regular outside law firm" in 2002.  (Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Sanctions for Spoliation and/or Fraud on the Court, or, in the Alternative, Leave to File a Second Amended Complaint, filed on August 11, 2010 ("Defs.' Mem.") at 6).  It is unclear for exactly how long Mr. Herrmann was involved in this case or whether he continues to represent Poly Prep as outside counsel, but there appears to have been at least some overlap between his involvement and the involvement of Roderick MacLeish, Esq. of Greenberg Traurig LLP.  (Pls.' Mem. at 5, 8).  It is also unclear exactly when Mr. MacLeish and Greenberg Traurig were retained by defendants; in one instance, plaintiffs allege that Mr. MacLeish was involved as counsel in December of 2002 (id. at 6), and yet plaintiffs later allege that Mr. MacLeish was retained by Poly Prep in early 2003.  (Id. at 8).  Defendants indicate that Mr. MacLeish and Greenberg Traurig were retained in October of 2002.  (See Exhibit 16 to the Mulhearn Declaration, which is a letter to the Court from defendants' counsel, dated June 14, 2010 ("Mulhearn Decl., Ex. 16")).

[12]Citations to "Mulhearn Decl., Ex. 26" refer to the second draft of the handwritten note by defendant Williams, entitled "Confidential Statement for David Harman, Robert Herrmann, Esq. and the Trustees of Poly Prep Country Day School," dated June 6, 2002, submitted as Exhibit 26 to the Mulhearn Declaration.

8

anonymous phone call in which the caller reiterated language similar to that found in the letters, such as: "he [is] doing terrible things to our kids." (Mulhearn Decl., Ex. 3 at 105-08). Williams was unable to remember if an investigation was conducted after the call was received, but he again testified that, at the time, he had thought the accusations related to verbal, rather than sexual, abuse. (Id. at 107). However, Williams claims that he nevertheless spoke with Parker about the allegations and also watched some of Foglietta's football practices, but saw nothing of concern. (Id. at 109). In their conversation about the phone call, Parker allegedly responded to Williams by saying that "[s]omebody is out to get [Foglietta]," and according to Williams, neither he nor Parker was concerned for the safety of the students at the time. (Id. at 110). Again, plaintiffs note that "Poly Prep did not memorialize in any way this 1970s telephone call or conduct any follow-up investigation." (Pls.' Mem. at 11 (citing Mulhearn Decl., Ex. 3 at 107-08)).

Plaintiffs also detail the allegations of other former students who have claimed abuse at the hands of Foglietta during Williams' tenure as headmaster. Plaintiff James Zimmerman ("Zimmerman"), who attended Poly Prep from seventh grade until graduating in 1982, alleges that he was abused by Foglietta. (Am. Compl. ¶¶ 106-15). Zimmerman, a distinguished athlete and co-captain of the football team during his senior year, alleges that around 1981, Foglietta sexually abused him on several occasions on school grounds. (Id.)

Another plaintiff, George Zarou ("Zarou"), attended Poly Prep from 1968, when he was in the fifth grade, until he left in 1972. (Id. ¶¶ 124-28). He alleges that he was sexually abused in 1969. (Id.)

9

Additionally, plaintiff John Doe II[13] started at Poly Prep as a fifth grader in 1968 and attended until his sophomore year in 1974. (Id. ¶¶ 136-43). He alleges that he was sexually abused on numerous occasions by Foglietta on school grounds, in Foglietta's apartment, and at his own parents' summer home in New Jersey. (Id.) He also alleges that Parker actually saw him being abused by Foglietta in the boys' showers. (Id.) Furthermore, John Doe II alleges that in 1972 or 1973, he told Robert Foreman, a Poly Prep administrator, that Foglietta was inappropriately grabbing boys. (Id.)

Plaintiff John Doe III alleges that, while a young boy,[14] he often visited Poly Prep because his brother was a student there. (Id. ¶¶ 144-51). He alleges that from 1968-1972, he was sexually abused by Foglietta on school grounds approximately two times per week and was also abused in Foglietta's apartment. (Id.) John Doe III also alleges that he found photographs of naked boys in Foglietta's bedroom drawer. (Id.)

Another complainant, John Doe IV, attended Poly Prep from 1970 until graduating in 1974. (Id. ¶¶ 152-60). He alleges that Foglietta sexually abused him in both the visiting team's locker room and in Foglietta's apartment. (Id.) In November of 2002, John Doe IV allegedly spoke with Harman and then also with Administrator Steven Andersen[15] about the allegations, but John Doe IV alleges that he received no further communication from the school. (Id.)

---

[13]In the pleadings, plaintiff Paggioli was originally referred to as John Doe I. (See discussion, infra at 18-19).

[14]Although his exact age at the time is unknown, John Doe III was allegedly as young as ten years old when the abuse began.

[15]Although sometimes spelled "Anderson," the Court assumes that this administrator Steve Andersen is the same person who was referred to as being a coach with Foglietta, as no other explanation has been provided. (See, e.g., Am. Compl. ¶ 156).

10

In February of 1991, plaintiff David Hiltbrand ("Hiltbrand") identified himself as a victim of abuse by Foglietta. Hiltbrand attended Poly Prep from 1965 until he graduated in 1971. (Id. ¶¶ 77-78). He alleges that in 1966, he was sexually abused by Foglietta on several occasions. (Id. ¶ 79). In a letter sent to Williams in February of 1991, Hiltbrand accused Foglietta of fondling and abusing him on school grounds and at Foglietta's apartment, when Hiltbrand was an eighth grade student at Poly Prep. (Mulhearn Decl., Ex. 4[16]). In addition, Hiltbrand's letter stated that he knew of other boys who were also abused by Foglietta and he named two boys who had been present on the occasions that he was abused. (Id.; Mulhearn Decl., Ex. 3 at 100).

Upon receipt of Hiltbrand's letter in 1991, Williams held a meeting with the athletic staff, many of whom were former athletes who had previously had Foglietta as a coach, including Edward Ruck ("Ruck"), the Director of Physical Education, and Mike Junsch ("Junsch"), a coach at Poly Prep and Hiltbrand's former classmate. (Mulhearn Decl., Ex. 3 at 100). Also present during this meeting were coaches Jim Esposito ("Esposito") and Steve Andersen ("Andersen"). (Id.) Williams testified that during this meeting, he asked if anyone had any direct or indirect knowledge about Hiltbrand's allegations. (Id. at 100-01). All of those present allegedly said that they did not have knowledge of the actual abuse; however, Esposito apparently said that there were rumors among alumni about Foglietta abusing children and that the abuse probably had happened. (Id.) Williams claims that he does not remember if he told the athletic staff to keep

---

[16]Citations to "Mulhearn Decl., Ex. 4" refer to the letter from plaintiff Hiltbrand to defendant Williams, dated February 20, 1991, submitted as Exhibit 4 to the Mulhearn Declaration. The Court notes that there are portions of the letter that appear to be missing, as noted by defendant Harman in a letter to David A. Berger, Esq. ("Berger"), Hiltbrand's attorney, dated June 6, 2002. This letter from defendant Harman to Berger was submitted as Exhibit 6 to the Mulhearn Declaration ("Mulhearn Decl., Ex. 6").

Hiltbrand's letter confidential; however, his written statements from May and June of 2002[17] to David Harman, Herrmann, and the Board suggest that the meeting was considered confidential. (See Mulhearn Decl., Exs. 25-26). Williams also alleges that he spoke with Harry Petchesky ("Petchesky"), the Board Chairman, after receiving Hiltbrand's letter. (Mulhearn Decl., Ex. 3 at 121).

Hiltbrand never received a written response to his letter from Williams. (Am. Compl. ¶ 84). Weeks after Williams had received Hiltbrand's letter, Hiltbrand contacted Williams by telephone.[18] (Id.; Mulhearn Decl., Ex. 3 at 101). It is uncontested that Williams then told Hiltbrand that other complaints had been made against Foglietta and that Williams suspected that they might be true. (Mulhearn Decl., Ex. 3 at 105). According to Hiltbrand, Williams allegedly told Hiltbrand that he was the first individual to actually come forward and identify himself, contrary to the aforementioned allegations. (Am. Compl. ¶ 85). In addition, the two apparently discussed Foglietta's future employment at Poly Prep. (Id. ¶¶ 86-89; see also Mulhearn Decl., Ex. 5[19]). While Hiltbrand alleges that he insisted that Foglietta be fired immediately, Williams claims that Hiltbrand agreed that Foglietta could remain at Poly Prep until June, at which time he would be forced to retire.[20] (Am. Compl. ¶ 87; Mulhearn Decl., Ex. 5).

---

[17]Plaintiffs note that the discussions about Hiltbrand's 1991 letter and the events following its receipt were not memorialized until 2002. (Pls.' Mem. at 11-12).

[18]Williams testified that he had tried to get in touch with Hiltbrand, but that Hiltbrand reached him first. (Mulhearn Decl., Ex. 3 at 119).

[19]Citations to "Mulhearn Decl., Ex. 5" refer to David Berger's letter to defendant Harman, dated May 21, 2002, submitted as Exhibit 5 to the Mulhearn Declaration.

[20]Defendants now admit that Foglietta was fired for sexual misconduct and did not simply retire. (Am. Compl. ¶ 95; Mulhearn Decl., Ex. 3 at 239).

Some time after Hiltbrand's letter was received, an additional anonymous letter that apparently said "nasty things" about Foglietta was placed in faculty mailboxes.[21] (Mulhearn Decl., Ex. 3 at 122-34). Williams testified that he personally never saw this letter, that the letters were removed from the mailboxes by someone else, and that he was not sure what the other faculty members had done with their copies. (Id. at 127-29). Williams further testified that no investigation was conducted regarding this anonymous letter because Poly Prep was already dealing with Hiltbrand's accusations. (Id. at 128). Again, plaintiffs note that the receipt of this letter was not in any way memorialized at the time. (Pls.' Mem. at 12).

Recently, on September 29, 2010, plaintiffs' counsel submitted the affidavit of a former Poly Prep teacher regarding a letter accusing Foglietta of sexual abuse that the teacher's wife had apparently received while she was also a teacher at Poly Prep. (9/29 Aff.[22]). The affiant, who taught history at the school from 1977 until 1982, alleges that his wife, a former math teacher from 1978 until 2000, who is now deceased, received a handwritten letter in her faculty mailbox in 1990 or 1991 with specific and angry charges that Foglietta was sexually abusing students. (Id. ¶¶ 2-5). The affiant alleges that he read the letter at that time and discussed its contents with his wife. (Id. ¶ 6). He also alleges that his wife decided to give the letter to Williams. (Id. ¶ 7).

---

[21]Plaintiffs mischaracterize Williams' testimony regarding the anonymous letter found in faculty mailboxes. Plaintiffs assert that, according to Williams, the letter accused Foglietta of doing "nasty things;" however, Williams actually testified that the letter said "something nasty about Foglietta." (Defendants' Sur-Reply in Further Opposition to Plaintiffs' Motion for Sanctions for Spoliation and/or Fraud on the Court, or in the Alternative, Leave to File a Second Amended Complaint, filed on August 27, 2010 ("Defs.' Sur-Reply") at 2; Plaintiffs' Reply Memorandum of Law in Further Support of their Motion for Sanctions against Defendants for Spoliation and/or Fraud upon the Court, or, in the Alternative, Leave to File a Second Amended Complaint, filed on August 19, 2010 ("Pls.' Reply Mem.") at 44; see also infra at 25 n.46). Since the actual letter no longer exists, there is no way to know what the letter actually said.

[22]Citations to "9/29 Aff." refer to the Affidavit of                 , dated September 29, 2010.

13

While the affiant does not have direct knowledge that she actually delivered the letter to Williams, she allegedly told him that she had done so. (Id. ¶¶ 8-9). It is unclear whether this letter was the same aforementioned letter that was put in all of the faculty mailboxes in or around 1991. However, the time frame of both letters appears to overlap, and Williams has indicated that the letter found in the faculty mailboxes was "brought to [his] attention by another faculty member" (Tr.[23] at 76), so it is possible that they are the same letter.

In his deposition, Williams also acknowledged that he had considered firing Foglietta, but that he had been worried about a lawsuit being initiated by Foglietta and about how alumni might react to the news. (Mulhearn Decl., Ex. 3 at 131-32). Williams testified as follows:

> Williams: Was I concerned about alumni reaction to firing Foglietta?
>
> Question: Yes.
>
> Williams: Yeah. Of course. . . .
>
> Question: So you were concerned about the possibility of Mr. Foglietta or some of his allies taking legal action against you for terminating his employment?
>
> Williams: Sure. Right. Yes.

(Id.) However, in 1991, Williams simply decided not to renew Foglietta's contract. (Id. at 147). Williams testified that while he informed the Board of this decision, he may have told only Petchesky the actual reason for the decision – namely, that he had received credible allegations that Foglietta had sexually abused a former student, Hiltbrand. (Id. at 239). Williams also testified that he told his staff to keep Foglietta away from kids and that he instructed Ruck and Parker to monitor Foglietta at all times. (Id. at 147-51). However, this appears to have been an

---

[23]Citations to "Tr." refer to the transcript of the oral argument proceedings before this Court on October 6, 2010.

incorrect statement, as Parker had retired years earlier, in 1987. (See Mulhearn Decl., Ex. 24).

Williams therefore subsequently corrected his deposition transcript, stating: "I gave the directive

to Ruck but I may not have discussed it with Parker."[24] (Am. Dep. Tr.[25] at 207). Williams also

testified that he did not go to the authorities regarding the accusations because he believed that

Hiltbrand would not testify against Foglietta. (Mulhearn Decl., Ex. 3 at 151). Therefore,

although he believed Hiltbrand's allegations, he also decided not to make a public statement or to

disclose the accusations of abuse to Poly Prep's alumni.[26] (Id. at 151-52). Williams further

asserted that he did not receive any additional complaints of abuse while he was the headmaster

of Poly Prep. (Id. at 182, 186, 237-38).

    After Foglietta's forced retirement in 1991, an alumni event was hosted in Foglietta's

---

[24]Plaintiffs have asserted that the changes made by Williams in his errata sheet in order to correct misstatements regarding Parker's involvement after his retirement are fraudulent and improper and leave his deposition incomplete. (Pls.' 9/13/10 Letter). Plaintiffs claim that defendants have not provided a sufficient explanation for these changes and that the plaintiffs should therefore be permitted to reexamine Williams. (Id.) Defendants respond by explaining that:

> Mr. Williams's mistake, if it is even a mistake, is that while he did in fact have that conversation as he testified, he is now not sure whether the conversation was in person or by telephone. Having now been reminded (weeks after the deposition by Plaintiffs' counsel, and not at the deposition) that Mr. Parker had already retired by 1991, Mr. Williams now recalls that the conversation could have been by telephone rather than in person and also recalls that the directions he gave after receiving the letter about how to deal with Mr. Foglietta were not made to Mr. Parker but instead to the then Director of Athletics. That is the extent of the corrections to which Plaintiffs' letter refers.

(Defs.' 9/16/10 Letter).

[25]Citations to "Am. Dep. Tr." refer to the complete transcript of Williams' June 30, 2010 deposition, including the amendments made by Williams in an errata sheet, dated September 30, 2010. This specific statement is indicated in the errata sheet.

[26]Defendants now admit that Foglietta was fired, but at the time, Poly Prep distributed an alumni magazine which characterized Foglietta's departure as a retirement, without mention of his sexual misconduct. (Am. Compl. ¶ 93). Plaintiffs highlight throughout their Complaint that the defendants used interstate mail when communicating this and other alleged misinformation to Poly Prep alumni. (Id. ¶¶ 95-97, 163-64, 171-72, 186).

honor at the Downtown Athletic Club. (Id. at 177).  Williams testified that he was not involved

in the planning; however, he acknowledges that the school's alumni relations department most

likely contacted alumni in order to sell tickets to the event.  (Id. at 185).  Williams testified that

he was uncomfortable attending the event, but that he did not want to insult the students who

revered Foglietta.  (Id. at 179-80).  In addition to attending, Williams was asked to say grace

before the meal.  (Id.)  According to plaintiffs, Williams' presence gave the impression that Poly

Prep approved of Foglietta, despite his behavior.  (Mulhearn Decl., Ex. 5).

　　　In 1998, Foglietta passed away and Poly Prep thereafter established the Philip A.

