UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
JAMES ZIMMERMAN, PHILIP CULHANE,
DAVID HILTBRAND, WILLIAM JACKSON,
GEORGE ZAROU, JOHN JOSEPH
PAGGIOLI, PHILIP LYLE SMITH, DAVID
ZARNOCK, PHILIP C. HENNINGSEN,
"JOHN DOE II," "JOHN DOE IV," and
"JOHN DOE V,"

            Plaintiffs,

       - against -

POLY PREP COUNTRY DAY SCHOOL,
WILLIAM M. WILLIAMS, DAVID B.
HARMAN, AND VARIOUS MEMBERS OF
THE POLY PREP BOARD OF TRUSTEES,
WHOSE NAMES ARE CURRENTLY
UNKNOWN AND THUS DESIGNATED AS
"JAMES DOES I-XXX," HARRY
PETCHESKY, ROBERT HERRMANN, and
MICHAEL NOVELLO,

            Defendants.

--------------------------------------------------------X

**MEMORANDUM**
**AND   O R D E R**

09 CV 4586 (FB)

      On October 26, 2009, seven plaintiffs filed a Complaint under the Racketeer Influenced

and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-68, against Poly Prep Country Day

School ("Poly Prep"), Poly Prep's former headmaster, William M. Williams ("Williams"), Poly

Prep's current headmaster, David B. Harman ("Harman"), and members of Poly Prep's Board of

Trustees ("the Board").[1]  (Compl.[2] ¶¶ 5, 15-18).  Since the Complaint was filed in 2009, five

---

[1]Since filing their original Complaint on October 29, 2009, plaintiffs have moved to
amend their Complaint three times.  Since the Second Amended Complaint was the pleading on
file at the time the instant motions were filed, the Court has referred to that document for the

1

more plaintiffs have joined the lawsuit, bringing the total number of plaintiffs to twelve.

Plaintiffs have also amended their Complaint to add claims against three additional defendants,

former Chairman of the Poly Prep Board of Trustees, Harry Petchesky, Esq., former general

counsel for Poly Prep, Robert Herrmann, Esq., and former Poly Prep administrator, Michael

Novello.  Plaintiffs' claims stem from the alleged sexual abuse perpetrated by Philip Foglietta

("Foglietta"), Poly Prep's football coach and physical education instructor from 1966 through

1991, who is now deceased.  (Id. ¶¶ 3, 22).

Currently pending before this Court are two motions filed by plaintiffs.  The first motion

seeks an Order permitting certain discovery based on the "crime/fraud exception" to the attorney-

client and work product privileges; and the second motion seeks an Order imposing sanctions

upon defendants and defendants' attorneys for allegedly committing a fraud upon the Court in

this case.[3]  Defendants have cross-moved for sanctions to be imposed upon plaintiffs for the

positions they have taken in pursuit of sanctions and additional discovery.

For the reasons set forth below, plaintiffs' motion for additional discovery is granted in

---

factual allegations and thus, citations to "Am. Compl." refer to plaintiffs' Second Amended
Complaint, dated July 14, 2011.

[2]Citations to "Compl." refer to plaintiffs' original Complaint, filed on October 26, 2009.

[3]Since filing their documentation in support of their motion for additional discovery and
their motion for sanctions for fraud on the court, plaintiffs have requested permission to
supplement their motion papers.  (See Pls.' 12/5/11 Ltr.; Pls.' 12/15/11 Ltr.)  Specifically,
plaintiffs seek to submit the affidavits of two additional plaintiffs who have recently joined the
action against defendants and who allege that Poly Prep staff members were made aware of
Foglietta's abuse in the 1970s.  (Id.)  While these new allegations may provide further support for
plaintiffs' contention that Poly Prep faculty and staff had knowledge of Foglietta's sexual
misconduct prior to 1991, the Court denies plaintiffs' request to submit additional paperwork, as
the additional allegations do not affect the Court's ruling on plaintiffs' motion for additional
discovery and motion for sanctions.

part and denied in part.  With respect to plaintiffs' motion for sanctions based upon an alleged

fraud on this Court, the Court reserves decision on the motion and Orders the parties to appear

for an evidentiary hearing scheduled to begin July 19, 2012.  The parties are further Ordered to

exchange witness lists on or before June 15, 2012.  Defendants' requests for sanctions are denied.


## FACTUAL BACKGROUND

The factual allegations underlying this case are set forth more fully in the Court's April

13, 2011 Memorandum and Order.  For purposes of these motions, the Court summarizes the

basic claims as follows.

Defendant, Poly Prep, is a college preparatory school for fifth through twelfth grade

students, located in Brooklyn, New York.  (Am. Compl. ¶¶ 1, 18).  From 1966 through 1991,

Philip Foglietta was employed as a football coach and physical education instructor at Poly Prep.

(Id. ¶ 26).  Plaintiffs allege that, as early as 1966, members of  Poly Prep's administration were

notified by students, their parents, and by other unidentified individuals that Foglietta was

sexually abusing certain students.[4]  (Am. Compl. ¶¶ 28-29, 41, 45-47, 70-72, 75-76, 81, 94).

Plaintiffs allege that in 1966, plaintiff William Jackson ("Jackson"), then an eighth grade

student at Poly Prep, and his parents met with then Headmaster Scull and then Athletic Director

Harlow Parker ("Parker"), at which time Jackson accused Foglietta of repeated sexual abuse,

providing graphic and explicit details.  (Id. ¶¶ 45-47).  Plaintiffs claim that Skull, Parker, and the

then Poly Prep Board of Trustees falsely notified Jackson and his parents that the school had

investigated Jackson's allegations and found them not to be credible.  (Id. ¶ 49).  According to

---

[4]See 4/13/11 Order at 4-10.

plaintiffs, Jackson was told to refrain from making further allegations and that he would face serious consequences, including possible expulsion, if he continued to accuse Foglietta of sexual misconduct.  (Id.)

Plaintiffs also claim that in 1973, the parents of another Poly Prep student, John Marino ("Marino"), met with then Headmaster William Williams and Mr. Parker and explained that their son had told them that Foglietta was sexually abusing boys on school grounds.  (Id. ¶ 71).  Plaintiffs allege that defendant Williams and Mr. Parker, who is now deceased, told the Marinos that their son was a liar and threatened to expel him in the event that he persisted in spreading such "rumors."  (Id.)  Plaintiffs allege that Marino's parents met with defendant Williams and Parker a second time in 1974, at which time Marino's parents once again informed the school of Marino's claims that Foglietta was abusing students.  (Id. ¶¶ 74, 75).  Headmaster Williams and Parker again discounted Marino's claims and told the Marinos that John Marino was "on thin ice."  (Id. ¶ 75).  Plaintiffs also allege that John Marino's father, John Anthony Marino, worked for the New York City Parks Department and knew Foglietta in that capacity.  (Id. ¶ 76).  Plaintiffs allege that John Anthony Marino communicated with Parker outside of Poly Prep, expressing his concerns about Foglietta's propensity to sexually abuse boys, and Parker told him to leave the issue alone.  (Id.)

Plaintiffs claim, and Williams confirmed in his deposition, that Williams received one or more letters in the 1970s that accused Foglietta of "doing terrible things to your students."  (Id. ¶

81; Am. Compl., Ex. S[5] at 84-86).  Although Williams testified at his deposition that he interpreted the letters as alleging verbal rather than sexual abuse, he threw out the letters, testifying that "unsigned complaints just should be tossed."  (Am. Compl., Ex. S at 87-88).  Approximately one year later, in the 1970s, Williams received an anonymous phone call in which the caller reiterated language similar to that found in the letters, accusing Foglietta of "doing terrible things to our kids."  (Id. at 105-08).  Williams claims that after speaking with Parker, he was not concerned about the safety of the students and did not memorialize either the phone call or the letters in any way at that time.  (Id. at 107-09).

Poly Prep and defendant Williams have denied Jackson's and Marino's claims.  Indeed, despite acknowledging at least one meeting with Marino, Williams testified at his deposition that "the first time, and only time, that they – anybody had identified themselves as somebody who had been molested in the school" (Am. Compl., Ex. S at 99), was in February 1991, when plaintiff David Hiltbrand ("Hiltbrand") sent a letter to then Headmaster Williams, identifying himself as a victim of abuse by Foglietta.  Mr. Hiltbrand's 1991 letter to Williams alleged that in 1966, he was sexually abused by Foglietta on several occasions, and he identified other boys who were also abused by Foglietta.  (Am. Compl. ¶¶ 96, 121, 237).  At or around the same time that Poly Prep received Hiltbrand's 1991 letter, an anonymous letter, also alleging sexual abuse by Foglietta, was placed in faculty mailboxes.  (Am. Compl., Ex. S at 122-126).  Williams conceded that this letter was brought to his attention by another faculty member.  (Id. at 126).

_____

[5]Citations to "Am. Compl., Ex. S" refer to the Transcript of the Deposition of William M. Williams, dated June 30, 2010.

Mr. Hiltbrand alleges that he never received a written response from Mr. Williams to his 1991 letter.  (Mulhearn Decl.,[6] Ex. C[7]).   Instead, according to Mr. Hiltbrand, he subsequently contacted Mr. Williams by telephone.  Plaintiffs allege that during that telephone conversation, Williams told Hiltbrand that other complaints had been made against Foglietta and that Williams suspected that they might be true.  (Id.; Am. Compl. ¶ 96).  However, according to Hiltbrand, Williams allegedly told him that Hiltbrand was the first individual to actually come forward and identify himself, failing to mention the earlier reports of Jackson and Marino.  (Am. Compl. ¶ 96).  When Williams told Hiltbrand that Foglietta was still on staff at Poly Prep, Hiltbrand insisted that Foglietta be fired immediately.  (Am. Compl. ¶ 98).  According to plaintiffs, Williams assured Hiltbrand that the matter would be "dealt with."  (Mulhearn Decl., Ex. C).

Thereafter, in 1991, Foglietta retired.  Poly Prep announced Foglietta's departure in the 1991 fall/winter bi-annual alumni magazine.  The announcement stated:

> [F]our much loved people retired in June, 1991.  They are:
>
> Philip Foglietta came to Poly in 1966.  For twenty-five years, he taught physical education, but it is as football coach that he is remembered by so many Poly students.  Assistant football coach for three years, he was named head coach in 1970. . . . and was named Coach of the Year twice by the *Daily News*.  Everyone calls him "Coach" . . . . [One alumni said]: "Coach elicited enormous respect and loyalty from his players. Poly football was Coach!  He had more influence over kids than anyone else at Poly because he worked hard to make you the best you could be."

---

[6]Citations to Mulhearn Decl., refer to the Declaration of Kevin T. Mulhearn, dated July 22, 2011, and filed with attached exhibits.

[7]Citations to "Mulhearn Decl., Ex. C" refer to Exhibit C, a letter from David A. Berger, Esq. to David B. Harman, dated May 21, 2002.

(Am. Compl. ¶ 105, Ex. B[8]).  In addition, the school hosted an alumni event in Foglietta's honor at the Downtown Athletic Club shortly after he left the school.  (Am. Compl. ¶ 102).  After Foglietta's death in 1998 (Am. Compl. ¶ 31), Poly Prep established the Philip A. Foglietta Memorial Fund in his honor.  (Id., Ex. S at 185).

In May 2002, Mr. Hiltbrand's lawyer, David Berger, Esq., sent a letter to defendant David B. Harman, who was then Headmaster, reiterating the accusations that Hiltbrand had made in his 1991 letter to defendant Williams.  (Mulhearn Decl., Ex. C).  The Board of Trustees of Poly Prep asked Headmaster Williams to prepare a memorandum memorializing his recollection of the events that transpired in connection with Mr. Hiltbrand's February 1991 letter.  (Pls.' Mem.[9] at 8-9).  In the initial memorandum, dated May 27, 2002, Williams wrote:  "At no time before or after David's [Hiltbrand] letter have I ever received a letter, or been told directly, from any alumnus or former student of Poly, that he had been assaulted by Philip Foglietta.  The only awareness during the 20 years prior to 1991 came from an unsigned letter from a parent accusing Coach Foglietta of molesting students."  (Mulhearn Decl., Ex. H[10]).  According to plaintiffs, the Board asked Williams to revise the memorandum, which he did, eliminating the reference to "assault[]"

---

[8]Citations to "Am. Comp., Ex. B" refer to a page from the Poly Prep alumni publication announcing Foglietta's retirement in June 1991, which was submitted as Exhibit B to plaintiffs' Second Amended Complaint.

[9]Citations to "Pls.' Mem." refer to Plaintiffs' Memorandum of Law in Support of Their Motion for Discovery Pursuant to the "Crime-Fraud Exception," dated July 22, 2011.

[10]Citations to "Mulhearn Decl., Ex. H" refer to Exhibit H, the handwritten memorandum of William M. Williams, dated May 27, 2002.

and "molesting."  (Mulhearn Decl., Ex. I[11]).  The revised memoranda, dated June 6, 2002, stated:
"The only reports I had received during my 20 years at Poly prior to David's letter were two
unsigned letters from parents (possibly the same one) who reported that that [sic] children had
been abused by Coach Foglietta."  (Id.)

By letter dated June 6, 2002, Headmaster Harman responded to Mr. Berger's letter,
stating in part:  "Mr. Hiltbrand's letter of February 20, 1991, with the exception of two
previously received anonymous letters, remains the only known accusation of Mr. Foglietta.  No
other charges, formal or informal, were ever made, as far as I have been able to determine."
(Am. Compl. ¶ 113, Ex. D[12]).   In addition to this statement, Mr. Harman's letter also claimed
that Foglietta had been removed involuntarily from his position at least in part because of the
allegations of his sexual misconduct, in direct contradiction to Poly Prep's earlier public
representations praising Foglietta upon his retirement from his position in June 1991.  (Am.
Compl. ¶¶ 26, 101, 105, 115).  Regarding Mr. Williams' response to Hiltbrand's 1991 letter and
telephone calls, Mr. Harman's letter states:

> Mr. Williams recalls that he had received two anonymous letters,
> and he did confront Mr. Foglietta with one of the letters. . . . Upon
> receipt of Mr. Hiltbrand's letter, Mr. Williams quickly convened a
> meeting with the Athletic Director and several other coaches to
> question them about the accusations stated in Mr. Hiltbrand's
> letter.  While those present acknowledged there had been rumors
> about Mr. Foglietta, Mr. Williams recalls, no one had direct or

---

[11]Citations to "Mulhearn Decl., Ex. I" refer to Exhibit I, the handwritten memorandum of
Williams M. Williams, dated June 6, 2002.

[12]Citations to "Am. Compl., Ex. D" refer to Exhibit D, a letter from David Harman to
David Berger, Esq., dated June 6, 2002.

> even second hand knowledge of any sexual abuse by Coach
> Foglietta. . . . Later, once Mr. Williams and Mr. Hiltbrand spoke by
> phone, again according to Mr. Williams, Mr. Hiltbrand agreed to a
> course of action proposed by Mr. Williams, Mr. Williams' clear
> impression from that conversation was that Mr. Hiltbrand did not
> want to "press the issue" and, in turn, have Mr. Williams fire Mr.
> Foglietta immediately for cause, as he explicitly offered to do.
> Rather, Mr. Hiltbrand agreed that the involuntary removal of Mr.
> Foglietta in June, albeit in the form of an immediate retirement,
> from his responsibilities at Poly Prep was sufficient.

(Id., Ex. D).  Mr. Hiltbrand denies that he ever agreed to this, contending that he wanted Foglietta

fired.  (Am. Compl. ¶ 100).

In 2002, Headmaster Harman received correspondence from plaintiff Joseph Paggioli

("Paggioli"), who was a student at Poly Prep from 1970 until his graduation in 1976.  (Id. ¶¶ 150-

151, 154; Pls.' Mem. at 8).  Paggioli alleged that Foglietta sexually abused him two or three

times a week on school grounds and once in Paggioli's New Jersey home during the period from

1970 through 1974.  (Am. Compl. ¶¶ 152, 154; Pls.' Mem. at 8).  Upon making these allegations,

Paggioli, through his lawyer, threatened to litigate the matter unless Poly Prep agreed to a

settlement.  (Pls.' Mem. at 8).

On or about September 12, 2002, in response to Hiltbrand's demand for an investigation

into Foglietta's alleged sexual abuse and Paggioli's threats of litigation, Poly Prep hired Peter T.

