UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

JAMES ZIMMERMAN, PHILIP
CULHANE, DAVID HILTBRAND,
WILLIAM JACKSON, GEORGE ZAROU,
JOHN JOSEPH PAGGIOLI (formerly
"JOHN DOE I"), "JOHN DOE II," "JOHN
DOE III," PHILIP C. HENNINGSEN
(formerly "JOHN DOE IV"), PHILIP
LYLE SMITH, and "JOHN DOE V,"

          Plaintiffs,

     -against-

POLY PREP COUNTRY DAY SCHOOL,
WILLIAM M. WILLIAMS, DAVID B.
HARMAN, VARIOUS MEMBERS OF
THE POLY PREP BOARD OF TRUSTEES,
WHOSE NAMES ARE CURRENTLY
UNKNOWN AND THUS DESIGNATED
AS "JAMES DOE I-XXX," HARRY
PETCHESKY, ESQ., ROBERT F.
HERRMANN, ESQ., and MICHAEL
NOVELLO,

          Defendants.

**MEMORANDUM AND ORDER**
Case No. 09-CV-4586 (FB) (CLP)

*Appearances*:
*For the Plaintiffs*:
KEVIN T. MULHEARN, ESQ.
60 Dutch Hill Road, Suite 8
Orangeburg, New York 10962

EDWARD FLANDERS, ESQ.
KIMBERLY L. BUFFINGTON, ESQ.
JOHN A. FEDUN, ESQ.
Pillsbury Winthrop Shaw Pittman LLP
1540 Broadway
New York, New York 10036

*For Defendants Poly Prep, Williams,
Harman, and "James Doe I-XXX"*:
JEFFREY I. KOHN, ESQ.
HOWARD E. HEISS, ESQ.
SHIVA EFTEKHARI, ESQ.
JAMES E. MILLER, ESQ.
O'Melveny & Myers, LLP
7 Times Square
New York, New York 10036

*For Defendant Petchesky:*
HARRY PETCHESKY, *pro* se
767 Third Avenue
New York, New York 10017

*For Defendant Herrmann:*
PHILIP TOUITOU, ESQ.
CONCEPCION A. MONTOYA, ESQ.
Hinshaw & Culbertson LLP
780 Third Avenue, 4th Floor
New York, New York 10017

*For Defendant Novello:*
DAVID G. TRACHTENBERG, ESQ.
STEPHEN ARENA, ESQ.
Trachtenberg Rodes & Friedberg LLP
545 Fifth Avenue, Suite 640
New York, New York 10017

## TABLE OF CONTENTS

FACTUAL ALLEGATIONS ................................................... 4
    A. Jackson's Accusations ............................................. 4
    B. Marino's Accusations ............................................. 4
    C. Anonymous Accusations ........................................... 5
    D. Defendants' Response Through 1991 ................................ 5
    E. Hiltbrand's 1991 Letter .......................................... 6
    F. Foglietta's Retirement and Death ................................... 7
    G. Hiltbrand's 2002 Letter .......................................... 7
    H. The Sheridan Investigation ........................................ 8
    I. Paggioli's Lawsuit ............................................... 9

THE FEDERAL LAWSUIT ................................................. 10

THE FEDERAL CLAIMS .................................................. 11
    A. RICO ......................................................... 11
        1. Violation ................................................... 11
            a. Enterprise .............................................. 11
            b. Racketeering Activity ................................... 12
            c. Pattern ................................................ 14
        2. Injury ..................................................... 15
        3. Causation .................................................. 17
        4. Conclusion ................................................. 19

B. Title IX  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
   1. Retroactive Application  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
   2. Statute of Limitations  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

THE STATE-LAW CAUSES OF ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
   A. Fraud: Hiltbrand . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
   B. Negligent Retention or Supervision and Breach of Fiduciary Duty  . . . . . . . . 26
      1. *Res Judicata*: Paggioli . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
      2. Statute of Limitations: Remaining Plaintiffs  . . . . . . . . . . . . . . . . . . . . 29

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

**BLOCK, Senior District Judge:**

      Plaintiffs are ten former Poly Prep students and two former attendees of the school's summer camp.  Their stories vary in the details, but each alleges that he was sexually abused by Philip Foglietta, Poly Prep's football coach from 1966 to 1991.  The abuse occurred between 1966 and 1986, and ranged in frequency from two incidents, in the case of plaintiff Philip Henningsen, to hundreds, in the case of plaintiff Philip Lyle Smith.

      Plaintiffs uniformly allege that their abuse led to severe psychological and emotional difficulties, including drug and alcohol dependency in some cases. They further allege that they have suffered diminished educational and employment opportunities, and the out-of-pocket costs of counseling, therapy and other forms of treatment.

      But this case is not against Foglietta, who died in 1998.  Rather, it is against Poly Prep, its Board of Trustees and current and former administrators ("Poly Prep").  In addition, one plaintiff brings a claim against Poly Prep's general counsel.  Much of the complaint, as amended, focuses on the defendants' alleged knowledge of Foglietta's predatory behavior, their failure to take corrective action, and their attempts to conceal both Foglietta's conduct and their knowledge of it.

Pending before the Court are the defendants' motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  For the following reasons, those motions are granted in part and denied in part.

## FACTUAL ALLEGATIONS

### A.  Jackson's Accusations

In 1966, Foglietta abused plaintiff William Jackson "on multiple occasions." Third Am. Compl. ¶ 48.  Jackson notified his parents, who arranged a meeting with Poly Prep's Headmaster, J. Folwell Scull, and Athletic Director, Harlow Parker.  According to the complaint, Scull and Parker, in concert with Poly Prep's Board of Trustees, conducted a "sham" investigation,  notified Jackson and his parents that his claims of abuse were "not credible," and warned that Jackson would face expulsion and other "severe consequences" if he persisted in making them.  *Id.* ¶ 53.  Poly Prep's response to Jackson's accusations caused him to "act out" in school; he was expelled for "repeated fighting" in 1968. *Id.* ¶ 63.

### B.  Marino's Accusations

Defendant William M. Williams replaced Scull as Headmaster in 1970.  Upon his appointment, he was told of Jackson's complaint against Foglietta.

Two years later, in 1972, Foglietta attempted to sexually abuse John Marino, who is not a plaintiff.  Marino, then a freshman, rebuffed Foglietta's advances, following which Foglietta began to subject Marino to physical, verbal and emotional abuse during football practice and elsewhere.

On "multiple occasions" during his remaining four years at Poly Prep, Marino saw Foglietta sexually abusing other boys.  One such incident was witnessed by

Marino's father.

Marino's parents met with Williams and Parker twice. Both times they were told that their son was an "undisciplined . . . trouble-maker" who had started a "false and malicious rumor about Foglietta's sexual abuse of children." *Id.* ¶ 78. At no point did Williams and Parker mention Jackson's earlier claim of abuse. Instead, they said that Marino was "on thin ice" and threatened to expel him for misbehavior. *Id.* ¶¶ 83-84. Williams and Parker told Michael Novello, another Poly Prep administrator, about Marino's allegations.

## C. Anonymous Accusations

Williams received anonymous letters and phone calls accusing Foglietta of sexual abuse throughout the remainder of the 1970s. On at least one occasion, Williams confronted Foglietta about the accusations. Foglietta denied the charges and threatened to file a defamation lawsuit if Poly Prep repeated them.

No one at Poly Prep retained the anonymous letters or memorialized the anonymous phone calls. Nor did anyone memorialize the meetings with Jackson and Marino. Instead, the complaint alleges that Poly Prep "made the conscious and fateful decision to whitewash Foglietta's egregious sexual misconduct." *Id.* ¶ 95. Among other things, the school moved Foglietta into the "bowels of the boys' locker room." *Id.* ¶ 98. There, he continued to sexually abuse students until 1991.