Foglietta Memorial Fund in his honor.  (Mulhearn Decl., Ex. 3 at 185).  Without explaining why,

Williams apparently told Angela Yurman ("Yurman") from Alumni Relations that he did not

want a public memorial for Foglietta.  (Id. at 186).  Nevertheless, the school sent out mailings

and solicited contributions for the scholarship fund in Foglietta's name.  (Id. at 185-90; Mulhearn

Decl., Exs. 27-28[27]).  In addition, the school's website posted Foglietta's obituary, which

Williams claims he did not see.  (Mulhearn Decl., Ex. 3 at 188).  On October 31, 1998, a

memorial service for Foglietta, initiated by the Alumni Association and Yurman, was scheduled

for the next homecoming.  (Id.; see also Mulhearn Decl., Ex. 27).  Williams testified that he

knew about the event once it was planned, but at that point, he could not stop it from taking place

because it was too late and because Foglietta's family was planning to attend and was sponsoring

---

[27]Citations to "Mulhearn Decl., Ex. 27" refer to a letter from Angela S. Yurman, Poly Prep Director of Alumni Relations, to the Poly Prep alumnus, dated February 6, 1998, regarding the death of Foglietta and the memorial fund and service in his honor, submitted as Exhibit 27 to the Mulhearn Declaration.  Citations to "Mulhearn Decl., Ex. 28" refer to a letter from Lorraine M. Tuccillo, of the Poly Prep Development Office, to Philip J. Iracane, Foglietta's nephew, dated March 3, 1998, with a list of donors to the Foglietta Memorial Fund, submitted as Exhibit 28 to the Mulhearn Declaration.

the event.  (Mulhearn Decl., Ex. 3 at 189).

C.  The Tenure of Headmaster Harman, 2000 - Present

Approximately two years later, in 2000, defendant David Harman assumed the position of

headmaster at Poly Prep.  On May 21, 2002, he received a letter from David A. Berger, Esq.

("Berger"), Hiltbrand's attorney, reiterating the accusations that Hiltbrand had made in his letter

to Williams back in 1991.  (Mulhearn Decl., Ex. 5).  Harman responded to Berger that he had

notified the Board of Berger's letter and he also indicated that Hiltbrand's earlier letter, along

with two anonymous letters received when Williams was headmaster, were the only allegations

of abuse that Poly Prep had ever received.  (Mulhearn Decl., Ex. 6).  Consistent with Williams'

testimony, Harman confirms that Williams had called a meeting with the athletic staff in 1991

after receiving Hiltbrand's letter.  (Id.)  Harman's letter to Berger also alleges that Williams and

Hiltbrand had agreed to allow Foglietta to continue working at Poly Prep until June of 1991, at

which time he would be forced into retirement.  (Id.)  Harman's letter states that "Mr. Williams'

clear impression from that conversation [with Hiltbrand] was that Mr. Hiltbrand did not want 'to

press the issue' and, in turn, have Mr. Williams fire Mr. Foglietta immediately for cause, as

[Williams] explicitly offered to do."  (Id.)

Mr. Berger then responded to Mr. Harman by noting that Harman's assertions "relating

Mr. Williams' recollection of events – were deeply disturbing to my client."  (Mulhearn Decl.,

Ex. 11[28]).  Mr. Berger's letter states that Hiltbrand "disputes entirely Mr. Williams' revisionist

---

[28]Citations to "Mulhearn Decl., Ex. 11" refer to the letter from Berger to Harman, dated
November 14, 2002, submitted as Exhibit 11 to the Mulhearn Declaration.

17

and self-serving recollection of his conduct" and that "Mr. Hiltbrand never 'agreed' to a course

of action proposed by Mr. Williams; indeed, Mr. Williams never proposed <u>any</u> course of action

to Mr. Hiltbrand nor, from any objective perspective, does he appear to have pursued any course

of action (other than to allow Foglietta to retire with honor and to cover-up the entire matter)."

(<u>Id.</u> (emphasis in original)).  The letter states:

> the notion that Mr. Williams ever offered to Mr. Hiltbrand
> explicitly (or impliedly, for that matter) that Poly immediately fire
> Foglietta for cause is ludicrous.  That Mr. Williams was under the
> "impression" that my client did not want to "press the issue"
> amounts to nothing less than blaming the victim for having
> approved of or acquiesced in allowing the perpetrator to remain at
> large, an intimation that is not only false but patently offensive.

(<u>Id.</u>)  Berger also complained about "Mr. Williams' abject failure . . . to report back to Mr.

Hiltbrand" and the "apparent failure (we suspect) to ever memorialize in writing anywhere this

tragic chapter in Poly's history, notwithstanding that other Poly coaches clearly had knowledge

of Foglietta's criminal conduct."  (<u>Id.</u>)

Harman also received correspondence in 2002 from plaintiff Paggioli ("Paggioli"), who

was a student at Poly Prep from 1970 until graduating in 1976.  (Am. Compl. ¶ 130).  From 1970

through 1974, Paggioli alleges that Foglietta sexually abused him two or three times a week on

school grounds and once in Paggioli's New Jersey home.  (<u>Id.</u> ¶ 131).  Upon making these

allegations, Paggioli, through this lawyer, offered to settle with the school in the amount of

$500,000 a year, for twenty years.  (Mulhearn Decl., Exs. 7-8[29]).  When that offer was rejected,

---

[29]Citations to "Mulhearn Decl., Ex. 7" refer to the letter from Milton I. Rothman, Esq.,
who was plaintiff Paggioli's attorney at the time, to Robert Herrmann, Esq., dated July 23, 2002,
submitted as Exhibit 7 to the Mulhearn Declaration.  Citations to "Mulhearn Decl., Ex. 8" refer
to a signed and witnessed statement, dated January 11, 2003, by Milton Rothman regarding the
offer he made on behalf of Mr. Paggioli and the verbal exchange with Mr. Herrmann that
followed, which was submitted as Exhibit 8 to the Mulhearn Declaration.

he filed a complaint in state court against Poly Prep and their administrators in 2004.  Paggioli's

lawsuit was subsequently dismissed on statute of limitations grounds and summary judgment was

granted in favor of defendants.  (Notice of Defs.' Mot. Dismiss,[30] Ex. 3[31]).

Philip Culhane ("Culhane"), another named plaintiff in this case, attended Poly Prep from

fifth grade until graduating in 1984.  (Am. Compl. ¶¶ 116-23).  On August 31, 2009, he sent a

letter to Harman alleging that Foglietta had sexually abused him on several occasions in the

physical therapy room that was adjacent to Foglietta's office.  (Id.)  Harman responded to

Culhane that he was sorry about his story, but that he had to confer with counsel before moving

forward.  (Id.)  Based on the documentation provided to the Court, it is unclear whether or not

Harman, or anyone else at Poly Prep, ever contacted Culhane again or actually conferred with

counsel about his allegations.


D.  The Sheridan Investigation

In 2002, after receiving Paggioli's settlement demand, Poly Prep consulted with their

outside counsel, Menaker & Herrmann LLP, and also hired Peter T. Sheridan, Esq., a sole

practitioner, to conduct what they claim was a privileged and confidential investigation regarding

Foglietta's alleged conduct, to be performed "in collaboration with Poly Prep's counsel, Menaker

---

[30]Citations to "Notice of Defs.' Mot. Dismiss" refer to the Notice of Defendants' Motion to Dismiss and the 5 exhibits attached thereto, submitted on April 30, 2010.

[31]Citations to "Notice of Defs.' Mot. Dismiss, Ex. 3" refer to the January 5, 2006 opinion by the Honorable Lewis L. Douglass in plaintiff Paggioli's state court case, submitted as Exhibit 3 to defendants' Notice of Motion to Dismiss.

& Herrmann LLP." (Defs.' Mem. at 6; Sheridan Decl.[32] ¶ 4). Sheridan interviewed faculty and

staff, including: Williams, Parker, Ruck, Andersen, Petchesky, Ralph Dupee, a former faculty

member and coach, and Joan Wright, a former Dean and Assistant Head of School. (Defs.'

Mem. at 7; Sheridan Decl. ¶ 6). Sheridan claims to have determined during his investigation that

there was no firsthand or secondhand knowledge of alleged sexual abuse at Poly Prep, other than

the accusations made by Hiltbrand and Paggioli. (Sheridan Decl. ¶ 8). However, Sheridan's

notes from his investigation have since been destroyed, resulting in the current motion for

spoliation sanctions.

Plaintiffs now allege that key individuals, including Junsch and Esposito, were not

interviewed by Sheridan, but that they should have been because they had attended the Athletic

Department meeting with Williams back in 1991. (Mulhearn Decl., Exs. 26-27; Pls.' Mem. at

26-27). Furthermore, on September 20, 2002, David Harman appears to have made a list of

people for Sheridan to interview, most of whom Sheridan did eventually interview. (Mulhearn

Decl., Ex. 29[33]). However, one individual on the list was not interviewed, John Doe V.[34] (Id.)

According to plaintiffs, it is unclear whether anyone ever spoke to John Doe V during the

investigation in 2002 and 2003, but plaintiffs assert that defendants have admitted that John Doe

V was previously identified as an individual who reported sexual abuse by Foglietta, but no

further details about his allegations have been provided. (Pls.' Mem. at 25-26 (citing Mulhearn

---

[32]Citations to "Sheridan Decl." refer to the Declaration of Peter T. Sheridan, Esq., dated August 9, 2010.

[33]Citations to "Mulhearn Decl., Ex. 29" refer to a copy of handwritten notes of David Harman, dated July 30, 2002, September 20, 2002, and May 29, 2002, and submitted as Exhibit 29 to the Mulhearn Declaration.

[34]All references to John Doe V refer to .

Decl., Ex. 30[35])).  Plaintiffs emphasize that the inclusion of John Doe V on Harman's list

indicates that John Doe V reported his abuse prior to the Sheridan investigation, despite

defendants' assertion that he and other potential victims "did not come forward in connection

with the investigation."  (Mulhearn Decl., Ex. 30; Pls.' Mem. at 25-26).  Therefore, plaintiffs

assert that in addition to Junsch and Esposito, John Doe V should have been interviewed by

Sheridan.  However, defendants respond that "Poly Prep has been unable to determine whether

[John Doe V] was a victim, much less that he reported abuse."  (Defs.' Sur-Reply at 1).

        Presently before this Court is plaintiffs' claim of spoliation; plaintiffs assert that

discoverable documents – specifically, Sheridan's investigative notes – have been withheld

and/or were improperly disposed of or destroyed by the defendants and that appropriate sanctions

should be imposed, including a finding that defendants are equitably estopped from arguing that

plaintiffs' claims in this case are time-barred.[36]  (Pls.' Reply Mem. at 7, 40).


E.  Procedural History

        Following the filing of the initial Complaint on October 26, 2009, plaintiffs filed an

Amended Complaint on March 24, 2010.  (See supra at 1 n.2; Am. Compl. ¶¶ 5, 241-60).  On

April 30, 2010, defendants filed a motion to dismiss all claims, arguing that plaintiffs' tort claims

are time-barred and that plaintiffs' RICO claims are legally and factually deficient.  (Defs.' Mot.

---

[35]Citations to "Mulhearn Decl., Ex. 30" refer to a letter from Jeffrey Kohn to Kevin Mulhearn, dated July 12, 2010, which includes a confidential list of three of the aforementioned victims, John Doe V, John Doe VI, and John Doe VII.  All references to John Doe VI refer to _____ ; references to John Doe VII refer to _____ .

[36]Plaintiffs' request that the Court find the defendants equitably estopped from arguing that plaintiffs' claims are time-barred is addressed infra at 27 n.48.

Dismiss[37] at 1-2).  On May 3, 2010, plaintiffs renewed an earlier request for limited discovery[38] to determine whether plaintiffs' claim of equitable estoppel was sufficient to defeat defendants' statute of limitations defense asserted in their motion to dismiss.  (Pls.' Mem. at 2).  This Court thereafter issued an Order, on May 25, 2010, granting in part and denying in part plaintiffs' request for limited discovery, ordering Poly Prep to produce investigative records concerning the alleged sexual misconduct committed by Foglietta, as well as Foglietta's personnel file and records.  (See Mulhearn Decl., Ex. 1[39]).  On June 16, 2010, defendants served plaintiffs with responsive documents, as well as a privilege log (Mulhearn Decl., Ex. 2[40]), and on June 30, 2010, plaintiffs conducted the deposition of former Headmaster Williams, also taken pursuant to this Court's May 25, 2010 Order.  (See Mulhearn Decl., Ex. 3; Am. Dep. Tr.).

1.  Plaintiffs' Spoliation Motion

On July 16, 2010, plaintiffs requested a pre-motion conference to discuss plaintiffs' anticipated motion for spoliation sanctions "based on additional information gleaned in the limited discovery conducted in this action."  (Pls.' 7/16/10 Letter).  In this letter request, plaintiffs set out the newly discovered evidence, the basis for the spoliation motion, and the

---

[37]Citations to "Defs.' Mot. Dismiss" refer to the Memorandum of Law in Support of Defendants' Motion to Dismiss, dated April 30, 2010.

[38]Plaintiffs' earlier request had been denied by this Court without prejudice on April 14, 2010.

[39]Citations to "Mulhearn Decl., Ex. 1" refer to this Court's May 25, 2010 Order, submitted as Exhibit 1 to the Mulhearn Declaration.

[40]Citations to "Mulhearn Decl., Ex. 2" refer to defendants' revised Privilege Log, dated July 9, 2010, submitted as Exhibit 2 to the Mulhearn Declaration.  (See Mulhearn Decl. ¶ 6).

requested sanctions in a relatively succinct and clear manner.  Given that an inordinate number of

documents, many of which are extremely repetitive,[41] have been filed on this issue since this

letter was filed, the Court has used this letter as a starting point in its spoliation analysis.

Plaintiffs' Memorandum of Law in support of their spoliation motion was filed on July

26, 2010, along with the Declaration of Kevin T. Mulhearn, Esq.  Defendants responded with

their Memorandum in Opposition on August 11, 2010.  On August 12, 2010, the Court received

a letter from plaintiffs addressing and attaching newly produced discovery from defendants,

marked POLY 194 -199.[42]  (Pls.' 8/12/10 Letter; see also Mulhearn Rep. Decl., Ex. D[43]).

Included in this discovery was an email, dated November 28, 2002, to David Harman

from John Doe VI, a former Poly Prep student, in response to Harman's October 2002 letter to

alumni.  The email asserts:

> The fact that coach Foglietta was a trusted role model that
> molested school children, including an incident involving myself,
> is bad enough, but to suggest in your letter that no member of the
> faculty knew of it at the time is a shame.  It was clear to everyone
> that he was molesting "certain" children while alienating others
> who rejected his advances.

(POLY 194; see Mulhearn Rep. Decl., Ex. E[44]).  This email further details Foglietta's abuse of

---

[41]The Court notes that because of the voluminous and repetitive nature of the filings in this case, citations to the parties' filings may not include every location in which the relevant information is alleged.

[42]Plaintiffs requested that "this letter (and its attachments) be added to the record on Plaintiffs' pending sanctions motion."  (Pls.' 8/12/10 Letter at 4).  The Court grants this request and considers both this letter and defendants' response on August 13, 2010, in connection with this motion, although this request was essentially rendered moot when plaintiffs attached these documents as Exhibits D, E, and F, to the Reply Declaration of Kevin Mulhearn, filed along with plaintiffs' Reply Memorandum of Law on August 19, 2010 ("Mulhearn Rep. Decl.").

[43]Citations to "Mulhearn Rep. Decl., Ex. D" refer to Kevin Mulhearn's August 12, 2010 Letter to the Court, submitted as Exhibit D to the Reply Declaration of Kevin Mulhearn.

[44]Citations to "Mulhearn Rep. Decl., Ex. E" refer to the August 10, 2010 Letter from Jeffrey Kohn to Kevin Mulhearn, attaching the new privilege log and the new production of

23

John Doe VI, which John Doe VI asserts led him to quit football. (Id.) The email ends by stating: "The only future correspondence I want from Poly is the name of the lawyer who is handling the sexual misconduct lawsuit." (Id.) In addition to requesting that the Court consider this new submission, plaintiffs, in their August 12, 2010 letter, also requested that the Court impose additional sanctions on defendants. These requested sanctions, which include permission to contact the newly discovered victims and to retake the deposition of defendant Williams (id.), are addressed at the end of this Court's opinion. (See infra at 62-72).

On August 27, 2010, pursuant to permission from this Court, defendants filed a sur-reply as well as a declaration by Jeffrey Kohn, Esq., defendants' counsel. On October 6, 2010, the Court heard oral argument on plaintiffs' motion.

2. Post-Hearing Submissions

By the Court's calculation, at least twelve (12) additional letters have been filed by the parties since the oral argument held in October. On December 20, 2010, plaintiffs requested a So Ordered subpoena from the Court in order to take the deposition of a newly discovered non-party witness[45] whom plaintiffs asserted "has information highly relevant to the equitable estoppel, fraudulent concealment, and fraud upon the Court issues. . . ." (Pls.' 12/20/10 Letter). Although defendants objected (Defs.' 12/22/10 Letter), the Court granted plaintiffs' request on December 23, 2010, and provided them with a So Ordered subpoena.

After conducting the deposition, plaintiffs sought to have the Court consider this new

POLY 194-199, submitted as Exhibit E to the Reply Declaration of Kevin Mulhearn.

[45]This new witness is

24

evidence in connection with their pending motion. (Pls.' 1/10/11 Letter). Defendants objected to plaintiffs' alleged "attempt[] to influence the Court on a fully briefed and pending motion." (Defs.' 1/14/11 Letter; see also Defs.' 1/10/11 Letter). Having reviewed the various letters that were filed by the parties relating to this issue, the Court has not considered the facts developed during the deposition in deciding the current motion for spoliation.