Sheridan ("Sheridan"), a sole practitioner and former Assistant United States Attorney, to

conduct an investigation in collaboration with defendant Robert Herrmann of Menaker &

Hermann LLP, Poly Prep's outside counsel.  (Mulhearn Decl., Ex. E[13]).  Poly Prep instructed Mr.

---

[13]Citations to "Mulhearn Decl., Ex. E" refer to Exhibit E, the engagement agreement
between Peter T. Sheridan, Esq. and Poly Prep, CDS, dated September 18, 2002.

Sheridan to investigate the extent to which members of the faculty or administration were aware of sexual misconduct or abuse by Foglietta. (Id.) Defendant Harman appears to have prepared a list of people for Sheridan to interview and provided him with contact information for those individuals. (Eftekhari Decl.,[14] Ex. 2[15] at 204-05).

Defendants agree that Sheridan was retained in 2002 to gather information regarding the Poly Prep faculty's and administration's awareness, if any, of the alleged abuse. (Defs.' Mem.[16] at 3). However, defendants insist that the investigation was conducted so that "Poly Prep's counsel could provide legal advice to the school and its Board of Trustees concerning the threatened litigation and appropriate communications to the school community regarding the allegations." (Id.) Defendants further contend that Mr. Sheridan understood in 2002 that he was to conduct a series of interviews as "part of a preliminary investigation" in order to provide legal advice to Poly Prep. (Id.)

In the course of his investigation, Sheridan interviewed seven faculty and staff members, including former Headmaster Williams, Harlow Parker, Edward Ruck, Steven Andersen, Harry Petchesky, Ralph Dupee, a former faculty member and coach, and Joan Wright, a former Dean

---

[14]Citations to "Eftekhari Decl." refer to the Declaration of Shiva Eftekhari, dated August 5, 2011.

[15]Citations to "Eftekhari Decl., Ex. 2" refer to Exhibit 2 to the Eftekhari Declaration, which consists of selected excerpts from the transcript of the deposition of David B. Harman on June 16, 2011.

[16]Citations to "Defs.' Mem." refer to Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Discovery Pursuant to the "Crime-Fraud Exception," dated August 5, 2011.

and Assistant Head of School.  (Pls.' Mem. at 10; Defs.' Mem. at 4).  Sheridan's notes from

these interviews and from his investigation have since been lost or destroyed.

Approximately one month after Mr. Sheridan began his investigation, on October 28,

2002, Poly Prep first disclosed the allegations of abuse to the Poly Prep community in a letter

sent to the school's alumni, stating that the school had "recently received credible allegations" of

sexual abuse taking place at Poly Prep.[17]  (Mulhearn Decl., Ex. M[18]).  The letter to alumni also

stated that "[t]he Board [of Trustees] agreed to conduct an investigation, which is ongoing."  (Id.)

After this letter was distributed, other former students came forward, alleging that they had also

been sexually abused at Poly Prep by Foglietta.


PROCEDURAL HISTORY

Following the filing of the Complaint in this action, defendants moved to dismiss all of

plaintiffs' claims, arguing that plaintiffs have failed to allege the elements necessary to sustain a

claim under RICO, and contending that plaintiffs' state law tort claims should be dismissed as

barred by the statute of limitations.  On May 25, 2010, this Court granted in part plaintiffs'

motion for limited discovery to determine whether there was sufficient evidence to support a

claim of equitable estoppel that could defeat defendants' statute of limitations defense.

---

[17]Given that Hiltbrand had first reported Foglietta's sexual abuse in 1991, almost nine years earlier, this claim that the allegations were "recent" is highly misleading, especially when considered with the evidence that other students and parents reported the abuse as early as 1966 or the early 1970s.  (Pls.' Mem. at 15, n.1).

[18]Citations to "Mulhearn Decl., Exhibit M" refer to Exhibit M, a letter from David Harman to Poly Prep alumni, dated October 28, 2002.

Based on that limited discovery, plaintiffs moved for sanctions for defendants' alleged spoliation of evidence. Included among the evidence allegedly spoliated were the two anonymous letters received by Williams in the 1970s, the letter placed in the faculty mailboxes, and Sheridan's notes of his investigation. By Order dated April 13, 2011, the Court granted plaintiffs' request for certain additional discovery to address the spoliation of evidence.

Having now obtained that additional discovery, plaintiffs seek discovery of certain documents for which the defendants have asserted a privilege and seek further sanctions in the form of entry of a judgment in plaintiffs' favor. Both motions are based on plaintiffs' contention that the defendants had knowledge of Foglietta's abuse as early as the 1970s but turned a blind eye to the allegations and failed to act because Foglietta and his role as coach of Poly Prep's prestigious football team were seen as assets to the school. Plaintiffs allege that not only did the school and its administrators take steps to cover up and conceal Foglietta's criminal conduct and the allegations of sexual abuse, but that once the allegations threatened to become public, certain school administrators allegedly engaged in a pattern of activity deliberately designed to protect the school and prevent victims of Foglietta's abuse from placing blame on the school. In addition to the loss or deliberate destruction of critical documents, the school is alleged to have initiated an investigation that was carefully cabined through the school's suggestions as to witnesses and allegedly terminated prematurely in an effort to conceal the extent of the school's knowledge of the allegations. Plaintiffs allege that as part of this investigation, the school sent misleading letters to alumni designed to discourage witnesses and victims from coming forward and pursuing their claims. Plaintiffs contend that there is probable cause to believe that

documents for which defendants have claimed a privilege were communications in furtherance of this fraudulent cover-up and therefore should be disclosed.

Plaintiffs further contend that this pattern of fraudulent activity and efforts to cover up the extent of the school's knowledge have continued throughout this litigation in an effort on the part of defendants to prevent plaintiffs from establishing their equitable estoppel arguments. Among the conduct cited by plaintiffs to support their claim that defendants have committed fraud on this Court is the lies allegedly told by various witnesses during their depositions and the creation of or offering of inaccurate or false documents in lieu of documents that have been lost or destroyed.

Having reviewed the evidence and considered the arguments of the parties as set forth below, the Court finds that plaintiffs have provided a sufficient factual basis to suspect that prior to the filing of this case, there was a period of time in which the school and/or certain administrators may have tried to cover up Foglietta's crimes and conceal the school's knowledge and that counsel may have been consulted or may have given advice that furthered the cover-up. Under these circumstances, an *in camera* review is required to determine if the requested documents fall within the crime-fraud exception. However, with respect to plaintiffs' claims of fraud on the court, the Court concludes that issues of credibility are paramount in making such a determination. Accordingly, an evidentiary hearing is required.

13

DISCUSSION

I.  Plaintiffs' Motion for Additional Discovery

Plaintiffs move to compel the production of certain privileged documents contained in the files of defendants and of Poly Prep's various attorneys based on the crime-fraud exception to the attorney-client and work product privileges.  (Pls.' Mem. at 3).


A.  The Crime-Fraud Exception

The crime-fraud exception to the attorney-client privilege "strips the privilege from attorney-client communications that 'relate to client communications in furtherance of contemplated or ongoing criminal or fraudulent conduct.'"  In re Enron Corp., 349 B.R. 115, 127 (S.D.N.Y. 2006) (quoting John Doe, Inc. v. United States, 13 F.3d 633, 636 (2d Cir. 1994)).  Thus, documents that "would otherwise be protected from disclosure by the attorney-client privilege are not protected if they relate to communications in furtherance of a crime or fraud." Duttle v. Bandler & Kass, 127 F.R.D. 46, 53 (S.D.N.Y. 1989); see also United States v. Richard Roe, Inc. ("In re Richard Roe, Inc."), 68 F.3d 38, 40 (2d Cir. 1995); Greenwood v. State of N.Y., No. 84 CV 9143, 1992 WL 203859, at *5 (S.D.N.Y. Aug. 10, 1992).  The purpose of the crime/fraud exception to the privilege is to "assure that the 'seal of secrecy' between lawyer and client does not extend to communications 'made for the purpose of getting advice for the commission of a fraud' or crime."  United States v. Zolin, 491 U.S. 554, 563 (1989) (internal citations omitted); see also Maine v. Moulton, 474 U.S. 159, 189 (1985) (stating "[t]he privilege takes flight if the relation [between attorney and client] is abused.  A client who consults an

14

attorney for advice that will serve him in the commission of a fraud will have no help from the law.  He must let the truth be told").

There are two prerequisites for the exception to apply:  (1) "'there must be a reasonable basis to suspect the perpetration or attempted perpetration of a crime or fraud;'" and (2) the communications must be in furtherance of that crime or fraud.  In re Enron Corp., 349 B.R. at 127 (quoting Ivers v. Keene Corp. ("In re Bairnco Corp. Sec. Litig."), 148 F.R.D. 91, 100 (S.D.N.Y. 1993)).  With respect to first prong of the test, there must be a showing that the client "was engaged in planning a fraudulent scheme when seeking advice from counsel or attempted fraud after receiving the benefit of counsel's work." Id. (citations omitted).  To satisfy the second prong, there must be a showing that the "communications reasonably relate to the subject matter of the possible violations."  In re Bairnco Corp. Sec. Litig., 148 F.R.D. at 100 (citations omitted).

A litigant seeking disclosure need only show that there is "probable cause to believe" that a fraud or a crime has been committed or attempted and that the communications sought to be disclosed were in furtherance of that crime or fraud.  In re Richard Roe, 68 F.3d at 40; Duttle v. Bandler & Kass, 127 F.R.D. at 53 (citing In re Grand Jury Subpoenas Duces Tecum, 798 F.2d 32, 34 (2d Cir. 1986); In re John Doe Corp., 675 F.2d 482, 491, n. 7 (2d Cir. 1982)).  "[I]f a prudent person [has] a reasonable basis to suspect the perpetration or attempted perpetration of a crime or fraud, and that the communications were in furtherance thereof," In re Grand Jury Subpoena Duces Tecum, Dated Sept. 15, 1983, 731 F.2d 1032, 1039 (2d Cir. 1984), then the burden has been satisfied and the documents are subject to disclosure.  Duttle v. Bandler & Kass,

15

127 F.R.D. at 53; see also Greenwood v. State of N.Y., 1992 WL 203859, at *5 (holding that

"this standard 'require[s] that a prudent person have a reasonable basis to suspect the perpetration

or attempted perpetration of a crime or fraud, and that the communications were in furtherance

thereof'") (citation omitted).

The fraud or crime need not be completed successfully in order for this exception to

apply; an attempt or contemplated fraudulent activity is sufficient to trigger the exception to the

privilege.  See In re Grand Jury Subpoena Duces Tecum, Dated Sept. 15, 1983, 731 F.2d at 1039;

Duttle v. Bandler & Kass, 127 F.R.D. at 53.  However, once the fraudulent conduct is no longer

ongoing, communications rendered in the course of giving legal advice to a client are protected

by the privilege; "communications with respect to advice as to past or completed frauds are

within the privilege."  In re Grand Jury Subpoena Duces Tecum, Dated Sept. 15, 1983, 731 F.2d

at 1041; see also Duttle v. Bandler & Kass, 127 F.R.D. at 53 (stating "when fraudulent or

criminal conduct is no longer ongoing, communications related to legitimate attempts to provide

legal defense to the alleged perpetrators are immune from discovery").

In addition to demonstrating probable cause that a crime or fraud has been committed, the

party seeking disclosure must establish a "'purposeful nexus'" between the criminal or fraudulent

activity and the communications sought to be disclosed.  Duttle v. Bandler & Kass, 127 F.R.D. at

53 (citing In re Grand Jury Subpoenas Duces Tecum, 798 F.2d at 34).  Thus, "[o]nly if the

attorney-client communication is 'reasonably relate(d)' to the crime or fraud will the privilege be

overridden."  Id. at 56 (citing In re Sealed Case, 676 F.2d 793, 815 (D.C. Cir. 1982)).

The majority of courts have suggested that the crime/fraud exception applies only where

the client's objective in communicating with his attorney is furthering the client's fraud.  See, e.g., In re Grand Jury Subpoenas Duces Tecum, Dated Sept. 15, 1983, 731 F.2d at 1039 (holding that the crime/fraud exception applies only where there is "probable cause to believe that a crime or fraud had been committed and that the communications [with counsel] were in furtherance thereof"); see also In re Richard Roe, 68 F.3d at 40, 41 (holding that the exception only applies where the documents or communications were "intended in some way to facilitate or to conceal the criminal activity;" "it is not sufficient that the documents provide relevant evidence of the fraud").  However, other courts have held that "legal advice that furthers a fraudulent goal is not privileged, regardless of the innocence of the client seeking the advice."  Duttle v. Bandler & Kass, 127 F.R.D. at 56; see also In re Sealed Case, 754 F.2d 395, 402 (D.C. Cir. 1985) (stating that the party seeking disclosure "is not required to make a specific showing of the client's intent in consulting the attorney").

Moreover, it is clear that the exception applies "even if the attorney is unaware that his advice is sought in furtherance of a crime or fraud."  Avramides v. First Nat'l Bank of Maryland, No. 87 Civ. 5732, 1997 WL 68559, at *1 (S.D.N.Y. Feb. 19, 1997).  Thus, the courts have made it clear that the "intent of the attorney is irrelevant; a communication relating to advice innocently provided by a lawyer loses its privileged status if used by the client in furtherance of crime or fraud."  Duttle v. Bandler & Kass, 127 F.R.D. at 53 (citing In re Grand Jury Proceedings, 604 F.2d 798, 802 (3d Cir. 1979); United States v. Loften, 518 F. Supp. 839, 848 (S.D.N.Y. 1981)).  Similarly, the "purported innocence of [defendant's] personnel is irrelevant as long as the legal advice they were seeking was nevertheless advancing the fraudulent activity."

17

Id.

      In <u>United States v. Zolin</u>, the Court established the standard for dealing with claims under the crime-fraud exception, setting forth a two-step procedure for determining when to engage in an *in camera* review of the documents.  491 U.S. at 572; <u>see also</u> <u>Avramides v. First Nat'l Bank of Maryland</u>, 1997 WL 68559, at *1.  First, "'the judge should require a showing of a factual basis adequate to support a good faith belief by a reasonable person' that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies." <u>United States v. Zolin</u>, 491 U.S. at 572.  "Once that showing is made, the decision whether to engage in *in camera* review rests in the sound discretion of the district court."  <u>Id.</u> (noting that the judge should consider the volume of the materials the court has been asked to review, the relative importance to the case of the alleged privileged information, and the likelihood that the evidence produced through *in camera* review, together with other available evidence, will establish that the crime-fraud exception does apply).

      Courts following the holding in <u>United States v. Zolin</u> have held that *in camera* review is an appropriate means for the court to determine whether allegedly privileged communications fall within the exception.  <u>See, e.g.</u>, <u>Avramides v. First Nat'l Bank of Maryland</u>, 1997 WL 68559, at *1 (ordering the documents produced to the court for *in camera* review based on the court's finding of "'a factual basis adequate to support a good faith belief by a reasonable person' that the requested documents may reveal that the crime-fraud exception applies"); <u>Greenwood v. State of N.Y.</u>, 1992 WL 203859, at *5.  After reviewing the documents *in camera*, the court must determine whether the two prongs of the test for the crime/fraud exception have been met.

Avramides v. First Nat'l Bank of Maryland, 1997 WL 68559, at *2.  In Avramides v. First National Bank of Maryland, the court ordered production of documents based on the crime/fraud exception upon finding that (1) there was probable cause to believe that a fraud on the court was perpetrated, and (2) there was probable cause to believe that the client communications or attorney work product were intended to facilitate or conceal the fraud and in fact were in furtherance of the fraud.  1997 WL 68559, at *2.

In Duttle v. Bandler & Kass, the court found several categories of documents involving communications with counsel not to be privileged in light of a fraudulent investment scheme. Among these were (1) communications between the corporation and counsel regarding its sales staff because the salesmen were being used as instrumentalities of the fraud; (2) communications with counsel regarding licenses to continue trading because such advice advanced the fraudulent activity; and (3) efforts at cover-up, including legal advice in an effort to shield the company from further inquiry.  127 F.R.D. at 54.  The court noted that "[c]ommunications concerning litigation designed to defend [the company] against charges of fraud would normally be privileged.  However, when those communications are themselves used to subvert the judicial process, the privilege is lost."  Id. (citing In re Sealed Case, 754 F.2d at 400-01 (holding that the destruction of documents in litigation furthers fraud)).