## D. Defendants' Response Through 1991

Throughout Foglietta's tenure, Poly Prep distributed to plaintiffs and others various publications that "represented that he remained in good standing at the school and

was held in high regard." *Id.* ¶ 397.  These publications included football programs, student newspapers, yearbooks, alumni magazines, press releases, and letters to students, parents, and alumni.  The school's administration made similar statements at athletic awards ceremonies and chapel services.  Needless to say, these publications and statements did not disclose any of the accusations of sexual abuse by Foglietta.  Thus, plaintiffs allege that the defendants

> falsely induced [them] and others similarly situated into believing that the school and its administrators had absolutely no knowledge about Foglietta's alleged sexual misconduct and/or the numerous specific claims of sexual misconduct made against Foglietta at various times and through different and independent sources during Foglietta's tenure at the school.

*Id.* ¶ 414.

**E.  Hiltbrand's 1991 Letter**

In February 1991, former student David Hiltbrand wrote to Williams, stating that Foglietta had sexually abused him in 1966.  When Williams did not immediately respond, Hiltbrand left him numerous telephone messages.

Hiltbrand finally reached Williams several weeks later.  Williams told Hiltbrand that the school had received anonymous reports of abuse, but that he "was the first to come forward and identify himself as an accuser." *Id.* ¶ 108.  In light of Jackson's and Marino's complaints, that statement was false.

When Williams told Hiltbrand that Foglietta was still at Poly Prep, Hiltbrand demanded that the school fire him immediately.  Williams responded: "You don't want him punished[.  H]e's a bitter sick old man[.  H]e's a shell of himself." *Id.* ¶ 110.

6

**F.  Foglietta's Retirement and Death**

Foglietta left Poly Prep later in 1991.  He was fêted with a lavish retirement dinner at New York City's Downtown Athletic Club.  The next issue of the school's biannual alumni magazine announced Foglietta's retirement in positive terms.  Plaintiffs allege, however, that Foglietta was fired for sexual misconduct, and that the references to retirement were false statements designed to obscure the circumstances of his departure.

Foglietta died in early 1998.  Poly Prep established a memorial fund in his name and solicited donations from alumni in a mailing dated February 6, 1998.  The mailing "falsely suggested that Poly Prep and its Board of Trustees had never been notified of Foglietta's sexual abuse of children at Poly Prep."  *Id.* ¶ 222.  Some recipients of the mailing made financial contributions based on that suggestion.  In addition, plaintiffs who received the mailing (i.e., those who had graduated) relied on it by refraining from bringing a lawsuit against Poly Prep and its administrators at that time.

**G.  Hiltbrand's 2002 Letter**

In 2000, defendant David B. Harman replaced Williams as Headmaster.  In 2002, Hiltbrand's lawyer, David Berger, wrote to Harman to reiterate Hiltbrand's claim of abuse and to demand "an appropriate factual investigation."  *Id.* ¶ 122.  In a response dated June 6, 2002, Harman wrote that his predecessor had "quickly convened a meeting with the Athletic Director and several other coaches to question them about the accusations."  *Id.* ¶ 125. According to Harman, those at the meeting acknowledged rumors about Foglietta's behavior, but "no one had any direct or even second hand knowledge of any sexual abuse by coach Foglietta."  *Id.*  In addition, he stated that Williams and Hiltbrand had "agreed

7

that the involuntary removal of Mr. Foglietta . . . in the form of an immediate retirement

from his responsibilities at Poly Prep" would address Hiltbrand's concerns.  *Id.*

**H.  The Sheridan Investigation**

        In October 2002, Harman sent a letter to Poly Prep alumni.  He reported that

the school had "recently received credible accusations that abuse occurred at Poly Prep

more than twenty years ago by a faculty member/coach, who is now deceased." *Id.* ¶ 229.

He advised alumni that the Board of Trustees had "agreed to conduct an investigation,

which is ongoing, and authorized the sending of this letter to all alumni and a modified

version to our present parents." *Id.*

        Two months later, in December 2002, Berger met with Harman in person.

Defendant Robert Herrmann, Poly Prep's general counsel, was also present.  Herrmann

announced at the meeting that Poly Prep had retained Philip Sheridan, a former Assistant

United States Attorney, to conduct an independent investigation.  According to Herrmann,

the recently completed investigation had found that prior to 1991, "no one at Poly Prep had

any knowledge of any sexual abuse complaints against Foglietta." *Id.* ¶ 133.  That finding

had not been reduced to writing, but had been relayed to Herrmann, who had, in turn,

reported the finding to Poly Prep's Board of Trustees.  In reliance on Herrmann's

statements, Hiltbrand decided not to file a lawsuit against Poly Prep at that time.

        Plaintiffs allege Harman's October 2002 letter and Herrmann's statements at

the December 2002 meeting were false because the investigation they referred to was a

sham.  Sheridan later stated that Poly Prep had

> abruptly terminated his investigation before he could complete
> his review of a multitude of follow-up issues which he needed
> to reconcile before he could form any conclusions as to the
> implicated issues.

*Id.* ¶ 139.  Some recipients of the October 2002 letter made financial contributions or tuition

payments in reliance on the assumption that the investigation had been "honest and

thorough."  *Id.* ¶ 233.  Plaintiffs relied on the same assumption in continuing to "refrain

and forbear from commencing legal action against Poly Prep and its administrators."  *Id.*

¶ 234.

## I.  Paggioli's Lawsuit

In 2005, plaintiff John Joseph Paggioli sued Poly Prep, Williams, Harman and

others in New York Supreme Court, alleging breach of fiduciary duty and negligent

retention and supervision.  The case was dismissed as time-barred in January 2006.  In

addition, the Supreme Court Justice stated that "Plaintiff failed to show sufficient proof

that POLY PREP's actions contributed to his emotional problems."  *Id.* ¶ 248.  Plaintiffs

allege that the decision was "obtained by extrinsic fraud," including Poly Prep's "deliberate

loss or destruction of the originals and all copies" of Sheridan's investigative notes.  *Id.*

On January 18, 2006, Harman sent a letter to alumni announcing the dismissal

of Paggioli's suit:

> We are pleased to report that the complaint against Poly Prep
> has been dismissed by the court.  According to the decision, the
> judge found that the claims were too remote in time to go
> forward.  The court also found that the school's actions were
> not unreasonable.

*Id.* ¶ 250.  Plaintiffs allege that the letter falsely implied that the decision had "categorically

cleared Poly Prep of any wrongdoing." *Id.* ¶ 251.  The false implication caused some recipients to continue to make financial contributions and tuition payments, and caused plaintiffs to continue not to file suit against Poly Prep.

## THE FEDERAL LAWSUIT

Plaintiffs' forbearance ended three years later, on October 27, 2009, when they filed suit in this Court.   Their Third Amended Complaint makes the following claims:

1.   All plaintiffs allege that all defendants except Herrmann violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c).

2.   All plaintiffs allege that all defendants except Herrmann conspired to violate RICO.

3.   All plaintiffs allege that Poly Prep violated Title IX of the Education Amendments of 1972.

4.   Plaintiff Hiltbrand alleges that defendant Herrmann is liable for fraud under New York law.

5.   All plaintiffs allege that all defendants except Herrmann are liable for negligent supervision and retention of Foglietta under New York law.

6.   All plaintiffs allege that all defendants except Herrmann and the individual Trustees are liable for breach of fiduciary duty under New York law.

With respect to the RICO claims, Poly Prep argues that plaintiffs have failed to state a claim in several respects.  As for the Title IX claim, Poly Prep argues — in addition to the failure to state a claim — that, in the alternative,  the putative claim is time-barred. With respect to the state-law fraud claim, Herrmann argues that Hiltbrand has failed to allege any cognizable damages.  Finally, with respect to the state-law claims for negligent retention or supervision and breach of fiduciary duty, Poly Prep seeks dismissal only

because they have been brought many years after the expiration of the statute of limitations.

The Court has allowed limited discovery to allow plaintiffs to investigate whether they have a basis to equitably estop Poly Prep from asserting a statute of limitations defense.  The fruits of that discovery have been incorporated into the current amended complaint and, accordingly, into the foregoing recitation of facts.

### THE FEDERAL CLAIMS

## A.  RICO

The RICO statute provides a civil remedy to "[a]ny person injured in his business or property by reason of a violation of [the statute]."  18 U.S.C. § 1964(c).  Thus, "a plaintiff must plead, at a minimum, '(1) the defendant's violation of § 1962, (2) an injury to the plaintiff's business or property, and (3) causation of the injury by the defendant's violation.'"  *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 120 (2d Cir. 2003) (quoting *Commercial Cleaning Servs. v. Colin Serv. Sys.*, 271 F.3d 374, 380 (2d Cir. 2001)).