Therefore, having considered the parties' respective arguments through the date of oral argument, the Court hereby grants plaintiffs' Motion as set forth below.

DISCUSSION

I. Spoliation

Plaintiffs allege that defendants spoliated certain evidence to which plaintiffs are entitled – specifically, the notes from Mr. Sheridan's 2002 investigation. (Pls.' 7/16/10 Letter). In their July 16, 2010 letter, plaintiffs note that these notes are not the only document allegedly destroyed by the defendants over the years in an effort to conceal the conduct of Foglietta. Other evidence which has been deliberately discarded or destroyed includes: 1) the two anonymous letters that Mr. Williams received in the 1970s and discarded, which accused Foglietta of molesting, abusing, and "doing terrible things to your children;" 2) the letter that was put into faculty mailboxes "in approximately 1990 or 1991 – likely after [Williams] received David Hiltbrand's letter," which "accused Foglietta of sexual misconduct"[46] (id. at 5-6 (emphasis in original); Pls.'

---

[46]Mr. Williams' responses, when questioned during his deposition about the content of the letter put into faculty mailboxes, illustrate the value of having these discarded or destroyed documents:

Q:  What specifically was in the mailboxes, Mr. Williams?

25

Mem. at 10-12); and 3) the letter sent to alumni by Ms. Yurman, Poly Prep's director of Alumni

Relations, regarding the retirement dinner being held for Foglietta.  (Mulhearn Decl., Ex. 3 at

183-84).

   As a result of defendants' alleged spoliation of the Sheridan notes, plaintiffs have

requested various sanctions, including:  1) permission to take the depositions of eight

individuals:  David Harman, Edward Ruck, Steven Andersen, Michael Junsch, James Esposito,

Ralph Dupee, Harry Petchesky, and Joan Wright[47] (Pls.' 7/16/10 Letter at 4); 2) permission to

take the deposition of Peter Sheridan (Pls.' Mem. at 37-38); 3) permission to engage in certain

additional discovery; 4) a request that defendants be required to bear all costs and attorneys' fees

associated with the taking of these depositions and related discovery, as well as attorneys' fees

incurred in preparation of this motion (Pls.' 7/16/10 Letter at 2); and 5) permission, after the

completion of any awarded additional discovery, to file a Second Amended Complaint in order

---

   A:  I don't remember.  Something nasty about Foglietta.  I don't remember what it was.

   Q:  It was a letter from a former student claiming that he had been sexually abused by
   Foglietta, correct?

   Mr. Kohn:  Objection to the form of the question.

   A:  I don't remember.  I don't remember that.  I absolutely don't.  That's incredible.

   Q:  You do recall that there was a letter in the faculty mailboxes?

   A:  There was something in the mailboxes, I guess, about Foglietta, and was gone from
   my head until you said something.

(Mulhearn Decl., Ex. 3 at 123).  Williams further testified that his "memory [] isn't very good, I
guess," and that he was "treading on stuff I don't know that well."  (Id. at 124, 128).  He also
stated that "[i]f it were signed by somebody, it – I think I would have remembered.  I don't think
it was signed. . . . This whole thing about the letter in the mailboxes is very, very vague to me."
(Id. at 124, 132).  The Court finds these answers particularly unsettling.

   [47]Plaintiffs' Memorandum contains a list of requested deponents, including, among
others, "John Wright;" the Court believes this is a typographical error and the intended
individual is actually Joan Wright.  (See Pls.' 7/16/10 Letter at 4).

"to add additional factual allegations . . . which will support and amplify [plaintiffs'] equitable estoppel and fraudulent concealment claims, as well as their Civil RICO claims." (Pls.' Mem. at 43).[48]


A.  Legal Standard

Rule 37 of the Federal Rules of Civil Procedure authorizes a court to impose various sanctions when a party "fails to obey an order to provide or permit discovery." Fed. R. Civ. P. 37(b)(2); see also Transatlantic Bulk Shipping Ltd. v. Saudi Chartering, S.A., 112 F.R.D. 185, 189 (S.D.N.Y. 1986) (noting that Rule 37(b) "provides for sanctions where a party fails to honor its disclosure obligations, especially after court orders").  It is clear that sanctions may therefore be imposed when a party spoliates evidence in violation of a court order.  See, e.g., West v. Goodyear Tire & Rubber Co. 167 F.3d 776, 779 (2d Cir. 1999) (citing John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc., 845 F.2d 1172, 1176 (2d Cir. 1988)).  The courts in this circuit have further held that even where no explicit discovery order has been issued, the court has the inherent power to preserve the integrity of judicial proceedings by, among other things, imposing sanctions for spoliation.  See id.; Kronisch v. United States, 150 F.3d 122, 126-27 (2d Cir. 1998); Sterbenz v. Attina, 205 F. Supp. 2d 65, 73-74 (E.D.N.Y. 2002); Barsoum v. N.Y.C. Hous. Auth., 202 F.R.D. 396, 399 (S.D.N.Y. 2001).  "The determination of an appropriate

---

[48]Since an order granting additional discovery and possible amendment of the pleadings could affect consideration of the motion to dismiss, the motion to dismiss has been stayed pending the outcome of this motion for sanctions.  For this reason, the Court has also denied plaintiffs' request that a finding be made at this time that defendants should be estopped from arguing that plaintiffs' claims are time-barred.  This issue is more appropriately decided after full briefing on the motion to dismiss.

sanction for spoliation, if any, is confined to the sound discretion of the trial judge and is assessed on a case-by-case basis." Fujitsu Ltd. v. Federal Express Corp., 247 F.3d 423, 436 (2d Cir. 2001) (internal citations omitted).  However, any such sanction "should be 'molded to serve the prophylactic, punitive and remedial rationales underlying the spoliation doctrine,' which is predicated upon the rationale that by destroying evidence, one party has deprived the other of the ability to prosecute or defend an action." Sterbenz v. Attina, 205 F. Supp. 2d at 74 (citing West v. Goodyear Tire & Rubber Co., 167 F.3d at 779).

The Second Circuit has defined spoliation as "the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 107 (2d Cir. 2001) (quoting West v. Goodyear Tire & Rubber Co., 167 F.3d at 779) (emphasis added); see also Houlihan v. Marriot Int'l, Inc., No. 00 CV 7439, 2003 WL 22271206, at *1 (S.D.N.Y. Sept. 30, 2003).  A party has an obligation to preserve evidence when the party is on notice "that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." Fujitsu Ltd. v. Federal Express Corp., 247 F.3d at 436 (citing Kronisch v. United States, 150 F.3d at 126); Barsoum v. N.Y.C. Hous. Auth., 202 F.R.D. at 400 (holding that a party is under an obligation to retain documents and other evidence that it knows may be relevant to a pending or future litigation).  "[A]nyone who anticipates being a party or is a party to a lawsuit must not destroy unique, relevant evidence that might be useful to an adversary." Zubulake v. UBS Warburg L.L.C. (Zubulake IV), 220 F.R.D. 212, 217 (S.D.N.Y. 2003) (emphasis added).  This obligation to preserve relevant evidence exists whether or not the documents have been specifically requested in a demand for discovery or whether there has been an explicit discovery order issued.

Kronisch v. United States, 150 F.3d at 126-27; Barsoum v. N.Y.C. Hous. Auth., 202 F.R.D. at

400.

A party seeking sanctions for the spoliation of evidence must establish that three elements

are present in order to be awarded such sanctions:

> (1) that the party having control over the evidence had an
> obligation to preserve it at the time it was destroyed; (2) that the
> records were destroyed 'with a culpable state of mind'; and (3) that
> the destroyed evidence was 'relevant' to the party's claim or
> defense such that a reasonable trier of fact could find that it would
> support that claim or defense.

Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 107 (2d Cir. 2002); Farella v.

City of New York, No. 05 CV 5711, 2007 WL 193867, at *2 (S.D.N.Y. Jan. 25, 2007); see also

Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d at 107-09; Fujitsu Ltd. v. Federal Express

Corp., 247 F.3d at 436; Zubulake IV, 220 F.R.D. at 220.

Therefore, in order to determine whether sanctions should be imposed upon the

defendants in this case for the spoliation of Peter Sheridan's investigative notes, the Court begins

by considering whether the plaintiffs have sufficiently established these three required elements.

See Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d at 107.


B. Analysis

   1. Prong One:  Obligation and Control

The first element necessary to establish spoliation requires that the plaintiffs show "that

the party having control over the evidence had an obligation to preserve it at the time it was

destroyed." Id.  In this case, it is beyond dispute that Peter Sheridan had control over the notes

from his investigation at the time that they were destroyed or discarded.  However, the parties

disagree as to whether another of defendants' prior counsel, Greenberg Traurig, also possessed copies of the notes and whether the defendants had an obligation to maintain a copy of the notes. (See discussion, infra at 35-36).


      a)  Notice of Potential Litigation

As detailed above, in September of 2002, Peter Sheridan was commissioned to conduct an investigation into the allegations of sexual abuse by Foglietta; both Hiltbrand and Paggioli had contacted Poly Prep to inform the school of their abuse by that time. (Pls.' 7/16/10 Letter at 1-2; Sheridan Decl. ¶ 4). Hiltbrand sent his initial letter in 1991 and Paggioli made his allegations in 2002. Indeed, on July 23, 2002, Mr. Paggioli's lawyer, Milton I. Rothman, Esq., sent a letter to Poly Prep's regular outside counsel, Robert Herrmann, Esq., offering to settle Paggioli's claims; that demand was rejected by the school. (Mulhearn Decl., Ex. 7). According to a sworn statement drafted by Mr. Rothman on January 11, 2003, Mr. Herrmann responded to Mr. Rothman's demand by saying: "Find something to sue us for and we'll talk." (Mulhearn Decl, Ex. 8). Thus, even before Mr. Sheridan had been retained to conduct the investigation, defendant Poly Prep and its counsel were aware of the potential for future litigation.

Plaintiffs further allege that in 2004, "John Paggioli's counsel communicated to Roderick MacLeish, Esq. and Greenberg Traurig, LLP[49] (who [plaintiffs' allege] had a copy of the Sheridan investigative notes) that Mr. Paggioli was commencing a lawsuit unless Poly Prep engaged in prompt and substantive settlement negotiations." (Pls.' Mem. at 34; see also

---

[49]As already noted, Mr. MacLeish and Greenberg Traurig appear to have been retained by the defendants in late 2002 or early 2003. (See supra at 8 n.11).

Mulhearn Decl., Exs. 17-18[50]).  In September of 2004, Paggioli filed his state court lawsuit,

which contained claims similar to those present in this case, such as negligence, negligent

supervision, failure to warn, and fraudulent concealment.  (Pls.' 7/26/10 Letter at 2-3; see also

Notice of Defs.' Mot. Dismiss, Exs. 2, 4[51]).  However, it does not appear that a litigation hold

was instituted by Poly Prep, Menaker & Herrmann, or Greenberg Traurig at that time.

      Poly Prep was also put on notice that Hiltbrand might initiate a lawsuit against the school.

In a letter dated December 13, 2002, Hiltbrand's lawyer, Berger, wrote to Poly Prep's lawyer,

Herrmann, stating:

> [a]t the outset of the meeting, I indicated that my client initially had
> hoped to work with Poly on this matter and did not want to proceed
> in an adversarial manner, but that he had since become outraged by
> Poly's apparent endorsement of Mr. Williams' false and selective
> recollection of events. . . . Under the foregoing circumstances, my
> client now has no interest in pursuing discussions with you or Mr.
> Harman, or in attempting to work cooperatively with Poly in any
> fashion.

---

[50]Citations to "Mulhearn Decl., Ex. 17" refer to a letter to David Harman from Marc J. Fliedner, Esq., entitled "Pending Litigation/John Joseph Paggioli v. Poly Prep Country Day School," dated July 7, 2004, and submitted as Exhibit 17 to the Mulhearn Declaration.  In the very beginning of this letter, Mr. Fliedner asserts "this office is fully prepared to file suit in the matter."  Although no explicit explanation has been provided, it appears that Mr. Fliedner had replaced Mr. Rothman as Mr. Paggioli's counsel by this time.  In a letter to Mr. MacLeish, dated August 3, 2004, Mr. Fliedner notes:  "As you are aware, a demand was previously provided in writing by Milton Rothman, Esquire, Mr. Paggioli's prior counsel." (Mulhearn Decl., Ex. 18).  Citations to "Mulhearn Decl., Ex. 18" refer to a letter to Roderick McLeish, Esq. from Marc Fliedner, Esq., entitled "Pending Litigation/John Joseph Paggioli v. Poly Prep Country Day School," dated August 3, 2004, and submitted as Exhibit 18 to the Mulhearn Declaration.  This letter is said to "acknowledge the substance of [their] phone conversation on Friday, July 30, 2004 relative to the above-captioned matter.  You advised that your client was prepared to aggressively litigate the matter."

[51]Citations to "Notice of Defs.' Mot. Dismiss, Ex. 2" refer to the Summons and Complaint filed by plaintiff Paggioli on September 14, 2004 in the Kings County Supreme Court, submitted as Exhibit 2 to defendants' Notice of Motion to Dismiss.  Citations to "Notice of Defs.' Mot. Dismiss, Ex. 4" refer to the Summons and Amended Complaint filed by Paggioli on December 27, 2005 in Kings County Supreme Court, submitted as Exhibit 4 to defendants' Notice of Motion to Dismiss.

(Mulhearn Decl., Ex. 12[52] (emphasis in original)).  Mr. Sheridan expressly acknowledges that he was engaged to conduct his investigation as a result of the receipt of both Mr. Hiltbrand's and Mr. Paggioli's accusations and that he "reviewed with each [interviewee] the allegations contained in the letters from Mr. Hiltbrand and Mr. Paggioli." (Sheridan Decl. ¶¶ 4, 7-8).  Indeed, in a letter to the Court, defendants concede that they were aware of "the threatened litigation in 2002." (Mulhearn Decl., Ex. 16).

Apart from the letters from Hiltbrand's and Paggioli's counsel raising the prospect of litigation, John Doe VI's November 28, 2008 email to Harman also expressed an interest in participating in litigation against Poly Prep.  (Poly 194; see also discussion, supra at 23-24).  Furthermore, former Headmaster Williams testified that he was cognizant of the potential for litigation much earlier, when he reviewed the allegations in Hiltbrand's 1991 letter.  (See discussion, supra at 14).  Although he explained that he was worried about being sued by Foglietta or his friends for wrongful termination or defamation if he accused Foglietta of molesting children, and that that was part of the reason why he did not fire Foglietta, he conceded that he nevertheless disposed of certain documents containing allegations of abuse.  (Id.; Mulhearn Decl., Ex. 3 at 131-32).  However, at his deposition, he was unable to articulate why he destroyed these documents, which could have been used to protect the school against any potential lawsuit brought by Foglietta.  When questioned at his deposition, Mr. Williams testified as follows:

---

[52]Citations to "Mulhearn Decl., Ex. 12" refer to the letter from Berger to Herrmann, dated December 13, 2002, and submitted as Exhibit 12 to the Mulhearn Declaration.

32

Q:  Why wouldn't you have kept the letter in the mailbox as corroboration?

\* \* \* \*

A:  I assumed – I don't know.  I guess – I don't know.  I can't guess.  I don't know.

(Mulhearn Decl., Ex. 3 at 132).

      b)  Litigation Hold

      Given that defendants were clearly on notice of the potential for litigation at the time that Peter Sheridan was retained, the question is whether an adequate litigation hold was instituted to preserve the notes and any other evidence gathered as part of the investigation.  Courts in this circuit have found that "once a party reasonably anticipates litigation it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents."  Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., L.L.C., 685 F. Supp. 2d 456, 466 (S.D.N.Y. 2010) (quoting Treppel v. Biovail Corp., 249 F.R.D. 111, 118 (S.D.N.Y. 2008); Zubulake IV, 220 F.R.D. at 218).  This obligation to preserve evidence "runs first to counsel, who has 'a duty to advise his client of the type of information potentially relevant to the lawsuit and of the necessity of preventing its destruction.'" Chan v. Triple 8 Palace, No. 03 CV 6048, 2005 WL 1925579, *6 (S.D.N.Y. Aug. 11, 2005) (quoting Turner v. Hudson Transit Lines, 142 F.R.D. 68, 73 (S.D.N.Y. 1991)); see also Vagenos v. LDG Fin. Servs., L.L.C., No. 09 CV 2672, 2009 WL 5219021, at *2 (E.D.N.Y. Dec. 31, 2009).  "Once a 'litigation hold' is in place, a party and her counsel must make certain that all sources of potentially relevant information are identified and placed 'on hold,'" which will

"involve communicating with the 'key players' in the litigation. . . . Unless counsel interviews each [player], it is impossible to determine whether all potential sources of information have been inspected." Zubulake v. UBS Warburg L.L.C. (Zubulake V), 229 F.R.D. 422, 432 (S.D.N.Y. 2004) (emphasis added). "Key players" have been defined as "the people identified in a party's initial disclosure and any subsequent supplementation thereto. Because these 'key players' are '[those] likely to have relevant information,' it is particularly important that the preservation duty be communicated clearly to them." Id. at 433-34.