Similarly, the "[u]se of the fact of an investigation to allay the concerns of third parties about possible criminal acts, to create the appearance of compliance with laws requiring disclosure, or to cover up a crime disclosed through a protected communication in the course of an investigation will cause the corporation to lose the privilege."  Id. at 55 (citing In re John Doe

Corp., 675 F.2d at 492).  In Greenwood v. State of N.Y., the court found that a disciplinary

proceeding that was "part of an effort to 'cover up' the responsibility of others for a patient's

death. . . . could constitute probable cause to believe that defendants had committed a crime or

fraud and that the communications and other materials in the file of the attorney who prosecuted

the disciplinary proceeding were made in furtherance of the crime or fraud."  1992 WL 203859,

at *5-6.


B.  Plaintiffs' Claims of Fraud

Plaintiffs present a number of arguments that they allege demonstrate that the defendants

engaged in an effort to cover up the criminal activities of Foglietta, and to mislead alumni and

potential victims into believing that the school was not aware of his conduct.


1.  Sheridan Investigation

Plaintiffs assert that Mr. Sheridan's investigation was a sham "designed to cover up

defendants' prolonged and ongoing fraud."  (Pls.' Mem. at 8).  They cite to a number of factors

that lead them to this conclusion.  First, plaintiffs note that Mr. Sheridan was never told of the

two conflicting memoranda prepared by Headmaster Williams in 2002.  (Id. at 10).  Plaintiffs

also claim that defendants failed to identify obvious potential witnesses, and withheld other key

facts from Mr. Sheridan, including:  (1) that Bart Moroney and Harry Barnieri, two assistant

football coaches who worked with Foglietta, were still on staff; (2) that Michael Junsch,

Hiltbrand's classmate and a Poly Prep coach since 1975, was on staff; and (3) that James

Esposito, an assistant football coach under Foglietta, was also available to be interviewed.  (Id. at 11-12).

Plaintiffs also allege that defendant Herrmann, who was Poly Prep's counsel and Mr. Sheridan's principal liaison with the school, selectively determined who Sheridan should interview.  Plaintiffs allege that the individuals chosen for Sheridan to interview – Steven Andersen, Harlow Parker, Edward Ruck, Ralph Dupee, Joan Wright,[19] William Williams, Poly Prep Headmaster from 1971 to 2000, Poly Prep's then Headmaster, David Harman, and Harry Petchesky, Esq., a member of the Poly Prep Board – were "carefully cherry-picked . . . Poly Prep loyalists [who] would stick to the script that no one at Poly Prep had any knowledge of allegations against Foglietta prior to Hiltbrand's February 1991 letter."  (Id. at 10-11).  In addition, the faculty and high level administrators were never told of Mr. Sheridan's investigation, including the then head of the Middle School, Lawrence Patton.  (Id.)  Moreover, despite the fact that Headmaster Harman had allegedly ascertained the names of several additional victims, he never gave Sheridan the names of other individuals who claimed they had been abused by Foglietta.  (Id. at 13).

Plaintiffs further contend that defendants "short-circuited and abruptly terminated Mr. Sheridan's investigation when . . . Sheridan conveyed to Defendants that he had been told certain facts which indicated or suggested that various faculty members and administrators at Poly Prep

_____

[19]Andersen played football for Foglietta in the 1960s and 1970s and was a long-time coach at the school; Parker was Athletic Director who retired in 1987; Ruck was a teacher, coach and Head of Physical Education, taking Parker's place as Athletic Director in 1987; Dupee was employed from 1961 to 1998 as a football coach; Wright was Dean of Faculty and Assistant Headmaster from 1983-1999 and drafted the sexual abuse and harassment policies.

did have knowledge of numerous sexual abuse complaints" prior to Hiltbrand's 1991 letter.

(Pls.' Mem. at 13).  Among other things, Sheridan recalled at his deposition that Steven

Andersen, a coach and a student who played football for Foglietta, had told Sheridan about three

separate allegations of sexual misconduct.  (Am. Compl., Ex. R[20] at 79, 80-81, 83).  When

Sheridan conveyed a description of the interviews to Mr. Herrmann on November 8, 2002,

Herrmann allegedly memorialized the phone conversation in six pages of notes that were

produced to plaintiffs.  (Id. at 11, 13; Mulhearn Decl., Ex. K[21]; Eftekhari Decl., Ex. 1[22]).  It is

notable that Sheridan's testimony about his interview with Andersen contradicts Herrmann's

notes, which indicate that Andersen was not aware of any "sexual" misconduct.  (Mulhearn

Decl., Ex. A[23] at 2 ("Nothing sexual")).

---

[20]Citations to "Am. Compl., Ex. R" refer to the transcript of the deposition of Peter T. Sheridan, dated June 27, 2001 and July 7, 2011.

[21]Citations to "Mulhearn Decl., Ex. K" refer to Exhibit K, a copy of the billing invoices of Peter T. Sheridan, dated October 3, 2002 and April 1, 2003.

[22]Citations to "Eftekhari Decl., Ex. 1" refer to Exhibit 1, which contains various documents produced by Poly Prep, including but not limited to:  (1) the engagement letter from Mr. Sheridan to Mr. Harman, dated September 18, 2002; (2) a copy of a payment from Poly Prep to Mr. Sheridan for his work, dated September 20, 2002; (3) an invoice documenting Mr. Sheridan's work on this matter, dated October 3, 2002; (4) Mr. Herrmann's handwritten notes from his conversation with Mr. Sheridan, dated November 8, 2002; (5) a letter from Mr. Berger to Mr. Harman, dated May 21, 2002; (6) a letter from Mr. Hiltbrand to Mr. Williams, dated February 20, 1991; (7) a letter from Mr. Harman to Mr. Berger, dated June 6, 2002; (8) an email from Mr. Herrmann to Mr. Harman regarding his meeting with David Berger, dated December 11, 2008; and (9) a fax from Mr. Herrmann to Mr. Berger, dated December 19, 2002.

[23]Citations to "Mulhearn Decl., Ex. A" refer to Exhibit A, a copy of the summary notes of Robert F. Herrmann, Esq., dated November 8, 2002.

Despite the fact that Mr. Sheridan had intended to pursue several open issues,[24] his

investigation was terminated in early 2003.  (Pls.' Mem. at 13).  During his deposition in this

action, Mr. Sheridan testified that at the time his investigation ceased, he "had questions

pertaining to whether or not . . . faculty and staff at Poly Prep had . . . direct, specific, and

substantiated knowledge of Mr. Foglietta's sexual misconduct."  (Mulhearn Decl., Ex. J at 324).

Defendants argue that there is nothing in the record to support plaintiffs' claim that the

Sheridan investigation was a sham or that Poly Prep intended plaintiffs to rely on Mr. Sheridan's

investigation.  (Defs.' Mem. at 10).  With respect to plaintiffs' claims regarding the individuals

selected to be interviewed by Mr. Sheridan, defendants contend that "Mr. Sheridan interviewed

six employees and a Board member who, collectively, had more than 130 years of experience

supervising, working with, or playing football for Mr. Foglietta."  (Id. at 13).  Defendants add

that, according to Mr. Sheridan, Poly Prep in no way limited who he could interview.  (Id.)  To

bolster their argument that Poly Prep did not seek to influence the Sheridan investigation,

defendants claim that Poly Prep "had little if any control over what [interviewees] did or did not

say" and note that no other Poly Prep employees or representatives were present during the

individual interviews.  (Id. at 13-14).

With respect to the duration of Mr. Sheridan's investigation and the reason it ended in

---

[24]Mr. Sheridan indicated that he intended (1) to investigate communications regarding the
need to remove Foglietta from his office in the boys' locker room; (2) to review possible law
enforcement complaints; (3) to ascertain the names of other victims; (4) to interview custodial
staff members; and (5) he requested a copy of the 1990-91 letter that had been placed in faculty
mailboxes, according to Mr. Williams.  (Pls.' Mem. at 12-13; Mulhearn Decl., Ex. J).  According
to defendants, no copies of that letter remain.  (Am. Compl., Ex. S at 127-30).  Citations to
"Mulhearn Decl., Ex. J" refer to Exhibit J, selected pages from the transcript of the deposition of
Peter T. Sheridan, dated June 27, 2001 and July 7, 2011.

2003, defendants argue that plaintiffs have no evidence to demonstrate that Sheridan's investigation was "short circuited" by Poly Prep once Sheridan discovered damaging information; defendants claim that "this is Plaintiffs' assumption, not Mr. Sheridan's characterization."  (Id. at 14).  Defendants contend that David Harman testified that he did not recall terminating Sheridan; according to Harman, Sheridan "conducted interviews and that was the end of his retention."  (Defs.' Mem. at 15; Eftekhari Decl., Ex. 4[25] at 212).  Thus, defendants argue that plaintiffs "only speculate" that the investigation was "abruptly terminated" and that the more "straightforward explanation" is that once Sheridan communicated his findings to Poly Prep, the school "shifted its focus to other aspects of the matter."  (Defs.' Mem. at 15).

The Court notes that defendants have supplied no support for this statement.  Indeed, when Mr. Sheridan was questioned about the circumstances relating to the termination of his investigation, Poly Prep's counsel objected on grounds of attorney-client privilege (Eftekhari Decl., Ex. 4 at 52),[26] leaving plaintiffs without an answer and inviting speculation.  The Court discounts defendants' self-serving explanation in light of the absence of any evidence whatsoever as to why the investigation ended when it did, particularly given Sheridan's statement that he had other areas of inquiry that he intended to pursue.

Defendants also contend that plaintiffs cannot identify the information discovered by Mr. Sheridan that would have prompted defendants to "short circuit" the investigation.  (Defs.' Mem.

---

[25]Citations to "Eftekhari Decl., Ex. 4" refer to Exhibit 4, excerpts from the transcript of the deposition of Peter T. Sheridan, dated June 27, 2011 and July 7, 2011.

[26]Defendants selectively invoked the privilege at various times during the Sheridan deposition.

at 15).  Defendants contend that it could not have been the "rumors" which Poly Prep had

disclosed to Hiltbrand before Sheridan was retained; nor was it Mr. Sheridan's "apparently

erroneous" recollection of the name William Jackson, for which Sheridan, at his deposition, was

unable to provide further information.  (Id. at 17-18).  Defendants also argue that it "is

unremarkable" that Sheridan did not interview the alleged victims, since his task was to

interview faculty and administrators to see what they knew.[27]  (Id. at 18).

Finally, defendants argue that "none of Plaintiffs' other speculative and self-serving

critiques of Mr. Sheridan's investigation in any way indicate fraud."  (Id.)  Defendants contend

that the record demonstrates that Mr. Sheridan was retained solely for the purpose of providing

legal advice to Poly Prep in connection with threatened litigation; he finished his interviews and

the school dealt with Hiltbrand and Paggioli in an effort to resolve their claims.  (Id. at 19).

### 2.  Defendants' Representations to Alumni

Plaintiffs also claim that in furtherance of the efforts to conceal the extent of the school's

knowledge and failure to act in the face of possible criminal conduct, Mr. Harman sent the

October 2002 letter to alumni, which contained certain false and misleading statements.  (Pls.'

Mem. at 15).  Specifically, plaintiffs argue that the letter's characterization of the school's receipt

of credible allegations as "recent" was dishonest, in light of Hiltbrand's 1991 letter and the

complaints the school received as early as 1966.  In addition, plaintiffs claim that the 2002 letter

---

[27]The Court notes that had Sheridan interviewed some of the victims, he may have
learned about their earlier reports of Foglietta's sexual abuse and questioned certain
administrators about specific complaints.

"implicitly yet falsely suggested to all alumni that the investigation it referenced would be . . . honest and thorough."  (Id.)

In further support of their allegations of fraud, plaintiffs point to the communication that Mr. Herrmann had with Mr. Hiltbrand's attorney about Mr. Sheridan's investigation.  According to Mr. Herrmann's notes from that conversation, he told Mr. Hiltbrand's attorney that "a former U.S. attorney had conducted the investigation interviewing a number of former faculty and that none had first or second hand knowledge at the time of any abuse."  (Pls.' Mem. at 16; Mulhearn Decl., Ex. N[28]).  According to plaintiffs, this conversation with Hiltbrand's attorney on December 10, 2002 regarding the "purported findings and conclusions" of Sheridan's investigation was misleading in that Sheridan had not concluded his investigation and had not even interviewed Petchesky at the time.[29]  (Mulhearn Decl., Ex. N; Pls.' Mem. at 10).  Plaintiffs argue that, in light of the preliminary nature of Mr. Sheridan's findings and the lack of any formal report issued by Mr. Sheridan, Mr. Herrmann's statement to Mr. Hiltbrand's counsel was dishonest.  (Id. at 16).  Plaintiffs further claim that a memorandum memorializing this conversation between Herrmann and Hiltbrand's attorney was sent to four members of the Board of Trustees, Donald Carswell, John B. Madden, Jr., Esq., Richard Mizrack, Esq., and Peg Tyre,[30] each of whom had also

_____

[28]Citations to "Mulhearn Decl., Ex. N" refer to Exhibit N, a copy of Robert F. Herrmann's December 11, 2002 email to "MAugust" regarding his December 10, 2002 meeting with David Berger, Esq.  The email indicates that it was "sent as bcc" to the members of the "2002-2003 Ad Hoc Committee on Sexual Misconduct."

[29]Mr. Sheridan did not interview Mr. Petchesky until early January 2003.  (Pls.' Mem. at 10; Defs.' Mem. at 5).

[30]It appears that these four board members made up the "2002-2003 Ad Hoc Committee on Sexual Misconduct."  (Mulhearn Decl., Ex. N).

received the two memoranda from Williams referencing anonymous letters in the 1970s.  (Id.)

Plaintiffs contend that based on the information available to them, each of these Board members

"knew that Poly Prep's 'no knowledge prior to 1991' assertion was dubious at best" and that the

representation to Hiltbrand's attorney was not accurate.  (Id.)

Defendants argue that Sheridan was hired to provide advice to defendants, not to conduct

an audit for the benefit of third parties.[31]  (Defs.' Mem. at 6).  Defendants contend that there is

nothing in the letter that "implicitly vouches for Mr. Sheridan's investigation or promises to

publish its results."  (Id. at 11).  Similarly, defendants assert that there is no evidence in the

record to support plaintiffs' claim that Poly Prep made false representations that Sheridan's

investigation would be "complete, thorough, and honest."  (Id.)  They also contend that plaintiffs

mischaracterize the overview of Sheridan's investigation that was presented to Hiltbrand's

attorney.  (Id. at 11).  They argue that Sheridan found no "first- or second-hand knowledge of

abuse" (id. at 11-12), and that this was consistent with what Herrmann told Hiltbrand's counsel.

(Id. at 12).

In response to defendants' claim that there is no support for plaintiffs' allegation that

alumni could have reasonably expected a "complete, thorough, and honest" investigation,

plaintiffs contend that "defendants apparently hold the view that it was perfectly acceptable for

---

[31]If it were true that Sheridan was only hired for the purpose of providing advice to
defendants, then it is unclear why the school notified the Poly Prep community of the ongoing
investigation into the allegations of sexual abuse by Foglietta in its October 28, 2002 letter to
Poly Prep alumni.  In the October 28, 2002 letter, Mr. Harman makes a representation to alumni
regarding the steps the school had taken since it received "recent . . . credible allegations" and
indicates that the Board "authorized the sending of this letter to all alumni and a modified version
to our present parents."  (Mulhearn Decl., Ex. M).

Poly Prep – after trumpeting the sexual abuse investigation to its alumni (not to mention David Hiltbrand's attorney) – to conduct an incomplete, half-baked, or even dishonest, investigation." (Pls.' Reply[32] at 13).  Plaintiffs argue that Harman's October 28, 2002 letter to alumni and Herrmann's December 2002 statements to Hiltbrand's attorney "both contained implicit [and material] misrepresentations regarding the completeness and honesty of Poly Prep's sexual abuse investigation."  (Id. at 14).

3.  Defendants' Representations to the Court

In seeking disclosure of the privileged materials created by or disclosed to Poly Prep's current counsel, O'Melveny & Myers, plaintiffs allege that the defendants have continued in their efforts to fraudulently conceal the extent of their knowledge of Foglietta's sexual abuse. Plaintiffs claim that throughout this litigation, defendants and counsel have "repeatedly parroted the fraudulent mantra that Mr. Sheridan's investigation did not reveal any evidence that anyone at Poly Prep knew of any allegations of sexual misconduct or sexual abuse against Mr. Foglietta prior to Mr. Williams' receipt of David Hiltbrand's February 20, 1991 letter."  (Pls.' Mem. at 16).  Plaintiffs contend that the evidence developed during discovery has demonstrated that these representations to the Court were false in a number of respects.