### 1.  *Violation*

To state a claim for a violation of the RICO statute, a plaintiff must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985).

### a.  Enterprise

Poly Prep argues that the school itself cannot be liable for a RICO violation because "a corporate entity may not be both the RICO person [liable for the violation] and the RICO enterprise."  *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d

11

339, 344 (2d Cir. 1994).  The plaintiffs respond that Poly Prep is named only as a RICO person participating in the distinct "Foglietta Concealment Enterprise."  However, the requirement that the RICO enterprise be distinct from the persons participating in it "may not be circumvented" by alleging a RICO enterprise "that consists merely of a corporate defendant associated with its own employees or agents carrying on the regular affairs of the defendant."  *Id.*  Since that is precisely what is alleged here — that, as part of Poly Prep's affairs, its employees and agents carried out a scheme to defraud — Poly Prep cannot be a "RICO person."  The complaint adequately alleges, however, that Williams, Harman, Novello, Petchesky and other unnamed board members constituted a RICO enterprise.

**b.  Racketeering Activity**

Plaintiffs allege eight instances of racketeering activity:

1. In 1991, Hiltbrand had a telephone conversation with Williams regarding his allegations of abuse.  Williams falsely told Hiltbrand that he "was the first to come forward and identify himself as an accuser."  He then told Hiltbrand, "You don't want [Foglietta] punished . . . he's a bitter sick old man . . . he's a shell of himself."  Plaintiffs claim that this phone conversation constituted witness tampering under 18 U.S.C. § 1512.  Third Am. Compl. ¶¶ 108-11.

2. In 1991, Poly Prep mailed an alumni magazine announcing Foglietta's retirement in positive terms.  Plaintiffs claim that, in fact, Foglietta was fired for sexual misconduct, and that Poly Prep's failure to disclose the "true" circumstances of his departure was mail fraud under 18 U.S.C. § 1341. *Id.* ¶¶ 115-20.

3. In response to Foglietta's death in 1998, Poly Prep mailed a letter to alumni soliciting contributions for the "Philip Foglietta Memorial Fund."  Plaintiffs claim that the mailing constituted mail fraud because it concealed Poly Prep's knowledge of Foglietta's conduct and the nature of his departure from the school. *Id.* ¶ 219-24.

4. In 2002, Harman mailed a letter to alumni reporting that the school had "recently received" credible allegations of sexual abuse and had, in response, authorized an

12

investigation, which was ongoing at the time of the mailing.  Plaintiffs claim that sending the letter amounted to mail fraud because it (1) did not disclose that Foglietta had been fired for sexual misconduct, (2) implied that no one at Poly Prep knew about the allegations earlier than 2002, and (3) implied that the investigation was legitimate, when, in fact, it was a "sham."  *Id.* ¶¶ 228-37.

5.    Harman's 2002 letter was re-sent in 2005 in response to the filing of Paggioli's suit. *See id.* ¶ 238.

6.    In 2006, Harman mailed a letter to alumni reporting that Paggioli's suit had been dismissed as time-barred, and also because the judge "found that the school's actions were not unreasonable."  A copy of the letter was posted on Poly Prep's website.  Plaintiffs claim that the letter amounted to mail and wire fraud because it implied that the judge had "categorically cleared POLY PREP of any wrongdoing," when, in fact, the decision was obtained through "extrinsic fraud." *Id.* ¶¶ 249-56.

7.    In 2009, Poly Prep responded to the filing of the present lawsuit by mailing a letter to alumni "categorically den[ying]" any conspiracy or cover up.  A copy of the letter was posted on Poly Prep's website.  Plaintiffs claim that the letter amounted to mail and wire fraud because there was such a conspiracy and, further, because it repeated the assertion that Foglietta had "retired" in 1991. *Id.* ¶¶258-65.

8.    In 2011, Harman mailed a letter to alumni responding to a blog post comparing Poly Prep to Penn State.  Plaintiffs allege that the letter, which was also posted on Poly Prep's website, amounted to mail and wire fraud because it denied any attempt "to hide allegations of abuse" and falsely suggested that Poly Prep was not aware of Foglietta's conduct until 1991. *See id.* ¶¶ 266-71.

        With respect to witness tampering, the complaint alleges that Williams's statements caused Hiltbrand not to testify "in an official proceeding," which is an element of the crime. *See* 18 U.S.C. § 1512(b).  The official proceeding "need not be pending or about to be instituted at the time of the offense," *id.* § 1512(f)(1), but the defendant must "have in contemplation [a] particular official proceeding." *Arthur Anderson LLP v. United States*, 544 U.S. 696, 707 (2005).  Since there was never any official proceeding against Foglietta, it is not plausible that Williams acted with the requisite intent when he spoke to

Hiltbrand.

With respect to mail and wire fraud, the complaint plausibly alleges that the purpose of the scheme to defraud was "for obtaining money or property." 18 U.S.C. §§ 1341, 1343. It specifically alleges that the fraud "was motivated by the Defendant's desire to derive substantial revenue, from alumni contributions, tuition payments, and otherwise." Third Am. Compl. ¶ 281. Furthermore, it alleges that the defendants acted with the specific intent to defraud, and alleges the manner in which each statement was fraudulent with sufficient particularity to satisfy Federal Rule of Civil Procedure 9(b). The Court need not address defendants' argument that plaintiffs have not adequately alleged that they relied on the statements because a civil RICO plaintiff need not allege such reliance. *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 661 (2008).

### c. Pattern

A "pattern of racketeering activity" requires at least two predicate acts, "the last of which occurred within ten years . . . after the commission of a prior [predicate act]." 18 U.S.C. § 1961(5). It also requires "either an open-ended pattern of racketeering activity (i.e., past criminal conduct coupled with a threat of future criminal conduct) or a closed-ended pattern of racketeering activity (i.e., past criminal conduct extending over a substantial period of time)." *GICC Capital Corp. v. Technology Fin. Group*, 67 F.3d 463, 466 (2d Cir. 1995) (internal quotation marks omitted).

The defendants argue that the 1991 predicate acts cannot be considered part of a pattern because they occurred more than ten years before the next predicate act in 2002. That argument is based on a misreading of § 1961(5), which requires only that the

*last* predicate act happen within ten years of another predicate act.  Since the last alleged predicate act — the 2011 mailing/posting — occurred within ten years of the 2002, 2005, 2006 and 2009 predicate acts, that requirement is satisfied.  In any event, the 2002-2011 acts are, by themselves, sufficient to plausibly establish at least closed-ended continuity.

## 2. *Injury*

Eleven of the 12 plaintiffs allege that they suffered "diminished educational opportunities and educational accomplishments, diminished vocational opportunities and vocational and career accomplishments, [and] diminished wages and salaries[.]"  Third Am. Compl. ¶¶ 69 (Jackson), 105 (Hiltbrand), 149 (Zimmerman), 166 (Smith), 171 (Zarou), 178 (Paggioli), 187 (John Doe II), 195 (John Doe III), 205 (Henningsen), 213 (John Doe V), 656 (Zarnock).  Ten allege that they expended "substantial sums . . . to attempt to combat and/or overcome" drug, alcohol and/or gambling additions, and "for psychological counseling and/or therapy."  *Id.* ¶¶ 69 (Jackson), 105 (Hiltbrand), 149 (Zimmerman), 155 (Culhane), 166 (Smith), 171 (Zarou), 178 (Paggioli), 195 (John Doe III), 213 (John Doe V), 656 (Zarnock).  Finally, Culhane alleges that he made a $2,000 contribution to Poly Prep in 2007, while Henningsen made a $500 contribution in 1996.