Plaintiffs assert that, having been given notice of potential pending litigation, defendants' counsels' obligation to initiate a litigation hold was triggered. (Pls.' 7/26/10 Letter at 2-3). Not only did Mr. Sheridan, allegedly an attorney for Poly Prep, have the duty to maintain a copy of his notes, but Mr. Herrmann, who was already engaged as Poly Prep's regular outside counsel at the time, did as well. Defendants assert that Mr. Sheridan was hired to conduct the investigation "in collaboration with" Mr. Herrmann, and, as already noted, defendants have emphasized that Mr. Sheridan "gave Mr. Herrmann a thorough description of his interviews," during which conversation, Herrmann took the notes that defendants claim is an adequate replacement for Sheridan's notes. (Defs.' Mem. at 6, 9; see discussion, infra at 53-54). Furthermore, as already noted, Mr. Herrmann: 1) received many of the letters from Mr. Hiltbrand's and Mr. Paggioli's attorneys threatening litigation, including Mr. Paggioli's settlement demand, to which he allegedly responded "Find something to sue us for and we'll talk;" 2) he met with plaintiff Hiltbrand and his attorney; 3) he was a recipient/addressee of Mr. Williams' two confidential statements written in 2002; and 4) after receiving Paggioli's settlement demand, defendants have made it clear that "[i]n anticipation of litigation in 2002, Poly Prep consulted with its regular

34

outside law firm, Menaker & Herrmann LLP." (Defs.' Mem. at 6; See also Mulhearn Decl., Exs. 7-8, 12, 25-26). Based on these facts, it is clear that Mr. Herrmann's representation of Poly Prep was ongoing and that he was well aware of the potential for litigation. He therefore had a duty to obtain a copy of Mr. Sheridan's notes, regardless of having taken his own notes during his conversation with Sheridan, and an obligation to issue and maintain a litigation hold on those notes on behalf of his client, Poly Prep.

Plaintiffs also contend that a copy of Sheridan's notes was actually provided to defendants' other, subsequently retained counsel: "Mr. Sheridan provided a copy of his investigative notes in late 2002 or early 2003 to Eric MacLeish, Esq., formerly of the law firm of Greenberg Traurig, who had been retained by Poly Prep in early 2003 (prior to any lawsuit being filed against Poly Prep)." (Pls.' 7/16/10 Letter at 2; see also Mulhearn Decl., Ex. 16). While defendants claim that "neither Peter Sheridan nor Poly Prep has ever represented that Mr. Sheridan in fact gave Mr. MacLeish or anyone at Greenberg Traurig a copy of his notes"[53] (Defs.' Sur-Reply at 3-4 (emphasis in original); Kohn Decl. ¶ 6), neither Mr. Sheridan or Greenberg Traurig have provided information as to whether a litigation hold was actually issued by defendants' counsel at the time.

Regardless of whether Greenberg Traurig actually received a copy of the notes, counsel was still under an obligation to institute a hold on those notes and to attempt to obtain a copy. The obligation to institute a litigation hold on all potentially relevant documents arose at least as

---

[53]Poly Prep states only that "'Mr. Sheridan believes that he provided a copy of his notes to Mr. MacLeish,'" a fact which defendants claim they have been unable to verify "despite a thorough search." (Defs.' Sur-Reply at 3-4 (emphasis in original); Declaration of Jeffrey I. Kohn, Esq. submitted with Defendants' Sur-Reply on August 27, 2010 ("Kohn Decl.") ¶ 6.

early as July of 2002, when Mr. Herrmann received Paggioli's settlement demand from Mr.

Rothman, and certainly no later than when Mr. Paggioli filed his lawsuit in 2004. Clearly, the

notes of an investigator, specifically commissioned to look into the allegations of abuse that were

at the heart of any potential lawsuits against defendants, were material and relevant, see Zubalake

IV, 220 F.R.D. at 218 (holding that the duty to preserve evidence extends to individuals "likely to

have relevant information – the 'key players'"), and counsel for Poly Prep, including Peter

Sheridan, Robert Herrmann, Menaker & Herrmann, Eric MacLeish, Greenberg Traurig, and

eventually, O'Melveny & Myers, had the responsibility to advise the defendants to maintain the

notes and to ensure their retention. See Chan v. Triple 8 Palace, Inc., 2005 WL 1925579, at *7

(noting that "the utter failure to establish any form of litigation hold at the outset of litigation is

grossly negligent"); see also Phoenix Four, Inc. v. Strategic Resources Corp., No. 05 CV 4837,

2006 WL 1409413, at *5-6 (S.D.N.Y. May 23, 2006) (underscoring counsel's affirmative duty to

ensure that all sources of relevant information are discovered); Zubalake IV, 220 F.R.D. at 217

(holding that anyone who anticipates being a party to a lawsuit "'is under a duty to preserve what

it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to

the discovery of admissible evidence, is reasonably likely to be requested during discovery and/or

is the subject of a pending discovery request'") (quoting Turner v. Hudson Transit Lines, 142

F.R.D. at 72). Furthermore, as the court in Vagenos v. LDG Financial Services, L.L.C. noted, the

defendants decided who to retain as their counsel and thus are "responsible for [their] attorney's

negligent conduct or bad advice in connection with the action." 2009 WL 5219021, at *2.

 Even if Greenberg Traurig failed to initiate a litigation hold on these notes, a litigation

hold should have later been initiated by defendants' current counsel, O'Melveny & Myers LLP,

who were retained in November of 2004 in relation to Paggioli's lawsuit. (Pls.' Mem. at 34). As noted by plaintiffs, O'Melveny & Myers' "representation [began] well before any of the dates which Mr. Sheridan claims he may have discarded his investigative notes." (Mulhearn Decl., Ex. 20[54] at 2). According to Mr. Sheridan, he "believe[s]" that he discarded his notes "either when moving offices or when conducting a regular review of files from closed matters" in November of 2006, Spring of 2008, or October of 2009, or when cleaning out the basement of his parents' house in February of 2010. (Sheridan Decl. ¶ 11; Pls.' 7/16/10 Letter at 2). Since O'Melveny & Myers, defendants' current counsel, handled the state court Paggioli case, which was filed in 2004, they should have secured a copy of the Sheridan notes from either Greenberg Traurig, Mr. Herrmann, or Mr. Sheridan himself and should have put a litigation hold in place at that time. (Conf. Tr.[55] at 3-5). Plaintiffs assert that:

> Defendants and their counsel, moreover, knew, or should have known, that the investigative notes of Peter T. Sheridan, Esq. were by far the best, most thorough, and most contemporaneous recollection of events pertaining to the knowledge of faculty members and administrators of Foglietta's sexual misconduct, and Poly Prep's response – in 1991– to David Hiltbrand's acknowledged credible accusations against Foglietta.

(Pls.' Mem. at 32).

O'Melveny & Myers asserts that once they were retained in November of 2004, during the pendency of the Paggioli litigation, they "made every effort to preserve potentially relevant documents by actually gathering documents from multiple sources." (Defs.' Sur-Reply at 3; Kohn Decl. ¶¶ 3, 6). Defendants' counsel asserts that they "contacted Mr. Sheridan during the

---

[54]Citations to "Mulhearn Decl., Ex. 20" refer to a ten-page letter from Kevin T. Mulhearn to Jeffrey I. Kohn, dated July 1, 2010, submitted as Exhibit 20 to the Mulhearn Declaration.

[55]Citations to "Conf. Tr." refer to the Transcript of the Telephone Conference held by the Court on May 11, 2010.

Paggioli lawsuit and asked him to provide any documentation of his investigation." (Kohn. Decl. ¶ 4). It is unclear, however, exactly when during the Paggioli lawsuit counsel contacted Mr. Sheridan; Mr. Sheridan's declaration does not mention any request from Mr. Kohn or O'Melveny & Myers regarding his investigative notes, and Mr. Kohn's declaration also fails to specify when Mr. Sheridan was asked for his notes. (See Tr. at 26). Mr. Kohn also states that although his firm was involved at the time, he personally was not yet involved in the conversation with Sheridan or with discovery, but he "believe[s] we told the school, litigation hold. I don't know if we went to every lawyer who may have been involved, okay? But I, I cannot represent to the Court that we did or didn't." (Id. at 40).

According to counsel, Mr. Sheridan indicated at the time that he would look for his files, although he stated that he "did not take a great deal of notes." (Kohn Decl. ¶ 4). While counsel admits that they "never received any documents from Mr. Sheridan," they contend that once the court dismissed the Paggioli suit, there was "no obvious reason to continue to pursue the matter." (Id.) Defendants' counsel, however, also represents that he "continue[s] to hold all documents collected from the Paggioli case"[56] (Id. ¶ 6; Defs.' Sur-Reply at 5), but does not explain why defendants did not follow through with Mr. Sheridan to obtain a copy of his notes or why they had "no obvious reason to continue to pursue the matter" (Kohn. Decl. ¶ 4); in fact, the retention of the Paggioli documents implies that counsel recognized their duty to retain those documents.

Furthermore, even if a litigation hold had been properly implemented in this case, a defendant's "discovery obligations do not end with the implementation of a 'litigation hold' – to

---

[56]Defendants' counsel states: "I had gathered a lot of this stuff back in 2004, 2005 in the prior lawsuit that was dismissed." (Tr. at 14).

38

the contrary, that's only the beginning. Counsel must oversee compliance with the litigation hold, monitoring the party's efforts to retain and produce the relevant" evidence. Zubulake V, 229 F.R.D. at 432. There are "a number of steps that counsel should take to ensure compliance with the preservation obligation," such as notifying the client of that obligation, but "[a]t some point, the client must bear responsibility for a failure to preserve." Id. at 433. "As with the litigation hold, the key players should be periodically reminded that the preservation duty is still in place." Id. at 433-34.

Although Mr. Sheridan was specifically retained to investigate the claims raised by plaintiffs Hiltbrand and Paggioli, defendants and defendants' counsel, after their initial attempt to obtain a copy of his notes during the Paggioli case, failed to reach out to Mr. Sheridan until at least six months after the current lawsuit was commenced. (Sheridan Decl. ¶ 11; Tr. at 27; see also infra at 41, 49). Since counsel was already aware of the existence of these notes from their involvement in the earlier litigation, counsel was under a duty to notify Mr. Sheridan of the newly filed action and remind him of the litigation hold. As in Keir v. UnumProvident Corp., however, by the time counsel took the necessary steps to locate the essential document, it had been destroyed. No. 02 CV 8781, 2003 WL 21997747 (S.D.N.Y. Aug. 22, 2003). "[H]ad counsel in [this case] promptly taken the precautions set out above, the [notes] would not have been lost." Zubulake V, 229 F.R.D. at 434. In light of the fact that two of the four potential times that Mr. Sheridan lists for when he might have discarded his notes are October of 2009 and February of 2010 (Sheridan Decl. ¶ 11; Pls.' 7/16/10 Letter at 2; Tr. at 29), it is possible that, had counsel contacted Mr. Sheridan shortly after this case was filed, they might have obtained the notes prior to their destruction.

Defendants, however, assert that neither they nor Mr. Sheridan were "obliged to preserve attorney notes between the dismissal of the Paggioli litigation and the time that they became relevant as a result of this Court's May 25 Order." (Defs.' Mem. at 12, 18-19). Defendants argue that since the notes were only disposed of after Paggioli's lawsuit was dismissed in 2005, any duty that might have existed had expired between the termination of the Paggioli case and the filing of this case. (Id. at 2, 11, 18-19; Sheridan Decl. ¶ 11). In an attempt to support this argument, defendants cite Toussie v. County of Suffolk, No. 01 CV 6716, 2007 WL 4565160, at *7 (E.D.N.Y. Dec. 21, 2001), contending that "as Mr. Sheridan had no duty to preserve privileged attorney notes, there is no evidence that the attorney notes and letters were discarded with a culpable state of mind." (Defs.' Mem. at 18-19 (citing 2007 WL 4565160, at *7)). This argument confuses and conflates the question of whether there was an obligation to preserve the evidence with the question as to the state of mind with which evidence was spoliated.

In Toussie, the court found that because the County defendants were under an obligation to preserve certain relevant electronic data, their failure to implement a litigation hold at the appropriate time constituted gross negligence. 2007 WL 4565160, at *7. However, under the circumstances, the court found that the County's "early foot dragging" and failure to implement a litigation hold did "not rise to the egregious level seen in cases where relevance is determined as a matter of law." Id. at *8. Instead, the court found the County defendants' conduct to be "'merely negligent,'" and denied the requested sanction of default and/or an adverse inference when plaintiffs failed to demonstrate that the missing emails were relevant and favorable to plaintiffs' case. Id. at *7.

Although the facts in Toussie are clearly distinguishable from the current matter, the court

40

in <u>Toussie</u> made it clear that "the duty to preserve arises prior to the filing of a complaint[,] at the point in time when a defendant first anticipates litigation." <u>Id.</u> at *6. Moreover, "once the duty to preserve attaches, at a minimum, a litigant is expected to 'suspend its routine document and retention/detention policy[57] and to put in place a litigation hold.'" <u>Id.</u> at *7 (citations omitted). As such, while <u>Toussie</u> might support an assertion that Mr. Sheridan's failure to preserve the notes was merely negligent, <u>Toussie</u> does not support defendants' assertions that defendants had no duty to preserve the notes at all.

Defendants further argue that Mr. Sheridan had no duty to maintain the notes because he "was not aware of the present action and did not anticipate further litigation against Poly Prep when he discarded his attorney notes." (Defs.' Mem. at 18). However, Mr. Sheridan's explanation for discarding the notes is somewhat different; according to Mr. Sheridan, he discarded the notes "because I am a solo practitioner, I am unable to store and maintain client files for closed matters indefinitely." (Sheridan Decl. ¶ 11). Apart from the fact that the file of notes was, by defendants' own account, not voluminous, perhaps more troubling is that, as already noted, even after the instant suit was commenced, defendants' counsel waited more than six months, until May of 2010, to notify Mr. Sheridan about the case and to ask about his notes. (<u>Id.</u>; <u>see also</u> Tr. at 27).

Even if the notes were destroyed prior to Mr. Sheridan's learning of the present lawsuit (Sheridan Decl. ¶ 11), the defendants and their counsel, including Mr. Sheridan, were on notice that other potential plaintiffs existed. Not only had Hiltbrand's attorney previously contacted

---

[57]This would include Mr. Sheridan's "regular review of files from closed cases," during which his notes were potentially discarded. (Sheridan Decl. ¶ 11; Pls.' 7/16/10 Letter at 2).

Poly Prep about possible litigation (Pls.' 7/16/10 Letter at 3), but given the "ample evidence that numerous other children had been sexually abused by Philip Foglietta during his quarter century tenure at Poly Prep" (Pls.' Mem. at 31), defendants should have anticipated possible future litigation. (See discussion, supra at 4-11; 17-19). Under these circumstances, it is clear that defendants and their counsel, including Mr. Sheridan, were under a continuing obligation to abstain from discarding files relevant to these allegations and to maintain the notes taken during Sheridan's investigation. See, e.g., Fujitsu Ltd. v. Federal Express Corp., 247 F.3d at 436. As noted earlier, defendants' counsel's assertion that "we continue to hold all documents collected from the Paggioli case," contradicts defendants' assertion that they believed their duty to retain those documents had expired. (See discussion, supra at 38 (citing Kohn Decl. ¶ 6; Defs.' Sur-Reply at 5)).

The law clearly requires defendants to have obtained the notes, or a copy thereof, to maintain them in a secure location, and to have put all necessary individuals, including Mr. Sheridan, on notice of the existence of a litigation hold. "It is no defense to suggest . . . that particular [individuals] were not on notice. To hold otherwise would permit [defendants] to shield [themselves] from discovery obligations by keeping [certain individuals] ignorant." Gutman v. Klein, No. 03 CV 1570, 2008 WL 4682208, at *8 (E.D.N.Y. Oct. 15, 2008) (citing Turner v. Hudson Transit Lines, Inc., 142 F.R.D. at 73), adopted in full, 2008 WL 5084182 (E.D.N.Y. Dec. 2, 2008). Therefore, even if it could be argued that Mr. Sheridan himself no longer had an independent duty to keep his notes at the time that they were discarded or destroyed, by that time, defendants' various counsel should have put a hold in place and should have obtained a copy, which it appears they never did.

42

Defendants raise an additional argument, namely, that "neither Poly Prep nor Mr. Sheridan had a duty to preserve attorney notes that were not discoverable because they were privileged and work product." (Defs.' Mem. at 12). However, these claims that defendants had no duty to maintain the notes and that they were destroyed because they were considered privileged is not supported by the evidence. Apart from the fact that there has been no assertion that Mr. Sheridan discarded his notes because he thought that they were privileged and non-discoverable, defendants have provided no authority to support their argument that the existence of a privilege allows a party to dispose of potentially relevant information during the pendency of a litigation. Not only has the Court been unable to find any case law to support such a proposition, but at least one court has found that spoliation had occurred when evidence appearing on a privilege log, or which had been marked as privileged, was destroyed. See Gutman v. Klein, 2008 WL 4682208, at *8, *12 (noting that "[t]he spoliated computer files labeled 'Privileged' and 'Confidential,' . . . might have related to any one or more of the claims. Because defendant spoliated the files, 'it is impossible to identify which files [were relevant to plaintiff's claims] and how they might have been used'"). Apart from the lack of support for defendants' argument that privileged documents can be destroyed and therefore not spoliated, there is also an issue as to whether the privilege would have even applied to Mr. Sheridan's notes. Since the notes are no longer available for review, the Court is unable to determine whether they constitute work product in whole or in part or whether they are subject to the attorney client privilege. (See discussion of the privilege, infra at 56-61).