Specifically, plaintiffs cite the testimony of Mr. Williams at his deposition in which Williams conceded that he had received notification from John Marino in 1973 or 1974 about Coach Foglietta's abuse (Am. Compl., Ex. S at 68-69), and that sometime in the 1970s, he had

_____

[32]Citations to "Pls.' Reply" refer to Plaintiffs' Reply Memorandum of Law, dated August 12, 2011.

received an anonymous letter and anonymous phone call regarding Foglietta.  (Id. at 104-109).

Although Williams denied that any of these complaints led him to think that Foglietta's

misconduct was in any way sexual in nature (id. at 107, 110-12), Mr. Sheridan testified that

Williams had told him that the letter Williams had received in the 1970s specifically accused

Foglietta of *sexual* misconduct.  (Pls.' Mem. at 17; Mulhearn Decl., Ex. J at 119; see also

Mulhearn Decl., Ex. A (corroborating Mr. Sheridan's testimony that the 1970s letters to

Williams referred to "sex. mis.")).[33]

Plaintiffs contend that the "truncated Sheridan investigation . . . further expose[d] the

preposterous and offensive nature of Defendants' 'no knowledge prior to 1991' shibboleth," even

though the investigation was never actually completed.  (Pls.' Mem. at 18).  Plaintiffs note that

Sheridan learned that various faculty members had heard rumors of Foglietta inappropriately

fondling or touching boys in the locker room and at his New Jersey vacation home; and that

faculty members had received a letter accusing Foglietta of misconduct.  (Mulhearn Decl., Ex. J).

Plaintiffs claim that defendants and their counsel consistently represented that Sheridan had

reached an "ultimate conclusion" that no one at the school had such knowledge despite

Sheridan's testimony that when his investigation was terminated, he was left with a question in

his mind as to whether faculty members or administrators were aware of Foglietta's sexual

misconduct.  (Pls.' Mem. at 19 (citing Mulhearn Decl., Ex. O[34] at 8)).

_____

[33]Defendants' counsel further claimed that the fact that defendants produced Mr.
Herrmann's notes suggests that defendants "wanted to be very open about this."  (Id. at 40).

[34]Citations to "Mulhearn Decl., Ex. O" refer to Exhibit O, which is Defendants' Sur-
Reply Memorandum of Law, dated August 27, 2010.

Specifically, in their sur-reply to plaintiffs' motion for spoliation sanctions, defendants, referring to a draft letter from Poly Prep to Hiltbrand's counsel, stated: "The draft letter was produced because it was responsive to the Court's order, as it briefly summarized the purpose of Mr. Sheridan's investigation and its <u>ultimate conclusion</u>."[35]  (Mulhearn Decl., Ex. O at 8 (emphasis added)).  In addition, during oral argument before this Court on October 6, 2010, prior to Mr. Sheridan's deposition, counsel for Poly Prep represented that "based upon [Sheridan's] interviews, <u>he reached the conclusion</u> that no one . . . he communicated to the school that based upon his investigation that no one really had any knowledge of any first or second-hand knowledge of any sexual abuse prior to 1991, 11, 12 years earlier."  (Mulhearn Decl., Ex. Q[36] at 38-39 (emphasis added)).  Defendants' counsel also represented that:  "Ten years later [in 1991] Mr. Hiltbrand shows up on the scene.  And that's when Mr. Foglietta – and that was the first time that anyone says that they were aware of this."  (<u>Id.</u> at 44).

In opposing plaintiffs' motion for sanctions based on the spoliation of Mr. Sheridan's investigation notes, defendants took the position that "there [was] no prejudice to plaintiffs" in part because defendants turned over Mr. Herrmann's summary notes from his conversation with

---

[35]The draft letter states that its purpose is to set forth a summary of the points Hiltbrand's attorney, David Berger, Esq., and Robert F. Herrmann discussed at their December 2002 meeting.  Although much of the document is redacted, it states in part that "Mr. Sheridan interviewed a number of former faculty and administrative staff and, as I pointed out at our meeting, we understand there was no first hand and second hand information of sexual abuse until Bill Williams received the letter sent by Mr. Hiltbrand."  (Eftekhari Decl., Ex. 1).

[36]Citations to "Mulhearn Decl., Ex. Q" refer to Exhibit Q, the transcript of proceedings before the undersigned on October 6, 2010.

Mr. Sheridan.  (Defs.' Spol. Mem.[37] at 11-16).  Plaintiffs offer this as another example of defendants' false representations to the Court, arguing that Herrmann's summary notes "are not in any way a fair and accurate summary of Mr. Sheridan's investigative notes."  (Pls.' Mem. at 23).  Based on Sheridan's testimony, plaintiffs assert that the Herrmann notes are "wildly inconsistent" with Sheridan's testimony in several regards.  (Id. at 24; see Mulhearn Decl., Ex. A).  For example, Herrmann's notes indicate that Andersen told Sheridan that he was not aware of anything "sexual" with respect to Foglietta's conduct (Mulhearn Decl., Ex. A at 2 ("Nothing sexual")), whereas Sheridan testified that Andersen told him about three separate allegations of sexual misconduct.  (Am. Compl., Ex. R at 79, 80-81, 83).  In addition, the Herrmann notes fail to reference the fact that Sheridan was told by several witnesses about fondling in the locker room and at Foglietta's summer home (Mulhearn Decl., Ex. J at 84-85), and the notes omit any reference to Sheridan's discussion with various witnesses regarding the letters in the faculty mailboxes in 1990 or 1991.  (Id. at 119).  Plaintiffs contend that "[t]he evidence thus suggests that the Herrmann summary notes have been, at least in part, fabricated, altered, or distorted, by Defendants for the fraudulent purpose of supporting the false narrative that Mr. Sheridan reached an 'ultimate conclusion' to the effect that no Poly Prep faculty members or administrators" were aware of sexual misconduct allegations prior to February 1991.  (Pls.' Mem. at 26).  Plaintiffs further argue that regardless of whether the notes were fabricated, they were used by defendants to mislead the Court as to Sheridan's "findings."  (Id.)

Plaintiffs also point to the fact that defendants have consistently taken the position that

---

[37]Citations to "Defs.' Spol. Mem." refer to Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Spoliation Sanctions, dated August 11, 2010.

the loss of Sheridan's investigative notes would not prejudice the plaintiffs.  In their opposition

to plaintiffs' motion for spoliation sanctions, defendants claimed that "there is no basis to believe

that any primary evidence has been lost."  (Id. at 19; Mulhearn Decl., Ex. P[38] at 12).  Defendants

also asserted that Mr. Herrmann's notes "would have included" any conclusions drawn by

Sheridan from his interviews and that regardless of the loss of Sheridan's notes, "plaintiffs have

everything that is relevant and discoverable on these points. . . ."  (Id. at 19-20; Mulhearn Decl.,

Ex. P at 13).  Defendants also attempted to convey their position that Sheridan's notes were of

limited value and "consisted only of a topical summary in his personal shorthand" (Mulhearn

Decl., Ex. O at 4); and that he discussed the substance with Herrmann, who took "detailed

notes."  (Mulhearn Decl., Ex. P at 16).  Plaintiffs assert that, having now deposed Mr. Sheridan,

it is clear that Herrmann's summaries of Sheridan's conversation were limited and indeed,

inaccurate in certain key respects.  (Pls.' Mem. at 26).

    With respect to these arguments, defendants contend that plaintiffs "fundamentally

misapprehend the difference between the record . . . and counsel's arguments concerning what

conclusions should be drawn from that record."  (Defs.' Mem. at 26).  Defendants "stand by

those arguments, which [Poly Prep argues] were grounded in and often specifically cited to the

record, including the Sheridan Declaration."  (Id.)  Referring to representations that Sheridan

made "findings" and reached "conclusions" based on information supplied in the course of his

interviews, defendants add that "the semantic differences between various shorthand ways of

describing Mr. Sheridan's interviews during advocacy are neither misleading nor do they even

---

[38]Citations to "Mulhearn Decl., Ex. P" refer to Exhibit P, Defendants' Memorandum of
Law, dated August 11, 2010.

remotely approach a "fraud" that would trigger the crime/fraud exception. . . ."  (Id. at 27-28).

Defendants further contend that plaintiffs' claims of fraud are based solely on the fact that

defendants have chosen to contest the merits of plaintiffs' lawsuit.  (Id. at 28).  Defendants argue

that "[j]ust because Plaintiffs allege that Poly Prep received a handful of allegations (some of

which were apparently anonymous) over the course of twenty-five years does not mean that Poly

Prep thereby had actual knowledge of Mr. Foglietta's alleged misconduct, or that Poly Prep

necessarily even should have reached that conclusion."  (Id. at 29).

     Plaintiffs respond that they do not claim that defendants' act of defending the lawsuit, by

itself, constitutes fraud; however, they argue that defendants' "oft-repeated mantra that no

administrators or faculty members at Poly Prep had knowledge of sexual abuse or sexual

misconduct complaints . . . 'has little or no factual basis' and is being 'carried on substantially for

the purpose of furthering [Defendants'] fraud.'"  (Pls.' Reply at 8-9 (citing In re Richard Roe,

168 F.3d at 71)).  In support of their argument, plaintiffs point to defendants' continued reliance

on the deposition testimony of former Headmaster Williams and the Declaration of Peter T.

Sheridan for the untenable proposition that Poly Prep had no knowledge prior to Hiltbrand's

1991 letter.  (Id. (citing Defs.' Mem. at 27-30[39])).  In addition, in their opposition to plaintiffs'

motion for sanctions for spoliation and/or fraud on the Court, defendants represented to the Court

that:

---

[39]In their Memorandum, defendants stand by the arguments they made in response to
plaintiffs' spoliation motion, specifically those pertaining to whether plaintiffs would be
prejudiced by the loss of Sheridan's interview notes.  (Defs.' Mem. at 26).  Defendants rely on
Sheridan's Declaration for the proposition that Sheridan "had not found any evidence that any of
his interviewees knew of abuse before 1991." (Id.)

> Had Plaintiffs been willing to accept Poly Prep's proffer [of
> information pertaining to Sheridan's interviews], they would have
> also learned that Mr. Sheridan uncovered no evidence that anyone
> at Poly Prep had any first- or second-hand knowledge of abuse
> before David Hiltbrand came forward in 1991, and found no
> evidence that anyone at Poly Prep tried to conceal the alleged
> abuse or Poly Prep's knowledge of the abuse or dissuade victims
> from reporting it or filing claims.

(Mulhearn Decl., Ex. P at 2; see also id. at 11).  In their opposition to plaintiffs' motion for

spoliation sanctions, defendants also represented that "there is no prejudice to plaintiffs [from the

loss of Sheridan's notes] because, as plaintiffs well know, the attorney notes would not support

their equitable estoppel argument – which was the only purpose of the limited discovery ordered

by this Court."  (Id.; see also discussion infra at 30 (regarding defendants' counsel's

representations to the Court in oral argument)).

     In arguing that defendants' actions constitute fraud, plaintiffs assert that defendants

repeatedly made false statements to the Court about material issues when they had access to

information that indicated that their public statements were not accurate.  (Pls.' Mem. at 27).

Plaintiffs also assert that defendants had a duty to check the information and to pursue the open

questions raised by the Sheridan investigation and they failed to do so.  (Id.)  With respect to

defendants' representations to alumni, plaintiffs claim that defendants benefitted by falsely

telling alumni that the matter was being fully investigated, a representation that induced

numerous victims from pursuing their legal claims against the school.  (Id. (citing Novak v.

Kasaks, 216 F.3d 300, 311 (2d Cir. 2000); In re Omnicom Group, Inc. Sec. Litig., No. 02 Civ.

4483, 2007 WL 2376170, at *13 (S.D.N.Y. Aug. 10, 2007))).

     Defendants argue that plaintiffs cannot meet their burden to show that Poly Prep

committed or attempted to commit a crime or fraud.  (Defs.' Mem. at 10).  Defendants claim that

"neither Mr. Sheridan's privileged interviews nor any subsequent reference by Poly Prep to those

interviews even remotely approaches a fraud."  (Id. at 6).


C.  Analysis

   1.  Defendants' Alleged Conduct

   "Case law on the crime-fraud exception does not make perfectly clear what wrongdoing

must be alleged, and with what specificity, in order for the [crime/fraud exception] to apply.

'[T]he actual burden to be imposed on a movant seeking to defeat a privilege in this way is still

an open question.'"  Chevron Corp. v. Salazar, 275 F.R.D. 437, 452 (S.D.N.Y. 2011) (citing In re

Omnicom Group, Inc. Sec. Litig., 233 F.R.D. 400, 406 (S.D.N.Y. 2006)).  Defendants argue that

"a 'fraud' for the purposes of invoking the crime/fraud exception is the same as 'fraud' for the

purposes of alleging a standalone claim."  (Defs.' Mem. at 8 (citing Unigene Labs., Inc. v.

Apotex Inc., No. 06 CV 5571, 2008 WL 356482, at *3-4 (S.D.N.Y. Feb. 4, 2008))).  Under

defendants' approach, plaintiff would be required to show probable cause that defendants have

committed fraud, defined as:  "(1) a material misrepresentation or omission of fact (2) made by

defendant with knowledge of its falsity (3) and with intent to defraud; (4) reasonable reliance on

the part of plaintiff; and (5) resulting damage to the plaintiff."  Crigger v. Fahnestock & Co., Inc.,

443 F.3d 230, 234 (2d Cir. 2006) (applying New York law in the context of general fraud

claims).

   However, as plaintiffs note, "fraud" in this context is broader than defendants suggest.

One court has observed that "[t]he term 'crime/fraud exception' . . . is a bit of a misnomer, as many courts have applied the exception to situations falling well outside of the definitions of crime or fraud." Rambus, Inc. v. Infineon Technologies AG, 220 F.R.D. 264, 281 (E.D.Va. 2004).  While "fraud" in the context of the crime/fraud exception "embraces common law fraud," Chevron Corp. v. Salazar, 275 F.R.D. at 452 (internal quotation and citation omitted), "some courts have interpreted the exception so broadly as to encompass 'misconduct fundamentally inconsistent with the basic premises of the adversary system.'" Id. at 452-453 (citing Madanes v. Madanes, 199 F.R.D. 135, 148-49 (S.D.N.Y. 2001)); see also In re Sealed Case, 754 F.2d at 400 (applying crime/fraud exception in case involving "willful, systematic and extensive" destruction of documents that had been subpoenaed); Parrot v. Wilson, 707 F.2d 1262, 1271 (11th Cir. 1983) (stating that crime/fraud exception applies to communications made in furtherance of "bad faith litigation conduct"); Rambus, Inc. v. Infineon Technologies AG, 220 F.R.D. at 282 (applying crime/fraud exception to materials and communications related to client's spoliation of evidence).

Without providing further guidance, the Second Circuit has also noted that "advice in furtherance of a fraudulent or unlawful goal" is not considered worthy of protection under the attorney-client privilege.  In re Grand Jury Subpoena Duces Tecum, Dated Sept. 15, 1983, 731 F.2d at 1038.  "At a minimum, the attorney-client privilege does not protect communications in furtherance of an intentional tort that undermines the adversary system itself."  Madanes v. Madanes, 199 F.R.D. at 149.  District courts in this circuit have "long construed the exception as reaching some conduct beyond crime and fraud."  Id. (citing Sackman v. Liggett Group, Inc., 173

F.R.D. 358, 364 (E.D.N.Y. 1997); <u>Cooksey v. Hilton Int'l Co.</u>, 863 F.Supp. 150, 151 (S.D.N.Y. 1994); <u>Rattner v. Netburn</u>, No. 88 Civ. 2080, 1989 WL 223059, at *47 (S.D.N.Y. June 20, 1989) (intentional torts); <u>In re Heuwetter</u>, 584 F.Supp. 119, 127 (S.D.N.Y. 1984) (torts); <u>Irving Trust Co. v. Gomez</u>, 100 F.R.D. 273, 276 (S.D.N.Y. 1983) ("intentional or reckless tortious behavior"); <u>Diamond v. Stratton</u>, 95 F.R.D. 503, 505 (S.D.N.Y. 1982) (intentional tort)).