It is beyond dispute that personal injuries are not injuries to "business or property."  *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) ("The phrase 'business or property' . . . would, for example, exclude personal injuries suffered.").  The overwhelming weight of authority interprets *Reiter* to exclude the economic consequences of personal injuries.  *See Doe v. Roe*, 958 F.2d 763, 770 (7th Cir. 1992) ("Doe's loss of earnings, her purchase of a security system and her employment of a new attorney are plainly

derivatives of her emotional distress—and therefore reflect personal injuries which are not compensable under RICO."); *Genty v. Resolution Trust Corp.*, 937 F.2d 899, 918 (3d Cir. 1991) (medical expenses not recoverable); *Grogan v. Platt*, 835 F.2d 844, 847 (11th Cir. 1988) ("[T]he phrase 'injured in his business or property' excludes personal injuries, including the pecuniary losses therefrom."); *Drake v. B.F. Goodrich Co.*, 782 F.2d 638, 644 (6th Cir. 1986) (wrongful-death damages not recoverable).  The Second Circuit has not addressed the issue, but many district judges in the circuit have adopted the majority interpretation.  *See, e.g., Le Paw v. BAT Industries P.L.C.*, 1997 WL 242132, *2 (E.D.N.Y. Mar. 6, 1997).

Plaintiffs urge the Court to follow Judge Weinstein's reasoning in three opinions stemming from RICO litigation against tobacco companies: *Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.*, 36 F. Supp. 2d 560 (E.D.N.Y. 1999), *National Asbestos Workers Medical Fund v. Philip Morris, Inc.*, 74 F. Supp. 2d 213 (E.D.N.Y. 1999), and *National Asbestos Workers Medical Fund v. Philip Morris, Inc.*, 74 F. Supp. 2d 221 (E.D.N.Y. 1999).  In those opinions, Judge Weinstein accepted that the non-economic aspects of personal injuries are not injuries to "business or property," but opined that economic damages flowing from personal injuries should be: "A line must be drawn under the 'business and property' rubric of the statute, but it would seem more sensible to draw it between pain and suffering and outlays for repairing windows and limbs." *National Asbestos Workers*, 74 F. Supp. 2d at 229.

The plaintiffs before Judge Weinstein were medical providers, health-insurance companies and self-insured ERISA medical funds.  They alleged that a cover-up concerning the dangers of tobacco caused them to pay money for the treatment

16

of their patients, insureds and beneficiaries.  Thus, Judge Weinstein was able to say that the "plaintiffs have standing under RICO because they have sustained economic injuries to their business and property separate and distinct from the personal injuries suffered by the smokers or second hand smoke victims." *Blue Cross & Blue Shield of N.J.*, 36 F. Supp. 2d at 570.

There is no similar distinction here.  Plaintiffs' alleged lost wages and out-of-pocket expenses are, in their own words, "closely associated with the personal injuries they incurred as a result of Defendants' misconduct."  Third Am. Compl. ¶ 330.  The Court holds that such damages are not injuries to business or property and, therefore, do not confer RICO standing on plaintiffs.

By contrast, the financial contributions made by Culhane and Henningsen are precisely the sort of injury for which RICO was designed to remedy.  Thus, those two plaintiff have alleged an injury to their property.

### 3. *Causation*

"[T]o state a claim under civil RICO, the plaintiff is required to show that a RICO predicate offense 'not only was a "but for" cause of his injury, but was the proximate cause as well.'"  *Hemi Group, LLC v. City of New York*, 130 S. Ct. 983, 989 (2010) (quoting *Holmes v. Securities Investor Prot. Corp.*, 503 U.S. 258, 268 (1992)).  Proximate cause requires "some direct relation between the injury asserted and the injurious conduct alleged," *Holmes*, 503 U.S. at 268; "[a] link that is 'too remote,' 'purely contingent,' or 'indirec[t]' is insufficient."  *Hemi Group*, 130 S. Ct. at 989 (quoting *Holmes*, 503 U.S. at 271, 274).

The "direct relationship" standard under RICO is stricter than the

17

"foreseeability" analysis for common-law causation. *See Hemi Group*, 130 S. Ct. at 991 ("Our precedents make clear that in the RICO context, the focus is on the directness of the relationship between the conduct and the harm. Indeed, [they] never even mention the concept of foreseeability."). In essence, the standard means that the plaintiff must be the direct victim of the predicate acts. *See id.* ("Because the City's theory of causation requires us to move well beyond the first step, that theory cannot meet RICO's direct relationship requirement.").

The only plausible reading of the complaint is that the targets of the alleged predicate acts were parents, alumni and others who made financial contributions to the school. Thus, even if the economic consequences of personal injuries constituted a RICO injury, the plaintiffs who suffered only those injuries could not plausibly allege that their injuries were directly caused by the predicate acts.

As financial contributors to the school, by contrast, Culhane and Henningsen are among the direct victims of the alleged fraudulent scheme. Poly Prep argues that the long temporal gap between the alleged predicate acts and the alleged contributions (one year in Henningsen's case and a minimum of five years in Culhane's) defeats any plausible theory of direct causation, but the Court disagrees. The scheme alleged is more than just a string of isolated statements. Rather, it is a decades-long attempt to conceal the school's knowledge of Foglietta's despicable conduct. The Court cannot say, as a matter of law, that a scheme of such magnitude could not plausibly have caused Culhane and Henningsen to make contributions they never would have made had they known the truth.

18

### 4. *Conclusion*

The plaintiffs cannot successfully allege that Poly Prep participated in a RICO enterprise with its employees and agents. With respect to the remaining participants in the alleged enterprise, only Culhane and Henningsen have adequately alleged that they suffered a cognizable injury caused by violations of the RICO statute. Accordingly, the RICO claims of those two plaintiffs can proceed against Williams, Harman, Novello, Petchesky and the unnamed members of Poly Prep's Board of Trustees.[1]

## B. Title IX

Title IX of the Education Amendments of 1972, Pub. L. 92-319, 86 Stat. 235 (codified as 20 U.S.C. §§ 1681-88), provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." The Supreme Court's decision in *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60 (1992), "establishes that a school district can be held liable in damages in cases involving a teacher's sexual harassment of a student." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 281 (1998) (citing *Franklin*, 503 U.S. at 74-75). In *Gebser*, the Supreme Court clarified that a school receiving federal funds will be liable for sexual abuse or harassment by a teacher when "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual

---

[1]Plaintiffs must identify the "James Doe" board members by the close of all discovery. *See Scheetz v. Morning Call, Inc.*, 130 F.R.D. 34, 37 (E.D. Pa. 1990) ("Fictitious parties must eventually be dismissed, if discovery yields no identities.").

knowledge of discrimination in the recipient's programs and fails adequately to respond" in a way that amounts to "deliberate indifference to discrimination." *Id.* at 290.

Plaintiffs allege that Poly Prep received federal financial assistance in the form of scholarships and loans for construction/rehabilitation projects.[2] Poly Prep argues that discovery will show that it did not receive any federal scholarships or loans during the relevant time frame, but concedes that the Court must accept plaintiffs' allegations to the contrary for now.[3] Instead, it argues (1) that plaintiffs' theory of liability is based on a construction of Title IX that did not prevail at the time of Foglietta's conduct, and (2) that the claim is time-barred.

### 1. *Retroactive Application*

In 1984, the Supreme Court held that an institution's receipt of federal funds for a particular "education program or activity" imposed Title IX's prohibition on sex discrimination on that program or activity, but not on the entire institution. *See Grove City Coll. v. Bell*, 465 U.S. 555, 572 (1984) ("[T]he fact that federal funds eventually reach the College's general operating budget cannot subject Grove City to institutionwide coverage."). Were *Grove City* still the governing interpretation, plaintiffs' Title IX would

---

[2]They further allege that Poly Prep enjoys tax-exempt status. Courts have held, however, that such status does not constitute federal financial assistance within the meaning of Title IX. *See, e.g., Stewart v. New York Univ.*, 430 F. Supp. 1305, 1314 (S.D.N.Y. 1976).

[3]Poly Prep is the only defendant to the Title IX claim. *See Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009) ("Title IX reaches institutions and programs that receive federal funds . . . but it has consistently been interpreted as not authorizing suit against school officials, teachers, and other individuals.").

fail because they do not allege that Poly Prep received any federal funds for its athletics program (or any other activity or program even arguably connected to Foglietta).