43

Finally, plaintiffs argue that under 22 N.Y.C.R.R. § 691.20(f),[58] an attorney must preserve, for a period of seven years, "virtually the entire file of the attorney," where there is a claim for personal injury. (Pls.' 7/16/10 Letter at 3 (citing Moore v. Ackerman, 24 Misc. 3d 275, 282, 876 N.Y.S.2d 831, 837 (N.Y. Sup. Ct. 2009))). In Moore v. Ackerman, the court stated that "there is nothing in the rules or case law that releases a lawyer from the obligation to retain specified documents when the client's file is released to the client or another law firm. The failure to maintain client files in violation of court rules is sanctionable conduct." 24 Misc. 3d at 282-83, 876 N.Y.S.2d at 837-38 (citing Matter of Dahowski, 103 A.D.2d 354, 354-55, 479 N.Y.S.2d 755, 755-56 (2d Dep't 1984)).

Under this requirement, plaintiffs contend that Mr. Sheridan and Mr. Kohn were required to maintain Mr. Sheridan's notes after the Paggioli lawsuit. However, it is not clear to this Court that Moore, Dahowski, or 22 N.Y.C.R.R. § 691.20 apply to Mr. Paggioli's case or the types of

---

[58]This section reads in full as follows:

> Attorneys for both plaintiff and defendant in the case of any such claim or cause of action shall preserve, for a period of seven years after any settlement or satisfaction of the claim or cause of action or any judgment thereon or after the dismissal or discontinuance of any action, the pleadings and other papers pertaining to such claim or cause of action, including, but not limited to, letters or other date relating to the claim of loss of time from employment or loss of income; medical reports, medical bills, X-ray reports, X- ray bills; repair bills, estimates of repairs; all correspondence concerning the claim or cause of action; and memoranda of the disposition thereof as well as canceled vouchers, receipts and memoranda evidencing the amounts disbursed by the attorney to the client and others in connection with the aforesaid claim or cause of action and such other records as are required to be maintained under section 691.12 of this Part.

22 N.Y.C.R.R. § 691.20(f).

documents at issue here.[59]  Regardless, even if 22 N.Y.C.R.R. § 691.20 does not apply to this

case, the Court finds that defendants had a continuing obligation to retain the Sheridan notes and

that plaintiffs have sufficiently established the first prong of the spoliation test.


   2. Prong 2:  State of Mind

   The second prong of the spoliation sanctions analysis requires that plaintiffs show "that

the records were destroyed 'with a culpable state of mind.'"  Residential Funding Corp. v.

DeGeorge Fin. Corp., 306 F.3d at 107.  "[A]s the Second Circuit recently observed, '[t]he law in

this circuit is not clear on what state of mind a spoliator must have when destroying [evidence].'"

Sterbenz v. Attina, 205 F. Supp. 2d at 74 n.13 (citing Byrnie v. Town of Cromwell, Bd. of Educ.,

243 F.3d at 107-08).  Some courts in this circuit have required a showing of bad faith, some have

required proof of intentional destruction, and others have drawn an inference based on gross

negligence.  See Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d at 107-08 (citing Reilly v.

NatWest Mkts. Group Inc., 181 F.3d 253, 267 (2d Cir. 1999), cert. denied, 528 U.S. 1119

(2000)).  Thus, the Second Circuit has concluded that "a case by case approach [i]s appropriate."

Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d at 108.  Plaintiffs, however, have the

burden of showing that the notes were destroyed, at a minimum, either knowingly or negligently.

See id. at 109.

_____

   [59]22 N.Y.C.R.R. § 691.20 applies to:  "[c]laims or actions for personal injury, property
damage, wrongful death, loss of services resulting from personal injuries, due to negligence or
any type of malpractice, and claims in connection with condemnation or change of grade
proceedings."  22 N.Y.C.R.R. § 691.20.  Much of this provision, as well as the opinions in
Moore and Dahowski refer to record or bookkeeping documents, such as retainer agreements,
bills, records regarding the use of client funds, and the like.  Except for section (f) of 22
N.Y.C.R.R. § 691.20, there is little reference to other types of documents such as evidence or
other discoverable materials.

Plaintiffs assert that "[t]he failure of [defendants'] lawyers and law firms to issue a

written litigation hold constitutes, at minimum, gross negligence because that failure was likely

to – and in fact did – result in the destruction of relevant information." (Pls.' 7/16/10 Letter at 3

(citing Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec. L.L.C., 685 F.

Supp. 2d at 464-65; Crown Castle USA, Inc. v. Fred A. Nudd Corp., No. 05 CV 6163T, 2010

WL 1286366, at *13 (W.D.N.Y. Mar. 31, 2010))).  Plaintiffs argue that the "discarding of the

original investigative notes (by Peter T. Sheridan, Esq.) and [allegedly] the copies of the notes

(by Greenberg Traurig, LLP) while litigation from David Hiltbrand or other victims should have

been reasonably anticipated, amounts to negligence, if not gross negligence or recklessness."

(Pls.' Mem. at 33).

The requirement that counsel "take affirmative steps to monitor compliance [with a

litigation hold] so that all sources of discoverable information are identified and searched," is not

a particularly burdensome one.  Zubulake V, 229 F.R.D. at 434 (emphasis added).  In fact,

"[c]ounsel does not have to review these documents, only see that they are retained."  Id.

Therefore, "the central question . . . is whether [defendant] and its counsel took all necessary

steps to guarantee that relevant data was both preserved and produced.  If the answer is 'no,' then

the next question is whether [defendant] acted willfully . . . negligently or even recklessly."  Id. at

431.

Neither negligence or gross negligence have been clearly defined in the context of

discovery misconduct, such as spoliation.  Pension Comm. of the Univ. of Montreal Pension Plan

v. Banc of Am. Sec., L.L.C., 685 F. Supp. 2d at 463.  "[T]hese terms simply describe a

continuum.  Conduct is either acceptable or unacceptable.  Once it is unacceptable the only

46

question is how bad is the conduct. . . . That said, it is well established that <u>negligence</u> involves unreasonable conduct in that it creates a risk of harm to others." <u>Id.</u> at 463-64. "'Gross negligence has been described as a failure to exercise even that care which a careless person would use.'" <u>Id.</u> (citation omitted). Courts in this circuit have found that the "failure to preserve evidence resulting in the loss or destruction of relevant information is surely negligent, and, depending on the circumstances, may be grossly negligent." <u>Id.</u> at 464-65. However, "the failure to issue a <u>written</u> litigation hold constitutes gross negligence because that failure is likely to result in the destruction of relevant information." <u>Id.</u> (emphasis in original); <u>see also</u> <u>Chan v. Triple 8 Palace, Inc.</u>, 2005 WL 1925579, at *7 (finding that "the utter failure to establish any form of litigation hold at the outset of litigation is grossly negligent"); <u>Zubulake IV</u>, 220 F.R.D. at 217.

In <u>Pension Committee</u>, the court held that a party's "fail[ure] to execute a comprehensive search for documents and/or fail[ure] to sufficiently supervise or monitor [] document collection," was "best characterized as either grossly negligent or negligent." <u>Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., L.L.C.</u>, 685 F. Supp. 2d at 477. While the failure to collect records from those who are not key players may constitute negligence, the failure to collect and preserve records from key players "constitutes gross negligence." <u>Id.</u> at 465, 477. Even in less extreme cases, where the defendant "failed to institute a full preservation program" and failed to ensure that all necessary employees, including support staff, knew about the preservation program, sanctions have been awarded. <u>Treppel v. Biovail Corp.</u>, 249 F.R.D. at 118-19.

Courts in this circuit have made it clear that, even where it cannot be shown that the

destruction of evidence was done willfully or in bad faith, sanctions may still be imposed upon a

finding of negligence.  See Zubulake V, 229 F.R.D. at 431 (holding that "[i]n this circuit, a

'culpable state of mind' for purposes of a spoliation inference includes ordinary negligence"); see

also Great Northern Ins. Co. v. Power Cooling, Inc., No. 06 CV 874, 2007 WL 2687666, at *9

(E.D.N.Y. Sept. 10, 2007); Indemnity Ins. Co. of N. Am. v. Liebert Corp., No. 96 CV 6675, 1998

WL 363834, at *3 (S.D.N.Y. June 29, 1998) (holding that sanctions may be awarded for

spoliation not just "where the evidence was destroyed willfully or in bad faith, since a party's

negligent loss of evidence can be just as fatal to the other party's ability to present a defense")

(internal citation omitted).  "[E]ven simple negligence [i]s a sufficiently culpable 'state of

mind.'"  Gaffield v. Wal-Mart Stores East, LP, 616 F. Supp. 2d 329, 339 (N.D.N.Y. 2009) (citing

Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d at 108).

 Under the circumstances present in this case, the Court is satisfied that defendants acted

with the requisite degree of culpability to satisfy this prong of the spoliation test.  Not only is it

unclear if any of defendants' various counsel ever instituted an oral litigation hold in connection

with the Paggioli case, but there does not appear to have been a written litigation hold issued at

any time prior to the destruction of the Sheridan notes.  Clearly, counsel from O'Melveny and

Myers recognized the potential relevance of the Sheridan notes, since it appears that they made a

request for those notes during the course of the Paggioli case, but they failed to follow up on that

request once the Paggioli case was dismissed.  While they may have believed that a litigation

hold was no longer necessary after the Paggioli case was dismissed, their failure to recognize the

potential for other litigation, particularly in light of the Hiltbrand and John Doe VI

communications, constitutes negligence at best, and their failure to alert Mr. Sheridan as soon as

the instant case was filed and to institute a litigation hold at that point, suffices to demonstrate gross negligence.  While it is unclear that such a litigation hold at that time would have necessarily preserved these notes, which may have in fact been destroyed prior to the filing of this case, there does not appear to have been any effort made, for at least six months after this case was filed, to locate these notes.

Accordingly, the Court finds that plaintiffs have demonstrated the requisite degree of culpability based on defendants' failure to establish a sufficient litigation hold on the Sheridan investigative notes.  See Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d at 107.


### 3.  Prong 3:  Relevance and Prejudice

Once evidence is alleged to have been destroyed due to a party's negligence, the Court considers whether "the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." Id. at 107-09; Zubulake V, 229 F.R.D. at 431.  The party seeking sanctions must make a showing that the destroyed evidence would have been favorable to them. See De Espana v. Am. Bureau of Shipping, No. 03 CV 3573, 2007 WL 1686327, at *6 (S.D.N.Y. June 6, 2007) (noting that "where the culpable party was negligent, there must be extrinsic evidence to demonstrate that the destroyed evidence was relevant and would have been unfavorable to the destroying party"); see also Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., L.L.C., 685 F. Supp. 2d at 467-68; Zubulake IV, 220 F.R.D. at 221.  However, courts have held that "[t]he burden placed on the moving party to show that the lost evidence would have been favorable to it ought not to be too onerous, lest the spoliator be permitted to profit from its destruction."

49

Treppel v. Biovail Corp., 249 F.R.D. at 123 (quoting Chan v. Triple 8 Palace, Inc., 2005 WL

1925579, at *7); see also Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d at 109;

Kronisch v. United States, 150 F.3d at 128; In re NTL, Inc. Sec. Litig., 244 F.R.D. 179, 199-200

(S.D.N.Y 2007).

 In considering the burden of establishing relevance and prejudice when documents have

been destroyed, at least one court has found that "[t]he burden of proof question differs

depending on the severity of the sanction. For less severe sanctions – such as fines and cost-

shifting – the inquiry focuses more on the conduct of the spoliating party than on whether

documents were lost, and if so, whether those documents were relevant and resulted in prejudice

to the innocent party." Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am.

Sec., L.L.C., 685 F. Supp. 2d at 467. However, "for more severe sanctions – such as dismissal,

preclusion, or the imposition of an adverse inference – the court must consider, in addition to the

conduct of the spoliating party, whether any missing evidence was relevant and whether the

innocent party has suffered prejudice as a result of the loss of evidence." Id. "[T]he burden of

proving that evidence would have been relevant to a party's claims or defense is proportional to

the mens rea of the party who destroyed the evidence," and "where the party destroyed the

evidence due to ordinary negligence [as opposed to bad faith], 'the burden falls on the

'prejudiced party' to produce 'some evidence suggesting that a document or documents relevant

to substantiating his claim would have been included among the destroyed files.'" Gutman v.

Klein, 2008 WL 4682208, at *7. To satisfy this burden, the innocent party may provide

sufficient evidence that would tend to show that the lost documents "'would have been favorable

to [its] case.'" Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec.,

50

L.L.C., 685 F. Supp. 2d at 468 (quoting Toussie v. County of Suffolk, 2007 WL 4565160, at *8).
Where a spoliating party has been grossly negligent, resulting in the loss of evidence, many
courts have presumed relevance, although the presumption is not required. Id.; see also Treppel
v. Biovail Corp., 249 F.R.D. at 121-22 (holding that "under certain circumstances 'a showing of
gross negligence in the destruction . . . of evidence' will support [a relevance] inference")
(internal citations omitted).

In this case, plaintiffs assert that "[d]efendants' gross negligence should automatically
trigger an inference of relevance." (Pls.' Mem. at 36). While it is unclear why Mr. Sheridan was
not contacted and a litigation hold put in place when the instant action was filed, the Court finds
that defendants' conduct does not rise to the level which requires a determination of relevance as
a matter of law. See Toussie v. County of Suffolk, 2007 WL 4565160, at *8. Although it is not
certain that a timely litigation hold, instituted upon commencement of this case, would have
preserved the notes, the Court finds that defendants should have recognized the need to preserve
Sheridan's notes even after the Paggioli case was dismissed. However, even if the defendants'
conduct can merely be characterized as negligent, it seems clear to the Court that the actual notes
from Sheridan's investigation are factually relevant to the claims and defenses in this case.

However, in addition to showing that "the destroyed evidence would have been relevant
to the contested issue," plaintiffs must show that they have been prejudiced by the loss of the
documents. Barsoum v. N.Y.C. Hous. Auth., 202 F.R.D. at 400 (quoting Kronisch v. United
States, 150 F.3d at 127); see also Sovulj v. United States, No 98 CV 5550, 2005 WL 2290495, at
*5 (E.D.N.Y. Sept. 20, 2005) (holding that "[t]he prejudiced party may be permitted an inference
in his favor so long as he has produced some evidence suggesting that a document or documents

51

relevant to substantiating his claim would have been included among the destroyed files"). As

the court in Pension Committee noted, at times "it is impossible to know the extent of the

prejudice suffered . . . as a result of those emails and documents that have been permanently lost .

. . 'Because we do not know what has been destroyed, it is impossible to accurately assess what

harm has been done to the innocent party and what prejudice it has suffered." 685 F. Supp. 2d at

478.

Plaintiffs assert that Mr. Sheridan's "investigative notes are by far the best and most

thorough evidence" with respect to "the information gleaned by Peter T. Sheridan, Esq. as to the

timing, nature, and extent of the knowledge of Poly Prep, and its various administrators, trustees,

and faculty members, as to Philip Foglietta's sexual abuse of children, and as to Poly Prep's

response in 1991 to David Hiltbrand's letter." (Pls.' 7/16/10 Letter at 2).  Plaintiffs also claim

that Sheridan's actual notes would not only have been useful in questioning witnesses, but that

their loss has caused prejudice to the plaintiffs' case because the notes may provide the only

record of the recollections of witnesses who no longer can recall the events or who have since

died.  (Mulhearn Decl., Ex. 3 at 237-38; see also discussion, supra at 25 n.46).  The Court agrees,

especially considering that:

> At least one individual interviewed by Mr. Sheridan, Harlow
> Parker], has since died, which makes it impossible to replicate his
> detailed testimony of events.  Likewise, Mr. Williams, during his
> June 30, 2010, claimed to have no knowledge or recollection
> whatsoever about ever meeting or being interviewed by Mr.
> Sheridan, and was unable to refresh his recollection even after
> being shown and questioned about notes taken by Robert F.
> Herrmann, Esq., Poly Prep's counsel, which purportedly
> summarize or provide highlights of Mr. Sheridan's fact-finding
> interview of Mr. Williams in 2002.

(Pls.' 7/16/10 Letter at 2; see also Mulhearn Decl., Ex. 3 at 159-60, 235-39).  Thus, despite notes

taken by Mr. Herrmann regarding a supposed discussion that Sheridan had with Williams,

Williams has testified that he has no recollection of ever speaking with Sheridan. Furthermore,

there are numerous inconsistencies in Williams' deposition testimony and in the two different

versions of his handwritten statement to the Board. (See Mulhearn Decl., Ex. 20 at 3 n.1, Exs.