The Court finds plaintiffs' allegations relating to Poly Prep's response to specific allegations of sexual abuse prior to 2002 (<u>see</u> 4/13/11 Order at 4-19), combined with the circumstances surrounding Mr. Sheridan's "investigation," and Poly Prep's subsequent representations to plaintiffs and other alumni regarding that investigation "adequate to support a good faith belief" that defendants may have attempted to conceal the extent of Poly Prep's prior knowledge of Foglietta's sexual misconduct.  <u>See</u> <u>United States v. Zolin</u>, 491 U.S. at 572. Plaintiffs have alleged, and former Headmaster Williams' deposition confirmed, that Williams became aware of complaints during his tenure in the 1970s.  (<u>See</u> 4/13/11 Order at 4-9; <u>see</u> discussion <u>supra</u> 4-5).  Williams readily found reasons to discredit the complaints that he received over the years, determining that neither students coming forward alleging abuse nor the anonymous letters alleging abuse warranted any further investigation.  (<u>Id.</u>)  While acknowledging receipt of the anonymous complaints and the allegations made by Marino, which he discredited, Williams, in a carefully worded statement, nevertheless claimed that David Hiltbrand's 1991 letter making specific allegations of abuse, was "the first time, and only time, that they – anybody had identified themselves as somebody who had been molested in the school."  (Am. Compl., Ex. S at 99).

Moreover, despite all of the information available to Williams, defendants point to the Sheridan investigation as positive evidence that Poly Prep lacked any actual knowledge of Foglietta's sexual misconduct prior to 1991.  Although plaintiffs argue that the Sheridan investigation was a sham, the Court does not need to find that the investigation was entirely a sham in order to find that defendants may have used Sheridan's investigation to cover up the extent of their knowledge of Foglietta's abuse; rather, it is sufficient to find probable cause that defendants at the very least attempted to use that investigation for an improper purpose that is "fundamentally inconsistent with the basic premises of the adversary system."  <u>Madanes v. Madanes</u>, 199 F.R.D. at 148-49.  Defendants concede that the investigation was aimed at determining whether Poly Prep had knowledge of Foglietta's sexual misconduct.  However, Sheridan conducted only seven interviews before his investigation was terminated and admittedly before he had exhausted the avenues he had identified for further investigation.  Due to defendants' assertion of the attorney-client privilege to block Sheridan's testimony, plaintiffs and the Court are left to speculate as to why the investigation ended when it did.[40]  There is no indication that Sheridan ever reached any conclusions about Poly Prep's knowledge; in fact, Sheridan testified at his deposition that as a result of his investigation he was left with "questions pertaining to whether or not . . . faculty and staff at Poly Prep had . . . direct, specific, and substantiated knowledge of Mr. Foglietta's sexual misconduct."  (Mulhearn Decl., Ex. J at 324).

---

[40]As the Court discussed earlier, plaintiffs asked Mr. Sheridan questions regarding the end of his investigation, but defendants objected to the questioning, asserting attorney-client privilege.  (<u>See</u> Eftekhari Decl., Ex. 4 at 52-54).  While plaintiffs expressed an intent to request a ruling on defendants' claim of the privilege from the undersigned, they have not raised such an argument in these papers.  Accordingly, the Court will not address the issue further at this time.

Other circumstances surrounding the Sheridan investigation raise an inference that defendants did not intend Mr. Sheridan's investigation to be complete or in any way conclusive. It appears that defendants did not provide Mr. Sheridan with sufficient facts necessary for him to discover the truth.  For example, even though Sheridan interviewed Williams, it appears that Poly Prep did not inform Sheridan that Williams had prepared written statements in May and June 2002 regarding the complaints he had received.[41]  While it does not appear that Poly Prep prevented Sheridan from speaking with anyone at the school, clearly the school was in the best position to know who had the most opportunity to observe Foglietta and yet Sheridan was not given the names of certain obvious witnesses.  Moreover, the fact that Poly Prep faculty and administrators were not told about Mr. Sheridan's investigation made it much less likely that anyone with relevant information would come forward voluntarily and suggests that Poly Prep had a desire to tailor, if not completely steer, Sheridan's findings.

While defendants may not have owed a legal duty to investigate the allegations about Foglietta after he left the school, the Court finds that there is a factual basis adequate to support a good faith belief that they may have used the "investigation" as a way to further their efforts to conceal their knowledge and discourage victims from coming forward with claims against the school.  Indeed, while the defendants never explicitly represented that the investigation would be "complete, thorough, and honest," based on a review of the record in this case, the Court finds

---

[41]Defendants do not deny that Sheridan was never informed of or shown the statements Williams provided, but argue instead that "it is clear that he [Sheridan] spoke to Mr. Williams at length and covered the very same information that was in the statements."  (Defs.' Mem. at 18). Certainly, Mr. Sheridan's questioning of Williams would have been better informed if he had been in possession of Williams' two somewhat contradictory statements.

that the Sheridan "investigation" was not an investigation at all, as the word connotes an inquiry that is both detailed and searching. Rather, Sheridan's prematurely-truncated inquiry is more properly characterized as a series of interviews that raised questions and provided very few answers.

Nevertheless, defendants reported back to Hiltbrand's attorney near the conclusion of Sheridan's interviews that the investigation produced no evidence of first- or second-hand knowledge of anyone at the school. In light of Williams' statements to Sheridan and the fact that multiple people who were interviewed mentioned "rumors" that Foglietta was abusing boys, defendants' report to Hiltbrand's counsel, while technically true, appears not to have been made entirely in good faith. A reasonable inference could be drawn from the totality of the circumstances that Poly Prep, faced with serious allegations of misconduct, undertook an "investigation" specifically designed <u>not</u> to discover the full extent of the faculty and administration's knowledge; rather, it was designed to mollify alumni and potential plaintiffs into believing that the school not only took the allegations of abuse seriously, but that after an independent investigation, the school was not to blame because no one actually knew about the abuse. In making the claim of no prior knowledge, the school was arguably attempting to dissuade potential victims from pursuing litigation against the school.

In light of the facts discussed here and in the Court's April 13, 2011 Memorandum and Order, the Court finds that there is a sufficient basis to support a good faith belief that Poly Prep and certain of the individual defendants took steps to conceal their prior knowledge of Foglietta's sexual misconduct in the period leading up to and including the 2002 letter to alumni and the

2002 communication with Hiltbrand's attorney.

However, with respect to plaintiffs' claims about representations made by defendants' counsel in the course of this litigation, and particularly within the context of the parties' briefing and argument on plaintiffs' spoliation motion, at this time the Court does not find that there is an adequate factual basis to believe that these statements were in furtherance of defendants' attempts to cover up the extent of the school's knowledge.  They could just as easily have been statements made in the course of mounting a legitimate defense to plaintiffs' litigation claims.

Having found a factual basis adequate to support a good faith belief by a reasonable person that at the time of the Sheridan investigation defendants were engaged in efforts to conceal the extent of their prior knowledge of Foglietta's misconduct, the Court now considers whether there is a sufficient showing that the requested communications and work product were intended by defendants to conceal the fraud and in fact furthered the fraud.

2.  <u>Nexus between Alleged Conduct and Attorney-Client Communications</u>

In addition to demonstrating probable cause that a crime or fraud has been committed, the party seeking disclosure must establish a "'purposeful nexus'" between the criminal or fraudulent activity and the communications sought to be disclosed.  <u>Duttle v. Bandler & Kass</u>, 127 F.R.D. at 53 (citing <u>In re Grand Jury Subpoenas Duces Tecum</u>, 798 F.2d at 34).  Thus, "[o]nly if the attorney-client communication is 'reasonably relate(d)' to the crime or fraud will the privilege be overridden."  <u>Id.</u> at 56 (citing <u>In re Sealed Case</u>, 676 F.2d at 815).  The issue here is whether the client's objective in communicating with his attorney is furthering the client's fraud.  <u>See</u> <u>In re</u>

Grand Jury Subpoenas Duces Tecum, Dated Sept. 15, 1983, 731 F.2d at 1039.  As discussed

supra at 18, a court has discretion to order *in camera* review of otherwise privileged documents

upon a "'showing of a factual basis adequate to support a good faith belief by a reasonable

person' that *in camera* review of the materials may reveal evidence to establish the claim that the

crime-fraud exception applies."  United States v. Zolin, 491 U.S. at 570.

Plaintiffs request the following:  (1) production of all documents received or generated by

Robert F. Herrmann, Esq., which pertain to this case; (2) production of all documents received

by, or generated by, Eric MacLeish, Esq., Jeffrey Newman, Esq., and Greenberg Traurig, LLP

which pertain to this case; (3) authorization to depose MacLeish and Newman on specific issues;

(4) production of all documents in the possession, custody, or control of O'Melveny & Myers

LLP which pertain to this case.  (Pls.' Mem. at 31-36).

Defendants contend that plaintiffs have failed to establish the core element of intent –

namely, that Poly Prep formed an intent to use communications with its attorneys to perpetrate a

fraud.  (Defs.' Mem. at 19).  Defendants claim that plaintiffs fail to explain how any of the

documents requested might relate to the furtherance of the alleged fraud in 2002.  (Id. at 21).

a.  Herrmann Documents

With respect to the Herrmann documents requested, plaintiffs argue that given

defendants' counsel's "vigorous endorsement" of the Herrmann summary notes as a substitute

for the lost Sheridan notes, and given the evidence of defendants' ongoing attempt to cover-up

the school's knowledge of Foglietta's conduct, the Court should now Order defendants to

produce all investigative records, all work product documents, and all documents listed in Entry 48 of the Defendants' Updated Privilege Log (the "Privilege Log"), which are documents in the possession of O'Melveny & Myers LLP.  (Pls.' Mem. at 31; Mulhearn Decl., Ex. B[42]).  Since plaintiffs contend that Herrmann was involved in and acted to facilitate the fraud, plaintiffs seek an Order requiring the production of all documents received by or generated by Herrmann, including investigative records, work product and documents listed in Entries 2, 3, 7, 19, 20, 23, 27, 31, 36, 37, 38, 39, 40, 41, 42, 43, and 44 of the Privilege Log.  (Pls.' Mem. at 32).

In response, defendants argue that "[o]ther than Mr. Herrmann's notes of his conversation with Mr. Sheridan, Plaintiffs make no effort to connect specific communications with or documents prepared by Mr. Herrmann to their theories of fraud."  (Id. at 21).  However, the circumstances of the Sheridan investigation support a good faith belief that certain of the defendants engaged in efforts to conceal the extent of their prior knowledge of Foglietta's misconduct and that defendants used their relationship with Sheridan and the purported investigation to further that unlawful objective.  Accordingly, the crime-fraud exception would apply most directly to Sheridan's work product and communications between Sheridan, defendants, and defendants' counsel from 2002 through early 2003.

In light of Herrmann's significant involvement in retaining Sheridan and directing his interviews, and his communication with Sheridan regarding Sheridan's purported "findings," the Court finds that there is a sufficient factual basis to support a good faith belief that Poly Prep may have communicated with Herrmann in furtherance of their attempted concealment.  Mr.

---

[42]Citations to "Mulhearn Decl., Ex. B" refer to Exhibit B, Defendants' Revised Privilege Log, dated May 31, 2011.

Sheridan's letter of engagement regarding his arrangement with Poly Prep to conduct the investigation states that his "services are to be performed in collaboration with Poly Prep's counsel, Menaker & Herrmann LLP" and specifically references conversations he had with Mr. Herrmann.  (Eftekhari Decl., Ex. 1 (Poly 00089)).  On November 8, 2002, Mr. Sheridan gave Mr. Herrmann a description of the interviews he had conducted up to that point.  Apart from Mr. Sheridan's own recollection, Mr. Herrmann's notes from that conversation are the only remaining evidence of Mr. Sheridan's purported "findings."  The evidence suggests that *in camera* review may reveal evidence that the crime-fraud exception applies to some of the school's communications with Herrmann.

Accordingly, upon reviewing defendants' revised privilege log, the Court Orders defendants to produce the following documents prepared by Mr. Herrmann for *in camera* review: 2 (POLY 00104), 3 (POLY 00111-00113), 4 (POLY 00115), 5 (POLY 00134; POLY 00188), 7 (POLY 00152), 9 (POLY 00173), 18 (POLY 00198-00199), 19 (POLY 00166-00168), 20 (POLY 00169-00172), 22 (POLY 00283), 27 (no Bates number indicated), 36 (no Bates number indicated), 40 (no Bates number indicated), 41 (no Bates number indicated), and 44 (no Bates number indicated).  These documents appear to relate to Mr. Sheridan's investigation and Poly Prep's communications with alumni, parents, and Mr. Hiltbrand's attorney.

### b.  Greenberg Traurig, LLP Documents

Plaintiffs also seek production of documents from Poly Prep's prior counsel, Greenberg Traurig LLP (the "Greenberg Firm"), Roderick MacLeish, Esq., and Jeffrey Newman, Esq.  (Id.

at 32).  Although Sheridan was engaged in September 2002 to conduct the investigation, a month

later, in October 2002, Poly Prep engaged Greenberg Traurig to advise the school regarding its

response to allegations.  (See 4/13/11 Order at 58).  Plaintiffs claim that not only did Mr.

Sheridan originally indicate that the Greenberg Firm and its lawyers had been conducting an

"investigation" into these matters both simultaneously with and subsequent to Sheridan's

investigation, but to date, defendants have produced no documents from the firm or the

individual attorneys.  (Id. at 33).  Plaintiffs argue that because counsel has acted to facilitate the

fraud with respect to concealing documents relating to any fact-based investigations, all

documents generated or received by MacLeish, Newman, or the Greenberg Firm pertaining to

this case should be produced.  (Id. at 35).  Plaintiffs also request an Order authorizing plaintiffs

to depose Mr. MacLeish and Mr. Newman to inquire as to whether they conducted any fact-based

investigations of sexual misconduct, whether they ever received Sheridan's notes, and what

efforts were made by O'Melveny to locate Sheridan's notes.  (Id.)

   In the alternative, plaintiffs request that the Court conduct an *in camera* review of the

above documents.  (Id.)

   With respect to plaintiffs' requests relating to Greenberg Traurig, LLP, defendants argue

that "Plaintiffs do not even explain – much less present evidence to support – how Mr.

MacLeish's representation of Poly Prep was somehow connected to this alleged fraud."  (Defs.'

Mem. at 23).  Defendants point to the fact that Mr. Sheridan did not communicate with Mr.

MacLeish until late 2002 or early 2003, "a month or more after the supposed 'fraud' on Mr.

Hiltbrand was completed."[43] (Id.) Defendants further represent that neither lawyer was "retained to conduct a factual investigation." (Id.) Thus, defendants argue that Poly Prep's review of their documents and determination as to the ones to be produced should be sufficient. (Id. at 23-24). Defendants argue that there is even less of a basis for plaintiffs' request for Jeffrey Newman's communications, as his "first involvement in the case appears to have come months – if not a year or more – after the end of Sheridan's engagement." (Id.)

Defendants retained Greenberg Traurig, LLP in October 2002 to advise the school regarding its response to allegations and there remains a question as to whether Sheridan gave MacLeish a copy of his investigative notes. (Pls.' Mem. at 33-34; Mulhearn Decl., Ex. J at 154). Mr. MacLeish has not submitted an affidavit indicating if in fact he was given these notes; rather, current counsel for defendants has indicated that based on his conversations with people at the Greenberg firm, no one could locate the notes or confirm that they had ever received them. (Id. at 34-35).

Based on the overlap in time of Sheridan's investigation and defendants' retention of Greenberg Traurig, the Court finds a sufficient factual basis to support a good faith belief that defendants may have communicated with MacLeish in an effort to conceal their prior knowledge of Foglietta's misconduct. As noted, there is no need to show that the lawyers intentionally assisted in these efforts or even were aware of defendants' objectives. See Avramides v. First Nat'l Bank of Maryland, 1997 WL 68559, at *1. Accordingly, the Court Orders the production

---

[43]As defendants have indicated that the school retained Greenberg Traurig, LLP for the purposes of advising the school regarding threatened litigation, it is puzzling that lawyers from the Greenberg Firm did not contact Sheridan sooner in order to coordinate their efforts.

46

for *in camera* review of documents 23, 24, 25, 26, 29, 30, 31, 32, 38, and 39 of defendants'
revised privilege log.  Bates numbers were not provided for any of these documents.  All of these
documents appear to have either been produced by Greenberg Traurig lawyers or produced by
defendants and sent to Greenberg Traurig lawyers.  All appear to relate to the Sheridan
investigation and/or the school's correspondence with alumni regarding the complaints and
investigation.