But in 1988, the Civil Rights Restoration Act, Pub. L. 100-259, 102 Stat. 28, took effect. The Act legislatively overruled *Grove City College* and provided that receipt of federal funds by an institution made Title IX applicable to the entire institution. In *Leake v. Long Island Jewish Medical Center*, 695 F. Supp. 1414 (E.D.N.Y. 1988), Judge Platt held that the Restoration Act applied retroactively to pending cases. *See id.* at 1417-18. He based his conclusion on the Act's use of terms such as "restore" and "clarify," as well as its legislative history. *See id.* at 1416-17. The Second Circuit affirmed "substantially for the reasons set out in Chief Judge Platt's opinion." *Leake v. Long Is. Jewish Med. Ctr.*, 869 F.2d 130, 131 (2d Cir. 1989).

Poly Prep argues that *Leake* is distinguishable because it dealt only with the application of the Restoration Act to cases pending at the time of its enactment. That is a distinction without a difference. Because the case was pending when the Act took effect, it necessarily involved pre-enactment conduct. *See Leake*, 695 F. Supp. at 1415 ("The Hospital terminated [Leake's] employment on April 11, 1985[.]"). Thus, *Leake* stands for the proposition that the Act applies retroactively to conduct predating its enactment.

Although *Leake* has never been overruled, it has arguably been supplanted by the Supreme Court's more recent decision in *Landgraf v. USI Film Products*, 511 U.S. 244 (1994). Under *Landgraf*, the analysis for determining whether a statute is to apply retroactively is as follows:

When a case implicates a federal statute enacted after the

> events in suit, the court's first task is to determine whether
> Congress has expressly prescribed the statute's proper reach.
> When . . . the statute contains no such express command, the
> court must determine whether the new statute would have
> retroactive effect, i.e., whether it would impair rights a party
> possessed when he acted, increase a party's liability for past
> conduct, or impose new duties with respect to transactions
> already completed.  If the statute would operate retroactively,
> our traditional presumption teaches that it does not govern
> absent clear congressional intent favoring such a result.

*Id.* at 280.  But even assuming that *Landgraf* requires the Court to disregard *Leake's* holding,

its discussion of the Act's wording and legislative history remains instructive.  The Court

concludes that those factors demonstrate the necessary "clear congressional intent"

favoring retroactive application.

### 2. *Statute of Limitations*

As plaintiffs concede, their Title IX claims are subject to a three-year statute

of limitations borrowed from state law.  *See Curto v. Edmundson*, 392 F.3d 502, 504 (2d Cir.

2004).  The borrowing of a state-law statute of limitations carries with it the borrowing of

the state's "coordinate tolling rules." *Board of Regents v. Tomanio*, 446 U.S. 478, 484 (1980).

The *accrual* of a federal claim, however, "is a question of federal law that is not resolved by

reference to state law." *Wallace v. Kato*, 549 U.S. 384, 388 (2007) (emphasis omitted).

As a matter of federal law, "a claim generally accrues once the plaintiff knows

or has reason to know of the injury which is the basis of the action." *Cornwell v. Robinson*,

23 F.3d 694, 703 (2d Cir.1994).  The knowledge required is minimal; the plaintiff need only

have "knowledge of the injury's existence and knowledge of its cause or the person or

entity that inflicted it." *Kronisch v. United States*, 150 F.3d 112, 121 (2d Cir. 1998) (quoting

*Guccione v. United States*, 670 F. Supp. 527, 536 (S.D.N.Y. 1987)).

In *Keating v. Carey*, 706 F.2d 377 (2d Cir. 1983), the Second Circuit held that "when the defendant fraudulently conceals the wrong, the time does not begin running until the plaintiff discovers, or by the exercise of reasonable diligence should have discovered, the cause of action." *See id.* at 382. Plaintiffs argue that *Keating* establishes that fraudulent concealment postpones accrual and is, therefore, a matter of federal law.

A subsequent decision of the Second Circuit, however, called *Keating* "not clear on this point." *Pearl v. City of Long Beach*, 296 F.3d 76, 83 (2d Cir. 2002). The court in *Pearl* observed that the language used in *Keating* — "the time does not begin running" — did not square with the result, which was to borrow New York's doctrine of equitable estoppel. *See id.* at 83 n.6. The circuit court then left the issue unresolved because in both *Keating* and *Pearl*, the conceptual difference between an accrual rule and a tolling rule was academic. *See id.* at 84. ("[The plaintiff's] current claims are barred whether the issue is viewed as one of delayed accrual or tolling.").

In the absence of clear guidance from the Second Circuit, the Court follows Judge Posner's exhaustive and scholarly decision in *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446 (7th Cir. 1990), which the Second Circuit has cited with approval. *See Veltri v. Building Serv. 32B-J Pension Fund*, 393 F.3d 318, 323 (2d Cir. 2004). In *Cada*, Judge Posner described fraudulent concealment as a "tolling doctrine[]," 920 F.2d at 451, reasoning as follows:

> Fraudulent concealment in the law of limitations presupposes that the plaintiff has discovered, or, as required by the discovery rule, should have discovered, that the defendant injured him, and denotes efforts by the defendant — above and beyond the wrongdoing upon which the plaintiff's claim is

founded — to prevent the plaintiff from suing in time.

*Id.*

It follows that the Court must borrow New York law regarding fraudulent concealment.  Thus, plaintiffs' argument that their Title IX claim is not time-barred merges with their argument that their state-law claims for negligent hiring and retention and breach of fiduciary duty are not time-barred.  For the reasons stated in Part B.2, *infra*, the Court concludes that plaintiffs have adequately alleged that fraudulent concealment prevented them from filing their Title IX claims within the limitations period.

### THE STATE-LAW CAUSES OF ACTION[4]

### A.  Fraud: Hiltbrand

Hiltbrand's separate fraud claim against Herrmann stems from the December 2002 meeting at which Herrmann allegedly told Hiltbrand and his lawyer that Sheridan "had reached the ultimate conclusion that prior to Hiltbrand's 1991 letter no one at Poly Prep had any knowledge of any sexual abuse complaints against Foglietta."  Third Am. Compl. ¶ 133.  According to the complaint, that statement was false because Sheridan had reason to believe that Poly Prep and its staff had knowledge of sexual abuse by Foglietta

---

[4]28 U.S.C. § 1367 confers supplemental jurisdiction over plaintiffs' state-law causes of action, along with the discretion to decline to exercise that jurisdiction.  *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006).  Although this case is still at the pleading stage, it has been pending for nearly three years.  In that time, the parties have engaged in extensive, though limited, discovery, and both the Court and the assigned magistrate judge have become intimately familiar with the parties' positions.  The Court concludes that concerns of judicial economy outweigh any possible grounds for declining to exercise supplemental jurisdiction.  In exercising supplemental jurisdiction over state-law causes of action, the Court is bound to apply the substantive law of New York.  *See Promisel v. First Am. Artificial Flowers, Inc.*, 943 F.2d 251, 257 (2d Cir. 1991).

prior to 1991, but Poly Prep had "abruptly terminated" his investigation "before he had reached any final conclusions [or] followed up numerous open issues." *Id.* ¶ 136. The complaint alleges that Herrmann's statement was intended to, and did, induce Hiltbrand to refrain from filing a lawsuit. *Id.* ¶ 138. Finally, it alleges that Hiltbrand has suffered "substantial damages, including but not limited to severe and long-lasting emotional distress and pain and suffering." *Id.* ¶ 621.

New York law does not allow recovery for non-economic damages, such as pain and suffering, in fraud. *See Stich v. Oakdale Dental Ctr.*, 501 N.Y.S.2d 529, 531 (3d Dep't 1986) ("[P]laintiff has failed to submit any proof of actual pecuniary injury, the sole compensable form of damages in a fraud action."). To the extent Hiltbrand means to argue that the loss of other causes of action caused him pecuniary harm, New York law also does not allow a separate fraud claim for fraudulent concealment of another tort, unless the fraud damages are "different or additional" to the damages caused by the other tort. *La Brake v. Enzien*, 562 N.Y.S.2d 1009, 1012 (3d Dep't 1990). In *La Brake*, the plaintiff asserted both a malpractice claim and a fraud claim against an attorney who had failed to file a notice of claim concerning an unsafe road, and had lied to his client about his neglect. *See id.* at 1011. Stating the rule just cited, the Third Department dismissed the fraud claim because the damages sought were the same as the malpractice damages, "i.e., the value of plaintiff's claim for negligence against the governmental body or bodies responsible for the alleged unsafe condition of the road at the site of the accident." *Id.* at 1012. And in *Doe v. Roe*, 596 N.Y.S.2d 620 (4th Dep't 1993), the Fourth Department considered the relationship between fraud and an intentional tort based on sexual abuse: "Plaintiff's injury was caused

25

by alleged sexual abuse, an intentional tort.  Defendant's alleged fraudulent conduct may

have facilitated access to plaintiff and may have managed to keep the alleged sexual abuse

secret, but it did not directly give rise to the injuries for which plaintiff seeks recovery."