25-26). Mr. Sheridan's notes may have been useful in shedding some light on these

discrepancies. Plaintiffs therefore claim that they "have suffered significant prejudice from the

loss or destruction of the Sheridan investigative notes. Indeed, the Sheridan fact-finding

interviews were critical to Plaintiffs' equitable estoppel/fraudulent concealment claims." (Pls.'

7/16/10 Letter at 4).

Defendants, however, assert that the loss of Sheridan's notes does not prejudice plaintiffs

in any way because the notes "were quite limited" and included only general themes and personal

shorthand. (Sheridan Decl. ¶ 11; Defs.' Mem. at 1, 9, 11). Defendants further assert that "[a]

spoliation motion must be based on primary evidence that cannot be replicated" and that the

notes taken by Mr. Herrmann, Poly Prep's outside counsel, of a conversation he had with Mr.

Sheridan, are a sufficient replica of Sheridan's notes. (Defs.' Mem. at 2, 11 (citing Zubulake IV,

220 F.R.D. at 217)). Specifically, Mr. Sheridan asserts that during this conversation his co-

counsel Mr. Herrmann, they "discussed [his] findings . . . a thorough description of [his]

interviews, which would have included the contents of any notes [he] had taken, as well as the

conclusions [he] had drawn from the interviews." (Sheridan Decl. ¶ 10). Defendants therefore

argue that Herrmann's notes, which have been produced to plaintiffs, likely provide the best

evidence of Sheridan's investigation and are therefore a sufficient replacement and "there is

nothing 'lost.'" (Defs.' Mem. at 2, 11-13). Defendants assert that "Plaintiffs have everything

53

that is relevant and discoverable on these points and their contention to the contrary is a transparent attempt to procure more discovery that they do not need." (Id. at 13).

However, as defendants note, Zubulake IV held that "anyone who anticipates being a party or is a party to a lawsuit must not destroy unique, relevant evidence that might be useful to an adversary." 220 F.R.D. at 217. Even if Herrmann took secondhand notes based on Sheridan's description of his findings, that does not mean that the Sheridan notes were not unique. The required preservation of evidence is to allow for "use [of the evidence] by the opposing party." Houlihan v. Marriot Int'l, Inc., 2003 WL 22271206, at *1. Plaintiffs assert that "[t]he prejudice [which results from the loss of the notes] may not be remedied by a mere proffer from Mr. Sheridan – eight years after the critical interviews took place – which has been offered by Defendants." (Pls.' 7/16/10 Letter at 4; see also Defs.' Mem. at 1-2). At the very least, Sheridan's notes might have assisted in refreshing his recollection of the investigation or been useful in jogging the memories of the individuals interviewed by Sheridan.

Defendants further argue that plaintiffs are not prejudiced by the loss of the notes because Sheridan found no evidence or knowledge of any abuse, and therefore, the "notes would not support their equitable estoppel argument" or "claims of fraudulent concealment." (Defs.' Mem. at 2, 13-16). However, there is really no way to know this without having the actual notes. Therefore, defendants' self-serving assertions of irrelevance cannot be verified due to the loss of the notes, and Mr. Sheridan's own recollection of the details of his investigation and the contents of his notes are, understandably, somewhat hazy given the passage of time. As a consequence, the Court is not convinced that the notes taken by Mr. Herrmann during a conversation with Mr. Sheridan are a sufficient replacement for Mr. Sheridan's notes, nor is there any way to verify that

54

Herrmann's notes reflect all of the issues mentioned in Mr. Sheridan's notes.[60]

Having considered the parties' arguments, the Court finds that Mr. Sheridan's notes, particularly viewed in conjunction with Mr. Herrmann's notes, would not only have been relevant, but favorable to plaintiffs, to the extent that they may have assisted in refreshing the recollection of witnesses who can no longer remember certain details about what they knew and when.  One of the key witnesses to plaintiffs' equitable estoppel inquiry, which is dependent in some measure on the timing of when the school learned of certain things, was Mr. Williams, who was, as already noted, unable to recall at his deposition many of the details and events that might have been clearer in his mind eight years earlier when he was interviewed by Mr. Sheridan.  Other witnesses may also have remembered events more clearly in 2002.  Mr. Sheridan's notes may have contained information helpful to jog the memories of those witnesses.

Under these circumstances, the Court cannot say that Mr. Sheridan's notes would not have been helpful in assessing the plaintiffs' equitable estoppel argument.  Even if Mr. Sheridan had concluded that there was no credible evidence of abuse, his conclusory assessment of the extent of the school's knowledge is not determinative.  Given that the defendants were under a duty to preserve the notes, that duty included a duty to preserve them in a manner such that they could be "use[d] as evidence" in the trial, which defendants have failed to do.  Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d at 107 (quoting West v. Goodyear Tire & Rubber Co., 167

---

[60]Plaintiffs cite to People v. Betts for the proposition that "[i]t has been repeatedly held that the spoilation of an original document will prevent that spoliator from proving the contents of the destroyed document by secondary evidence." (Pls.' Reply Mem. at 39 (citing 272 A.D. 737, 741 (N.Y. App. Div. 1947))).  While Betts involved the willful, intentional destruction of evidence, which is not present in this case, the Court nevertheless finds that defendants' proffered secondary evidence is insufficient to replace the lost notes.

F.3d at 779); see also Houlihan v. Marriot Int'l, Inc., 2003 WL 22271206, at *1.  Considering

defendants' conduct in light of the "continuum" described in Pension Committee and in light of

the relative lack of severity of the discovery sanctions requested, the Court finds that plaintiffs

have satisfied their burden under the third prong of the test.  Pension Comm. of the Univ. of

Montreal Pension Plan v. Banc of Am. Sec., L.L.C., 685 F. Supp. 2d at 467.


### 4. Privilege

Defendants assert that "there is simply no basis to conclude that plaintiffs have been

prejudiced" because Mr. Sheridan's notes "were privileged and work product"[61] (Defs.' Mem. at

2, 11), and therefore, "[p]laintiffs have no right to assert spoliation of attorney notes to which

they would never have been entitled in the first place."  (Id. at 16).  Plaintiffs assert that

defendants' privilege claim "is a specious attempt to sanctify 'fact gathering' interviews with the

cloak of attorney-client privilege even though there is no evidence that any legal advice was

dispensed by Peter T. Sheridan, Esq. to his selected interview subjects."  (Pls.' Mem. at 32).

Indeed, as already noted, there is no legal support for defendants' assertion that a claim of

privilege gives them the right to spoliate evidence.  (See discussion supra at 43-44).

Irregardless, defendants' privilege claim fails for a variety of reasons.  To the extent that

defendants may be claiming that the notes are protected from disclosure by the attorney-client

---

[61]Although defendants' counsel represents that "[i]n reviewing the records, we have
confirmed that [the attorney-client and work product privileges] apply" (Mulhearn Decl., Ex. 16
at 1), counsel also admits that Mr. Sheridan disposed of his original notes and files before
defendants actually obtained a copy.  (Id. at 3).  Thus, it does not appear that defendants' counsel
has actually reviewed the Sheridan notes and it is unclear how they are able to "confirm" the
existence of a privilege.

privilege, it is well established that the privilege does not protect underlying facts from disclosure simply because they are relayed to an attorney. Upjohn Co. v. United States, 449 U.S. 383, 395 (1981); see also United States Postal Service v. Phelps Dodge Refining Corp., 852 F. Supp. 156, 160, 163 (E.D.N.Y. 1994). "It is the communication which is privileged, not the underlying facts communicated. Thus, facts are not invested with a privilege merely by being communicated to an attorney and the presence of documents in an attorney's files does not automatically mean that privilege attaches." Smith v. Harmon Group, Inc., No. 90 CV 3348, 1992 WL 8176, at *2 (S.D.N.Y. Jan. 13, 1992) (citing inter alia Upjohn Co. v. United States, 449 U.S. at 395-96; Colton v. United States, 306 F.2d 633, 537 (2d Cir. 1962); Grossman v. Schwarz, 125 F.R.D. 376, 386 (S.D.N.Y. 1989); see also Hickman v. Taylor, 329 U.S. 495, 511 (1947); Matter of Grand Jury Subpoenas Dated Oct. 22, 1991 and Nov. 1, 1991, 959 F.2d 1158, 1165 (2d Cir. 1992) (finding that the "privilege protects 'confidential disclosures by a client to an attorney made in order to obtain legal assistance,' but it 'attaches not to the information but to the communication of the information'") (citations omitted).

In this case, even though Sheridan asserts that his notes were privileged and confidential "work product and were prepared in anticipation of litigation" and for the purpose of "provid[ing] legal advice to Poly Prep" (Sheridan Decl. ¶¶ 4-5, 12), defendants refer to Sheridan's notes as "fact-finding" notes.[62] (Mulhearn Decl., Ex. 20 at 2). Indeed, Sheridan admits that he asked benign questions of each interviewee, "about his or her background and

---

[62]Mr. Sheridan's invoices submitted to David Harman lists many of the tasks as "Communicate," but, on multiple occasions, Mr. Sheridan actually described his task as "Fact Gathering" and then listed the names of individuals who he interviewed. (See Exhibit 14 to the Mulhearn Declaration, which consists of invoices submitted by Peter Sheridan for his work for Poly Prep. ("Mulhearn Decl. Ex. 14").

role(s) at the school, and the nature, extent, and duration of his or her relationship with Mr.

Foglietta." (Sheridan Decl. ¶ 7; Defs.' Mem. at 7). The purpose of Sheridan's retention by Poly

Prep was to investigate and learn "the extent, if any, to which members of the school's faculty or

administration knew of sexual misconduct or sexual abuse by Mr. Foglietta," not to advise Poly

Prep on how to proceed. (Sheridan Decl. ¶ 4; see discussion, supra at 19-21). Indeed, although

Sheridan was engaged in September 2002 to conduct the investigation, a month later, in October

2002, Poly Prep engaged Greenberg Traurig to advise the school regarding its response to the

allegations. (Mulhearn Decl., Ex. 16 at 1-2). Plaintiffs' counsel also notes that "according to

th[e] documentation, [Sheridan] did not tell any of the people he interviewed that he was an

attorney. He did not tell them that he was there for the purpose of trying to defend Poly Prep in a

potential litigation. He did not tell them anything of that nature. So, the attorney-client privilege,

burden, the initial threshold burden is not met." (Tr. at 52-53).

To the extent that defendants assert that these notes, or parts thereof, would not have been

subject to disclosure because they are protected as work product, defendants have also failed to

meet their burden of showing that the notes qualify for work product protection.[63] "'Ordinarily, a

party may not discover documents and tangible things that are prepared in anticipation of

litigation or for trial by or for another party or its representative.'" Gonzalez v. City of New

York, No. 08 CV 2699, 2009 WL 2253118, at *2 (E.D.N.Y. July 28, 2009) (quoting Fed. R. Civ.

---

[63]Plaintiffs question whether the notes were actually created in anticipation of litigation, arguing that Sheridan's investigation might have been conducted even if there had been no threat of litigation. (Pls.' Reply Mem. at 29-30). "Defendants' mass mailing of a letter to alumni in October, 2002, which assured alumni that the Board was conducting an 'ongoing' investigation into sexual abuse allegations, would likely have been sent for business purposes regardless of" explicit threats or hints of pending litigation. (Id. at 29).

P. 26(b)(3)(A)).  However, "[a] contemporaneous factual memorandum memorializing the circumstances of [an incident] does not become attorney work product solely because the [incident] may thereafter lead to litigation." Robbins v. Chase Manhattan Bank, N.A., No. 97 CV 676, 1998 WL 106152, at *1 (S.D.N.Y. Mar. 9, 1998) (citing Smith v. Harmon Group, Inc., 1992 WL 8176, at *4).  In Smith v. Harmon Group, Inc., the document at issue was claimed to have been "prepared for and under the direction of counsel in anticipation of potential litigation," as is claimed here, but the court found that "[t]he content of the document does not support this claim.  It is a straightforward narrative account of what was said and done . . . the document 'does not relay any legal advice but merely discusses factual circumstances.'" 1992 WL 8176, at *2.  The court therefore held that "[i]n light of the possibility that the parties may rely on different versions of the events on the day of the [incident], raising issues of credibility and accuracy of recollection, plaintiff is entitled to defendants' contemporaneous factual record of their conversations with him." Id. (citing Grossman v. Schwarz, 125 F.R.D. at 389); see also In re Pfohl Bros. Landfill Litig., 175 F.R.D. 13, 25 (W.D.N.Y. 1997) (finding that "[a] fair determination of the threshold [issues in the case] can not be made unless [the requesting party] is allowed [access to] the objective factual information available to [the other party]").

Defendants claim that the work product "doctrine protects both fact work product, such as the factual content of Mr. Sheridan's interview notes, and opinion work product." (Defs.' Mem. at 17-18).  The Court disagrees.  However, even if the Court were to find that these notes could potentially be considered protected work product, the Supreme Court has clearly held that "[t]he privilege derived from the work-product doctrine is not absolute," but rather a "qualified privilege or immunity." United States v. Armstrong, 517 U.S. 456, 474 (1996) (quoting United

59

States v. Nobles, 422 U.S. 225, 239 (1975)); see also Hickman v. Taylor, 329 U.S. at 510;

Gonzalez v. City of New York, 2009 WL 2253118, at *2 (holding that "discovery of such

information may be obtained, . . . if 'the party shows that it has substantial need for the materials

to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by

other means'") (quoting Fed. R. Civ. P. 26(b)(3)(A)).  Therefore, the claim of work product

protection can be overcome in some circumstances.

Since the notes have been destroyed, the Court is unable to evaluate their contents to

make its own determination as to whether portions of the notes should have been protected or

whether plaintiffs have demonstrated an inability to obtain the information through other means.

Although the Court cannot review the notes, the facts of this case demonstrate that these notes

most likely would not have qualified for work product protection in their entirety.

Finally, to the extent that defendants have argued that Herrmann's notes are sufficient to

replace the lost Sheridan notes, it is unclear why Sheridan's notes would be protected as

privileged but Herrmann's notes,[64] presumably prepared during a conversation with Mr.

Sheridan, would not.  Defendants assert that "[w]hile [Mr. Herrmann's] notes are unquestionably

privileged, Poly Prep is willing to agree to a limited waiver of privilege as to the factual matters

in the notes, but not to waive the privilege as to Mr. Herrmann's legal opinions or advice."

(Mulhearn Decl., Ex. 16 at 3-4).  Having reviewed Herrmann's notes, the unredacted portions

---

[64]Mr. Herrmann's notes consist of eleven sheets of paper, the first six of which are numbered consecutively and appear to be one document.  (See Exhibit 15 to the Mulhearn Declaration, which is a copy of the handwritten notes taken by Robert F. Herrmann, Esq., as a result of his conversation with Peter Sheridan, dated November 8, 2002 ("Mulhearn Decl., Ex. 15").  Of those six pages, there is only one small portion that has been redacted as non-factual. (Id. at 1).  Of the remaining five pages, it is unclear if they are part of the same document, but three of these five pages have been redacted.  (Id. at 7-11).

appear to contain mostly facts or personal opinions and views related by the interviewees. (Id. at

1-6).  As facts are not privileged in the first place, there was no privilege for defendants to waive.

Indeed, the Herrmann notes do not appear to be much different in form or substance from the

handwritten notes of David Harman, for which no privilege has been asserted. (See Mulhearn

Decl., Ex 29).

In conclusion, based on all of the above, the Court finds that defendants have not met

their burden with respect to the applicability of either the attorney-client or work product

privileges.[65]  See von Bulow v. von Bulow, 811 F.2d 136, 144 (2d Cir. 1987), cert. denied, 481

U.S. 1015 (1987); King v. Conde, 121 F.R.D. 180, 189 (E.D.N.Y. 1988).  However, even if parts

of the notes would have been considered privileged, the defendants' spoliation has deprived

plaintiffs of the opportunity to have this Court conduct an *in camera* review to determine the

existence of said privilege and to have the documents produced in partially redacted form.

Therefore, the Court finds that plaintiffs have sufficiently satisfied the third prong of the

spoliation test.  See Siggelko v. Kohl's Dept. Stores, Inc., No. 06 CV 2281, 2009 WL 750173, at

*2 (E.D.N.Y. Mar. 17, 2009).

C. Sanctions

Having found that plaintiffs have met all three prongs of the spoliation test, the Court

---

[65]The Court notes that plaintiffs have also asserted that any privilege that might have
applied was either waived by defendants due to voluntary disclosure or is lost because of the
crime-fraud exception. (Pls.' Reply Mem. at 32-34).  Since the Court has found that defendants
have not sufficiently proven that any privilege applies, it is not necessary to analyze these
arguments further.  In addition, as noted below (see discussion, infra at 74-79), the Court has
found that fraud has not been proven and thus the crime-fraud exception would not apply.

must now determine what, if any, sanctions to impose.  As already noted, "the determination of

an appropriate sanction for spoliation, if any, is confined to the sound discretion of the trial

judge."  Id. at *3.  "[A]t the end of the day the judgment call of whether to award sanctions is

inherently subjective.  A court has a 'gut reaction' based on years of experience as to whether a

litigant has complied with its discovery obligations and how hard it worked to comply."  Pension

Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., L.L.C., 685 F. Supp. 2d at

471.  The Court must determine whether the defendants' "[c]onduct is either acceptable or

unacceptable," and therefore warrants sanction.  Id. at 463-64.  As already noted, the Court finds

that the defendants in this case have acted negligently, at best, in not preventing the spoliation of

relevant evidence.  The Court therefore finds that sanctions are warranted.