Plaintiffs have also requested an Order authorizing plaintiffs to depose Mr. MacLeish and
Mr. Newman to inquire as to whether they conducted any fact-based investigations of sexual
misconduct, whether they ever received Sheridan's notes, and what efforts were made by
O'Melveny to locate Sheridan's notes.  (Pls.' Mem. at 35).  The Court reserves decision on this
particular request until after the Greenberg Traurig documents are reviewed *in camera*.


### c. O'Melveny & Myers LLP Documents

With respect to plaintiffs' request to review current counsel's files, defendants argue that
the request should be rejected as even more attenuated from any hypothetical fraud.  (Defs.'
Mem. at 24).  O'Melveny & Myers was retained almost two years after the Sheridan interviews
and defendants argue that plaintiffs have not provided any evidence as to how O'Melveny's
defense in this or in the prior lawsuits could further an alleged fraud.  (Id. at 24-25).  Defendants
further contend that it is their lawyers' duty to advocate before the court and ask the court to
draw all reasonable inferences in defendants' favor; there is nothing that requires defendants to
concede the validity of the claims in a complaint upon pain of being accused of fraud.  (Id. at 28-

47

29).  Defendants argue that the fact that they draw different inferences from the evidence and the testimony does not make them complicit in a fraud.  (Id. at 29).

On May 25, 2010, this Court Ordered defendants to produce any investigative records concerning the alleged misconduct by Foglietta.  (5/25/10 Order at 16).  The Court subsequently clarified that Order by requiring defendants to produce a detailed privilege log if they felt that a given document was subject to a privilege.  (See 4/20/10 Order at 3).  Plaintiffs claim that instead of complying with that Order, the defendants represented that

> [w]e are in possession of various memoranda and related documents prepared by O'Melveny & Myers LLP as litigation counsel for Poly Prep during the course of [the Paggioli lawsuit] . . . and the instant lawsuit.  These memoranda are not part of any investigation independent of litigation counsel's preparations for and defense of the aforementioned lawsuits, and as such are properly withheld as attorney-client privileged information and/or as attorney work product.

(Mulhearn Decl., Ex. B at 7).  Although plaintiffs objected to defendants' refusal to prepare a detailed privilege log that would enable plaintiffs to challenge specific designations, this Court declined at that time to require defendants to further delineate their claims of work product or privilege.  (See 6/30/11 Order).

Although the Court is not inclined to order in camera review of O'Melveny & Myers documents at this time, upon reconsideration of its June 30, 2011 Order, the Court now Orders O'Melveny & Myers, LLP to prepare a privilege log as required by Federal Rule of Civil Procedure 26(a).[44]  Upon production of the privilege log, the Court will conduct a review of the

---

[44]The Court notes that the privilege log attached as Exhibit B to plaintiffs' papers includes names of individuals that are unknown to the Court.  Specifically, the "subject matter" of documents 11, 12, 14, 15, and 16 reference individuals unknown to the Court.  Accordingly,

O'Melveny log to determine whether there is a sufficient basis to Order the production of any of those documents for *in camera* review.

Defendants are Ordered to produce the documents designated for *in camera* review and O'Melveny's privilege log on or before June 15, 2012.

II.  Plaintiffs' Motion for Sanctions

Plaintiffs have also moved separately seeking an Order imposing sanctions on defendants for perpetrating a fraud on the court.  Plaintiffs argue that "through the limited discovery conducted to date, the developed record demonstrates that Defendants have engaged in a prolonged, reprehensible, and ongoing fraud upon this Court through . . .  the fabrication and/or distortion of material evidence" and "the dishonest and fraudulent conduct of various attorneys, all officers of this Court, who have misrepresented and omitted numerous material facts to this Court."  (Pls.' 2nd Mem.[45] at 15).  Among the various sanctions requested, plaintiffs seek a recommendation that default judgment be entered against the defendants.

A.  Fraud on the Court

"A fraud on the court occurs where it is established by clear and convincing evidence that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by . . . unfairly hampering the

---

defendants are Ordered to revise their privilege log to identify all individuals referenced therein.

[45]Citations to "Pls.' 2nd Mem." refer to plaintiffs' Memorandum of Law in Support of their Motion for Sanctions for Fraud on the Court, dated August 19, 2011.

presentation of the opposing party's claim or defense." Passlogix, Inc. v. 2FA Tech., LLC, 708

F. Supp. 2d 378, 393 (S.D.N.Y. 2010) (internal quotation omitted); see also Rezende v. Citgroup

Global Markets, Inc., No. 09 CV 9392, 2011 WL 1584603, at *4 (S.D.N.Y. Apr. 27, 2011).  In

analyzing the term "fraud upon the court," the Second Circuit, citing Moore's Federal Practice,

stated that the "concept should 'embrace only that species of fraud which does or attempts to,

defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial

machinery cannot perform in the usual manner its impartial task of adjudging cases that are

presented for adjudication.'" Kupferman v. Consolidated Research & Mfg. Corp., 459 F.2d

1072, 1078 (2d Cir. 1972) (quoting 7 Moore, Federal Practice ¶ 60.33 at 515 (1971 ed.)); see also

In re Dynex Capital, Inc. Securities Litigation, No. 05 Civ. 1897, 2011 WL 2581755, at *2

(S.D.N.Y. Apr. 29, 2011) (report and recommendation adopted in its entirety, 2011 WL 2471267

(S.D.N.Y. June 21, 2011)) (noting that "[a]s opposed to a fraud against an adverse party, a fraud

upon the court will only be found where the misconduct at issue 'seriously affects the integrity of

the normal process of adjudication'") (internal citations omitted).

Once it has been determined that a party has engaged in conduct constituting a fraud on

the court, the Court may impose sanctions.  Indeed, the Court has inherent authority to "do

whatever is reasonably necessary to deter abuse of the judicial process and assure a level playing

field for all litigants." Passlogix, Inc. v. 2FA Tech., LLC, 708 F. Supp. 2d at 394.  In

determining the appropriate sanction for a fraud on the court, courts typically weigh the

following five factors:  "'1) whether the misconduct was the product of intentional bad faith; 2)

whether and to what extent the misconduct prejudiced the other party; 3) whether there is a

pattern of misbehavior, rather than one isolated instance; 4) whether and when the misconduct

was corrected; and 5) whether further misconduct is likely to continue in the future.'" Dag

Jewish Directories, Inc. v. Y&R Media, LLC, No. 09 CV 7802, 2010 WL 3219292, at *4

(S.D.N.Y. Aug. 12, 2010) (quoting McMunn v. Mem'l Sloan-Kettering Cancer Ctr., 191 F. Supp.

2d 440, 446 (S.D.N.Y. 2002); Shangold v. Walt Disney Co., No. 03-9522, 2006 WL 71672, at *4

(S.D.N.Y. Jan. 12, 2006)).


B.  Plaintiffs' Claims of Fraud on the Court

        Plaintiffs claim that "Poly Prep's categorical denial of 'knowledge' defense is patently

false, well known by Defendants and their counsel to be false to the core, and the centerpiece of

Defendants' and Defendants' counsel's attempted ongoing fraud upon this Court."  (Pls.' 2nd

Mem. at 2).  Defendants concede that they have "asserted that the evidence suggests that no one

at Poly Prep had actual knowledge that Mr. Foglietta was abusing students based on these

allegations or rumors," but they contend that neither they nor their counsel have represented that

before 1991 no one at Poly Prep had heard of allegations, complaints, or accusations of sexual

abuse by Foglietta.  (Defs.' 2nd Mem.[46] at 11).  Defendants argue further that plaintiffs'

"recycling of unfounded accusations against litigation counsel, which they know they cannot

prove, is reckless and irresponsible."  (Id. at 12).

---

[46]Citations to "Defs.' 2nd Mem." refer to defendants' Memorandum of Law in Opposition
to Plaintiffs' Motion for Sanctions for Fraud on the Court, dated September 9, 2011.

1.  <u>Sheridan Investigation</u>

In support of their motion for sanctions, plaintiffs claim that in the course of this litigation, defendants and their counsel have improperly distorted the Sheridan investigation, and have been dishonest with the Court regarding the loss of Sheridan's notes.  (Pls.' 2nd Mem. at 3). Specifically, plaintiffs argue that the loss of Sheridan's notes from his interviews, coupled with defendants' failure to detail their efforts to locate the notes beyond the declaration provided by Poly Prep's current counsel, Jeffrey Kohn of O'Melveny & Myers, supports the inference that defendants have engaged in fraud.  (<u>Id.</u> at 4).

In connection with plaintiffs' motion for spoliation sanctions, defendants submitted two declarations relating to Sheridan's notes:  (1) the August 9, 2010 Declaration of Peter T. Sheridan, and (2) the August 27, 2010 Declaration of Jeffrey I. Kohn.  Mr. Sheridan's Declaration states that:

> None of the individuals [I interviewed] stated that he or she had ever witnessed any sexual misconduct or sexual abuse by Foglietta. None was aware, before David Hiltbrand came forward in 1991, of any specific or substantiated allegation or complaint of sexual misconduct or sexual abuse against Mr. Foglietta. . . . My investigation uncovered no facts indicating that any person at Poly Prep had engaged in any activity designed to conceal the alleged abuse or Poly Prep's knowledge of the abuse, or to dissuade alleged victims from coming forward, reporting abuse, or filing any lawsuit.

(Eftekhari Decl., Ex. 3[47] ¶ 8).  With respect to Sheridan's notes, his Declaration states:

> During the interviews I did not take a great deal of notes.  I do not

---

[47]Citations to "Eftekhari Decl., Ex. 3" refer to the Declaration of Peter T. Sheridan, dated August 9, 2010.

take verbatim notes during interviews, and did not take verbatim
notes during these interviews.  Instead, I took notes in my personal
shorthand, recording background information along with general
themes and concepts on one side of the page, and any follow-up
items along with my own mental impressions on the other side.
These notes were not in any way summaries of my interviews, nor
intended to be.  I discussed my findings with Poly Prep's outside
counsel, Robert Herrmann, Esq., who was my co-counsel during
the investigation.  During these discussions, I gave Mr. Herrmann a
thorough description of my interviews, which would have included
the contents of any notes I had taken, as well as the conclusions I
had drawn from the interviews.  I did not write a report.

(Id. ¶¶ 9, 10).

Mr. Kohn's Declaration states that O'Melveny contacted Mr. Sheridan during the

Paggioli lawsuit (2004-2006), and "asked him to provide any documentation from his

investigation."  (Pls.' 2nd Mem. at 5 (quoting Mulhearn 2nd Decl.,[48] Ex. C[49] ¶ 4)).  However,

when Mr. Sheridan was deposed, he testified that he recalled being contacted by Poly Prep's

counsel during the Paggioli suit regarding whether he "had any notes," but that he did not recall

O'Melveny requesting his notes until May 2010.  (Id. at 5 (citing Mulhearn 2nd Decl., Ex. B[50] at

63-64, 154, 219-220)).  Sheridan also testified that he may have given Mr. MacLeish of

Greenberg Traurig a copy of his investigative notes some time in 2002 or 2003.  (Id. at 4).

Plaintiffs claim that prior to Mr. Sheridan's deposition, "[d]efendants' willful failure to

---

[48]Citations to "Mulhearn 2nd Decl." refer to the Declaration of Kevin T. Mulhearn with
attached exhibits, dated August 19, 2011.

[49]Citations to "Mulhearn 2nd Decl., Ex. C" refer to Exhibit C, the Declaration of Jeffrey
A. Kohn, Esq., dated August 27, 2011.

[50]Citations to "Mulhearn 2nd Decl., Ex. B" refer to Exhibit B, excerpts from the
transcripts of the deposition of Peter T. Sheridan, dated June 27, 2011 and July 7, 2011.

disclose Mr. Sheridan's specific recollection, and his dispute of defendants' counsel's self-serving version, evidences defendants' counsel's attempt to mislead and deceive this Court about a vital issue in this litigation."  (Id. at 8).  Plaintiffs further opine that O'Melveny failed to provide more detailed information regarding their conversations with Mr. Sheridan on the issue of locating his notes because their version of the events contradicts Mr. Sheridan's recollection.  (Id. at 6).

Plaintiffs also argue that the Sheridan Declaration "is a false and misleading document which was designed by defendants' counsel . . . to foreclose any further pre-motion discovery by plaintiffs."  (Id. at 11).  They contend that although defendants proffered the Sheridan Declaration to support the claim of no knowledge prior to 1991, Sheridan's deposition testimony demonstrates that during his investigation, he discovered information that, at the very least, suggested that Poly Prep may have had knowledge of Foglietta's sexual misconduct long before Hiltbrand's 1991 letter.  (Id. at 11-12 (citing Mulhearn 2nd Decl., Ex. D[51] at 25-28)).  Plaintiffs argue that by concealing the reasons why the Sheridan investigation was abruptly terminated by Poly Prep before he could form a final assessment of the "knowledge" issue, defendants' counsel have furthered defendants' initial fraud.  (Id.)

In response, defendants raise many of the same objections to plaintiffs' characterization of the Sheridan investigation as they did in the context of plaintiffs' discovery motion; therefore, the Court will not repeat all of defendants' arguments here.  (Defs.' 2nd Mem. at 12-15; see discussion supra at 28-35).  However, defendants note that Mr. Sheridan confirmed that his

---

[51]Citations to "Mulhearn 2nd Decl., Ex. D" refer to Exhibit D, defendants' Memorandum of Law, dated August 5, 2011.

Declaration is accurate (Defs.' 2nd Mem. at 12), and they point out that there is no support for plaintiffs' claim that Mr. Sheridan's investigation was prematurely terminated.  (Id. at 13).  With respect to Mr. Herrmann's notes, defendants argue that plaintiffs "cannot point to a single instance in which counsel described Mr. Herrmann's notes as a 'reasonable,' 'fair,' or 'comprehensive' substitute for Mr. Sheridan's notes."  (Id. at 15).  Defendants also point out that, even if their argument regarding Herrmann's notes had been improper, plaintiffs have suffered no prejudice as a result of that representation because the Court resolved the issue in plaintiffs' favor, finding that Herrmann's notes were not a sufficient replacement for Sheridan's notes.  (Id. at 16 (citing 4/13/11 Order at 54-55)).

### 2.  Defendants' Testimony

Plaintiffs also rely on the testimony given by a number of defendants' witnesses during the course of the limited discovery conducted to date as further evidence of defendants' fraud on the court.  Plaintiffs claim that much of the testimony contradicts defendants' "avowals of ignorance about whether they knew of allegations of [Foglietta's] sexual abuse or sexual misconduct" prior to Hiltbrand's 1991 letter.  (Pls.' 2nd Mem. at 23).  Defendants argue that plaintiffs' claims of perjury "distort the record and disregard both the context of the testimony and the fundamental difficulty for witnesses to recall details of events years and decades in the past."  (Defs.' 2nd Mem. at 19).

a. <u>Williams</u>

Plaintiffs begin with the deposition testimony of former Headmaster William Williams, arguing that he has engaged in perjury.  Plaintiffs point out that, during his deposition, Williams conceded that he was told by John Marino that Foglietta was fooling around with boys in his car in Battery Park; Williams also received an anonymous letter saying something nasty about Foglietta, and an anonymous phone call during which the caller said that Foglietta was doing terrible things to his students, all during the 1970s.  (Pls.' 2nd Mem. at 23 (citing Mulhearn 2nd Decl., Ex. F[52] at 108)).  Williams claimed in his testimony that the anonymous letter did not indicate that Foglietta's behavior was sexual in nature.  (<u>Id.</u> at 24 (citing Mulhearn 2nd Decl., Ex. F at 110, 260)), and yet, as plaintiffs point out, Sheridan's investigation revealed that Williams acknowledged the sexual nature of the letter.  (<u>Id.</u> at 24).  Indeed, in his summary notes from his conversation with Sheridan regarding Sheridan's interview of Williams, Herrmann recorded Sheridan as stating:  "[p]rior to H's [Hiltbrand's] letter believes 2 in 70's of unsigned letter alleging sex mis. with F. Unsigned & discarded."  (<u>Id.</u> at 24 (citing Mulhearn 2nd Decl., Ex. E[53] at 108)).

In response to the allegation that Williams' subsequent contradictory testimony constitutes perjury, defendants claim that "Williams truthfully testified that he understood 'terrible things' to mean something other than sexual abuse . . . during a period when sexual

---

[52]Citations to "Mulhearn 2nd Decl., Ex. F" refer to Exhibit F, excerpts from the transcript of the deposition of William A. Williams, dated June 30, 2010.