*Id.* at 621.

Since Hiltbrand has not alleged any pecuniary injury separate from the loss

of possible causes of action to recover for Foglietta's abuse, he cannot maintain a separate

claim for fraud.  Morever, since  it is clear that he has said all he can about his injuries,  his

alternative motion for leave to further amend the complaint is denied.

## B.  Negligent Retention or Supervision and Breach of Fiduciary Duty

Under New York law, plaintiffs can sue Foglietta's employer, Poly Prep, for

negligent retention or supervision if it "knew or should have known" of Foglietta's

"propensity for the conduct which caused [their] injury."  *Bumpus v. New York City Transit*

*Auth.,* 851 N.Y.S.2d 591, 591-92 (2d Dep't 2008). They can also sue if the school failed to

"exercise such care of them as a parent of ordinary prudence would observe in comparable

circumstances."  *Hoose v. Drumm*, 281 N.Y. 54, 57-58 (1939); *see also  Garcia v. City of N.Y.*,

646 N.Y.S.2d 508, 509 (1st Dep't 1996) ("This duty [of care] derives from the fact that the

school, once it takes over physical custody and control of the children, effectively takes the

place of their parents and guardians.").[5]  Poly Prep argues, however, that those claims are

---

[5]Though the plaintiffs denominate their claim as one for breach of fiduciary duty,
New York courts do not describe the duty of a school to its students as such.  Plaintiffs'
terminology also risks confusion with their argument that Poly Prep was under a fiduciary
duty to inform them of facts possibly giving rise to a cause of action.  For these reasons, the
Court will refer to the negligent hiring and retention claim, together with the "breach of
fiduciary duty" claim, as "negligence claims."

barred by *res judicata*, in the case of Paggioli, and by the statute of limitations, in the case
of all remaining plaintiffs.

## 1.  Res Judicata*: Paggioli*

The Court is obliged to give the judgment dismissing Paggioli's state-court
lawsuit in 2006 "the same preclusive effect" that it would be given in the courts of New
York.  *Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 467 (1982) (citing 28 U.S.C. § 1738).

"In New York, res judicata . . . bars successive litigation based upon the same
transaction or series of connected transactions if: (i) there is a judgment on the merits
rendered by a court of competent jurisdiction, and (ii) the party against whom the doctrine
is invoked was a party to the previous action, or in privity with a party who was."  *People
ex rel. Spitzer v. Applied Card Sys.*, 11 N.Y.3d 105, 122 (2008) (citing, *inter alia*, *Gramatan Home
Investors Corp. v. Lopez*, 46 N.Y.2d 481, 485 (1979); other citations and internal quotation
marks omitted).

Paggioli does not dispute that the 2006 dismissal satisfies each of those
elements.  Instead, he argues that the doctrine does not apply to judgments obtained by
"extrinsic fraud," and that Poly Prep's concealment of its complicity from the state-court
judge constituted such a fraud.

For more than 100 years, New York courts have held that the correctness of
a judgment has no bearing on its preclusive effect.  *See Griffin v. Long Is. R. Co.*, 7 N.E. 735,
736 (N.Y. 1886) ("Even if the decision was wrong, it does not impair the effect of the former
judgment as a bar to the right to raise the same question."); *Insurance Co. of Pa. v. HSBC
Bank USA*, 10 N.Y.3d 32, 40 n.4 (2008) ("[A]ll legal conclusions—whether erroneous or

27

correct — are treated identically for purposes of res judicata."). No New York case makes an exception for cases obtained by fraud.

Even if New York law made such an exception, it would not apply here. As Paggioli recognizes, jurisdictions that acknowledge the exception (such as California) distinguish between "intrinsic" and "extrinsic" fraud. In this context, "extrinsic" means "collateral to the questions examined and determined in the action." *Pico v. Cohn*, 25 P. 970, 971 (Cal. 1891). Thus, extrinsic fraud includes such tactics as "[k]eeping the unsuccessful party away from the court by a false promise of a compromise, or purposely keeping him in ignorance of the suit; or, where an attorney fraudulently pretends to represent a party, and connives at his defeat or . . . corruptly sells out his client's interest. " *Id.* at 972.

Fraud is "intrinsic," by contrast, when it goes to the merits of the questions decided by the judgment. Committing perjury, submitting false evidence and concealing evidence helpful to one's adversary are all classic examples of intrinsic fraud. *See Eichman v. Fotomat Corp.*, 197 Cal. Rptr. 612, 614 (Cal. Ct. App. 1983) ("[F]raud or perjury by a party, which goes undiscovered until after judgment is entered, does not affect the finality and conclusiveness of the judgment[.]"); *Beresh v. Sovereign Life Ins. Co.*, 155 Cal. Rptr. 74, 77 (Cal. Ct. App. 1979) ("[T]he alleged fraud consisting of deliberate, intentional misrepresentations, untruths, half truths, and deceitfully misleading affidavits, arguments and declarations . . . is clearly what courts have consistently characterized an intrinsic fraud, not extrinsic.").

In jurisdictions where fraud is relevant to the *res judicata* analysis, only extrinsic fraud will affect the validity of the prior judgment. *See Beresh*, 155 Cal. Rptr. at 77

28

(citing *Pico*, 25 P. at 971).  "Therefore, a judgment does not lose its res judicata effect because it was entered while evidence was being suppressed."  *Eichman*, 197 Cal. Rptr. at 616.

Since the fraud alleged here involved the concealment of evidence that might have defeated Poly Prep's statute of limitations defense in the state-court action, it was intrinsic to that action.  It would, therefore, not vitiate the *res judicata* effect of the prior judgment, even if New York law made fraud a relevant consideration.

In sum, the 2006 state-court judgment bars Paggioli from relitigating his state-law claims.[6]

## 2.  *Statute of Limitations: Remaining Plaintiffs*[7]

Negligence claims are subject to the general three-year statute of limitations for personal-injury actions.  *See Sharon B. v. Reverend S.*, 665 N.Y.S.2d 139, 140 (4th Dep't 1997) (applying N.Y. C.P.L.R. § 214[5] to claims against dioceses arising out of sexual abuse by priest).  Because the plaintiffs were all minors at the time of the alleged abuse, they receive the benefit of the toll for infancy created by N.Y. C.P.L.R. § 208.  Under that statute, a minor has until "three years after the disability [of infancy] ceases"—that is, until age 21—to bring a claim.  *Id.*

"The general rule in New York is that the Statute of Limitations starts to run when the cause of action accrues," *Woodlaurel, Inc. v. Wittman*, 606 N.Y.S.2d 39, 40 (2d

---

[6]Poly Prep does not argue that *res judicata* bars Paggioli's federal claims.

[7]The remaining plaintiffs are Zimmerman, Culhane, Hiltbrand, Jackson, Zarou, "John Doe II," "John Doe III," Henningsen, "John Doe V," Smith and Zarnock,

Dep't 1993), and that a cause of action for negligence accrues from the date of the injury.