　　　While the appropriate sanction to be imposed lies within the Court's discretion, sanctions

"should be designed to:  (1) deter parties from engaging in spoliation; (2) place the risk of an

erroneous judgment on the party who wrongfully created the risk; and (3) restore 'the prejudiced

party to the same position he would have been in absent the wrongful destruction of evidence by

the opposing party.'"  West v. Goodyear Tire & Rubber Co., 167 F.3d at 779 (citing inter alia

Update Art, Inc. v. Modiin Pub., Ltd., 843 F.2d 67, 71 (2d Cir. 1988)).  In addition to outright

dismissal, many other sanctions, such as an adverse jury inference and additional discovery, are

available to remedy acts of spoliation.  See Dahoda v. John Deere Co., 216 Fed. Appx. 124, 124

(2d Cir. 2007) (holding that a trial court should not order dismissal for spoliation where less

drastic alternatives exist); see also Fed. R. Civ. P. 37(b)(2) (providing examples of available

sanctions).  "The choices include - from least harsh to most harsh - further discovery, cost-

shifting, fines, special jury instructions, preclusion, and the entry of default or dismissal

(terminating sanctions)." Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am.

Sec., L.L.C., 685 F. Supp. 2d at 469.

As noted above (see supra at 26-27), plaintiffs have requested an assortment of sanctions,

such as additional discovery, including permission to take numerous additional depositions,

attorneys' fees and costs incurred in connection with the filing of this motion and in conducting

all other additional discovery awarded by the Court, and permission to file a Second Amended

Complaint upon completion of said discovery. The Court notes that these are among the less

severe or "lowest range of sanctions that are available for spoliation," or "the lowest threshold of

relief." (Tr. at 33, 75).

1. Additional Depositions

Plaintiffs first request an opportunity to take additional depositions to "support and

amplify their equitable estoppel and fraudulent concealment claims, as well as their Civil RICO

claims." (Pls.' Mem. at 43). As previously addressed in this Court's May 25, 2010 Order,

plaintiffs seek to assert an equitable estoppel argument in opposition to defendants' motion to

dismiss. (See Order[66] at 4-11). In allowing plaintiffs to take some limited discovery, this Court

found that there was sufficient evidence suggesting that Poly Prep and the other defendants may

have engaged in acts that were "designed to dissuade the underage victims and, more

importantly, their parents, from further pursuing their complaints" of sexual abuse. (Id. at 12-

13). The Court therefore held that, before deciding the issue of equitable estoppel, plaintiffs

_____

[66]Citations to "Order" refer to this Court's May 25, 2010 Order granting plaintiffs
additional limited discovery.

should be given the opportunity to determine if "additional discovery might establish" that

plaintiffs did not have "actual knowledge of their cause of action at the moment the alleged

sexual abuse took place." (Id.)  See Kalaras v. Manhattan Eye, Ear & Throat Hosp., No. 95 CV

7784, 1996 WL 727439, at *2 (S.D.N.Y. Dec. 18, 1996) (permitting limited discovery into

statute of limitations issues where plaintiff raised equitable tolling in response to defendant's

motion to dismiss plaintiff's claims as untimely); McKenney v. Nat'l Rural Letter Carriers Ass'n,

No. 07 CV 584A, 2009 WL 902506, at *1 (W.D.N.Y. Apr. 2, 2009) (denying motion to dismiss

without prejudice as premature and authorizing limited discovery); Wynder v. McMahon, No. 99

CV 772, 2008 WL 111184, at *1 (E.D.N.Y. Jan. 9, 2008).

In an attempt to remedy the prejudice resulting from the loss of the Sheridan investigation

notes, plaintiffs request permission to depose "all living individuals interviewed by Mr.

Sheridan;" this includes Steven Andersen, David B. Harman, Edward Ruck, Ralph Dupee, Joan

Wright, and Harry Petchesky, Esq., as well as individuals who plaintiffs claim should have been

part of Poly Prep's 2002/2003 investigation – James Esposito[67] and Michael Junsch.[68] (Pls.'

---

[67]Plaintiffs have alleged that Esposito, a former Poly Prep student and football coach, told Mr. Williams during a faculty meeting held after receipt of Hiltbrand's letter, that there were rumors among alumni that Foglietta sexually abused children. (Pls.' Reply Mem. at 4; Tr. at 58). Plaintiffs therefore ask: "What, if anything, did Mr. Sheridan do to ascertain the source or provenance of the 'persistent rumors' of Foglietta's sexual abuse of children, as stated – according to Mr. Williams – by James Esposito?  Why didn't Mr. Sheridan interview Mr. Esposito?" (Pls.' Reply Mem. at 43).

[68]Plaintiffs allege that Junsch, who was a classmate of David Hiltbrand's and who is apparently still teaching at Poly Prep, was present when Williams investigated the Hiltbrand accusations in 1991. (Pls.' Reply Mem. at 4).  Plaintiffs question why Mr. Sheridan neglected to interview Michael Junsch, or "other faculty members who had played football for Foglietta, or had been present at the school for the bulk of Foglietta's tenure." (Id. at 45).  Plaintiffs claim that Junsch was "present during the initial meeting that Mr. Williams had with his athletic department in 1991 after he received Hiltbrand's letter" (Tr. at 49), and where the rumors were mentioned by Esposito.  Plaintiffs assert that the Sheridan notes might have shed some light on what else happened at this meeting, such as things that Williams might have told Sheridan, but which, at the time of his deposition, he could no longer remember. (Id. at 49-50). Mr. Harman's

Mem. at 37-38).  Plaintiffs contend that "[t]he loss of [Sheridan's] notes has created a chasm of

critical questions . . . which cannot be answered absent further discovery." (Pls.' Reply Mem. at

43).  For this reason, the Court grants plaintiffs' request to depose these individuals, including

Mr. Junsch and Mr. Esposito.  With respect to Messrs. Junsch and Esposito, plaintiffs assert that:

> whether or not Mr. Sheridan interviewed those two individuals, the
> scope and extent of the communications that Mr. Williams and/or
> others at Poly Prep had with Mr. Junsch and Mr. Esposito,
> specifically with respect to the knowledge as to what and whether
> Poly Prep and their faculty and administrators had knowledge of
> Foglietta's sexual abuse prior to 1991, surely would have been
> within the scope and purview of that investigation.

(Tr. at 58-59).  Similarly, in light of the declaration provided by Mr. Sheridan, the Court finds

that a deposition of Mr. Sheridan may be helpful in reconstructing the information he gathered

during his investigation.  (See discussion supra at 19-21, 53-54).

In summary, in light of the loss of the Sheridan notes, the Court finds that the requested

additional depositions are the only alternative and should be permitted at this time[69] in order to

restore the plaintiffs to the position they would have been in but for defendants' spoliation, or "to

alleviate the harm suffered" by the spoliation of Sheridan's notes.  Pension Comm. of the Univ.

of Montreal Pension Plan v. Banc of Am. Sec., L.L.C., 685 F. Supp. 2d at 470.

### 2.  Scope of May 25, 2010 Order

During the course of briefing this sanctions motion, the parties raised a dispute as to the

---

notes from September 29, 2002 contain the reference:  "show Hiltbrand's letter to Junsch and
Anderson."  (Id. at 57-58).  As noted earlier (supra at 10 n.15), the Court assumes that
"Anderson" refers to Steven Andersen, who, unlike Junsch, was interviewed by Sheridan.

[69]The Court notes that if plaintiffs' Complaint survives defendants' motion to dismiss in
whole or in part, plaintiffs would be entitled to take these depositions as part of the regular
course of discovery.

scope of this Court's earlier discovery Order of May 25, 2010.  Plaintiffs complain that the

defendants have narrowly construed the Court's earlier Order and are "attempting to thwart the

Court's clear mandate by limiting the scope of 'investigative records' to those documents

produced by or in reference to Peter T. Sheridan, Esq.'s 2002/2003 investigation." (Pls.' 8/12/10

Letter at 2).  Plaintiffs suspect that based on this interpretation of the Court's Order, the

defendants might have withheld from production "other documents and information . . . that shed

light on the school's knowledge and facilitation of Foglietta's sexual abuse of children, and/or its

efforts to conceal that knowledge from Foglietta's victims (and their parents) and to dissuade

those victims from taking legal action." (Id. at 3).

     In response, defendants assert that "communications from the few potential victims

initiated in response to Poly Prep's efforts to reach out to parents and alumni in October 2002

were not part of Poly Prep's investigation;" therefore, these documents were not considered to be

responsive to the Court's May 25, 2010 Order. (Defs.' 8/13/10 Letter at 3; Defs.' Sur-Reply at

6).  According to defendants, they produced "'limited discovery' of [the] investigation conducted

by Poly Prep's attorney in 2002 after Plaintiffs Paggioli and Hiltbrand retained lawyers to

threaten the school" and they admit that "this is **not** a full production of every possible relevant

document." (Defs.' Mem. at 22 n.57) (emphasis in original)).

     While the Court's Order may have been unclear, what the Court intended to Order was

the production of all "Poly Prep investigative records concerning the alleged sexual misconduct

committed by Philip Foglietta." (Order at 16 (emphasis added)).  The Court considers the

Harman letter and responses thereto to be part of that "investigation."  Harman's letter was sent

shortly after Paggioli's and Hiltbrand's letters were received in 2002 and within a month of the

school's decision to hire Sheridan to perform his investigation. (Defs.' Sur-Reply at 4). Written allegations by new victims, even if not part of Sheridan's formal investigation, fall within a broad reading of the phrase "records concerning the alleged sexual misconduct" of Foglietta. Moreover, while defendants contend that the responses to Harman's October 2002 letter "have no relevance to the issue of equitable estoppel" (Id. at 6), at least one of those letters – John Doe VI's letter – directly asserts that the school knew about the abuse, which may be relevant to plaintiffs' estoppel claim. (See supra at 23-24).

Given the uncertainty expressed by the parties, the Court now clarifies its Order so as to include any and all relevant documents which could bear upon the knowledge of anyone at Poly Prep regarding the abuse by Foglietta, including any documents relevant to the investigation into the allegations in general. The Court did not intend to limit the required production to Mr. Sheridan's investigation; the Order was intended to encompass any documents relevant to any investigation into Foglietta's conduct, including complaints by other individuals, whether potential victims or witnesses of Foglietta's conduct, and the school's knowledge of those complaints.[70] Accordingly, the Court now Orders defendants to produce any additional discovery that it has within its control and that, under the corrected interpretation, should be produced to plaintiffs as a result of this Court's earlier Order.

---

[70]Although the Court noted during oral argument that "it appears that [defendants] are saying they have given you everything," upon review of the transcript and the various submissions in this case, it is not clear whether this representation by defendants' counsel was based upon a mistaken interpretation of this Court's earlier Order. (Tr. at 24).

### 3. Other Sanctions Requested

In addition to the request for additional depositions, plaintiffs have requested: 1) that the Court grant plaintiffs' counsel permission to communicate with the newly identified victims of Foglietta; 2) that the Court vacate the 'Attorneys' Eyes Only' designation of all documents produced by defendants, so that plaintiffs can review these documents with their clients; 3) that plaintiffs be permitted to retake the deposition of Mr. Williams to address the newly produced evidence;[71] 4) "that this Court promptly conduct an *in camera* examination of all documents withheld or redacted by Defendants on the bases of attorney-client or work product privileges;" and 5) that the Court Order defendants to reimburse plaintiffs in full for all attorneys' fees and costs incurred as a result of defendants' spoliation, fraud upon the Court, and/or late production of documents and/or impose any other sanctions or grant plaintiffs any other relief which the Court deems just and proper. (Pls.' 8/12/10 Letter at 4; Mulhearn Rep. Decl., Ex. D).

As discussed, defendants have provided limited information regarding six individuals, beyond the plaintiffs in this action, who have reported abuse to Poly Prep.[72] (Pls.' Mem. at 27).

---

[71]Plaintiffs are concerned that they received information, such as the John Doe VI letter, after Mr. Williams' deposition. Plaintiffs' counsel noted that "the [John Doe VI] document production bothered me because I wasn't able to ask Mr. Williams, Mr. Williams was the headmaster during Mr. [John Doe VI]'s tenure as a student at Poly Prep. . . . It would have been very, very valuable for me to have the opportunity to petition the Court to speak to Mr. [John Doe VI] so I could elucidate what he meant." (Tr. at 20).

[72]In addition to the aforementioned John Doe V, three other individuals have apparently been identified to the plaintiffs, one has requested that his identity not be revealed, and the sixth has only been identified as "Student: Class of 1984 – 3-4 times abused." (Pls.' Mem. at 27; Mulhearn Decl. Exs. 30-31). Exhibit 31 refers to handwritten notes, dated November 12, 2002 and November 2, 2002, most of which are redacted, submitted as Exhibit 31 to the Mulhearn Declaration ("Mulhearn Decl., Ex. 31"). In their letter to the Court on August 13, 2010, defendants indicated that: "On June 28, 2010 and July 9, 2010, we disclosed two of the names to Plaintiffs' counsel and produced the relevant documents as we had been able to speak with these former students. . . . We did provide Plaintiffs' counsel on July 12 confidentially and 'for attorneys' eyes only' the names of the remaining three former students who may have reported abuse and stated that we would produce under separate cover the documents relevant to those

Plaintiffs assert that none of the documents provided by defendants pursuant to this Court's

Order, nor Mr. Williams' deposition testimony, "shed any light as to when, how, and to whom,

the six alleged additional victims of Foglietta reported their abuse to Poly Prep." (Id. at 27-28).

Plaintiffs argue that this information may be highly relevant to their equitable estoppel/fraudulent

concealment claims, and they seek permission to contact these individuals, noting that "[t]he

[John Doe VI] email provides support for Plaintiffs' critical equitable estoppel argument . . ."

(Pls.' 8/12/10 Letter at 2). Based on the facts and new witnesses that have been discovered since

May 2010, and based on the defendants' possible misunderstanding of this Court's prior Order,

the Court grants plaintiffs' request with respect to the individual victims whose names have been

disclosed to plaintiffs' counsel, but not with respect to the individual who has requested that

defendants not disclose his identity. (Id. at 4; Mulhearn Rep. Decl., Exs. D, F; Defs.' 8/13/10

Letter at 2-3).

However, at this time, the Court denies plaintiffs' request to remove the "Attorneys' Eyes

Only" designation from any documents containing these individuals' names. The Court finds

this request to be premature as it is unnecessary for counsel to review the names of these

individuals with their clients in order to interview them.

The Court further denies plaintiffs' request to retake Mr. Williams' deposition at this

time, without prejudice to renew, if additional facts come to light. Based on Mr. Williams'

testimony to date and his poor memory regarding the incidents in this case, the Court does not

find that it will be beneficial to depose Mr. Williams again, as it is unlikely that any new,

---

individuals . . . The sixth individual had asked us not to disclose his name." (Defs.' 8/13/10
Letter at 2-3; see Mulhearn Rep. Decl., Ex. F).

additional information will be gleaned from such efforts.  (See, e.g., supra at 25 n.46).

The Court also denies plaintiffs' request for "this Court [to] promptly conduct an *in camera* examination of all documents withheld or redacted by Defendants on the bases of attorney-client or work product privileges."[73] (Pls.' 8/12/10 Letter at 4; Mulhearn Rep. Decl., Ex. D). The Court Orders defendants to reevaluate the documents that they have heretofore claimed as privileged in light of this Court's Memorandum and Order, and to provide the plaintiffs with an updated privilege log, along with the updated production required by this Order. If, at that time, the plaintiffs still believe an *in camera* review is necessary, plaintiffs may renew their request.

Finally, plaintiffs request an award of costs and attorneys' fees based on the defendants' failure to maintain a litigation hold to prevent the destruction of an obviously relevant piece of evidence, when they were or should have been on notice of plaintiffs' claims. The Court finds that an award of "reasonable expenses, including attorneys' fees and costs" incurred in connection with the filing of this spoliation motion is warranted. Fed. R. Civ. P. 37(b)(2)(C); see also Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., L.L.C., 685 F. Supp. 2d at 471; Zubulake V, 229 F.R.D. at 437. "Such a monetary award 'may be appropriate to punish the offending party for its actions or to deter [the] litigant's conduct, sending the message that egregious conduct will not be tolerated. . . . Compensable costs may arise either from the discovery necessary to identify alternative sources of information or from the

---

[73]In their July 16, 2010 letter, plaintiffs indicated that "Plaintiffs will, under separate cover, make an application to this Court to hold the attorney-client and work product privileges which have been asserted by Defendants inapplicable – for a number of independent reasons." (Pls.' 7/16/10 Letter at 1 n.1). However, no application was ever made.

investigation and litigation of the [] destruction itself." In re NTL, Inc. Sec. Litig., 244 F.R.D. at

201 (quoting Chan v. Triple 8 Palace, Inc., 2005 WL 1925579, at *10).