[53]Citations to "Mulhearn 2nd Decl., Ex. E" refer to Exhibit E, Robert Herrmann's summary notes, dated November 8, 2002.

abuse was rarely discussed." (Defs.' 2nd Mem. at 20).  They argue further that "it is possible that 'terrible things' acquired a sexual connotation for Mr. Williams years later – in 1991 and then again in 2002 when he was interviewed by Mr. Sheridan – in light of later revelations about Mr. Foglietta." (Id. at 20).  Defendants opine that it is also possible that the anonymous letters made some allegation of sexual misconduct, but that Williams did not find them credible at the time and no longer recalls what the letters said.  (Id. at 20).

With respect to the anonymous letter regarding Foglietta's conduct that was placed in faculty mailboxes in 1990 or 1991, Williams testified that he had omitted it from his 2002 memoranda because he had forgotten about it and could not recall what the letter said.  (Pls.' 2nd Mem. at 27 (citing Mulhearn 2nd Decl., Ex. F at 129-33, 230)).  A number of other witnesses have confirmed that the letter specifically alleged that Foglietta was sexually abusing students and that not only had a teacher brought the letter to Williams' attention, but the information led Williams to confront Foglietta about the allegations.  (Pls.' 2nd Mem. at 28-30).  In addition, Sheridan testified that Williams told him about one or two anonymous written allegations against Foglietta that were received in the early 1990s, including the letter that was sent to the entire faculty, which Williams claims to have seen.  (Id. at 30).  In fact, according to Mr. Sheridan, Mr. Williams recalled many details regarding his response to the anonymous faculty letter during his interview with Mr. Sheridan.  (Id. at 31-33).  Mr. Hiltbrand also claims that Mr. Williams acknowledged his receipt of an anonymous letter stuffed in faculty mailboxes in 1990 or 1991 alleging sexual abuse by Foglietta.  (Id. at 34 (citing Mulhearn 2nd Decl., Ex. J[54] at 10)).

---

[54]Citations to "Mulhearn 2nd Decl., Ex. J" refer to Exhibit J, the Affidavit of David Hiltbrand, dated August 17, 2011.

Defendants point out that Mr. Williams did not deny knowledge that a letter had been placed in faculty mailboxes nor did he deny that the letter contained accusations of misconduct; rather, he only stated that he was not sure if he saw the letter itself.  (Defs.' 2nd Mem. at 21). Defendants argue that the only supposedly contradictory evidence plaintiffs provide is hearsay from non-percipient witnesses and they contend that their statements do not contradict Williams' testimony.  (Id.)  They argue that Williams' failure to recall the contents of a document he may have seen 20 years ago does not constitute perjury.  (Id. at 22).

Plaintiffs argue that Williams was lying when he claimed that Marino had not informed him of the sexual nature of Foglietta's conduct.  Plaintiffs contend that "[a]ny reasonable construction of Mr. Williams' testimony as to John Marino's allegations thus establishes that John Marino did notify Poly Prep about Mr. Foglietta's sexual misconduct in the 1970s."  (Pls.' 2nd Mem. at 37).  Williams testified that during a meeting with John Marino and his parents, John Marino told Williams that he had seen Foglietta "fooling around with young boys in his car" on Battery Avenue.  (Id. at 35-36).  Williams claims that Marino's complaint did not seem credible, but that Parker, who Williams talked to about the allegations, spoke to Foglietta about it.  (Id. at 36).  Williams claimed that "the specific sexual implication was not clear in what he [John Marino] said, as I can recall it, and we did not take it as a serious complaint . . . . It was inconceivable to us that Foglietta would do something like that."  (Id. (citing Mulhearn 2nd Decl., Ex. F at 68-69)).

In response, defendants argue that plaintiffs conflate how Mr. Williams understood Mr. Marino's allegation with what Marino actually said and contend that the fact that witnesses have

differing recollections regarding a conversation that occurred nearly 40 years ago does not mean that one is perjuring himself or effecting a fraud on the court.  (Defs.' 2nd Mem. at 23). Defendants contend that Williams' testimony that it was "inconceivable" that Foglietta would do "something like that" was "not a contradictory recollection of the subject matter of Mr. Marino's alleged complaint."  (Id. at 23).

Plaintiffs also claim that Williams lied in his testimony about his telephone conversation with Hiltbrand in 1991.  (Pls.' 2nd Mem. at 38).  Williams testified at his deposition that upon hearing Hiltbrand's allegations against Foglietta, Williams offered the option of firing Foglietta immediately or telling Foglietta that he must retire at the end of the year.  Williams claimed that Hiltbrand said, "I don't want to make trouble for the school.  I don't want to – I leave it in your hands."  (Id. at 38 (citing Mulhearn 2nd Decl., Ex. F at 135-36)).  However, according to Hiltbrand, upon learning that Foglietta was still employed at Poly Prep, Hiltbrand demanded that Williams fire him immediately.  Williams replied, "You don't want him punished . . . he's a bitter sick old man . . . he's a shell of himself."  (Id. at 39 (citing Mulhearn 2nd Decl., Ex. J ¶¶ 12-13)).

While plaintiffs contend that Williams perjured himself, defendants argue that the Court should not rely on Mr. Hiltbrand's Declaration because he has not yet been subject to cross-examination.  They argue that plaintiffs cannot prove perjury based on contradictions with Mr. Hiltbrand's untested and uncorroborated recollection.  (Defs.' 2nd Mem. at 24).  Defendants further argue that Williams' testimony about this conversation is supported by that of other witnesses.  Specifically, Mr. Petchesky recalled having a conversation with Williams in 1991

after Williams spoke with Hiltbrand.  (Id. at 23-24 (citing Kohn Decl.,[55] Ex. 6[56] at 114).  When

asked what he recalled from his conversation with Williams regarding whether Hiltbrand wanted

to have Foglietta fired, Petchesky testified:

> He [Williams] spoke to Mr. Hiltbrand and said You want me to
> fire him on the spot?  And Mr. Hiltbrand said No, what you're
> doing, what you proposed to do, or what you have done is fine.
> Have him leave at the end of the school year.

(Kohn Decl., Ex. 6 at 114-115).  Defendants also claim that Andersen's recollection corroborates

Williams' version of the facts, as Andersen testified that he recalled Williams "specifically

saying David doesn't want to hurt the school."  (Defs.' 2nd Mem. at 24 (citing Kohn Decl., Ex.

7[57] at 64)).

Plaintiffs also allege that Williams lied about the steps he took to safeguard children after

Hiltbrand notified him of Foglietta's abuse.  According to Williams, he removed Foglietta from

assignments, limited who Foglietta was around, and directed certain staff members, specifically

Ruck and Parker, to monitor Foglietta as best they could.  (Pls.' 2nd Mem. at 40 (citing Mulhearn

2nd Decl., Ex. F at 147-48)).  However, according to plaintiffs, Ruck does not recall Williams

asking him to keep an eye on Foglietta.  (Id. at 41 (citing Mulhearn 2nd Decl., Ex. K[58] at 34)).

---

[55]Citations to "Kohn Decl." refer to the Declaration of Jeffrey I. Kohn, dated September 9, 2011.

[56]Citations to "Kohn Decl., Ex. 6" refer to Exhibit 6, excerpts from the transcript of the deposition of Harry Petchesky, Esq., dated June 1, 2011.

[57]Citations to "Kohn Decl., Ex. 7" refer to Exhibit 7, excerpts from the transcript of the deposition of Steven Andersen, dated June 15, 2011.

[58]Citations to "Mulhearn 2nd Decl., Ex. K" refer to Exhibit K, excerpts from the transcript of the deposition of Edward Ruck, dated June 14, 2011.

Plaintiffs claim that Williams' testimony about taking steps to safeguard children was "patently false."  (Id. at 42).

Defendants contend that the fact that Ruck claimed that he does not remember Williams asking him to monitor Foglietta does not mean that Williams did not in fact do so; defendants take the position that Ruck's testimony in no way contradicts Williams' testimony.  (Defs.' 2nd Mem. at 25).  Defendants also note that Andersen's testimony corroborates Williams' recollection on this point.  (Id.)  Andersen testified that he recalled having a conversation with Ruck in roughly 1991, during which Ruck told him that Williams had instructed Ruck to monitor Foglietta's activities.  (Id. (citing Kohn Decl., Ex. 7 at 143)).

### b. Andersen

Plaintiffs claim that Mr. Andersen lied during his deposition about his knowledge of Foglietta's sexual misconduct in 1991.  (Pls.' 2nd Mem. at 43).  In support of this claim of perjury, plaintiffs note discrepancies between Andersen's deposition testimony from 2011 and Sheridan's recollection of his interview of Andersen in 2002.  During his deposition, when asked whether he had heard rumors involving alleged sexual abuse by Foglietta in 1991, Mr. Andersen said that he had not.  (Id. (citing Mulhearn 2nd Decl., Ex. L[59] at 59)).  However, Mr. Sheridan, who interviewed Mr. Andersen in 2002, testified that Andersen had stated that Andersen had heard rumors that Foglietta inappropriately touched and fondled boys near the locker room and that he sexually molested students in his New Jersey summer home.  (Id. at 44-45 (citing

_____

[59]Citations to 'Mulhearn 2nd Decl., Ex. L' refer to Exhibit L, excerpts from the transcript of the deposition of Steven Andersen, dated June 15, 2011.

Mulhearn 2nd Decl., Ex. B at 79)).

Defendants argue that "plaintiffs have failed to make even a coherent charge that Mr. Andersen committed perjury." (Defs.' 2nd Mem. at 26). They argue that Andersen's recollection of events in 2002, when he was interviewed by Sheridan, and his recollection of events in 2011, when he was deposed, "are different issues, and Plaintiffs' attempts to manufacture an inconsistency here requires them again to distort the record." (Id. at 27). Defendants contend that "Mr. Andersen's apparent recollection of rumors in fact arose between 1991 and 2002, when Mr. Andersen and other interviewees were discussing and speculating about David Hiltbrand's and John Paggioli's allegations." (Id.) Defendants also emphasize that Sheridan stated only that Andersen had heard "rumors," and did not contend that Andersen claimed to have first- or even second-hand knowledge. (Id.)

Plaintiffs also contend that Mr. Andersen lied during his deposition regarding his conversation with Witness I. Plaintiffs allege that Andersen lied when he said he did not recall Witness I conveying the details of a specific incident of Foglietta's sexual misconduct to him in 1993. (Id. at 46-47 (citing Mulhearn 2nd Decl., Ex. L at 79)). However, Witness I recalls telling Andersen about this incident in 1993. (Id. at 47-48 (citing Mulhearn 2nd Decl., Ex. N[60] at 45)). Witness I claims that, in response to his allegations about Foglietta, Andersen said, "I knew it. I knew you were one of the kids that was molested by Foglietta." (Id. at 48 (citing Mulhearn 2nd Decl., Ex. N at 46)). In response, defendants argue that plaintiffs "fail to explain why they credit Witness I's recollection that Mr. Andersen made that statement over Mr. Andersen's denial that

---

[60]Citations to "Mulhearn 2nd Decl., Ex. N" refer to Exhibit N, excerpts from the transcript of the deposition of Witness I, dated June 10, 2011.

he made it." (Defs.' 2nd Mem. at 29).

Plaintiffs also point out that Andersen denied that he had knowledge of the letter placed in faculty mailboxes prior to the filing of this lawsuit. (Pls.' 2nd Mem. at 49-50). Sheridan testified that he "believe[d]" he heard about this faculty mailbox letter from Andersen. (Id. (citing Mulhearn 2nd Decl., Ex. B at 109)). Defendants argue that Andersen's testimony does not amount to perjury, and in any case is not material to plaintiffs' case. (Defs.' 2nd Mem. at 30).

### c. Petchesky

Plaintiffs claim that Petchesky's testimony at his deposition "contradict[ed] his repeated avowals of ignorance about the sexual nature of David Hiltbrand's . . . 1991 letter . . . provid[ing] clear and convincing evidence of the falsity of [his other] material statements." (Pls.' 2nd Mem. at 53). Initially, when asked about Hiltbrand's accusations in his 1991 letter to Williams, Petchesky recalled that Hiltbrand wrote Williams a letter about things Foglietta had done to him 20 to 25 years prior, but claimed that he could not remember the specifics of Hiltbrand's allegations. (Id. at 52 (citing Mulhearn 2nd Decl., Ex. O[61] at 19-20)). Petchesky also testified that Williams "didn't give [him] any details as to Mr. Hiltbrand's letter other than to say it was the first time he received anything in writing signed by anybody." (Id. at 51 (citing Mulhearn 2nd Decl., Ex. O at 25)). Petcheksy also initially denied that Williams conveyed the sexual nature of Foglietta's misconduct. (See Mulhearn 2nd Decl., Ex. O at 25-26). However, later in

---

[61]Citations to "Mulhearn 2nd Decl., Ex. O" refer to Exhibit O, excerpts from the transcript of the deposition of Harry Petchesky, dated June 1, 2011.

his deposition, Petchesky acknowledged that in 1991, Williams, in describing the letter from

Hiltbrand, told him that one or more students at Poly Prep had accused Foglietta of sexually

molesting them.  (Pls.' 2nd Mem. at 53 (citing Mulhearn 2nd Decl., Ex. O at 30)).

Defendants indicate that Petchesky testified that Williams' description of the 1991 letter

included the fact that the letter leveled an accusation of sexual abuse and argue that plaintiffs

"contrast this testimony with Mr. Petchesky's testimony about a different and more narrow

subject: namely, whether Mr. Williams told Mr. Petchesky the 'details' or the 'specifics' in Mr.

Hiltbrand's letter regarding 'things allegedly that Mr. Foglietta had done.'"  (Defs.' 2nd Mem. at

31 (citing Mulhearn 2nd Decl., Ex. O at 21)).


d.  Dupee

Plaintiffs claim that Ralph Dupee lied during his deposition.  First, plaintiffs point to the

fact that Dupee denied having met with Peter Sheridan, even though Sheridan specifically

recalled meeting with Dupee outside of the train station at Katonah, New York.  (Pls.' 2nd Mem.

at 55).  Dupee also denied having received the anonymous letter placed in faculty mailboxes;

however, Sheridan thought he remembered Dupee telling him that he recalled receiving a copy of

the letter.  (Id. at 56 (citing Mulhearn 2nd Decl., Ex. B at 122)).

Defendants argue that Dupee cannot be charged with perjury simply because he does not

recall speaking with Mr. Sheridan nine years ago and does not recall receiving the faculty

mailbox letter.  (Defs.' 2nd Mem. at 32).

     e.  <u>Harman</u>

Plaintiffs claim that Harman lied during his deposition when he claimed that he did not

recall having a conversation with Witness II in which Witness II alleged that Foglietta tried to

sexually molest his brother.  (Pls.' 2nd Mem. at 58).  Witness II recalls telling Harman about the

incident after he saw James Zimmerman at Poly Prep.  (<u>Id.</u> at 59).  According to Witness II,

Harman "expressed sort of – you know – not amazement, but sort of a I can't believe that; it's

awful.  You know, he couldn't believe it in a sense.  Not that he couldn't believe it, but it was a

terrible thing."  (<u>Id.</u> (citing Mulhearn 2nd Decl., Ex. I[62] at 65)).

As defendants note, during his deposition, Harman did acknowledge that he had a

conversation with Witness II about Foglietta's alleged sexual misconduct in or around fall 2002.

(Defs.' 2nd Mem. at 34 (citing Kohn Decl., Ex. 1[63] at 235)).  Defendants argue that "there is no

conflict between Mr. Harman's and Witness II's testimony on the issue of whether they spoke in

2002 about Foglietta's alleged sexual abuse in the 1970s . . . . The only difference between their

recollections is that Witness II recalls <u>the specifics</u> of their conversation."  (<u>Id.</u> at 34).


3.  <u>Defendants' Counsel's Representations</u>

Plaintiffs claim that defendants' counsel, O'Melveny & Myers, has "engaged in dishonest

and fraudulent conduct" on behalf of its clients.  (Pls.' 2nd Mem. at 62).  Specifically, plaintiffs

---

[62]Citations to "Mulhearn 2nd Decl., Ex. I" refer to Exhibit I, excerpts from the transcript of the deposition of Witness II, dated January 6, 2011.