*See Brooklyn Union Gas Co. v. Hunter Turbo Corp.*, 660 N.Y.S.2d 877, 878 (2d Dep't 1997) ("It is well established that in any action to recover damages for negligence . . . , the plaintiff's claim accrues upon the date of injury."). That rule applies "even if the plaintiff is unaware that he or she has a cause of action" at the time of injury. *Woodlaurel, Inc.*, 606 N.Y.S.2d at 40.[8] The rationale is that the injury puts the putative plaintiff on inquiry notice and, therefore, charges him or her "with responsibility for investigating, within the limitations period, all potential claims and all potential defendants." *Doe v. Archdiocese of Wash.*, 689 A.2d 634, 644 (1997), *cited in Zumpano v. Quinn,* 6 N.Y.3d 666, 677 (2006). Thus, in *Zumpano,* where former parishioners of two Catholic dioceses claimed they were sexually abused by priests, the Court of Appeals held that the abuse was sufficient to trigger the statute of limitations for claims against both the priests and the dioceses that employed them:

> [E]ach plaintiff was aware of the sexual abuse he or she suffered at the hands of defendant priests. Certainly they had sufficient knowledge to bring an intentional tort cause of action against the individual priests. Plaintiffs were likewise aware that the priests were employees of the dioceses and could have brought actions against the dioceses, or at least investigated whether a basis for such actions existed.

*Id.* at 674.

Such is the majority rule. *See Doe v. Catholic Bishop for Diocese of Memphis*, 306 S.W.2d 712, 717 (Tenn. Ct. App. 2008) ("It is undisputed that, at the time he reached majority, Doe knew that he had been sexually abused by Father DuPree, that he had a right

---

[8]Contrast the more generous accrual rule governing plaintiffs' Title IX claim.

of action against Father DuPree, and that Father DuPree was employed by the Diocese." (footnotes omitted)); *Doe v. Archdiocese of Milwaukee*, 734 N.W.2d 827, 838-39 (Wis. 2007) ("[T]hose claims [for negligent supervision] accrued, as a matter of law, by the time of the last incident of sexual assault."); *Doe v. Archbishop of Cincinnati*, 849 N.E.2d 268, 273 (Ohio 2006) ( "At the time of the alleged abuse, Doe knew the identity of the perpetrator, knew the employer of the perpetrator, and was fully aware of the fact that a battery had occurred."); *Cevenini v. Archbishop of Wash.*, 707 A.2d 768, 773 (D.C. 1998) ("[W]e conclude that a reasonable plaintiff would have investigated his potential claims against the Archdiocese at the same time that his claims accrued against its representative."). But it is not universally accepted. In *Turner v. Roman Catholic Diocese of Burlington*, 987 A.2d 960 (Vt. 2009), the Vermont Supreme Court held that knowledge of an abuser's employer was not sufficient to trigger even inquiry notice of a possible claim against the employer. *See id.* at 981. It reasoned that the majority rule was "unrealistic given the limitations on plaintiff's ability to discover necessary evidence." Id.[9]

Notwithstanding New York's strict accrual rule, its courts have long recognized that "a wrongdoer should not be able to take refuge behind the shield of his

---

[9]The harsh effect of the statute of limitations in cases of sexual abuse makes it a frequent subject of criticism. *See, e.g.*, Henry G. Miller, *Statute of Limitations: An Immoral Defense?*, N.Y. St. B.J., Mar./Apr. 2011, at 24. It is also regular fodder for debate in the New York Legislature. Between 2006 and 2008, the New York Assembly passed three bills that would have given minor victims of sexual abuse until age 28 to bring suit and, in addition, would have revived previously time-barred claims for one year. *See* http://www.sol-reform.com/Pages/bin/ ChildVictimsAct-NY.html (last visited July 31, 2012). Each bill died in the Senate. *See id.* Similar bills have been introduced at each subsequent session, but have not been acted on in either house.

own wrongdoing." *General Stencils, Inc. v. Chippa*, 18 N.Y.2d 125, 127 (1966).  In that regard, "a defendant may be estopped to plead the Statute of Limitations where plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action." *Simcuski v. Saeli*, 44 N.Y.2d 442, 448-49 (1978). Thus, "[a] defendant/wrongdoer cannot take affirmative steps to prevent a plaintiff from bringing a claim and then assert the statute of limitations as a defense." *Zumpano*, 6 N.Y.3d at 674.   In *General Stencils,* for example, the plaintiff was allowed to invoke equitable estoppel against a bookkeeper who had used his position to "carefully conceal[]" his theft of the plaintiff's money.  18 N.Y.2d at 128.

Plaintiffs do not take issue with the fact that under New York's strict accrual rule the statute of limitations has long since run. They contend, however, that they come within the conceptual purview of *General Stencils;* hence, Poly Prep should be estopped from hiding behind the statute of limitations to avoid an adjudication of the merits of their claims.

A close reading of *Zumpano* provides the necessary guidance for evaluating plaintiffs' equitable estoppel claim.  There, the Court of Appeals considered appeals in two consolidated actions. In the first, *Zumpano v. Quinn*, plaintiff contended "that defendants should be equitably estopped from asserting the statute of limitations since their misconduct caused his insanity." *Id.* at 676.  In the other case, *Boyle v. Smith*, 42 plaintiffs " alleged that the bishops and the Diocese were aware that the priests had abused children and that they engaged in a corrupt campaign and a pattern of concealment by failing to investigate and report the conduct to law enforcement authorities, transferring abusive priests to different parishes and making secret payments to victims and their families in

return for their silence." *Id.*

The court would not toll the statute of limitations in either case.  Common to both were the court's observations that plaintiffs "do not allege they made timely complaints to the dioceses regarding clergy mistreatment," and that "[s]ubsequent conduct by the dioceses did not appear in any way to alter plaintiff's early awareness of the essential facts and circumstances underlying their causes of action or their ability to timely bring their claims." *Id.,* at 674.   As it explained:

> A wrongdoer is not legally obliged to make a public confession, or to alert people who may have claims against it, to get the benefit of a statute of limitations. *Plaintiffs do not allege any specific misrepresentation to them by defendants, or any deceptive conduct sufficient to constitute a basis for equitable estoppel.*  Nor is there any indication that further discovery would yield such information. *No new separate and subsequent acts of wrongdoing beyond the sexually abusive acts themselves are alleged,* and equitable estoppel is therefore inapplicable to these cases.

*Id.* at 675 (emphases added).

The court then addressed separate claims unique to each case. As for Zumpano's insanity argument, it noted that he "fail[ed] to establish a continuing disability" since as an adult he held a full-time job for nine years, and had successfully prosecuted a personal injury action on his own behalf; therefore, "these facts contradict[ed] the assertion that Zumpano suffered from an ongoing mental disability and was unable to protect his rights." *Id.* at 677.

The plaintiffs in *Boyle* argued that equitable estoppel applied because, even in the absence of an actual affirmative misstatement, "the defendants breached a fiduciary

duty owed to them by concealing their own actions in covering up the abuse." *Id.* at 675.

Without deciding whether a fiduciary relationship existed between a cleric and congregant

during the congregant's infancy, and, if so, whether "the diocesan defendants had a legal

duty to disclose any knowledge of prior incidents of sexual abuse and breached that duty,"

the plaintiffs "still failed to demonstrate how that breach prevented them from bringing

a timely action." *Id.* at 675.  The court reasoned that any alleged concealment did not

change plaintiffs' awareness of the identity of the abusers and that they were employed by

the Diocese "*or that defendants had a direct role in plaintiffs' failure to file suit within an

appropriate time period.*" *Id.* at 676 (emphasis added).  Moreover, the court noted no fiduciary

duty could have continued once the plaintiffs had become adults, more than a decade

before bringing suit.

       Finally, the court cited a number of cases from other jurisdictions "addressing

similar issues." *Id.* at 677.  A review of those cases, however, reveals that in each the court

recognized that affirmative misrepresentations or deceitful conduct designed to keep a

potential plaintiff from gaining knowledge of an essential element of a viable cause of

action for a claim of negligent retention or supervision by an employer of a sexual-predator

employee would be a game-changer.  *See Baselice v. Franciscan Friars Assumption BVM

Province*, 879 A.2d 270, 279 (Pa. Super. Ct. 2005) ("Had appellant (sometime after the abuse

but before the running of the statute of limitations) questioned the Archdiocese about his

abuser . . . and had the Archdiocese affirmatively and independently acted in response to

appellant's inquiries so as to mislead appellant into forgoing his suit, the fraudulent

concealment exception would later allow appellant's suit."); *Doe v. Roman Catholic*

*Archbishop of Archdiocese of Detroit*, 692 N.W.2d 398 (2004) ("Fraudulent concealment means employment of artifice, planned to prevent inquiry or escape investigation, and mislead or hinder acquirement of information disclosing a right of action.  The acts relied on must be of an affirmative character and fraudulent." (citations and internal quotation marks omitted)); *Mark K. v. Roman Catholic Archbishop*, 79 Cal. Rptr. 2d 73, 79 (Cal. Ct. App. 1998) ("[T]here has been no allegation here that the church concealed the fact of plaintiff's underlying injury. . . .  The wrongful conduct alleged against the church was its inaction in the face of the accusations against Father Llanos.  Thus, what the church failed to disclose was merely evidence that the wrong had been committed."); *Doe v. Archdiocese of Wash.*, 689 A.2d 634, 644 (Md. Ct. Spec. App. 1997) ("Nowhere does Doe allege that, once he inquired of the Archdiocese, the Church negligently or deliberately mislead him as to what it knew about the priests.").