However, the Court notes that there have been an extraordinary number of letters filed in

this case that reference the issue of spoliation and finds that awarding fees for all of those filings

would be excessive.  The Court therefore grants plaintiffs' request for a fee and cost-shifting

sanction, but limits this sanction only to those hours expended in relation to the Memorandum of

Law and Reply Memorandum of Law, as well as the declarations or affidavits filed therewith.

The Court Orders plaintiffs' counsel to submit an affidavit, along with detailed contemporaneous

records of the time spent in connection with this motion for spoliation, along with an explanation

for the rates requested, by **May 13, 2011**.

Furthermore, to the extent that plaintiffs are also seeking an award of costs and fees to

cover the additional discovery that they wish to take as a result of the loss of these notes, the

Court finds that the defendants' conduct was not sufficiently culpable to warrant such a drastic

sanction.  While the Court has found the negligent failure to maintain the notes of the

investigation to be sanctionable, the discovery now sought by plaintiffs would, in all likelihood,

have been discovery they would have requested even in the absence of the spoliation of the

Sheridan notes.  The Court finds that the fact that the plaintiffs are being permitted to conduct

additional discovery while the motion to dismiss is pending provides a sufficient sanction.

Although the Court has granted discovery regarding plaintiffs' equitable estoppel claims,

the Court's decision is not intended to suggest an opinion on the ultimate outcome of those

claims.  Plaintiffs have alleged numerous incidents in which Poly Prep has misled the victims of

Foglietta's abuse, and, in some instances, covered up the complaints that had been made against

Foglietta in an attempt to dissuade the victims from pursuing legal remedies. (See, e.g., Am. Compl. ¶¶ 45, 67-71; Mulhearn Decl., Ex. 3 at 38-39, 180, 185-89; Pls.' 7/16/10 Letter at 6; Pls.' Mem. at 10-11, 13). Plaintiffs have also listed numerous events that were not memorialized in any way by the defendants and other evidence that was destroyed. (See, e.g., Pls.' Mem. at 10-12; Mulhearn Decl., Ex. 3 at 148, 183-84; Pls.' 7/16/10 Letter at 5-6).[74] Given that the Court has ordered additional discovery, the briefing schedule and the final determination regarding the defendants' motion to dismiss and the validity of plaintiffs' assertion of equitable estoppel and the substantive issues underlying that claim, such as the existence and breach of fiduciary duty, have been stayed.

The Court Orders that all additional discovery approved herein be completed by **May 31, 2011**. The Court has also scheduled a status conference in this case for **June 21, 2011 at 3:00 p.m.** Lastly, an affidavit in support of the attorneys' fees and costs awarded herein shall be submitted by plaintiffs on or before **May 13, 2011**.


II. Motion to Amend

Plaintiffs also request permission to amend their Complaint once all additional discovery is completed in order "to add additional factual allegations . . . which will support and amplify [plaintiffs'] equitable estoppel and fraudulent concealment claims, as well as their Civil RICO

---

[74]For example, defendant Harman's response to Hiltbrand's attorney asserts that "with the exception of two previously received anonymous letters, [Hiltbrand's accusation] remains the only known accusation of Mr. Foglietta. No other charges, formal or informal, were ever made, as far as I have been able to determine." (Mulhearn Decl., Ex. 6). However, as noted above, both Jackson and Marino had previously made accusations. If those meetings had been memorialized, statements such as these would be easier to disprove.

claims." (Pls.' Mem. at 43). Plaintiffs explain that for the latter claims, "the aforesaid new []

allegations will bear upon Plaintiffs' pleading of a related and continuous pattern of racketeering

activity." (Pls.' 7/16/10 Letter at 6; see also Pls.' Mem. at 2).

      Rule 15 of the Federal Rules of Civil Procedure provides that:

> A party may amend its pleading once as a matter of course within:
> (A) 21 days after serving it, or
> (B) if the pleading is one to which a responsive pleading is
> required, . . . 21 days after service of a motion under rule 12 (b),
> (e), or (f), . . .

Fed. R. Civ. P. 15(a)(1). The Rule further provides that: "In all other cases, a party may amend

its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P.

15(a)(2).

      In this case, defendants assert that much of the information presented by plaintiffs in their

papers and labeled as having been "gleaned through limited discovery" was actually information

that plaintiffs had previously learned from other sources and included in their Amended

Complaint. (Defs.' Mem. at 3-4). "Poly Prep does not believe that any of the above information

is new, that any other information obtained from Mr. Williams' deposition would significantly

alter Plaintiffs' factual allegations in their Amended Complaint, or that any of these facts would

have any bearing on the legal issues raised in Poly Prep's motion to dismiss, particularly

equitable estoppel." (Id. at 4). However, defendants admit that regardless, "Poly Prep cannot

seriously claim prejudice if Plaintiffs are allowed to amend their Amended Complaint." (Id. at 4,

24). They also note that "had Plaintiffs simply asked Poly Prep if it objected, Poly Prep may very

well have agreed" to allow them to amend their Amended Complaint. (Id. at 23). Nevertheless,

defendants continue to assert that none of the discovery which the plaintiffs seek to use to amend

their Complaint helps to "remedy the legal deficiencies of Plaintiffs' claims." (Id.)

Given that defendants do not appear to object to plaintiffs' request to further amend their Complaint, and indeed, have conceded that they will not suffer prejudice as a result, the Court grants plaintiffs permission to file a second amended complaint once they have completed any additional discovery as authorized by this Order, to be submitted on or before **June 13, 2011**.

III. Fraud on the Court

Plaintiffs also allege that the defendants have committed and are "attempting to perpetuate" a fraud upon this Court, that "Defendants' blatant and pervasive falsehoods and inconsistencies" have created "a pressing need for the Court to determine whether Defendants are engaging in an 'unconscionable scheme' to interfere with the adjudication of this case by unfairly hampering Plaintiffs' claims or by lying to the Court and Plaintiffs about issues central to the case." (Pls.' Mem. at 42; Pls.' Reply Mem. at 6, 16, 19-20; see also Mulhearn Rep. Decl., Ex. A-B[75]).  Therefore, plaintiffs assert that the Court can and should grant plaintiffs "further discovery and cost-shifting sanctions against defendants in order to determine whether defendants are attempting to perpetuate fraud upon the Court," or to allow plaintiffs to "root out Defendants' likely and unconscionable fraud." (Pls.' Mem. at 40, 42).

Defendants, on the other hand, assert that such claims are "brazen, groundless, and

---

[75]Citations to "Mulhearn Rep. Decl., Ex. A" refer to a letter from Kevin Mulhearn to Jeffrey Kohn, dated August 3, 2010, in which Mr. Mulhearn alleges that the defendants have committed fraud, submitted as Exhibit A to the Reply Declaration of Kevin Mulhearn.  Citations to "Mulhearn Rep. Decl., Ex. B" refer to a letter from Mr. Kohn to this Court, dated August 11, 2010, in response to Mr. Mulhearn's August 3, 2010 letter, in which he defends against these accusations and notes that defendants had already "addressed the allegations regarding 'fraud on the Court' in response to Plaintiffs' motion before Your Honor," and which was submitted as Exhibit B to the Reply Declaration of Kevin Mulhearn.

nothing short of irresponsible." (Defs.' Mem. at 19).  Defendants also assert that "[p]laintiffs do

not even try to support their claim that Poly Prep is perpetrating a fraud on the Court, and their

allegations should be stricken from their motion." (Id. at 20, 22).  According to defendants, none

of plaintiffs' allegations "even remotely support Plaintiffs' charge that Poly Prep unfairly

obstructed Plaintiffs' claims in this action or presented false evidence to this Court." (Id. at 20).


A.  Legal Standard

      "If a party commits a fraud on the court, the court has the inherent power to do whatever

is reasonably necessary to deter abuse of the judicial process." Hargrove v. Riley, No. 04 CV

4587, 2007 WL 389003, at *11 (E.D.N.Y. Jan. 31, 2007) (citing Shangold v. The Walt Disney

Co., No. 03 CV 9522, 2006 WL 71672, at *4 (S.D.N.Y. Jan. 12, 2006)).  "In order for a court to

grant sanctions based upon fraud, it must be established by clear and convincing evidence that a

party has 'sentiently set in motion some unconscionable scheme calculated to interfere with the

judicial system's ability impartially to adjudicate a matter by unfairly hampering the presentation

of the opposing party's claim or defense.'" Hargrove v. Riley, 2007 WL 389003, at *11 (citing

McMunn v. Mem'l Sloan-Kettering Cancer Ctr., 191 F. Supp. 2d 440, 455 (S.D.N.Y. 2002)); see

also Intelli-Check, Inc. v. TriCom Card Techns., Inc., No. 03 CV 3706, 2005 WL 3533153, at

*11 (E.D.N.Y. Dec. 22, 2005).

      "Fraud upon the court should embrace 'only that species of fraud which does or attempts

to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial

machinery cannot perform in the usual manner its impartial task of adjudging cases.'" King v.

First Am. Investigations, Inc., 287 F.3d 91, 95 (2d Cir. 2002) (citing Hadges v. Yonkers Racing

Corp., 48 F.3d 1320, 1325 (2d Cir. 1995); Kupferman v. Consol. Research & Mfg. Corp., 459

F.2d 1072, 1078 (2d Cir. 1972)).  "Indeed, 'fraud upon the court' as distinguished from fraud on

an adverse party is limited to fraud which seriously affects the integrity of the normal process of

adjudication."  Gleason v. Jandrucko  860 F.2d 556, 559 (2d Cir. 1988) (citing Kupferman v.

Consol. Research & Mfg. Corp., 459 F.2d at 1078.


B. Analysis

Plaintiffs assert that Williams' testimony demonstrates that Poly Prep was engaged in,

among other things, fraud, and accuses Williams of stating "demonstrable falsehoods."  (Pls.'

Mem. at 14, 16, 24; Pls.' Reply Mem. at 2-3, 7).  "The story spun by Mr. Williams and Poly Prep

is nothing more than a fanciful fairytale which was designed to cover-up the school's much

earlier knowledge and facilitation of Foglietta's sexual abuse of children."  (Pls.' Mem. at 23-

24).

Defendants respond that "[i]t is outrageous for Plaintiffs to accuse Mr. Williams of

making false statements simply because, in Plaintiffs' view, he was unable to recall precisely

every single detail at his June 2010 deposition about events that occurred long ago."  (Defs.'

Mem. at 21).  As defendants note, "it should not surprise anyone that recollection could be

affected by the passage of time."  (Id.)  Although it does appear that there are many

inconsistencies in Williams' deposition testimony and handwritten notes, and there are many

things that he could not recall, the Court finds that plaintiffs have failed, at this time, to provide

sufficient evidence to show that Mr. Williams intentionally perjured himself.  In the errata sheet,

Mr. Williams attempted to clarify some of the things about which he had been mistaken.  (See

76

discussion supra at 14-15).  While this does not rise to a level sufficient to be "labeled 'fraud' or 'perjury'" (Defs.' Mem. at 21 n.52), it does demonstrate, as noted above (see supra at 25 n.46, 23, 44-45), how and why having the Sheridan notes would have been helpful in this case, at the very least to refresh his recollection.[76]

Plaintiffs also assert that defendants' discarding of documents, failure to keep records, and celebrations of Foglietta after his retirement and death constitute fraud on the Court.  (See Defs.' Mem. at 22 ; Pls.' Mem. at 10-13, 40-42).  While the Court has found that those facts tend to support plaintiffs' assertions of estoppel, fraudulent concealment, and spoliation, they do not demonstrate fraud upon the Court, largely because many of these events occurred before this suit was commenced.  For instance, any alleged destruction of documents or false statements written in the assortment of aforementioned letters or notes by various defendants over the years were not committed in the context of misleading the Court in this case, and the documents were not altered after litigation was commenced.  Thus, they cannot be considered part of a scheme to perpetrate fraud upon the court.  Similarly, while defendants may have withheld certain documents based on a misunderstanding of the Court's previous Order regarding discovery, there is insufficient evidence to believe that this was an intentional act of concealment on the part of either the defendants or defendants' counsel.  See King v. First Am. Investigations, Inc., 287 F.3d

─────────────────────

[76]With respect to Williams' alleged perjurious statements about his knowledge or lack thereof, the Court, during the oral argument, suggested that:

> obviously fraud on the Court is a very serious charge, is it possible that what the defendants were saying is that no one had any concrete knowledge . . . in other words, people were coming forward and making these claims, anonymously so, there was no way to follow-up on them . . . I'm not suggesting that that's not a disingenuous position to take, but I'm just saying that I'm not sure it rises to the level of fraud on the Court.

(Tr. at 68-69).

at 95 (holding that "[f]raud upon the court must be established by clear and convincing evidence") (citing Madonna v. United States, 878 F.2d 62, 65 (2d Cir. 1989)).

Even if the Court found that all of the aforementioned acts were intentional, courts have held that:

> After-discovered evidence of alleged perjury by a witness is simply not sufficient for a finding of "fraud upon the court." Similarly, allegations of nondisclosure during pretrial discovery do not constitute grounds for an independent action under Fed. R. Civ. P. 60(b). Absent the type of fraud which "subvert[s] the integrity of the court itself, or is perpetrated by officers of the court," the requisite interference with the judicial machinery cannot be established and an independent action for fraud on the court therefore will not lie. In short, neither perjury nor nondisclosure, by itself, amounts to anything more than fraud involving injury to a single litigant.

Gleason v. Jandrucko 860 F.2d at 559-60 (citing inter alia Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 245-46 (1944); Great Coastal Express, Inc. v. Int'l Brotherhood of Teamsters, 675 F.2d 1349, 1357 (4th Cir. 1982) ("[p]erjury and fabricated evidence are evils that can and should be exposed at trial, and the legal system encourages and expects litigants to root them out as early as possible"), cert. denied, 459 U.S. 1128 (1983); H.K. Porter Co. v. Goodyear Tire & Rubber Co., 536 F.2d 1115, 1118 (6th Cir. 1976); Serzysko v. Chase Manhattan Bank, 461 U.S. 699, 702 (2d Cir. 1972) (per curiam), cert. denied, 409 U.S. 883 (1972)). In one case, a court found that the defendant "is at most guilty of not disclosing material information during discovery. But failure to disclose material during pretrial discovery is not fraud on the court." Pentagon Techs. Int'l Ltd. v. CACI Int'l, Inc., 282 Fed. Appx. 32, 34 (2d Cir. 2008) (citing Gleason v. Jandrucko, 860 F.2d at 559-60). Unlike the cases cited by plaintiffs in support of their fraud argument, the evidence in this case is insufficient to support a finding that defendants here fabricated evidence, "erased handwritten notes," or intentionally

78

perjured themselves.  (<u>See</u>, <u>e.g.</u>, Pls. Reply Mem. at 9-12, 15-18).

Therefore, the Court finds that plaintiffs have not provided sufficient evidence to support a claim that defendants or defendants' counsel have committed fraud upon this Court. Furthermore, the wrongs to plaintiffs here are sufficiently addressed by awarding sanctions for defendants' spoliation.

CONCLUSION

In conclusion, in order to restore the plaintiffs to the position they would have been in but for defendants' spoliation, "to alleviate the harm suffered" by the plaintiffs, <u>Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., L.L.C.</u>, 685 F. Supp. 2d at 470, the Court imposes the following sanctions:  1) defendants are to produce, by **May 31, 2011**, any additional discovery that defendants have within their control that, under the correct interpretation explained above, should have been produced to plaintiffs as a result of this Court's May 25, 2010 Order; 2) plaintiffs are granted permission to take the depositions of all living individuals interviewed by Mr. Sheridan, as well as the depositions of Mr. Sheridan and of Michael Junsch and James Esposito, with all depositions to be completed by **May 31, 2011**; 3) plaintiffs are also granted permission to contact the additional victims whose names have been disclosed to plaintiffs' counsel; 4) defendants are Ordered to review the privilege discussion above, to reevaluate their privilege log, and to provide plaintiffs with an updated privilege log along with the updated production required by this Order; 5) plaintiffs are granted permission to file a Second Amended Complaint, due on or before **June 13, 2011**; and 6) defendants are Ordered to pay plaintiffs' reasonable expenses, including attorneys' fees and costs, incurred in

79

connection with the filing of this motion as explained above; plaintiffs to submit an affidavit in support of these fees and costs by **May 13, 2011**. The parties are Ordered to appear for a status conference on **June 21, 2011 at 3:00 p.m.**

The Clerk is directed to send copies of this Order to the parties either electronically through the Electronic Case Filing (ECF) system or by mail.

**SO ORDERED.**

Dated: Brooklyn, New York
      April 13, 2011

Cheryl L. Pollak
United States Magistrate Judge
Eastern District of New York