[63]Citations to "Kohn Decl., Ex. 1" refer to Exhibit 1, excerpts from the transcript of the deposition of David B. Harman, dated June 16, 2011.

claim that O'Melveny lawyers have falsely represented that: (1) Mr. Sheridan reached an "ultimate conclusion" as to whether Poly Prep faculty had knowledge of allegations of Foglietta's sexual misconduct prior to 1991; (2) Sheridan concluded that no one at Poly Prep had such knowledge; and (3) Herrmann's November 8, 2002 summary notes are a fair and accurate substitute for the lost Sheridan notes.  (Id. at 63).  These claims involve nearly the same allegations that plaintiffs raised with respect to their motion for discovery under the crime-fraud exception; accordingly, the Court will not repeat all of the allegations here.

With respect to plaintiffs' claim that defendants' counsel misrepresented to the Court that Sheridan's investigation resulted in an "ultimate conclusion," defendants argue that plaintiffs distort the record.  Defendants claim that they only used the term "ultimate conclusion" when referring to a draft letter prepared by Mr. Herrmann which was never actually sent to Mr. Hiltbrand's counsel.  The draft letter states that, based on Mr. Sheridan's investigation, "we understand there was no first hand or second hand information of sexual abuse until Bill Williams received the letter sent by Mr. Hiltbrand."  (Defs.' 2nd Mem. at 16 (citing Kohn Decl., Ex. 4[64])).  In their sur-reply to plaintiffs' motion for spoliation sanctions, defendants described Herrmann's draft letter as "briefly summariz[ing] the purpose of Mr. Sheridan's investigation and its ultimate conclusion."  (Id. at 17 (citing Mulhearn 2nd Decl., Ex. R[65] at 8)).  Defendants argue that "this description was not even material to the waiver issue, much less a representation

---

[64]Citations to "Kohn Decl., Ex. 4" refer to Exhibit 4, a draft letter from Mr. Herrmann to Mr. Berger, dated December 19, 2002.

[65]Citations to "Mulhearn 2nd Decl., Ex. R" refer to Exhibit R, defendants' sur-reply memorandum of law, dated August 27, 2010.

of a substantive analysis of Mr. Sheridan's findings."  (Id. at 17).

With respect to plaintiffs' claims about the Herrmann notes, defendants argue that neither

they nor their counsel have ever described Herrmann's notes as a "reasonable," "fair," or

"comprehensive" substitute for the Sheridan notes; rather, Poly Prep has argued that plaintiffs

were not prejudiced by loss of the Sheridan notes because they were of limited volume and

content and Sheridan relayed the contents of his notes to Herrmann.  (Id. at 15).


C.  Plaintiffs' Request for Sanctions

Plaintiffs request an Order:  (1) finding that defendants and defendants' counsel have

perpetrated, or attempted to perpetrate, a fraud upon this Court; (2) recommending that the

district court enter a judgment of default against defendants on each of plaintiffs' counts in the

Second Amended Complaint; (3) mandating that all other appropriate sanctions for fraud upon

the Court be imposed against such defendants; (4) mandating that said defendants and/or

defendants' counsel, O'Melveny & Myers, LLP, pay plaintiffs for all reasonable attorneys' fees,

costs, and/or expenses incurred in the prosecution of this action, for fraud upon the Court and bad

faith litigation conduct, pursuant to the Court's inherent powers and/or 28 U.S.C. § 1927; and (5)

granting plaintiff any other, different, or further relief this Court considers just, proper, or

necessary.  (Pls.' 2nd Mem. at 80-81).  In the alternative, plaintiffs request an Order setting an

evidentiary hearing to address plaintiffs' fraud upon the Court allegations.  (Id. at 81).

In support of their request for sanctions, plaintiffs claim that defendants' and their

counsel's misconduct was a product of intentional bad faith.  (Id. at 71).  Plaintiffs argue that

defendants' counsel "deliberately chose to cooperate with defendants in deceiving this Court and in subverting the necessary truth-finding process that is at the heart of this litigation." (Id. at 72). Plaintiffs argue that defendants' alleged deception potentially benefitted defendants in the context of plaintiffs' earlier motion for sanctions and with respect to plaintiffs' overarching efforts to obtain discovery prior to a decision on the defendants' motion to dismiss. (Id. at 8). According to plaintiffs, "[d]efendants' fraud has substantially prejudiced plaintiffs" by forcing them "to expend substantial investigating and legal time in rooting out [d]efendants' misconduct." (Id. at 73). Plaintiffs also claim that defendants' representations regarding the extent of their prior knowledge of Foglietta's abuse and regarding Sheridan's engagement with the school were designed to hinder plaintiffs' ability not only to obtain pre-motion discovery, but ultimately to hamper their efforts to make out their claim of equitable estoppel. (Id. at 74).

Defendants argue that plaintiffs have not provided clear and convincing evidence of fraud on the Court. Even if plaintiffs have made such a showing, defendants contend, the sanctions plaintiffs demand "are wholly unprecedented and inappropriate." (Defs.' 2nd Mem. at 35). They argue that several factors militate strongly against plaintiffs' requested sanctions, including the lack of bad faith, the lack of a "pattern" of misbehavior, and the lack of prejudice to plaintiffs. (Id. at 36). Defendants contend that "the most reasonable explanation for the supposed inconsistencies in the testimony of the witnesses is an innocent one based on the inevitable variation on how witnesses perceive and recall events. . . . Inconsistencies among witnesses is a commonplace occurrence that does not constitute clear and convincing evidence required to establish fraud. . . ." (Id. at 36). With respect to any prejudice to plaintiffs resulting from

defendants' alleged misconduct, defendants argue that "plaintiffs do not even claim that they have been prejudiced . . . aside from reiterating their demand . . . that the Poly Prep Defendants be compelled to pay Plaintiffs for all pre-motion discovery conducted solely at Plaintiffs' request." (Id. at 37).

D.  Analysis

Courts have imposed sanctions for fraud on the court based on a party's conduct in pretrial proceedings.  See, e.g., Rezende v. Citigroup Global Markets, Inc., 2011 WL 1584603, at *4-5 (imposing sanctions for fraud on the court for plaintiff's production of fraudulent letter and other evidence, production of a misleading affidavit, and false statements under oath); Shangold v. The Walt Disney Co., 2006 WL 71672, at *5-6 (dismissing plaintiffs' case where court found fraud on the court based on plaintiffs' fabrication of evidence, lies during their depositions, and "manipulat[ion of] the judicial process"); Miller v. Time-Warner Comms., Inc., No. 97 Civ. 7286, 1999 WL 739528, at *3-4 (S.D.N.Y. Sept. 22, 1999) (dismissing plaintiff's suit based on plaintiff's spoliation of evidence and repeated perjury in pre-trial proceedings); Cerruti 1881 S.A. v. Cerruti, Inc., 169 F.R.D. 573, 583-84 (S.D.N.Y. 1996) (imposing sanction of default judgment against the defendants based on defendants' repeated lies under oath, and the fabrication of evidence central to the case, despite the fact that defendants withdrew the documents after falsity had been detected); Rybner v. Cannon Design, Inc., No. 95 Civ. 0279, 1996 WL 470668, at *5-6 (S.D.N.Y. Aug. 20, 1996) (imposing sanctions for fraud on the court based on plaintiff's perjury "in an attempt to hinder the fair and full adjudication fo the case").

Generally, "neither perjury nor nondisclosure, by itself, amounts to anything more than fraud involving injury to a single litigant."  Gleason v. Jandrucko, 860 F.2d 556, 559-60 (2d Cir. 1988) (refusing to vacate a stipulation of dismissal induced by defendants' perjured deposition testimony and concealed evidence); see also H.K. Porter Co., Inc. v. Goodyear Tire & Rubber Co., 536 F.2d 1115, 1118  (6th Cir. 1976) (noting that "[a]llegations of nondisclosure during pretrial discovery are not sufficient to support an action for fraud on the court"); Rybner v. Cannon Design, Inc., 1996 WL 470668 at *5-6 (noting that "[p]erjury and fabricated evidence . . . can and should be exposed at trial") (citations omitted).  However, fraud on the court occurs "'when a party lies to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process.'"  Rezende v. Citigroup Global Markets, Inc., 2011 WL 1584603, at *4 (quoting Passlogix, Inc. v. 2FA Tech., LLC, 708 F. Supp. 2d at 393 (quoting McMunn v. Mem'l Sloan-Kettering Cancer Ctr., 191 F. Supp. 2d at 445) (finding fraud on the court where party forged and fabricated affidavits, driver's license, other documents, and made false statements under oath)).

In this case, the Court is confronted with allegations reaching far beyond claims of perjury alone.  Plaintiffs allege that not only did certain defendants misrepresent the extent of their prior knowledge of Foglietta's abuse during their depositions, but also that defendants' counsel have adopted and thus furthered those misrepresentations, along with the presentation of misleading documents, such as the Sheridan Declaration and Herrmann's notes.  Plaintiffs contend that these tactics were adopted in an effort to persuade the Court that plaintiffs suffered no prejudice from defendants' loss of the Sheridan notes; that there was no basis on which to

70

believe anyone in authority had actual knowledge of abuse; and that, as a consequence, no further discovery was necessary.

At this stage, it is impossible for the Court to determine whether there has been a fraud committed upon the court by defendants in an effort to limit plaintiffs' access to information and to defeat plaintiffs' equitable estoppel arguments.  Although plaintiffs contend that defendants and their counsel have attempted to mislead the court through perjured testimony, through counsel's representations and arguments, and through certain documents submitted in connection with the litigation, defendants have offered equally plausible alternative explanations for the discrepancies in testimony and differing interpretations of the documents and arguments made in legal papers.  While the Court does not agree that plaintiffs' charges of fraud "would not entitle Plaintiffs to relief <u>even if</u> their factual premises were true" (Defs.' 2nd Mem. at 37), there have been serious questions raised as to whether defendants and their counsel were simply engaged in a good faith effort to vigorously defend this lawsuit or whether certain of the alleged conduct was in furtherance of an effort to conceal the extent of the school's knowledge and to hinder plaintiffs' efforts in pursuing their case.

Plaintiffs have asked the Court to hold an evidentiary hearing in the event that the Court is not prepared to find a fraud on the Court based on the current record.  "The Court has inherent authority 'to conduct an independent investigation in order to determine whether it has been the victim of fraud.'" <u>Passlogix, Inc. v. 2FA Tech., LLC</u>, 708 F. Supp. 2d at 394 (quoting <u>Chambers v. NASCO, Inc.</u>, 501 U.S. 32, 44 (1991)).  As the court in <u>Shah v. Eclipsys Corp.</u>, No. 08 CV 2528, 2010 WL 2710618 (E.D.N.Y. July 7, 2010), noted, "[a]lthough an evidentiary hearing is

not always necessary before finding a party has committed fraud on the court, many courts in this circuit and elsewhere have exercised their discretion to hold an evidentiary hearing before imposing sanctions on this basis." Id. at *14-15; see also Passlogix, Inc. v. 2FA Tech., LLC, 708 F. Supp. 2d at 392 (noting that the court held a five-day evidentiary hearing on motions for fraud on the court and spoliation sanctions); Jung v. Nechis, No. 01 Civ. 6993, 2009 WL 762835, at *9 (S.D.N.Y. Mar. 23, 2009) (discussing findings from two-day evidentiary hearing held on issue of fraud on the court based on alleged lack of authenticity of audio tapes); Greenberg v. Roberts Properties, Ltd., No. CV04-0001, 2005 WL 3536114 (D. Ariz. Dec. 22, 2005) (holding that "the best way to resolve the issue of Plaintiffs' alleged fraud is to conduct an evidentiary hearing" where defendants alleged that plaintiffs defrauded the court by forging signatures on certain documents and perjuring themselves in their depositions); Cerruti 1881 S.A. v. Cerruti, Inc., 169 F.R.D. at 574, 578-82 (discussing witness testimony at two evidentiary hearings held on the issue of whether defendant falsely testified and fabricated evidence); but cf, In re Dynex Capital, Inc. Sec. Litig., 2011 WL 2581755 at *2 (stating "[i]n this regard, it is within the Court's discretion to hold an evidentiary hearing on a sanctions motion, although no such hearing is required," but declining to hold an evidentiary hearing based on concerns with usurping the role of the jury, undue delay, and logistical challenges).

Defendants argue that the Court should refrain from holding an evidentiary hearing on plaintiffs' motion for sanctions based on a concern identified by the court in In re Dynex Capital, Inc. Sec. Litig., 2011 WL 2581755, at *5 – namely, the possibility that the determination of certain credibility issues raised in plaintiffs' motion for sanctions would have a significant impact

72

on the merits of plaintiffs' underlying claims.  (Defs.' 2nd Mem. at 9).  While the Court is

cognizant of this concern, the focus in this hearing is more narrow and relates solely to the

defendants' conduct during the course of this litigation and the alleged efforts by defendants to

subvert plaintiffs' ability to establish an equitable estoppel argument.  Unlike Dynex, the merits

of plaintiffs' underlying negligence claims against Poly Prep for its failure to supervise Foglietta

in the period from 1970-1991 are not at the heart of the issues relevant to a determination of

plaintiffs' claim that defendants in this case deliberately engaged in a scheme to subvert the

judicial process during the course of this litigation.  Moreover, other factors, not present here,

influenced the Dynex court's decision not to hold an evidentiary hearing.  Specifically, the party

in Dynex claiming fraud on the court did not request an evidentiary hearing and additional

factors, such as logistical difficulties posed by a hearing and the possible undue delay of trial in

an otherwise trial-ready case, were considered by the court in deciding not to hold an evidentiary

hearing.  In re Dynex Capital, Inc. Sec. Litig., 2011 WL 2581755, at *5.

Accordingly, because credibility issues are critical to a determination of the plaintiffs'

motion, the Court reserves decision on the motion for sanctions pending an evidentiary hearing.

Both parties will be permitted to call witnesses and present other evidence.


III.  Defendants' Requests for Sanctions

Defendants urge this Court to sanction plaintiffs for the position that they have taken in

pursuing their motion for additional discovery pursuant to the crime/fraud exception and their

motion for sanctions for fraud upon the Court.  (Defs.' Mem. at 30).  Relying on 28 U.S.C. §

1927, defendants seek an award of costs and attorneys' fees expended by defendants in connection with plaintiffs' discovery motion.  (Id.)  Defendants argue that plaintiffs' claims of a crime/fraud exception are "baseless," as are the charges made against defendants' counsel.  (Id. at 31).  Defendants argue that particularly in light of the Court's prior consideration of the claims brought under a "crime/fraud" theory, the attempt to collaterally attack the court's prior decisions is frivolous.  (Id.)

Defendants also request sanctions based on their claim that plaintiffs brought their motion for sanctions for fraud upon the Court in bad faith.  (Defs.' 2nd Mem. at 38).  Defendants claim that plaintiffs' motion for sanctions "is based on multiple instances of plaintiffs deliberately misrepresenting and distorting the record concerning the testimony of witnesses and the legal arguments of counsel."  (Id.)  They contend that "much of the misconduct is a repetition of what has been served up by plaintiffs in other motions already rejected by the Court."  (Id.) Defendants argue that because there are readily available explanations for the testimony plaintiffs rely on in making their motion, such as mistake, confusion, and faulty memory, plaintiffs motion is "calculated to multiply the proceedings and burden the Poly Prep Defendants, counsel, and the Court."  (Id.)

As the Court finds that plaintiffs' motion for additional discovery has merit and that plaintiffs' motion for sanctions for fraud on the Court has sufficient basis in the record to justify a finding that it was brought in good faith, defendants' requests for sanctions are denied.

<u>CONCLUSION</u>

Accordingly, plaintiffs' motion for additional discovery pursuant to the crime-fraud exception is granted in part and denied in part.  The Court Orders defendants to produce the following documents for *in camera* review from defendants' revised privilege log:  2, 3, 4, 5, 7, 9, 18, 19, 20, 22, 23, 24, 25, 26, 27, 29, 30, 31, 32, 36, 38, 39, 40, 41 , and 44.  The Court also Orders O'Melveny & Myers, LLP to prepare a privilege log as required by Federal Rule of Civil Procedure 26(a).  Defendants are Ordered to produce the documents designated for *in camera* review and O'Melveny's privilege log on or before June 15, 2012.

The Court reserves decision on plaintiffs' motion for sanctions for fraud on the Court and Orders the parties to appear for an evidentiary hearing scheduled to begin July 19, 2012.  The parties are further Ordered to exchange witness lists on or before June 15, 2012.

Defendants' requests for sanctions are denied.

The Clerk is directed to send copies of this Order to the parties either electronically through the Electronic Case Filing (ECF) system or by mail.

**SO ORDERED.**

Dated: Brooklyn, New York
June 5, 2012

    /s/   CHERYL POLLAK
Cheryl L. Pollak
United States Magistrate Judge

75