Central to plaintiffs' claims in the present case are their allegations that Poly Prep engaged in an affirmative course of conduct during the period of limitations to deceive the plaintiffs into believing that they had no claim against Poly Prep because the school had no knowledge of Foglietta's wrongdoing after Jackson's parents complained that their thirteen-year-old son had told them that Foglietta had sexually abused him.  This qualitatively distinguishes this case from *Zumpano*.  Unlike the plaintiffs in *Zumpano*, all plaintiffs here have alleged that Poly Prep affirmatively misrepresented, at school events they attended and in school publications they received, that Foglietta "remained in good standing" and "was held in high regard."  Third Am. Compl. ¶ 397. Thus, Foglietta was consistently portrayed to the plaintiffs as a reputable and esteemed football coach

throughout the limitations period (1966-1991).[10]  While  that deceitful conduct could not have plausibly altered plaintiffs' knowledge to the contrary,  it might plausibly have led them to falsely believe that Poly Prep was unaware of Foglietta's misconduct and could not be liable for negligent retention or supervision.

As for Jackson, he separately alleges that Scull and Parker told his parents, after conducting a "sham investigation," that their son's accusations were "not credible" and that he would face expulsion and other "severe consequences" if he persisted in making them.  Third Am. Compl. ¶¶ 53, 61.  Taken as true, these allegations establish that Scull and Parker induced Jackson's parents (who lacked personal knowledge of the abuse) to forgo bringing suit on their son's behalf. *See* N.Y. C.P.L.R. § 1201 ("[A]n infant shall appear by the guardian of his property or, if there is no such guardian, by a parent having legal custody . . . ."); *Stahl v. Rhee*, 643 N.Y.S.2d 148, 152 (2d Dep't 1996) ("In [§ 1201], the Legislature demonstrated a preference for natural guardians.").

The effect on Jackson's parents cannot, however, standing alone, create an estoppel because the misstatement must prevent the timely commencement of an action. By virtue of the infancy toll, Jackson had a full three years in which he could have sued in his own behalf.  The unwillingness of his parents to sue did not prevent him from bringing such a suit once he turned 18.  Thus, the key inquiry for Jackson's discrete basis for the application of equitable estoppel is the effect that Scull and Parkers's statement had on him

---

[10]By "limitations period," the Court means the period running from the date of the earliest abuse (1966) to a date three years after Zarnock, the youngest plaintiff, reached majority (1991).  Each plaintiff, of course, faces an individual limitations period running from the date he turned 18.

once he reached his majority.

In light of the bases for the dismissal of plaintiffs' suits in *Zumpano,* the court did not have to address other requisites for the application of equitable estoppel. Foremost is the need to establish justifiable reliance. *See  Jordan v. Ford Motor Co.*, 426 N.Y.S.2d 359, 360 (4th Dep't 1980) ("Where the estoppel is based upon an actual misrepresentation by defendant, the plaintiff is required to allege that justified reliance upon the misrepresentation was the reason for not timely starting the action."). As a result, only misrepresentations occurring during the limitations period are relevant; equitable estoppel cannot revive a claim that is already time-barred. *See, e.g., Powers Mercantile Corp. v. Feinberg*, 490 N.Y.S.2d 190, 193 (1st Dep't 1985) ("[T]he assertion of the statute of limitations is not, as plaintiff contends, precluded by equitable estoppel since the misappropriation claim was already time-barred long before the Feinbergs gave the allegedly false testimony upon which the estoppel argument is based."). Plaintiffs have alleged such reliance. *See* Third Am. Compl. ¶ 414.

Moreover, whether based on affirmative misrepresentations or concealment by a fiduciary, "due diligence on the part of the plaintiff in bringing his action is an essential element for the applicability of the doctrine of equitable estoppel." *Simcuski*, 44 N.Y.2d at 450. Thus, "the burden is on the plaintiff to establish that the action was brought within a reasonable time after the facts giving rise to the estoppel have ceased to be operational." *Id.* Whether a plaintiff has acted with due diligence "must necessarily depend on all the relevant circumstances," *id.*; in general, the length of the statute of limitations — measured from the time the basis for the estoppel ends — "sets an outside

37

limit on what will be regarded as due diligence."  *Id.* at 451.  The complaint alleges that

Poly Prep's knowledge of Foglietta's conduct "could not possibly have been independently

uncovered or discovered" and, therefore, that the facts creating the estoppel "have still not

ceased to be operational."  Third Am. Compl. ¶ 416.

        Thus, plaintiffs' estoppel claim faces several hurdles.  Each plaintiff must

show that the statements about Foglietta's lily-white reputation were false and made with

knowledge of their falsity.  For his part, Jackson must demonstrate that the statement that

his accusation was "not credible" was false, and that Scull and Parker knew it was false

(because, for example, they had knowledge corroborating the accusation).  All plaintiffs

must further show that they justifiably relied on the misrepresentations and deceitful

conduct in not bringing suit during the limitations periods, and that they acted with due

diligence in bringing their suit within a reasonable period of time after they learned of the

defendants' misconduct.  For now, however, the Court holds only that the plaintiffs have

alleged sufficient facts to warrant the denial of the defendants' motions to dismiss on

statute of limitations grounds.

## CONCLUSION

        All RICO claims against Poly Prep are dismissed.  As to the remaining

defendants, the RICO claims of all plaintiffs except Culhane and Henningsen are

dismissed.  In addition to the RICO claims of Culhane and Henningsen, the Title IX claims

of all plaintiffs also survive, subject to resolution of Poly Prep's statute of limitations

defense.

        As for the state-law claims, Hiltbrand's fraud claim and Paggioli's claims are

dismissed.  The claims for negligence (both for negligent retention and supervision and for breach of a "fiduciary" duty, *see supra* n.5) of all plaintiffs except Paggioli survive, also subject to resolution of Poly Prep's statute of limitations defense.

In respect to that defense, the issue of whether the defendants should be equitably estopped from asserting the defense to the Title IX and state-law negligence claims is for the Court, not a jury.  *See Upadhyay v. Sethi*, ___ F. Supp. 2d ___, 2012 WL 260636 (S.D.N.Y. Jan. 25, 2012) ("Questions pertaining to matters of equity, including the applicability of equitable tolling to statutes of limitations, are well within the ambit of the Court's authority to resolve."); *Pauling v. Secretary of the Dep't of Interior*, 71 F. Supp. 2d 231, 233 (S.D.N.Y. 1999) ("[A]pplication of the equitable doctrines at issue—tolling and estoppel—remains within the province of the Court.").  Because resolution of the equitable estoppel issue against plaintiffs would terminate all claims save Culhane's and Henningsen's RICO claims, it should be addressed as soon as possible to avoid potentially superfluous litigation.  As noted, the parties have already engaged in discovery on equitable estoppel, and have previously been instructed by the Court more than two months ago to complete that process.  *See* Tr. of June 20, 2012, at 7 ("THE COURT: I want the discovery to be complete on the focused issue of the equitable estoppel.").  The parties are directed to appear on September 14, 2012, at 10:30 a.m., to set a date for an evidentiary hearing on the equitable estoppel issue.

**SO ORDERED.**

_____

FREDERIC BLOCK
Senior United States District Judge

39

Brooklyn, New York
August 28, 2012